Jonathan S. Henes, P.C.
Emily E. Geier (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Ryan Blaine Bennett, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SUNGARD AVAILABILITY SERVICES CAPITAL, INC. *et al.*,[1] | ) | Case No. 19-22915 (RDD) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**DECLARATION OF ERIC KOZA, CHIEF**
**RESTRUCTURING OFFICER AT SUNGARD AVAILABILITY SERVICES**
**CAPITAL, INC., (I) IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST**
**DAY PLEADINGS AND (II) PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

I, Eric Koza, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am the Chief Restructuring Officer (the "CRO") of Sungard Availability Services

Capital, Inc. ("Sungard AS"), one of the above-captioned debtors and debtors in possession

(collectively, the "Debtors" and together with its non-Debtor affiliates, collectively,

the "Company").  I have served as the Company's CRO since February 2019.  Prior to becoming

CRO of the Company, I advised the Debtors and their non-Debtor affiliates in my capacity as

Managing Director of AlixPartners, LLP ("Alix" and together with its affiliate AP Services, LLC,

---

[1]    The last four digits of the Debtors' tax identification numbers are Sungard Availability Services Capital, Inc. (7677); Sungard Availability Services Holdings, LLC (6403); Sungard Availability Services Technology, LLC (9118); Inflow LLC (9489); Sungard Availability Services, LP (6195); Sungard Availability Services VeriCenter Inc. (4039); Sungard Availability Network Solutions, Inc. (1034).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  50 Main Street, Suite 1014, White Plains, NY 10606.

collectively "AlixPartners") beginning on November 26, 2018.  In my capacity as CRO, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I am above 18 years of age and I am competent to testify.

2.       Since being engaged, AlixPartners has been one of the principal advisors to the Company, and in that capacity members of my team and I have been directly involved in the matters leading up to the Company's chapter 11 filings including the negotiations of that certain Restructuring Support Agreement dated as of April 1, 2019 (the "RSA") and the *Joint Prepackaged Plan of Reorganization of Sungard Availability Services Capital, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"), and the transactions contemplated thereunder.[2]

3.       I submit this declaration (this "Declaration") in accordance with Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") to assist the United States Bankruptcy Court for the Southern District of New York (the "Court") and parties in interest in understanding:   (a) the Debtors, their operations, and their capital structure; (b) the circumstances related to the commencement of the chapter 11 cases; and (c) the support for (i) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") and (ii) the relief requested by the Debtors pursuant to the pleadings described herein (collectively, the "First Day Motions").

4.       Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my

---

[2]     Capitalized terms used herein, but not defined have the meaning ascribed to them in the Plan and RSA, as applicable.

experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.  I am authorized to submit this Declaration on behalf of the Debtors.

### Preliminary Statement

5.      Sungard AS is a leading provider of information technology (IT) production and recovery services for companies in the financial services, manufacturing, retail, healthcare, business services, transportation, telecommunications, utilities, and government sectors across North America, Europe, and India.  The Company provides a range of disaster recovery services, managed information technology services, and information availability consulting solutions to this diverse customer base.  Indeed, Sungard AS is critical to maintaining critical business information availability and the data integrity of these businesses and institutions' daily operations.

6.      The Company and its over 2,500 employees operate approximately 80 data centers and workplace recovery facilities worldwide and provide services to approximately 3,250 customers.  The Company is headquartered in Wayne, Pennsylvania, and has corporate offices in eight other countries outside of the United States, including the United Kingdom, Canada, Ireland, France, Poland, India, Belgium and Luxembourg.  The Company's global business segments generated approximately $977 million of net revenue[3] and adjusted EBITDA of approximately $203 million in fiscal year 2018.

7.      As described more fully herein, the Company's capital structure consists of approximately $1.3 billion of funded debt in the form of a revolver facility, a term loan facility with two tranches, and an issuance of unsecured notes, each guaranteed by each of the above-captioned Debtors.  This legacy capital structure was created based upon the Company's

---

[3]      Consolidated net revenue based on actual foreign exchange rates.

historical operating model and performance and is unsustainable under current market conditions. When the capital structure was put in place, the Company benefited from a larger revenue base with substantially higher free cash flow.  As business conditions evolved and the Company's revenue declined, cash flow available to service debt and invest in products and services has substantially declined in turn.  Consolidated net revenue declined by approximately 18% from approximately $1.2 billion in 2016 to $977 million in 2018 while EBITDA margins maintained within a range of approximately 20% to 22%.  Negative net cash flow from 2016 to 2018 was approximately $80 million.

8.     Despite successful cost-cutting initiatives in recent years, resulting in a more streamlined, efficient, and resilient operating model, the Company's cash flow profile has remained constrained by substantial fixed debt service.  The Company's recent performance, legacy capital structure, and high operating leverage began to severely impact its cash flow and bring into question the Company's confidence in its ability to meet certain future debt obligations. Under current conditions, the Company has no reasonable prospects of being able to fully repay its debt obligations.

9.     Following an unsuccessful marketing process during the second half of 2018 (described further herein) and faced with over $65 million in interest payments during the first half of 2019, the Company and its advisors acted swiftly to develop a comprehensive restructuring solution.  Beginning in December 2018, the Company and its advisors engaged in discussions with certain of its major stakeholders with the goal of developing a comprehensive consensual restructuring transaction.  Specifically, the Company and its advisors engaged with two ad hoc groups, including (a) a crossover group of the Debtors' secured lenders and unsecured noteholders (the "Crossover Group") and (b) a separate group of secured lenders (the "Secured Lender Group" and together with the Crossover Group, the "Creditor Groups").  The Company also engaged in

discussions with its prepetition equity sponsors (the "Sponsors") as the discussions among the Creditor Groups advanced.

10.     The Debtors brought the Creditor Groups to the table with the goal of developing a consensual restructuring transaction with support across their capital structure.  That process has involved substantial diligence, discussion, and interaction among the relevant parties. These extensive, good-faith negotiations resulted in the Company entering into the RSA with the Creditor Groups and the Sponsors.  The Debtors have also secured a $100 million commitment under a debtor-in-possession credit facility (the "DIP Facility") to be provided by certain of their prepetition creditors (the "DIP Lenders") to fund the restructuring contemplated by the RSA, as needed.  In addition to funding day-to-day operations, the DIP Facility would provide the liquidity necessary to implement the Company's business plan, including funding working capital, operational initiatives, and capital expenditures.  With access to the DIP Facility, the Debtors will commence these chapter 11 cases with a strong message to the market that the Company is both well-capitalized and has the liquidity necessary to maintain its operations.

11.     To minimize the possible adverse effects on its business, the Debtors have filed the First Day Motions seeking various types of relief to allow the Company to meet necessary obligations and fulfill its duties as debtors in possession for the purposes of preserving value for all of the Company's stakeholders.  I am familiar with the contents of each First Day Motion and believe that the relief sought therein is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful reorganization of the Company, and best serves the Company's estates and creditors' interests.  The facts set forth in each First Day Motion are incorporated herein by reference.

12.     To familiarize the Court with the Company, its business, the circumstances leading to these chapter 11 cases, and the relief the Company is seeking in the First Day Motions, I have organized this Declaration as follows:

- **Part I** provides a general overview of the Company's corporate history and operations;

- **Part II** provides an overview of the Company's prepetition capital structure;

- **Part III** describes the circumstances leading to these chapter 11 cases, the Company's proposed postpetition secured debtor-in-possession financing, negotiations with the Creditors Groups, and entry into the RSA;

- **Part IV** discusses the basis for the Court's jurisdiction for these chapter 11 cases

- **Part V** sets forth the evidentiary bases for the relief requested in each of the First Days Motions; and

- **Part VI** sets forth certain additional information about the Company, as required by Local Rule 1007-2

## I.    General Background

### A.    Sungard AS's Corporate History

13.     The Company, as it exists today, is the result of a series of transactions dating back over 25 years.  In 1983, Sun Oil Company spun-off and re-branded its computer services division as Sundata Corp., later known as SunGard Data Systems Inc. ("SDS").   In August 2005, the Company (together with its former parent companies, including, SDS and Sungard Capital Corp.) was taken private by a consortium of private equity firms in an $11.4 billion leveraged buyout, at that time, the largest privatization of a technology company and the one of the largest leveraged buyouts.  On March 31, 2014 SDS and its parent companies, including SunGard Capital Corp., completed a spin-off of the Company including its Debtor and non-Debtor affiliates.

14.     The Company obtains new customers and maintains long-term customer relationships through its differentiated capabilities in IT disaster recovery services, hosting and

colocation, private cloud, cloud recovery services, managed Amazon Web Services (AWS), and virtual infrastructure and its ability to respond to its customers' changing IT needs and market drivers. The Company also provides work area recovery services that provide IT enabled workplaces for customers' critical employees when their own places of work are affected by disasters. Finally, the Company provides consulting services to help customers assess their business continuity needs, build business continuity plans, and migrate and transform their critical infrastructure. To satisfy customer needs in a timely and cost-effective manner, the Company operates over 80 data centers and workplace recovery locations in North America, Europe, and India.

15.     The Company helps thousands of customers globally achieve uninterrupted access to their mission-critical data and systems. The Company's data centers and recovery services support the operation of crucial systems and provide business continuity and recovery services for customers such as major insurers, airport service providers, hospitality companies, business service providers, and telecommunications companies. Since its inception, the Company has helped customers recover from unplanned interruptions resulting from localized events such as fires and power outages to wide ranging natural disasters, including Hurricane Sandy in 2012, the Gulf Coast hurricanes in 2008, widespread flooding in the United Kingdom in 2007, Hurricane Katrina in 2005, the Florida hurricanes in 2004, the Northeast U.S. blackout in 2003, and human-made disasters such as the September 11 U.S. and London bridge terrorist attacks. For example, after Hurricane Sandy, the Company mobilized trucks outside NYU Langone, one of the largest hospitals in New York City, to support the hospital's access to medical records during this critical time. In 2018, the Company responded and/or prepared to respond to over 250 customers who believed their business could be impacted by man-made or natural disaster driven business interruptions.

### B.    Sungard AS's Business Operations

16.    The Company helps its customers maintain access to the information and computer systems needed to run their business by providing cost-effective solutions to keep their IT systems operational and secured in the event of an unplanned business disruption, ranging from man-made events to natural disasters (*e.g.*, cyberattacks, power outages, telecommunication disruptions, acts of terrorism, floods, hurricanes, and earthquakes).  The Company replicates and recovers data, production infrastructure and applications across its in-house and external data centers, other legacy systems and public and private clouds.  Increasingly, these services are provided as part of an integrated service known as "Recovery as a Service" as customers seek more tailored managed recovery programs for complex and hybrid IT systems.  The Company provides these services by offering a broad set of business capabilities across four solution categories:

| Solution Category | Service | Description |
|---|---|---|
| **Managed Cloud and Physical IT Recovery Services** | IT Workload recovery into Sungard AS or AWS cloud (Recover to Cloud – R2C) or offsite infrastructure (hotsite) | These services allow customers to continue the use of their critical business systems in an alternate location should the need arise. |
| | Recovery managed by Sungard AS | Recovery is the process of starting from a known point in time and establishing a new IT services environment able to execute business processes consistent with how they were running prior to the triggering event.  This process, the sequencing, timing and dependencies can be fully managed and executed by the Company should a customer desire, ending with returning to the customer a fully functioning IT environment able to resume their business operations. |
| | Data replication and protection | Customers require one or more copies of their critical business data in a secure and accessible location.  The Company has multiple technology choices available to support the customer in ensuring their exposure to data loss is within the risk profile |

| Solution Category | Service | Description |
|---|---|---|
| | | established by the customer.  Each customer has its own needs based upon the categories and types of information that dictate their requirements for copies and protection. |
| | Alternative workplace (workplace recovery, mobile recovery) | The Company provides customers with readily available replacement offices (workplace recovery), offering fixed or mobile options.  Fixed workplace clients have the option of selecting either shared or dedicated workplace recovery space.  These workplaces support customers who need the ability for their employees to transact business just as they would have at their usual work location had it been available.  These services are particularly important to the financial services, banking, brokerage, and other regulated industries, in addition to the more traditional customers.  The Company also maintains a fleet of mobile offices that can be deployed across the country to allow for onsite or alternate site office space, complete with workstations (computers, monitors, etc.), network connectivity, power, etc. for a customer to use to support displaced workers in the event of a disaster that renders their primary location unusable. |
| Managed Cloud and Hybrid IT Outsourcing | Support for heterogeneous compute and storage requirements | The Company provides support for a wide range of computing and storage technologies, including mainframes, dedicated servers, shared services, private cloud platforms, as well as a collection of storage technologies to meet the specific needs of a client's applications environment.  The Company offers a range of services for these environments matching the customer's desires for support assistance to full production management and control. |
| | Combinations of mainframe, dedicated hardware, virtualized hardware, and cloud technologies (including Managed AWS) | The Company's typical customer has a collection of various types of equipment and benefits from a holistic management approach coupled with the Company's ability to provide services across these disparate systems through a single provider model. |
| | Workload optimization – pick the best platform for | The range of services provided by the Company enable a customer to pick and choose the optimum balance of cost and performance for their unique |

| Solution Category | Service | Description |
|---|---|---|
| | the required balance of cost, availability, response time, etc. | business requirements. The Company routinely helps guide the customer in analyzing and identifying the tradeoffs they can make to select their best mix of technologies for their unique circumstances. |
| | Support for a mixture of dedicated and shared resources – storage, network, compute, etc. | Most customers are forced by business drivers to make tradeoffs between technologies, hardware providers, operating systems, and whether they can afford and need to be on all single-customer platforms/dedicated equipment or have the option to utilize cost-efficient shared strategies to more closely align their business needs with their budget. The Company supports the analysis, design and implementation of the customer selected mix that optimally meets their current and future needs. |
| | Purpose-built compute platforms for unique requirements | Where customers have very specific requirements, the Company can and does design very unique solutions to address those requirements, be they high speed computing, security, fault tolerance or other business requirements that require a custom solution. These can range from a specially designed secure environment to support government work, to an entire separate datacenter to reduce the risk of a virus or other threat compromising both the primary and backup environments and rendering the recovery process for the customer lengthy, difficult and in some cases cause catastrophic business impact. |
| | Hosted Private Cloud ("HPC") | In circumstances where a customer has unique requirements, but still wants to leverage the economies of a cloud delivery model, the Company will collaborate with the customer to design, build, and run a dedicated HPC. These circumstances can be driven by performance, security, sovereignty, or various other unique requirements that preclude that some computational workload being cost effectively or technically feasible deployment in a shared or public environment. |
| **Managed Services and Colocation** | Managed security services – intrusion and penetration testing, PCI compliance, content | The Company provides a range of services focused on helping customers ensure a secure and trusted environment, as well as support their security certification requirements. |

| Solution Category | Service | Description |
|---|---|---|
| | filtering (SPAM), managed firewalls | |
| | Managed network services – carrier and workload balancing | Customers have the option of having the Company procure, manage, and deploy network services on their behalf including traffic management, carrier diversity and workload optimization. |
| | Global traditional hosting | For customers who want to have a secure and reliable facility in which to place their own equipment, the Company provides a collection of global datacenters and connectivity to support these customers, providing space, reliable power with backup and redundant network connectivity. |
| | Operating system patching and currency management | For customers who want to have a third-party manage their updates and application currency, the Company provides a reliable and structured approach to timely updates (patching and upgrades) aligned with the need for a stable and reliable environment where the Company makes recommendations on the suitability and timing for implementing recommended updates. |
| Infrastructure and Business Continuity Consulting | Assess and recommend Business Continuity solutions | These solutions aid clients in determining the right technology to meet their needs for availability and resilience/resistance to man-made or environmental driven events. |
| | Datacenter relocation | The Company advises clients on how to move their IT environments with minimal disruption to their day-to-day operations. |
| | Datacenter engineering, buildout, and provisioning | The Company offers full scale design services and management for the customer who wants to start from an empty space and deploy an entire datacenter, including the cabling, security, organization, and layout of the facility. |
| | Failover strategy, testing, and validation | The Company also provides advice and support for development of strategies for recovery, testing and validation, ensuring the environment will work and the business can continue to operate out of secondary or relocated production locations. |
| | Application dependency | A key part of a client's software environment is understanding the relationship between multiple |

| Solution Category | Service | Description |
|---|---|---|
| | mapping and analysis | systems, technologies, applications (such as financials, order entry, manufacturing), and network. The Company, through its years of experience, has developed tools and methodologies for helping clients understand these dependencies and test to validate. |
| | Information security assessment, strategy, and design | With an increased focus on computer security, cyber threats, and data vulnerabilities, the Company's consultants have developed and deliver a comprehensive set of evaluations, advice on the appropriate cost-effective strategy, and full-scale computer security design services. |
| | Data governance solutions | As data becomes an increasingly valuable corporate asset, its effective management has become a discipline akin to keeping track of any other corporate physical asset and, in some cases, more critical to the business should control of that data be compromised. The Company assists clients in understanding and applying best practices to manage/govern that asset effectively. |

## II.    The Debtors' Prepetition Corporate and Capital Structure

### A.    Corporate Structure

17.    The Company is privately held.  The chart below depicts the Company's current corporate structure.

[*Remainder of Page Left Intentionally Blank*]



## B.    Capital Structure

18.    As of the Petition Date, the Company and certain of its U.S. subsidiaries are obligors (either as borrower or guarantor) on a principal amount of prepetition funded indebtedness totaling approximately $1,261 million, as summarized below:

| Debt Instrument (as defined herein) | Facility Size | Maturity Date | Outstanding Principal Amount |
|---|---|---|---|
| Revolver | $45.5 million | September 30, 2020 | $35 million[4] |
| 2021 Term Loan | N/A | September 30, 2021 | $421 million |
| 2022 Term Loan | N/A | October 1, 2022 | $380 million |
| Notes | N/A | April 1, 2022 | $425 million |
| Total | | | $1,261 million |

### 1.    Secured Debt

19.    All of the Company's secured debt was borrowed pursuant to that certain Credit Agreement dated as of March 31, 2014 (as amended, restated, modified, and supplemented from time to time, the "Credit Agreement") by and between Sungard AS as borrower, the other Debtors as guarantors (the "Debtor Guarantors"), and JPMorgan Chase Bank, N.A., as administrative agent (the "Credit Facility Agent").  The secured debt obligations issued under the Credit Agreement consist of:  (a) a revolving credit facility (the "Revolver Loans"); (b) a secured term loan due September 30, 2021 (the "2021 Term Loan"); and (c) a secured term loan due October 1, 2022 (the "2022 Term Loan").

### (a)    Revolver Loans

20.    On July 19, 2017, Sungard AS entered into that certain First Loan Modification Agreement (the "First Loan Modification Agreement"), which provided for, among other things, the extension of the maturity, from March 8, 2018 to September 30, 2020, of $45.5 million of the initial $250 million commitment with respect to Revolver Loans.  On March 8, 2018, the total commitments with respect to Revolver Loans were reduced from $250 million to $45.5 million. As of the date hereof, there are approximately $35 million of outstanding borrowings under the Revolver Loans, as well as $10.5 million in outstanding letters of credit.  Interest on the Revolver Loans accrues, at Sungard AS's option, at either (i) LIBOR plus the applicable rate (ranging from

---

[4]    The outstanding principal amount reflected here does not include the approximately $10.5 million of letters of credit that have been issued under the Revolver.  Accordingly, the Revolver has no additional borrowing capacity.

5.25% to 6.00%) plus certain costs related to compliance with European banking institutions, if applicable, or (ii) the greater of (a) the Federal Reserve Bank of New York's federal funds rate plus 0.5% and (b) the Credit Facility Agent's prime rate plus, in each case, the applicable rate (ranging from 4.25% to 5.00%). In addition, the Revolver Loans have a commitment fee ranging from 0.850% to 1.000% on the undrawn portion of the Revolver facility.

### (b)    2021 Term Loan

21.    The First Loan Modification Agreement also extended the maturity of approximately $471 million of the Debtors' approximately $896 million term loan from March 31, 2019 to September 30, 2021. As of the date hereof, there are approximately $421 million of outstanding borrowings under the 2021 Term Loan, accruing interest, at Sungard AS' option, at either (i) LIBOR plus 7.00% per annum with a 1.00% LIBOR floor plus certain costs related to compliance with European banking institutions, if applicable, or (ii) the greater of (a) the Federal Reserve Bank of New York's federal funds rate plus 0.5% and (b) the Credit Facility Agent's prime rate, plus, in each case, 6.00% per annum (with a stepdown to 5.5% and 4.5% in certain circumstances).

### (c)    2022 Term Loan

22.    On January 4, 2018, Sungard AS entered into that certain Loan Modification Agreement by and among Sungard AS, the Credit Facility Agent, and the lenders party from time to time thereto (the "Second Loan Modification Agreement"), to, among other things: (a) extend the maturity of the remaining approximately $425 million term loan due March 31, 2019 to October 1, 2022; and (b) modify and amend certain other provisions of the Credit Agreement. The 2022 Term Loan bears interest, at Sungard AS's option, at either (i) LIBOR plus 10.00% per annum with a 1.00% LIBOR floor plus certain costs related to compliance with European banking institutions, if applicable, or (ii) the greater of (A) the Federal Reserve Bank of New York's federal

funds rate plus 0.5% and (B) the Credit Facility Agent's prime rate, plus, in each case, 9.00% per annum. As of the date hereof, there are approximately $380 million of outstanding borrowings under the 2022 Term Loan.

23.    Pursuant to the Second Loan Modification Agreement, beginning with the quarter ended June 30, 2018, amortization of principal is required on the 2022 Term Loan at the rate of 0.25% of $425 million, the outstanding principal balance on the effective date of the Second Loan Modification Agreement. As a result of the *pro rata* application of divestiture-based mandatory prepayments of approximately $35 million during 2018 and $61 million in January 2019, approximately $45 million of which was applied against the 2022 Term Loan, Sungard AS has satisfied the amortization requirement and is no longer required to make quarterly principal payments. In addition to the mandatory prepayment requirements, the 2022 Term Loan may be voluntarily prepaid before maturity, in whole or in part, subject to certain prepayment fees.

24.    The Credit Agreement includes several key provisions regarding the Company's obligation to pay an acceleration make-whole premium (the "Acceleration Make Whole Premium") in the event of acceleration in the payment of the 2022 Term Loan,[5] including the filing of a chapter 11 petition. Specifically, the Second Loan Modification Agreement provides that:

> All voluntary prepayments of 2022 Term Loans made by the Company pursuant to Section 2.05(a) of the Credit Agreement will be accompanied by a prepayment fee (to be applied on a ratable basis among the applicable 2022 Term Lenders) equal to:
>
> (A)    in the case of any prepayment in connection with a Change of Control, 3.00% of the aggregate principal amount of such 2022 Term Loans so prepaid; and
>
> (B)    in the case of any other prepayment pursuant to Section 2.05(a) of the Credit Agreement, the Make Whole Amount (as defined below) with

---

5    *See* Second Loan Modification Agreement, § 7(b)(iv).

respect to the aggregate principal amount of such 2022 Term Loans so prepaid.[6]

25.     Moreover, the Second Loan Modification Agreement included the following provision, which is applicable in the event the Company files for chapter 11:

> Notwithstanding anything to the contrary in this Agreement, the Credit Agreement or any other Loan Document, it is understood and agreed that *if the 2022 Term Loans are accelerated (including as the result of the occurrence of any Event of Default or the commencement of any proceeding under any Debtor Relief Law, whether pursuant to Article VIII of the Credit Agreement, by operation of law or otherwise)*, in addition to all principal, accrued and unpaid interest and any unpaid accrued fees or other amounts under or in respect of the Credit Agreement and the other Loan Documents, *a make-whole premium equal to the Make Whole Amount with respect to the aggregate principal amount of the 2022 Term Loans outstanding on the date of such acceleration shall also become due and payable immediately upon such acceleration* (the make-whole premium payable under this clause (v), the "Acceleration Make Whole Premium"). The Acceleration Make Whole Premium shall constitute part of the Obligations for all purposes of this Agreement, the Credit Agreement and the other Loan Documents, and *is intended by the parties hereto to be taken into account and included in any calculation of the value of the claim represented by the Obligations in any plan of reorganization or other definitive determination of distributable value in any proceeding under any Debtor Relief Law*.[7]

26.     As of the Petition Date, the amount of the Acceleration Make Whole Premium, calculated pursuant to the Second Loan Modification Agreement,[8] is approximately $155 million.

### 2.      Notes

27.     The Company issued approximately $425 million aggregate principal amount of 8.75% senior unsecured notes due 2022 (the "Notes") under that certain Notes Indenture, dated as of March 31, 2014, with each of the Debtors as guarantors, and Bank of New York Mellon as indenture trustee.

---

[6]     *Id.* at § 7(b)(iv).

[7]     *Id.* at § 7(b)(v) (emphasis added).

[8]     *Id.* at § 7(b)(vi).

### C.    Intercompany Relationships

28.    As is customary for a global enterprise of the Company's size and scale, the Debtors are parties to a series of formal and informal relationships with their affiliates, with whom the Debtors transact with on a regular basis in the ordinary course of business.  Such transactions include, among other things:  (a) global operations and back office support costs charged by non-Debtor affiliate, Sungard Availability Services (India) Private Limited, on a monthly basis to the Debtors; and (b) management fees paid to the Debtors by various international non-Debtor affiliates for certain corporate costs subject to support services agreements.  These transactions are recorded in a number of different ways, including through account receivable/payable relationships, contractual obligations, intercompany loans, and capital contributions.  Additionally, certain of the Debtors and/or their affiliates are party to various intercompany letter agreements, or comfort letters, through which the issuing party has agreed to provide financial support for the applicable counterparty on the terms and conditions set forth therein (collectively, the "Comfort Letters").[9]

## III.    Events Leading to These Chapter 11 Cases

29.    The Company operates in a complex and rapidly shifting market.  Despite the market-leading position of its legacy products, enterprise adoption of public cloud technology created significant pressure on the Company's historical business model and pushed the Company's traditional operations into structural decline.  In response, the Company has built a new set of more solution-oriented services to address more modern customer needs, which now encompass approximately 40% of the Company's global revenue.  However, the Company has not been able to grow those new services fast enough to offset the decline of its legacy products.

---

[9]    The Comfort Letters include a support letter agreements issued by Sungard Availability Services, LP in favor of (a) Sungard AS (UK) Limited; (b) Sungard Availability Services (France); (c) Guardian dr (Overseas Holdings) Limited; and (d) Guardian iT Holdings (Belgium) NV.

And, the adoption of public cloud and rapidly changing technology has required swift evolution in the newer service offerings as well.

30.     The Company has sold certain non-core assets to facilitate its transition from an infrastructure-focused vendor to a services-oriented partner. However, the Company's existing fixed costs, including interest payments due under its debt obligations, are unsustainable in the current market environment. Consequently, the Debtors have negotiated a prepackaged plan with their key creditor constituencies to de-lever their balance sheet and provide much needed operational liquidity to effectuate the Company's business plan.

### A.     Sale of Non-Core Assets and Strategic Transition

31.     As the Company's financial performance declined, the Company implemented a number of initiatives to increase focus on growing market segments and reduce the need for future capital investment in non-core business segments. Beginning in 2015, the Company undertook an assessment of its capacity and sales in various data centers and, as a result, divested certain non-core facilities including facilities in St. Louis, Missouri, St. Paul, Minnesota, and Austin, Texas.

32.     The Company further divested certain non-core, low contribution or non-strategic assets including:

- the Assurance software business, which was non-core, and not growing at a significant pace, sold in May 2018;

- the Company's business in Sweden, which was heavily reliant on the Company's legacy colocation offering and no longer growing significantly, sold in September 2018; and

- the Chicago data centers, which had been reduced to a non-core, legacy colocation facility, sold in January 2019.

33.     Historically, a significant portion of the Company's costs have been fixed. Consequently, as revenues have declined, the Company has made a substantial effort to control

costs and scale its global operations through consolidation, focus, globalization, and automation. Those efforts, combined with divestures of non-core assets, contributed to a total cost reduction of over $90 million from 2017 to 2018.  Costs in the Global Operations segment were reduced by approximately 9% and sales costs were reduced by 10% over the same period.  The Company has further cost saving and revenue enhancement initiatives and investments that will take place through 2019, building on its recent success adjusting its cost structure to its new operating environment; these initiatives include:

- transitioning from Enterprise Cloud Services and replacing them with new Managed AWS services and Hosted Private Cloud services;

- investments in improving the efficiency of the Company's sales force; and

- continuing efforts to capture operational efficiencies

34.     Despite all of the efforts made to date, the Company continues to be adversely impacted by declining revenue.  New customer contracts signed in 2017 and 2018 have been insufficient to replace revenue lost to contract expirations and renewals at lower prices, and long lead times for bringing new customers onto the Company's systems and offerings mean that any improvements derived from new strategic initiatives and products will require significant lead-time to reverse the trend of revenue declines.  Accordingly, the restructuring contemplated by the Plan and RSA is critical to ensure the Company's viability as a going concern.

### B.     Capital and Liquidity Constraints

35.     In spite of the Company's efforts to right-size its cost structure, the Company continued to have high operating leverage, carrying a sizable amount of fixed costs.  Further exacerbating capital and liquidity constraints, the Company's 2017 debt refinancing limiting the Company's flexibility to reinvest sale proceeds or pay down debt.  While the Company has continued to make substantial investments in the business, its cash flow projections present no reasonable path to repay its existing debt.  More importantly, given the ongoing cash flow impact

from high maintenance capital expenditures and significant cash interest payments, it became clear to the Company and its management team that a comprehensive restructuring was necessary.

### C. Debtors' Prepetition Sale and Marketing Efforts

36.    Since early 2018, the Debtors have been exploring a possible sale or other transaction with a variety of strategic and financial buyers.    The Company engaged Centerview Partners ("Centerview") to advise the Company on potential strategic opportunities. In September 2018, Centerview reached out to a number of parties and nearly 100 parties executed nondisclosure agreements and were granted access to an electronic diligence data room.

37.    The Debtors and Centerview set a late November 2018 deadline for indications of interest and indicative offers.    Ultimately, two parties submitted offers ahead of the deadline. Following a series of meetings with the two parties, neither of the indicative offers were competitive enough to fully repay the Company's funded debt, causing the Company to pivot to a debt restructuring and engage with its lenders in December.

### D. Debtors' Prepetition Restructuring Efforts and Stakeholder Engagement

38.    On the heels of the unsuccessful marketing process, the Company retained Kirkland & Ellis LLP ("K&E") and Alix, who along with Centerview, began to assist with the development of possible restructuring alternatives.    The Company, with the assistance of its advisors, explored many alternatives, including whether it was practicable to effectuate an out-of-court restructuring, refinancing, or other similar transaction that would reduce its leverage and provide the Company with additional liquidity, or whether an in-court restructuring was necessary.

39.    The Company and its advisors engaged with the Creditor Groups to develop a long-term solution to properly capitalize the Company and enable it to focus on implementing its

business plan initiatives.  The Company and its advisors also engaged in discussions with the Sponsors as the discussions among the Creditor Groups advanced.

### E.  The Restructuring Support Agreement and Proposed DIP Financing

40.  As discussed above, after considering various alternatives, in an effort to quickly and efficiently address its funded debt and to manage its liquidity, the Company began negotiations regarding potential restructuring transactions with the Creditor Groups and, later, with the Sponsors.  These extensive, good-faith negotiations resulted in the Company entering into the RSA, which is attached hereto as **Exhibit A**, which provides for a comprehensive restructuring of the Company's capital structure pursuant to a plan of reorganization.

41.  The RSA contemplates a restructuring of the Debtors' capital structure through the (a) conversion of the Debtors' secured obligations under the Credit Agreement into: (i) a $300 million term loan facility (the "New Term Loan"); and (ii) 89% of the new equity in the Reorganized Sungard AS (the "New Sungard AS Equity") and (b) the conversion of the Notes into 11% of the New Sungard AS Equity, plus 2% of the New Sungard AS Equity otherwise distributable to the holders of the 2022 Term Loan Claims that will instead be distributed Pro Rata to holders of the Notes Claims.

42.  Further, the proposed DIP Facility, which consists of a $100 million delayed draw facility, would, if required, provide much needed liquidity that will allow the Company to finance these chapter 11 cases.  The proceeds of the DIP Facility will provide the Company with the ability to fund day-to-day operations, make critical capital expenditure investments, fund domestic and international operations, finance operational restructuring and cost-savings initiatives, meet its administrative obligations during these chapter 11 cases, and emerge on a timely basis as a reorganized business enterprise.  Furthermore, funds from the DIP Facility may be reserved to provide financial assurance related to the Comfort Letters (as defined above).  The DIP Facility

will also reassure the Company's customers and employees that the Company will be able to continue to meet its commitments during these chapter 11 cases and that the Company's businesses are likely to continue as a going concern.

43.     The DIP Lenders, should the DIP Facility be required, have agreed that their claims under the DIP Facility, including amounts drawn to finance the Company's emergence from chapter 11, will be converted into an exit facility upon emergence, subject to agreed-upon conditions and fees.

44.     After emergence from chapter 11, the reorganized Debtors' capital structure will consist of (a) a $50 million new revolving credit facility (the "Exit Revolver Facility"); (b) a $100 million term loan consisting of converted DIP Facility Claims and commitments (the "Exit Term Loan Facility"); and (c) the New Term Loan, each secured by liens of priority consistent with the Exit Term Sheets attached to the RSA as Exhibit D-1 and Exhibit D-2 thereto.

45.     The RSA and Plan, and the transactions contemplated thereunder, present the optimal path forward for the Company.  Preserving value for the benefit of the Company's stakeholders depends, in large part, on the Company's proceeding swiftly to confirmation of a plan of reorganization and minimizing the effects of the Debtors' chapter 11 cases on the value of the Company's brand—a critical component of the value of the Company's business—and the Company's ongoing liquidity position.  Due to the fact that customer sentiment in the industry shifts rapidly and stakeholders need their IT services running at all times, time is of the essence. The Company intends to proceed with a fair and efficient process to preserve and maximize value for all stakeholders, which ultimately will inure to the substantial benefit of all parties in interest.

## IV.   Jurisdiction

46.     JPMorgan Chase holds certain of the Company's stock certificates in a building located in the Southern District of New York.  As such, the Company commenced these

chapter 11 cases in the Southern District of New York.  The Company submits that venue is proper

in the Southern District of New York because placement of stock certificates is a valid cause for

venue.  The Debtors also have significant ties to the Southern District of New York in particular

because, among other things:  (a) Debtor Sungard Availability Services, LP, Inc. leases office

space in White Plains (b) the debt agreements specify that any action related to the Company are

to be adjudicated in the Southern District of New York, and (c) the professional advisors and

funded debt creditors of this entity reside primarily in the Southern District of New York.

**V.      Evidentiary Support for First Day Motions**

47.      Contemporaneously herewith, the Company has sought relief through a number of

First Day Motions that it believes are necessary to enable it to efficiently administer its estates

with minimal disruption and loss of value during the reorganization described herein.

The Company has requested that the relief sought in each of the First Day Motions be granted as

a critical element in ensuring the maximization of value of the Company's estates.  I have reviewed

each of the First Day Motions discussed below, and the facts set forth therein are true and correct

to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.

I further believe that the relief requested in the First Day Motions is necessary to allow the

Company to operate with minimal disruption during the pendency of these chapter 11 cases.

A description of the relief requested in, and the facts supporting each of, the First Day Motions is

set forth in **Exhibit B** attached hereto and incorporated herein by reference.

**VI.     Information Required by Local Rule 1007-2**

48.      Local Rule 1007-2 requires certain information related to the Company, which

I have provided in the exhibits attached hereto as **Exhibit C** through **Exhibit N**.  Specifically,

these exhibits contain the following information with respect to the Company (on a consolidated

basis, unless otherwise noted):[10]

- Pursuant to Local Rule 1007-2(a)(3), **Exhibit C** provides the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in these chapter 11 cases, and a brief description of the circumstances surrounding the formation of the committee and the date of the formation.

- Pursuant to Local Rule 1007-2(a)(4), **Exhibit D** provides the following information with respect to each of the holders of the Company's thirty (30) largest unsecured claims, excluding claims of insiders:  the creditor's name; the address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the telephone number; the name(s) of the person(s) familiar with the Company's account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

- Pursuant to Local Rule 1007-2(a)(5), **Exhibit E** provides the following information with respect to each of the holders of the five largest secured claims against the Company's:  the creditor's name; address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and an indication of whether the claim or lien is disputed at this time.

- Pursuant to Local Rule 1007-2(a)(6), **Exhibit F** provides a summary of the Company's assets and liabilities.

- Pursuant to Local Rule 1007-2(a)(7), **Exhibit G** provides a summary of the publicly held securities of the Company.

- Pursuant to Local Rule 1007-2(a)(8), **Exhibit H** provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity:  the name; address; and telephone number of such entity and the court in which any proceeding relating thereto is pending.

---

[10]  The information contained in **Exhibit C** through **Exhibit N** attached to this declaration does not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

- Pursuant to Local Rule 1007-2(a)(9), **Exhibit I** provides a list of property comprising the premises owned, leased, or held under other arrangement from which the Company operates its business.

- Pursuant to Local Rule 1007-2(a)(10), **Exhibit J** sets forth the location of the Company's substantial assets, the location of its books and records, and the nature, location, and value of any assets held by the Company outside the territorial limits of the United States.

- Pursuant to Local Rule 1007-2(a)(11), **Exhibit K** provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Company or its property where a judgment or seizure of its property may be imminent.

- Pursuant to Local Rule 1007-2(a)(12), **Exhibit L** sets forth a list of the names of the individuals who comprise the Company's existing senior management, such individual's tenure with the Company, and a brief summary of such individual's relevant responsibilities and experience.

- Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Exhibit M** provides the estimated amount of payroll to the Company employees (not including officers, directors, and equity holders) and the estimated amounts to be paid to officers, equity holders, directors, and financial and business consultants retained by the Company, for the 30-day period following the Petition Date.

- Pursuant to Local Rule 1007-2(b)(3), **Exhibit N** provides a schedule, for the 30-day period following the Petition Date, of estimated cash receipts and disbursements, net gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the filing of the chapter 11 cases, and any other information relevant to an understanding of the foregoing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated:  April 26, 2019          */s/ Eric Koza*
New York, New York              Eric Koza
                                Managing Director, AlixPartners, LLP

## EXHIBIT A

**Restructuring Support Agreement**

EXECUTION VERSION

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 13.02, this "**Agreement**") is made and entered into as of April 1, 2019 (the "**Execution Date**"), by and among the following parties, each in the capacity set forth on its signature page to this Agreement (each of the following described in sub-clauses (i) through (iv) of this preamble, collectively, the "**Parties**"):[1]

    i.    Sungard Availability Services Capital, Inc., a company incorporated under the Laws of Delaware ("**Sungard AS**") and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**");

    ii.    the undersigned and non-affiliated holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Credit Agreement Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**Consenting Credit Agreement Lenders**");

    iii.    the undersigned and non-affiliated holders, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Notes Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (iii), collectively, the "**Consenting Noteholders**" and, collectively with the Consenting Credit Agreement Lenders, the "**Consenting Creditors**"); and

    iv.    the undersigned investment funds and affiliates that hold, or are investment advisors, sub-advisors or managers of funds or accounts that hold Interests in Sungard AS and that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (iv), collectively, and solely in their capacity as

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1 or the Plan, as applicable.

current holders of Interests in Sungard AS, the "**Sponsors**," and together with the Consenting Creditors, the "**Consenting Stakeholders**").

### *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the restructuring term sheet attached hereto as **Exhibit B** (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions by commencing voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

### *AGREEMENT*

**Section 1.**    *Definitions and Interpretation.*

1.01.    <u>Definitions</u>.  The following terms shall have the following definitions:

"**2021 Term Loans**" means those certain term loans with a maturity date of September 30, 2021 pursuant to the First Loan Modification Agreement.

"**2021 Term Loan Claims**" means any Claim on account of the 2021 Term Loans.

"**2022 Term Loans**" means those certain term loans with a maturity date of October 1, 2022 pursuant to the Second Loan Modification Agreement.

"**2022 Term Loan Claims**" means any Claim on account of the 2022 Term Loans.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 13.02 (including the Term Sheets (as defined herein)).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

2

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, consent solicitation, exchange offer, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, and Interest in, a Company Party, including the Credit Agreement Claims and the Notes Claims.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with the proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting Credit Agreement Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Noteholders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Credit Agreement**" means that certain credit agreement, dated as of March 31, 2014, between Sungard AS and JPMorgan Chase Bank, N.A., as modified by the First Loan Modification

3

Agreement and the Second Loan Modification Agreement, and as may be further amended, modified, or supplemented from time to time.

"**Credit Agreement Claims**" means any Claim against a Company Party arising under, derived from, secured by, based on, or related to the Credit Agreement or any other agreement, instrument or document executed at any time in connection therewith including the Credit Agreement Ancillary Documents and all Obligations (as defined in the Credit Agreement) and any guaranty thereof (which shall include the 2021 Term Loan Claims, the 2022 Term Loan Claims, and the Revolver Claims); provided, however, that any obligation owing to any Credit Agreement Lender or Affiliate thereof in respect of overdraft and related liabilities arising from treasury, depositary and cash management services, credit card programs, merchant card programs, or any other automated clearing house funds, to the extent constituting a Secured Claim, shall constitute an Other Secured Claim pursuant to the Plan and not a Credit Agreement Claim.

"**Credit Agreement Ancillary Documents**" means, collectively, the Credit Agreement and any security documents and any other collateral, guarantee, and ancillary documents, including any applicable forbearance agreement, executed in connection with the Credit Agreement.

"**Creditor Professional Agreements**" means, collectively, the Houlihan Letter, the PJT Letter and the DH Letter, and all other agreements agreed to by the Company Parties (including Sungard AS) as of the Agreement Effective Date with respect to any other Secured Lender Group Representatives or Crossover Group Representatives.

"**Crossover Group**" means that ad hoc group of holders of Credit Agreement Claims and Notes Claims represented by the Crossover Group Representatives.

"**Crossover Group Representatives**" means Akin Gump Strauss Hauer & Feld LLP, PJT Partners LP, and DH Capital, LLC.

"**Definitive Documents**" means the documents set forth in Section 3.01.

"**DH**" means DH Capital, LLC.

"**DH Letter**" means that certain engagement letter among DH, Sungard AS, and Akin Gump Strauss Hauer & Feld LLP dated January 1, 2019.

"**DIP Facility**" means the loans under the debtor-in-possession financing facility for the priming super priority secured term loans on the terms and conditions set forth in the term sheet attached hereto as **Exhibit C** (the "**DIP Term Sheet**") and on other terms and conditions to be agreed by the DIP Lenders, not inconsistent with the DIP Term Sheet.

"**DIP Facility Documents**" means the documents governing the DIP Facility to be entered into in accordance with the DIP Term Sheet and the DIP Orders and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith, including the DIP Term Sheet.

4

"**DIP Lenders**" means the lenders providing the DIP Facility under the DIP Facility Documents.

"**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit Facilities**" means each of the exit financing facilities, the terms and conditions of which shall be consistent with the terms and conditions set forth in the term sheets attached hereto as **Exhibit D-1** and **Exhibit D-2** (the "**Exit Term Sheets**") and shall consist of other terms and conditions to be agreed by the applicable Parties in accordance with this Agreement.

"**Exit Facilities Documents**" means the documents governing each of the Exit Facilities, including any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine, in consultation with the Secured Lender Group and the Crossover Group, are necessary or desirable to file in connection with the Chapter 11 Cases.

"**Final DIP Order**" means the final order authorizing the entry into the DIP Facility Documents.

"**First Loan Modification Agreement**" means that certain Loan Modification Agreement and Refinancing Amendment, dated as of July 19, 2017, by and between Sungard AS, JPMorgan Chase Bank, N.A., as administrative agent, and each of the lenders party thereto.

"**Houlihan**" means Houlihan Lokey Capital, Inc.

"**Houlihan Letter**" means that certain engagement letter among Houlihan, Sungard AS, and Jones Day dated January 8, 2019.

"**Indenture**" means the Indenture, dated March 31, 2014, by and among Sungard AS, the subsidiary guarantors named therein, and The Bank of New York Mellon, as trustee, as may be amended, supplemented, or otherwise modified from time to time.

"**Interest**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests

5

of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Interim DIP Order**" means the interim order authorizing the entry into the DIP Facility Documents.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit E**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Lenders**" shall have the meaning ascribed to it in the Credit Agreement.

"**Loans**" shall have the meaning ascribed to it in the Credit Agreement.

"**Milestones**" means the milestones set forth in Section 11.05.

"**Notes**" means the 8.750% senior notes due April 1, 2022, issued by Sungard AS pursuant to the Indenture.

"**Notes Claim**" means any Claim against a Debtor arising under, derived from, based on, or related to the Notes or the Notes Indenture and the guarantees in respect thereof under the Notes Indenture Ancillary Documents.

"**Notes Indenture Ancillary Documents**" means, collectively, the Indenture and any guarantee and ancillary documents, including any applicable forbearance agreement, executed in connection with the Indenture.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Petition Date**" means the date on which each of the Debtors filed its respective petition for relief commencing its Chapter 11 Case.

"**PJT**" means PJT Partners LP.

"**PJT Letter**" means that certain engagement letter among PJT, Sungard AS, and Akin Gump Strauss Hauer & Feld LLP dated March 12, 2019.

"**Plan**" means the joint prepackaged chapter 11 plan, including all appendices, exhibits, schedules and supplements thereto (including any appendices, exhibits, schedules and supplements to the Plan that are contained in the Plan Supplement), as it may be altered, amended, modified, or

6

supplemented from time to time in accordance with the terms thereof and this Agreement, subject to the RSA Definitive Document Requirements.

"**Plan Effective Date**" means the date on which all conditions precedent to the effectiveness of the Plan have been satisfied or waived in accordance with the terms of the Plan, and the Plan is substantially consummated according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits, in each case subject to the terms and provisions of the Restructuring Support Agreement (including the RSA Definitive Document Requirements), to be filed no later than the Plan Supplement Filing Date, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement, including the following documents: (a) the New Organizational Documents; (b) the New Operating Agreement; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) a list of retained Causes of Action; (e) to the extent known, the identity of the members of the New Board; (f) the Exit Revolver Documents; (g) the New Term Loan Documents; (h) the Exit Term Loan Documents; (i) an exhibit to the Plan Supplement describing the Restructuring Transactions; (j) the binding agreement, if any, effectuating any acquisition of substantially all of the assets of Sungard AS by a newly formed entity pursuant to a transaction described in the Plan Supplement; and (k) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan, in each case, subject to the RSA Definitive Document Requirements.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Reorganized Sungard AS**" means either Sungard AS, as reorganized pursuant to the Plan, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Plan Effective Date, which shall be the ultimate parent of a newly formed entity that acquires substantially all of the assets of Sungard AS, which newly formed entity will be defined as the "Acquisition Company" under the Plan, or any other new corporation or limited liability company that may be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Sungard AS Equity to be distributed pursuant to the Plan.

"**Required Consenting Creditors**" means, as of the relevant date, the Required Consenting Credit Agreement Lenders and the Required Consenting Noteholders.

"**Required Consenting Credit Agreement Lenders**" means, as of the relevant date, Consenting Creditors holding at least 50.01% of the aggregate outstanding principal amount of Credit Agreement Claims held by the Consenting Creditors; provided that the Required Consenting Credit Agreement Lenders must include at least one member of the

Crossover Group and one member of the Secured Lender Group, in each case, who holds at least 6% of the Credit Agreement Claims.

"**Required Consenting Noteholders**" means, as of the relevant date, Consenting Creditors holding at least 50.01% of the aggregate outstanding principal amount of Notes Claims held by the Consenting Creditors.

"**Required Consenting Stakeholders**" means the Required Consenting Creditors and each of the Sponsors.

"**Required Crossover Group Members**" means, as of the relevant date, members of the Crossover Group holding at least (i) 50.01% of the aggregate outstanding principal amount of Credit Agreement Claims held by the members of the Crossover Group and (ii) 50.01% of the aggregate outstanding principal amount of Notes Claims held by the members of the Crossover Group.

"**Required Secured Lender Group Members**" means, as of the relevant date, members of the Secured Lender Group holding at least 50.01% of the aggregate outstanding principal amount of Credit Agreement Claims held by the members of the Secured Lender Group.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Second Loan Modification Agreement**" means that certain Loan Modification Agreement and Refinancing Amendment, dated as of January 4, 2018, by and between Sungard AS, JPMorgan Chase Bank, N.A., as administrative agent, and each of the lenders party thereto.

"**Secured Lender Group**" means that ad hoc group of holders of Credit Agreement Claims represented by the Secured Lender Group Representatives.

"**Secured Lender Group Representatives**" means Jones Day and Houlihan.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means the solicitation materials with respect to the Plan

"**Sponsor Consent Right**" means each Sponsor's right to consent or approve any of the Definitive Documents (or any amendments, modifications or supplements to the Definitive Documents) and shall apply solely to the extent any Definitive Document modifies or affects the release, exculpation, injunction, indemnification, or insurance provisions related to such Sponsor as identified in the Restructuring Term Sheet and this Agreement and implemented pursuant to the Plan or (ii) adversely affects the rights or obligations of such Sponsor pursuant to or identified in this Agreement and implemented pursuant to the Plan; provided that, any ruling by a Court of competent jurisdiction permitting a holder of Company Claims/Interests other than a Consenting Stakeholder to opt out of releases in the Plan shall not give rise to any consent right.

8

"**Sungard AS**" has the meaning set forth in the preamble to this Agreement.

"**Term Sheets**" means, collectively, the term sheets attached as exhibits to this Agreement, including the Restructuring Term Sheet, DIP Term Sheet, Exit Term Sheets, and Corporate Governance Term Sheet.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, 11.04, 11.07, or 11.08.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit G**.

1.02.   Interpretation.  For purposes of this Agreement:

(a)     in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)     capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)     unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)     unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)     unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)     the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

9

(h)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)     the use of "include" or "including" is without limitation, whether stated or not; and

(j)     the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 13.10 other than counsel to the Company Parties.

**Section 2.     *Effectiveness of this Agreement.*** This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Consenting Stakeholders;

(b)     the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties, the Crossover Group, the Secured Lender Group and each of the other Consenting Stakeholders:

(i)     holders of at least two-thirds (2/3) of the aggregate outstanding principal amount of Credit Agreement Claims;

(ii)     holders of at least two-thirds (2/3) of the aggregate outstanding principal amount of Notes Claims; and

(iii)     each of the Sponsors;

(c)     counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 13.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred; and

(d)     Sungard AS or the other Company Parties shall have paid, in full, the accrued but unpaid reasonable and documented fees and expenses of the Secured Lender Group Representatives and the Crossover Group Representatives.

**Section 3.     *Definitive Documents.***

3.01.    The Definitive Documents governing the Restructuring Transactions shall consist of the following:  (A) the Plan; (B) the Confirmation Order; (C) the Disclosure Statement; (D) the Solicitation Materials and any motion seeking approval thereof; (E) the order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials; (F) the First Day Pleadings and all orders sought pursuant thereto; (G) the Plan Supplement; (H) the DIP Orders, DIP Facility Documents and DIP Motion; (I) the Exit Facilities Documents; (J) the corporate governance documents and other organizational documents of Reorganized Sungard AS

and its subsidiaries; and (K) such other agreements and documentation reasonably desired or necessary to consummate and document the Restructuring Transactions.

3.02.    The Definitive Documents (and, consistent with Section 12 hereof, any modifications, restatements, supplements or amendments to any of them) not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation in good faith and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement (including the Term Sheets) and be in form and substance reasonably satisfactory in all respects to each of: (i) the Company Parties; (ii) the Required Secured Lender Group Members; and (iii) the Required Crossover Group Members; and (iv) the Sponsors, solely to the extent required under the Sponsor Consent Right (as defined below).

**Section 4.**    ***Commitments of the Consenting Stakeholders.***

4.01.    <u>General Commitments, Forbearances, and Waivers.</u>

(a)    During the Agreement Effective Period, each Consenting Stakeholder severally, and not jointly, agrees in respect of all of its Company Claims/Interests (as applicable) pursuant to this Agreement to:

(i)    support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate in their capacity as holders of Company Claims/Interests (as applicable)), in each case, in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)    to the extent inconsistent with this Agreement, not, and shall not, direct any other person to, exercise any right or remedy for the enforcement, collection, or recovery of any of the Claims or Interests against the Company Parties other than in accordance with this Agreement and the Definitive Documents; and

(iii)    subject to the respective consent rights set forth in Section 3.02 hereof, negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

(b)    During the Agreement Effective Period, each Consenting Stakeholder severally, and not jointly, agrees in respect of all of its Company Claims/Interests (as applicable) pursuant to this Agreement that it shall not, directly or indirectly:

(i)    object to, delay, impede, or take any other action that is reasonably likely to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)    propose, file, support, solicit, or vote for any Alternative Restructuring Proposal;

(iii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iv)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties that is reasonably likely to materially and adversely impact the ability to consummate the Restructuring Transactions; or

(v)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; provided, however, that nothing in this Agreement shall limit the right of any party hereto to exercise any right or remedy provided under this Agreement or any other Definitive Document.

(c)    Notwithstanding anything to the contrary in this Agreement, any obligation set forth in this Agreement for a Consenting Stakeholder to forbear from taking any action: (a) shall automatically terminate, without the need for any further notice, if this Agreement is terminated in accordance with its terms; (b) shall not constitute a waiver with respect to any Defaults or Events of Default (each as defined in the Credit Agreement or the Indenture, as applicable); and (c) shall not bar any Consenting Stakeholder from filing a proof of claim in the Chapter 11 Cases or taking action to establish the amount of such claim consistent with the terms of this Agreement.  If the Restructuring Transactions are not consummated, the Parties fully reserve any and all of their rights, remedies, claims and defenses.  For the avoidance of doubt, any obligation set forth in this Agreement for the Consenting Stakeholders to forbear from taking any action shall not constitute a waiver with respect to any default or event of default under any agreement among such Consenting Stakeholder and Company Party (which, for the avoidance of doubt, shall include any Default or Event of Default under the Credit Agreement or Indenture (each as defined in the Credit Agreement or the Indenture (as applicable))).  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict any right of any Consenting Stakeholder to protect and preserve any right, remedy, condition or approval requirement under this Agreement or the Definitive Documents.  Upon the termination of this Agreement in accordance with Section 11 below, the agreement of the Consenting Stakeholders to forbear from exercising rights and remedies in accordance with this Agreement shall immediately terminate without requirement of any demand, presentment or protest of any kind, all of which the Company Parties hereby waive.

(d)    During the Agreement Effective Period, each Sponsor severally, but not jointly, agrees in respect of all of its Company Interests pursuant to this Agreement, to:

(i)    subject to and upon the occurrence of the Plan Effective Date, waive all Claims (including any claims for accrued and unpaid management fees payable by the Debtors) against the Company Parties other than Claims (x) that are Credit Agreement Claims or Notes Claims, if any, (y) related to any rights or defenses of the Sponsors arising under or related to the indemnification and insurance provisions set forth in this Agreement and implemented pursuant to the Plan, or (z) held by a Sponsor or affiliate of a Sponsor incurred in the ordinary course of business and unrelated to the Sponsors' ownership of Company Interests, including

12

Claims on account of existing arms'-length commercial contracts and vendor, customer, and landlord relationships; and

(ii)    not (x) pledge, encumber, assign, sell, or otherwise transfer, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, directly or indirectly, any portion of its right, title, or interests in any of its shares, stock, or other interests in any Company Party or any subsidiary thereof, in each case, other than direct or indirect transfers of interests in the Sponsors, (y) acquire any outstanding indebtedness of any Company Party or any subsidiary thereof, or (z) make any worthless stock deduction for any tax year ending on or prior to the Plan Effective Date, in the case of each of (x), (y), and (z), to the extent such pledge, encumbrance, assignment, sale, acquisition, declaration of worthlessness or other transaction or event may impair or adversely affect any of the tax attributes of the Company Parties or any of their subsidiaries (including under section 108 or 382 of the Internal Revenue Code of 1986 (as amended)).

4.02.    <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)    During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees severally, and not jointly, that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)    vote each of its Company Claims/Interests on or before April 26, 2019 to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)    to the extent it is required to vote pursuant to Section (i) and is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election (except such Consenting Stakeholder shall not be prohibited from "opting out" of granting such a release to any Party that has materially breached or terminated this Agreement); and

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a)(i) and (ii) above; <u>provided</u>, <u>however</u>, that upon the occurrence of a Support Termination Event, all votes tendered by Consenting Stakeholders that triggered such Support Termination Event shall be immediately revoked and deemed void *ab initio* without any further notice to or action, order or approval of the Bankruptcy Court.

(b)    During the Agreement Effective Period, each Consenting Stakeholder severally, and not jointly, agrees, in respect of each of its Company Claims/Interests, that it will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with

13

any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

(c)    No Expenses or Liabilities.    Nothing in this Agreement shall require any Consenting Stakeholder to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to any Consenting Stakeholder.    Notwithstanding the immediately preceding sentence, nothing in this Section 4.02 shall serve to limit, alter or modify any Consenting Stakeholder's express obligations under the terms of this Agreement.

**Section 5.    *Additional Provisions Regarding the Consenting Stakeholders' Commitments.***
Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (d) prevent any Consenting Stakeholder from taking any action not inconsistent with this Agreement; (e) prevent any Consenting Stakeholder from making, seeking or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, licenses or approval; (f) prevent any Consenting Stakeholder from appearing in the Chapter 11 Cases and taking positions not inconsistent with this Agreement; or (g) limit, condition or restrict the applicable Consenting Creditors, in their capacities as DIP Lenders, from (i) exercising any rights and remedies under the DIP Facility Documents (and any related credit documents, including the DIP Orders), (ii) waiving or forbearing with respect to any "Default" or "Event of Default" under and as defined in the DIP Facility Documents (and any related credit documents, including the DIP Orders), (iii) amending, modifying or supplementing the DIP Facility Documents (and any related credit documents) in accordance with the terms thereof or (iv) refusing to make additional advances under the DIP Facility Documents (and any related credit documents, including the DIP Orders) consistent with the terms of the applicable DIP Facility Documents.

**Section 6.    *Commitments of the Company Parties.***

6.01.    <u>Affirmative Commitments</u>.    Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall:

(a)    support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, support and take all steps reasonably necessary and desirable to address any such impediment; <u>provided</u>,

however, that any actions taken in connection with such support or such steps shall be reasonably acceptable to the Required Consenting Creditors;

(c)     use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(d)     subject to the consent rights set forth in Section 3.02 hereof, negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(f)     deliver draft copies of all substantive motions, documents, and other pleadings to be filed in the Chapter 11 Cases to counsel to the Consenting Stakeholders as soon as reasonably practicable, but in no event less than two (2) Business Days prior to the date when the Company Parties intend to file such documents, and, without limiting any consent rights set forth in this Agreement, consult in good faith with respective counsel to the Consenting Stakeholders regarding the form and substance of any such proposed filing, which, in the case of the Sponsors, consultation with respect to the form and substance of any such proposed filing shall relate solely to the Sponsor Consent Right; notwithstanding the foregoing, in the event that not less than two (2) Business Days' notice is not reasonably practicable under the circumstances, the Company Parties shall deliver draft copies of any such motions, documents, or other pleadings to respective counsel to the Consenting Stakeholders as soon as otherwise reasonably practicable before the date when the Company intends to file any such motion, documents, or other pleading;

(g)     provide, and direct their employees, officers, advisors, and other representatives to provide, to the Consenting Creditors, and each of their respective legal and financial advisors (i) reasonable access to the Company Parties' books and records during normal business hours on reasonable advance notice to the Company Parties' representatives and without disruption to the operation of the Company Parties' business, (ii) reasonable access to the management and advisors of the Company Parties on reasonable advance notice to such persons and without disruption to the operation of the Company Parties' business, and (iii) such other information as reasonably requested by the Consenting Creditors or their respective legal and financial advisors; notwithstanding the foregoing, the Company shall not be required (x) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company, would cause the Company to violate its respective obligations with respect to confidentiality to a third party if the Company used its commercially reasonable efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure, (y) to disclose any legally privileged information of the Company, or (z) to violate applicable Law;

(h)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code,(iii) dismissing the Chapter 11 Cases; (iv) seeking the entry of an order modifying or

15

terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization; (v) sustaining a challenge to the validity, enforceability, perfection or priority of, or seeking avoidance or subordination of, any portion of the Credit Agreement Claims or Notes Claims (as applicable), or asserting any other cause of action against or with respect or relating to such Claims or any pre-petition liens securing such Claims;

(i)     maintain its good standing under the laws of the state or other jurisdiction in which it is incorporated or organized;

(j)     not engage in any material merger, consolidation, disposition, acquisition, investment, dividend, or similar transaction outside the ordinary course without Consenting Stakeholder approval;

(k)     promptly notify counsel to the Consenting Stakeholders in writing of the commencement or filing of any material governmental or third party complaints, litigations, investigations or hearings (or communications indicating that the same may be contemplated or threatened);

(l)     if any Company Parties know of a material breach by any Party of such Party's obligations, representations, warranties, or covenants set forth in this Agreement, furnish prompt written notice (and in any event within three Business Days of such actual knowledge) to counsel to the Consenting Stakeholders and promptly take all remedial action necessary to cure such breach by any such Party; and

(m)     subject to the terms of the DIP Orders, timely pay the reasonable and documented fees and expenses of the Secured Lender Group Representatives and the Crossover Group Representatives arising prior to and after the Petition Date; provided, that, for the avoidance of doubt, all of such fees and expenses shall be paid consistent with the Creditor Professional Agreements.

6.02.   Negative Commitments.  Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     take any action that is inconsistent with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(c)     modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(d)     file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement, any other Definitive Documents, or the Plan;

(e)        sell, or file any motion or application seeking to sell, any assets other than in the ordinary course of business;

(f)        seek, solicit or support any Alternative Restructuring Proposal, other than as expressly permitted under Section 7.01 hereof; or

(g)        terminate, and shall remain in compliance with and not breach, the reimbursement obligations owed to (i) the Secured Lender Group Representatives and the members of the Secured Lender Group, which includes the reimbursement obligations set forth in agreements with each of the Secured Lender Group Representatives (including the Houlihan Letter) and (ii) the Crossover Group Representatives and the members of the Crossover Group, which includes the reimbursement obligations set forth in agreements with each of the Crossover Group Representatives.

**Section 7.        *Additional Provisions Regarding Company Parties' Commitments.***

7.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party (including any directors, officers, managers, or employees of a Sponsor in their capacity as a member of any such body), after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement

7.02.    Notwithstanding anything to the contrary in this Agreement, but subject to the terms of Section 7.01, each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives: shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals.  At all times prior to the date on which the Company Parties enter into a definitive agreement in respect of such an Alternative Restructuring Proposal or make a public announcement regarding their intention to do so, the Company Parties shall (x) provide the Crossover Group Representatives, the Secured Lender Group Representatives, and counsel to the Consenting Stakeholders a copy of any written offer or proposal (and notice and a description of any oral offer or proposal) for such Alternative Restructuring Proposal within two (2) Business Days of the Company Parties' or their advisors' receipt of such offer or proposal and (y) provide such information to the foregoing advisors regarding such discussions (including copies of any materials provided to such parties hereunder) as necessary to keep the Crossover Group Representatives, Secured Lender Group

17

Representatives, and counsel to the Consenting Stakeholders contemporaneously informed as to the status and substance of such discussions.

7.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

7.04.    During the Agreement Effective Period, the Company Parties (a) will not make or declare any dividends, distributions or other payments on account of any Interests, (b) will not make any payments to the Sponsors or any of their respective affiliates, (c) will not initiate or seek court approval for any employee incentive, retention, or severance plan, and (d) will ensure that all other Company Parties do not make any transfers (whether by dividend, distribution or otherwise) to any direct or indirect parent entity or shareholder of Sungard AS and that no subsidiaries of Sungard AS make any transfers (whether by dividend, distribution or otherwise) to any direct or indirect parent entity or shareholder of Sungard AS, except, in each case, for any transfers or payments incurred in the ordinary course of business  by the Sponsors or any of their respective affiliates incurred in the ordinary course of business and unrelated to the Sponsors' ownership of Company Interests, including transfers or payments on account of existing arms'-length commercial contracts and vendor, customer, and landlord relationships.

**Section 8.**     *Transfer of Interests and Securities.*

8.01.    During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless, in the case of any Company Claims/Interests, the authorized transferee either (1) is a Consenting Stakeholder and provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer or (2) executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or a Joinder.

8.02.    Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.    Subject to Section 4.01(d)(ii), this Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; provided, however, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to respective counsel to each of the Company Parties and the Consenting Stakeholders within five (5) Business Days of such acquisition.

18

8.04.    This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations (including any obligation by any Company Party to issue a "cleansing letter" or otherwise make a public disclosure of information) otherwise arising under such Confidentiality Agreements.

8.05.    Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the Transfer otherwise is a Permitted Transfer under Section 8.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.  In the event any Qualified Marketmaker is a Consenting Stakeholder as of the Agreement Effective Date, its obligations hereunder shall be limited to the Claims/Interests it beneficially owns as of the Agreement Effective Date.

8.06.    Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.**    *Representations and Warranties of Consenting Stakeholders.*  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of (i) any Company Claims/Interests, in the case of the Consenting Creditors or (ii) any Company Interest, in the case of the Sponsors, in each case, other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as

applicable (as may be updated pursuant to Section 8);

(b)        it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)        such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)        it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)        solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

(f)        if it is a Sponsor or holds any equity interests in a Company Party or any subsidiary thereof neither it nor any of its affiliates has engaged in any action prohibited by Section 4.01(d)(ii) since January 1, 2018;

(g)        it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability; and

(h)        except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with any other entity or person with respect to Company Claims/Interests that have not been disclosed to all Parties to this Agreement.

**Section 10.        *Representations, Warranties and Covenants of Company Parties.*** Each of the Company Parties represents, warrants, and covenants to each other Party, severally and not jointly, as of the date such Party executed and delivers this Agreement, and as of the Plan Effective Date:

(a)        it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)        except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the

20

Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with any other entity or person with respect to Company Claims/Interests that have not been disclosed to all Parties to this Agreement;

(f)      it is not party to any asset sale or investment agreement with any other entity or person with respect to Company Claims/Interests that have not been disclosed to all Parties to this Agreement; and

(g)      neither it nor any of its subsidiaries has undergone an "ownership change," as defined in section 382(g) of the Internal Revenue Code of 1986 (as amended), since January 1 2016.

## Section 11.      *Termination Events*.

11.01.  Consenting Creditor Termination Events.  This Agreement may be terminated (a)  by the Required Consenting Creditors upon the occurrence of any of the following events, unless waived, in writing, by the Required Consenting Creditors on a prospective or retroactive basis; (b) with respect to the members of the Secured Lender Group, by the Required Secured Lender Group Members upon the occurrence and continuation of any of the following events, unless waived, in writing, by the Required Secured Lender Group Members on a prospective or retroactive basis and (c) with respect to the members of the Crossover Group, by the Required Crossover Group Members upon the occurrence and continuation of any of the following events, unless waived, in writing, by the Required Crossover Group Members on a prospective or retroactive basis (collectively, the "**Consenting Creditor Termination Events**"), in each case, by the delivery to the Company Parties of a written notice in accordance with Section 13.10 hereof:

(a)      the occurrence of a material breach of this Agreement by any Company Party or other Party, which material breach (i) is adverse to the applicable Consenting Creditors seeking termination pursuant to this provision and (ii) has not been cured (if susceptible to cure) before the earlier of (A) five (5) Business Days after written notice in accordance with Section 13.10 hereof

21

to the Company Parties and the non-terminating Parties of such material breach and (B) one calendar day prior to any proposed Plan Effective Date;

(b)     the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the filing of a motion by a Company Party seeking such relief;

(c)     the dismissal of one or more of the Chapter 11 Cases, or the filing of a motion by a Company Party seeking such relief;

(d)     the appointment of a trustee, receiver or examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases, or the filing of a motion by a Company Party seeking such relief;

(e)     the rejection of this Agreement, or the filing of a motion by a Company Party seeking such relief;

(f)     if (i) any Definitive Document does not comply with Section 3 of this Agreement, (ii) any other document or agreement necessary to consummate the Restructuring Transactions is not satisfactory or reasonably satisfactory (as applicable) to the Required Consenting Creditors; or (iii) the Company withdraws the Plan;

(g)     any Company Party files, amends, or modifies, or files a pleading seeking approval of, any Definitive Document or authority to amend or modify any Definitive Document, in a manner that is materially inconsistent with, or constitutes a material breach of, this Agreement and is adverse to the applicable Consenting Creditor seeking termination pursuant to this provision (including with respect to the consent rights afforded such Consenting Creditor under this Agreement), without the prior written consent of the applicable threshold of Consenting Creditors;

(h)     any Company Party (i) makes a public announcement that it intends to accept an Alternative Restructuring Proposal or (ii) enters into a definitive agreement with respect to an Alternative Restructuring Proposal;

(i)     the failure to meet a Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is result of any act, omission, or delay on the part of the terminating Consenting Creditor in violation of its obligations under this Agreement;

(j)     the breach in any material respect by one or more of the Consenting Creditors holding an amount of Credit Agreement Claims and/or Notes Claims that would result in non-breaching Consenting Creditors holding less than two-thirds (2/3) of the aggregate principal amount of Credit Agreement Claims or Notes Claims of any provision set forth in this Agreement that remains uncured (to the extent curable) for five (5) Business Days after the terminating

22

Consenting Creditors transmit a written notice in accordance with Section 13.10 detailing any such breach;

(k)      any Company Party files any motion or application seeking authority to sell any material assets without the prior written consent of the Required Consenting Creditors;

(l)      the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring Transactions; provided, however, that the Company Parties shall have five (5) Business Days after the issuance of such ruling or order to obtain relief that would allow consummation of the Restructuring Transactions in a manner that (A) does not prevent or diminish in a material way compliance with the terms of this Agreement, or (B) is reasonably acceptable to the Required Consenting Creditors;

(m)      the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not in the form of the DIP Orders or otherwise consented to by the Required Consenting Creditors;

(n)      the occurrence of any Event of Default under the DIP Orders or DIP Facility Documents that has not been cured (if susceptible to cure) or waived by the applicable percentage of DIP Lenders in accordance with the terms of the DIP Documents;

(o)      either (A) any Company Party or any other Party files a motion, application, or adversary proceeding (or any Company Party or other Party supports any such motion, application, or adversary proceeding filed or commenced by any third party) (1) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Loans or asserting any other cause of action against the Consenting Credit Agreement Lenders or with respect to or relating to such Loans or the prepetition liens securing any of the Loans, or (2) challenging the validity, enforceability, or priority of, or seeking avoidance or subordination of, any portion of the Notes or asserting any other cause of action against the Consenting Noteholders or with respect to or relating to the Notes; or (B) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order with respect to any of the foregoing adverse to any of the Consenting Credit Agreement Lenders or Consenting Noteholders or that is inconsistent with this Agreement or the Term Sheets in any material respect;

(p)      if the Bankruptcy Court enters an order in the Chapter 11 Cases terminating the any Company Party's exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(q)      the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of any Company Party or that would materially and adversely affect any Company Party's ability to operate their businesses in the ordinary course;

(r)      the commencement of an involuntary case against any Company Party or any Company Party's foreign subsidiaries and affiliates or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or

other relief in respect of any Company Party or any Company Party's foreign subsidiaries and affiliates, or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect (provided that such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof) or if any court grants the relief sought in such involuntary proceeding;

(s)     any Company Party or any Company Party's foreign subsidiaries or affiliates (A) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except as provided in this Agreement, (B) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (C) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (D) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official, (E) makes a general assignment or arrangement for the benefit of creditors or (F) takes any corporate action for the purpose of authorizing any of the foregoing;

(t)     if (A) any of the DIP Orders are reversed, stayed, dismissed, vacated, reconsidered, modified or amended without the consent of the DIP Lenders (as applicable), or (B) a motion for reconsideration, reargument or rehearing with respect to any such order has been filed and the Company Parties have failed to timely object to such motion;

(u)     if (A) any of the Confirmation Order or the order(s) approving the Disclosure Statement or Solicitation Materials is reversed, stayed, dismissed, vacated, reconsidered, modified or amended without the consent of the Required Consenting Creditors, or (B) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Company Parties have failed to timely object to such motion; or

(v)     the Company exercises its fiduciary out, in accordance with Section 7.01 hereof.

11.02.   Required Consenting Noteholders / Required Consenting Credit Agreement Lenders Termination Events.   This Agreement may be terminated by either the Required Consenting Noteholders or the Required Consenting Credit Agreement Lenders should the treatment of the Notes (in such case, by the Required Consenting Noteholders), or the Loans, (in such case, by the Required Consenting Credit Agreement Lenders) in any material Definitive Document, including for the avoidance of doubt, any material amendments or modifications to any material Definitive Document, be inconsistent with the Term Sheets.

11.03.   Company Party Termination Events.   Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 13.10 hereof upon the occurrence of any of the following events each, a "**Company Termination Even**t"):

(a)     the breach in any material respect by one or more of the Consenting Stakeholders holding an amount of Credit Agreement Claims that would result in non-breaching Consenting Stakeholders holding less than two-thirds of the aggregate principal amount of Credit Agreement

Claims of any provision set forth in this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions that (to the extent curable) remains uncured for a period of ten (10) Business Days after the receipt by the Consenting Stakeholders of notice of such breach to all Parties of such breach and a description thereof;

(b)    to the extent consistent with Section 7.01 hereof, the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal; or

(c)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) days after such terminating Company Party transmits a written notice in accordance with Section 13.10 hereof detailing any such issuance; provided, however, that the Company Parties have made commercially reasonable, good faith efforts to cure, vacate or have overruled such ruling or order prior to terminating this Agreement; provided, further, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

11.04.    Sponsor Termination Events.    Each Sponsor may, upon notice to the other Parties in accordance with Section 13.10, terminate its obligations under this Agreement upon the occurrence of any of the following events (each, a "**Sponsor Termination Event**," and together with the Creditor Termination Events and the Company Termination Events, the "**Support Termination Events**"), unless waived, in writing, by the terminating Sponsor on a prospective or retroactive basis:

(a)    the occurrence of a material breach of this Agreement by any Party (other than the terminating Sponsor), which material breach is (i) adverse to the Sponsor seeking termination pursuant to this provision and (ii) has not been cured (if susceptible to cure) before the earlier of (A) five (5) Business Days after written notice in accordance with Section 13.10 hereof to the Company Parties and the non-terminating Parties of such material breach and (B) one calendar day prior to any proposed Plan Effective Date;

(b)    the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the filing of a motion by a Company Party seeking such relief;

(c)    the dismissal of one or more of the Chapter 11 Cases, or the filing of a motion by a Company Party seeking such relief;

(d)    the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases, or the filing of a motion by a Company Party seeking such relief;

(e)    a rejection of this Agreement, or the filing of a motion by a Company Party seeking such relief;

(f)      if any Definitive Document, including any amendment or modification to a Definitive Document, does not comply with the Sponsor Consent Right;

(g)      if (i) any Definitive Document does not comply with Section 3 of this Agreement, (ii) any other document or agreement necessary to consummate the Restructuring Transactions is not satisfactory or reasonably satisfactory (as applicable) to the terminating Sponsor consistent with the Sponsor Consent Right; or (iii) the Company withdraws the Plan;

(h)      any Company Party files, amends, or modifies, or files a pleading seeking approval of, any Definitive Document or authority to amend or modify any Definitive Document, in a manner that is materially inconsistent with, or constitutes a material breach of, this Agreement as to the applicable Sponsor and is materially adverse to the applicable Sponsor  that is inconsistent with the Sponsor Consent Right seeking termination pursuant to this provision (including with respect to the Sponsor Consent Right), without the prior written consent of the applicable Sponsor;

(i)      if any Company Party withdraws or adversely alters the treatment to the Sponsors under the Plan or files any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement or the Plan, in each case subject to the Sponsor Consent Right;

(j)      any Company Party (i) makes a public announcement that it intends to accept an Alternative Restructuring Proposal or (ii) enters into a definitive agreement with respect to an Alternative Restructuring Proposal;

(k)      the breach in any material respect by one or more of the Consenting Creditors holding an amount of Credit Agreement Claims and/or Notes Claims that would result in non-breaching Consenting Creditors holding less than two-thirds (2/3) of the aggregate principal amount of Credit Agreement Claims or Notes Claims of any provision set forth in this Agreement that remains uncured (to the extent curable) for five (5) Business Days after the terminating Consenting Creditors transmit a written notice in accordance with Section 13.10 detailing any such breach;

(l)      the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring Transactions; provided, however, that the Company Parties shall have five (5) Business Days after the issuance of such ruling or order to obtain relief that would allow consummation of the Restructuring Transactions in a manner that (A) does not prevent or diminish in a material way compliance with the terms of this Agreement, (B) is reasonably acceptable to the Required Consenting Creditors, and (C) complies with the Sponsor Consent Right and does not adversely affect the Sponsors' rights and obligations pursuant to or identified in this Agreement and implemented pursuant to the Plan;

(m)      if (A) any of the Confirmation Order or the order(s) approving the Disclosure Statement or Solicitation Materials is reversed, stayed, dismissed, vacated or reconsidered, or modified or amended with respect to a matter within the scope of the Sponsor Consent Right without the consent of the Sponsors, or (B) a motion for reconsideration, reargument, or rehearing

26

with respect to any such order has been filed and the Company Parties have failed to timely object to such motion; or

(n)    the Company exercises its fiduciary out in accordance with <u>Section 7.01</u> hereof.

11.05.    <u>Milestones</u>.    The following Milestones shall apply to this Agreement unless extended or waived in writing by each of the Company Parties and the Required Consenting Creditors (and, in the case of the Outside Date, by the Company Parties, the Required Crossover Group Members and Required Secured Lender Group Members only):

(i)    by no later than April 5, 2019, the Company Parties shall have commenced solicitation of the Plan;

(ii)    by no later than May 1, 2019, the Debtors shall have commenced the Chapter 11 Cases;

(iii)    by no later than May 2, 2019, the Debtors shall have filed the Plan and the Disclosure Statement with the Bankruptcy Court;

(iv)    by no later than May 8, 2019, the Bankruptcy Court shall have entered the Interim DIP Order;

(v)    by no later than May 8, 2019, the Bankruptcy Court shall have entered the order scheduling a combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan;

(vi)    by no later than May 31, 2019, the Bankruptcy Court shall have entered an order approving the Disclosure Statement and the Confirmation Order (which may be one order); and

(vii)    by no later than July 31, 2019, the Plan Effective Date shall have occurred (such date, the "**Outside Date**").[2]

---

[2]    If (i) the Debtors have not published a notice of intent to file by April 5, 2019, (ii) the Debtors, in consultation with the Consenting Stakeholders, have otherwise determined to pursue a standard prepackaged case or prearranged case, or (iii) if the Bankruptcy Court does not approve the case on such expedited basis, the following dates shall be automatically extended as follows:   (A) by no later than April 20, 2019, the Company Parties shall have commenced solicitation of the Plan; (B) by no later than June 1, 2019, the Debtors shall have commenced the Chapter 11 Cases; (C) by no later than June 8, 2019, the Debtors shall have filed the Plan and Disclosure Statement with the Bankruptcy Court; (D) by no later than June 8, 2019, the Bankruptcy Court shall have entered the Interim DIP Order; (E) by no later than June 8, 2019, the Bankruptcy Court shall have entered the order scheduling a combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan; (F) by no later than July 15, 2019, the Bankruptcy Court shall have entered an order approving the Disclosure Statement and the Confirmation Order (which may be one order); and (G) by no later than August 31, 2019, the Plan Effective Date shall have occurred  and the Required Consenting Credit Agreement Lenders and the Required Consenting Noteholders shall execute any waiver or forbearance as necessary to ensure that no Company Party defaults under the Credit Agreement or Indenture by virtue of the extended dates.

11.06. <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Stakeholders; and (b) each Company Party.

11.07. <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice on the Plan Effective Date.

11.08. <u>Effect of Termination</u>.  Subject to clause (a) of this Section 11.08, upon the occurrence of a Consenting Creditor Termination Event, unless waived by the applicable Parties, each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and any of the Definitive Documents and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action, and there shall be no liability or obligation hereunder on the part of any Party hereto; provided that in no event shall any such termination relieve a Party hereto from (i) liability for its breach or non-performance of its obligations under this Agreement before the date of such Consenting Creditor Termination Event or (ii) obligations under this Agreement which expressly survive any such termination pursuant to Section 13.20 hereunder.  Upon the occurrence of a Consenting Creditor Termination Event prior to the Plan Effective Date, any and all consents, agreements, undertakings, tenders, waivers, forbearances, and ballots tendered or delivered by the Parties subject to such termination before such Support Termination Event shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; <u>provided</u>, <u>however</u>, any Consenting Creditor withdrawing or changing its vote pursuant to this Section 11.08 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court before the entry of the Confirmation Order by the Bankruptcy Court. The automatic stay imposed by section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action necessary to effectuate the termination of and otherwise enforce this Agreement pursuant to and in accordance with the terms hereof, and the Company Parties hereby waive the automatic stay for such purposes.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Creditors from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserves its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 11.08 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement.  For the avoidance of doubt, the automatic stay arising pursuant to section 362

28

of the Bankruptcy Code shall be deemed waived or modified for purposes of providing notice or exercising rights hereunder.

(a)      Termination by Sponsors.  Notwithstanding anything in this Agreement, in the event any Sponsor terminates this Agreement under the terms hereof, (i) the Required Consenting Credit Agreement Lenders and the Required Consenting Noteholders (as applicable) shall have the option (which shall be delivered in writing to the Company Parties, including via email) to (A) determine that the Consenting Credit Agreement Lenders and/or the Consenting Noteholders (as applicable) will continue remaining Parties to this Agreement in pursuit and in support of the Restructuring Transactions in which case all other Parties (other than the terminating Sponsor) shall remain bound by their obligations under this Agreement or (B) terminate this Agreement in accordance with this Section 11; (ii) this Agreement shall be deemed terminated with respect to the terminating Sponsor and such Sponsor shall no longer be a Party to this Agreement and shall be relieved of any obligations hereunder; (iii) such other Parties shall be permitted to take further actions otherwise permitted hereunder with respect to any Definitive Documents or other document or matter or the Restructuring Transactions without any liability hereunder, except the rights and obligations of such other Parties under this Agreement shall remain in full force and effect; and (iv) the Consenting Stakeholders (other than any Consenting Stakeholder that has breached this Agreement and such breach caused the occurrence of a Sponsor Termination Event pursuant to which such Sponsor has terminated this Agreement) shall no longer be obligated to not "opt out" of any releases proposed to be granted to the terminating Sponsor under the Plan; (v) such other Parties shall not be obligated to grant or support the grant of any releases to such Sponsor under the Plan; and (vi) all of the applicable rights and remedies of the remaining Parties under this Agreement, the Credit Agreement, the Indenture and applicable law shall be reserved in all respects.

**Section 12.**   *Amendments and Waivers*.

(a)      This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)      Subject to the consent rights set forth in Section 3.02 hereof, this Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (i) each Company Party, (ii) the Required Consenting Creditors; provided, however, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate (as compared to other Consenting Creditors holding Company Claims/Interests within the same class as provided for in the Restructuring Term Sheet), and adverse effect on any of the Company Claims/Interests held by a Consenting Creditor, the consent of each such affected Consenting Creditor shall also be required to effectuate such proposed modification, amendment, waiver, or supplement, and (iii) the Sponsors (solely to the extent such modification, amendment or supplement (A) pertains to a matter that is subject to the Sponsor

Consent Right, which shall expressly exclude the Milestones or (B) adversely affects the rights and obligations of the Sponsors under this Agreement and implemented pursuant to the Plan).

(c)    Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.    *Miscellaneous.***

13.01.  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

13.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

13.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

13.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

13.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Notwithstanding the

foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State and County of New York, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

13.06. <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.07. <u>Execution of Agreement</u>. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

13.08. <u>Rules of Construction</u>. This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

13.09. <u>Successors and Assigns; Third Parties</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

13.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to a Company Party, to:

Sungard Availability Services
680 E. Swedesford Road
Wayne, PA 19087
Attention: General Counsel

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Jonathan S. Henes, P.C. and Emily E. Geier
E-mail address:  jonathan.henes@kirkland.com and emily.geier@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Ryan Blaine Bennett, P.C.
E-mail address:  ryan.bennett@kirkland.com

(b)    if to a Consenting Secured Lender represented by the Secured Lender Group Representatives, to:

Jones Day
250 Vesey Street
New York, New York 10281
Attention: Scott J. Greenberg, Esq.; Michael J. Cohen, Esq., and Steven Domanowski, Esq.
Email address: sgreenberg@jonesday.com, mcohen@jonesday.com and sdomanowski@jonesday.com

(c)      if to a Consenting Crossover Creditor represented by the Crossover Group Representatives, to:

> Akin Gump Strauss Hauer & Feld LLP
> 1 Bryant Park
> New York, New York 10036
> Attention: Philip C. Dublin and Daniel Fisher
> Email address: pdublin@akingump.com; dfisher@akingump.com

(d)      if to a Sponsor, to:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York 10019
> Attention:  Brian Hermann and Jacob Adlerstein
> Email: bhermann@paulweiss.com; jadlerstein@paulweiss.com

Any notice given by delivery, mail, or courier shall be effective when received.

13.11.   <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

13.12.   <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

13.13.   <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

13.14.   <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

13.15. <u>Several, Not Joint, Claims</u>. Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

13.16. <u>Severability and Construction</u>. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

13.17. <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.18. <u>Capacities of Consenting Stakeholders</u>. Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

13.19. <u>Relationship Among Consenting Creditors.</u>

(a)    None of the Consenting Creditors shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Consenting Stakeholder, the Company Parties or their affiliates, or any of the Company Parties' or their affiliates' creditors or other stakeholders, including, without limitation, any holders of Notes, Credit Agreement Claims, or Company Claims/Interests, and, other than as expressly set forth in this Agreement, there are no commitments among or between the Consenting Stakeholders. It is understood and agreed that any Consenting Stakeholder may trade in any debt or equity securities of the Company without the consent of the Company or any other Consenting Stakeholder, subject to applicable securities laws, this Agreement (including Section 8 of this Agreement), and any applicable confidentiality agreement. No prior history, pattern or practice of sharing confidences among or between any of the Consenting Stakeholders and/or the Company shall in any way affect or negate this understanding and agreement.

(b)    The Company Parties understand that the Consenting Stakeholders are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Company Parties acknowledge and agree that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of the Consenting Stakeholders that principally manage and/or supervise the Consenting Stakeholder's investment in the Company Parties, and shall not apply to any other trading desk or business group of the Consenting Stakeholder so long as they are not acting at the direction or for the benefit of such Consenting Stakeholder and so long as confidentiality is maintained consistent with any applicable confidentiality agreement.

13.20. <u>Email Consents</u>. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 12, or

otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

13.21.  Survival.

(a)     Notwithstanding (i) any transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 4.01(d)(ii)(z), Section 6.01(*l*), and Section 13 shall survive such transfer or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof; provided that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination; provided, further, that Section 4.01(d)(ii)(z) shall only survive an automatic termination of this Agreement pursuant to Section 11.07 and shall not survive a termination of this Agreement pursuant to any other provision.

(b)     Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible financial restructuring of the Company Parties and in contemplation of possible chapter 11 filings by the Company Parties and that the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court, including the Bankruptcy Court.

13.22.  Tax.  To the extent practicable, subject to the consent of the Required Consenting Creditors (such consent not to be unreasonably withheld, conditioned or delayed), the Restructuring Transactions will be structured so as to preserve or otherwise maximize the availability and/or use of favorable tax attributes (including tax basis) of the Company Parties and to otherwise obtain the most beneficial structure for the Company Parties or the reorganized debtors and the holders of New Sungard AS Equity post-Effective Date, and the Company Parties will cooperate on a reasonable basis with the Consenting Creditors in connection with making such determination, including by providing the Consenting Creditors with reasonable information relevant to making such determination.

13.23.  Publicity.

(a)     The Company Parties shall not (i) use or disclose to any person the name of any other Consenting Stakeholder, including in any press release, without such Consenting Stakeholder's prior written consent or (ii) disclose to any person, other than legal, accounting, financial and other advisors to the Company Parties who have a need to know such information in connection with the Restructuring, the amount or percentage of any Loans or Notes held by any Party; provided that the Company shall be permitted to disclose at any time the aggregate amount of, and aggregate percentage of Loans, Notes or Interests held by the Parties. The Parties hereby consent to the disclosure by the Company in the Definitive Documents, or in any motion or other pleading seeking approval of any aspect of the Restructuring Transactions, or as otherwise required by law or regulation or by the Company's existing financing agreements, of the execution, terms

35

and contents of this Agreement and the aggregate amount of, and aggregate percentage of, the Loans, Notes and Interests held by the Parties.

(b)      In the event that the Company Parties seek to disseminate a press release, public filing, public announcement or other communications (collectively, an "**Announcement**") regarding the commencement of the Chapter 11 Cases, the Restructuring Transactions or any terms thereof, it shall provide a draft of such Announcement to counsel to the Consenting Stakeholders for review and comment at least 24 hours before the public disclosure of such Announcement and shall act in good faith in considering and incorporating the reasonable comments of the Consenting Stakeholders to any such Announcement.   The Company shall consult with the Consenting Stakeholders with respect to any communications plan with respect to the Restructuring Transactions or the Company's business on a go-forward basis, including a communications plan with respect to customers (any such plan, a "**Communications Plan**"), and shall act in good faith in considering and incorporating the reasonable comments of the Consenting Stakeholders to any such plan; provided that any such Announcement and Communications Plan must be reasonably acceptable to the Consenting Stakeholders.


[*Remainder of Page Intentionally Left Blank*]

# EXHIBIT A

**Sungard AS Affiliate Entities**

Sungard Availability Services Holdings, LLC

Sungard Availability Network Solutions, Inc.

Sungard Availability Services Technology, LLC

Inflow LLC

Sungard Availability Services, LP

Sungard Availability Services VeriCenter, Inc.

## **EXHIBIT B**

**Restructuring Term Sheet**

<strong>EXECUTION VERSION</strong>

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

<em><strong>RESTRUCTURING TERM SHEET</strong></em>

<strong>INTRODUCTION</strong>

This term sheet (this "**Term Sheet**")[1] summarizes the material terms and conditions of restructuring and recapitalization transactions regarding certain indebtedness of Sungard Availability Services Capital, Inc., Sungard Availability Services Holdings, LLC, Sungard Availability Network Solutions, Inc., Sungard Availability Services Technology, LLC, Inflow LLC, Sungard Availability Services, LP, and Sungard Availability Services VeriCenter, Inc. (collectively, the "**Debtors**," and such restructuring, the "**Restructuring**").

The Restructuring will be accomplished through the Debtors commencing cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") to implement, on a prepackaged basis, the chapter 11 plan of reorganization described herein (the "**Plan**").

This Term Sheet is being agreed to in connection with entry by the Debtors and the Consenting Stakeholders into that certain Restructuring Support Agreement, dated as of April 1, 2019 (the "**RSA**"). Pursuant to the RSA, the parties thereto have agreed to support the transactions contemplated therein and herein.

This summary is being presented for discussion and settlement purposes, and is entitled to protection from any use or disclosure to any person pursuant to Rule 408 of the Federal Rules of Evidence and any other Rule of similar import.

This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documentation governing the Restructuring, which remain subject to negotiation and completion in accordance with the RSA and applicable bankruptcy law. The Restructuring will not contain any material terms or conditions that are inconsistent in any material respect with this Term Sheet or the RSA.

| OVERVIEW OF THE RESTRUCTURING |
|---|
| In general, the Restructuring contemplates that: |
| (a)    The Debtors will implement the Restructuring in the Bankruptcy Court pursuant to the Plan on the terms set forth in this Term Sheet. |
| (b)    Certain of the Consenting Creditors have agreed to provide up to $100.0 million in debtor-in-possession financing (the "**DIP Facility**") and consent to the use of cash collateral securing the Credit Agreement Claims to fund the Chapter 11 Cases, or, to the extent no |

---

[1]    Capitalized terms used but not otherwise defined in this Term Sheet have the meanings ascribed to such terms as set forth on **Exhibit A** attached hereto or the RSA, as applicable.

DIP Facility is required during the Chapter 11 Cases, to provide up to $100.0 million under a term loan facility subject to the terms and conditions set forth in the term sheet attached to the RSA as **Exhibit D-1**.

(c)    Subject to certain terms and conditions set forth in the DIP Facility, the DIP Facility will automatically convert into the Exit Term Loan Facility on the Plan Effective Date.

(d)    The Debtors will obtain commitments for a revolving credit facility in the amount of up to $50 million to be entered into on the Plan Effective Date (the "**Exit Revolver**").

(e)    In full and final satisfaction of each Credit Agreement Claim, each Holder thereof shall receive its Pro Rata share of and interest in:  (i) the New Term Loan; and (ii) 89% of the New Sungard AS Equity, subject to dilution by any Management Incentive Plan that provides awards in the form of New Sungard AS Equity; *provided*, *however*, that 2% of the New Sungard AS Equity, which is otherwise distributable to the Holders of the 2022 Term Loan Claims (and included in such 89%), shall instead be distributed Pro Rata to the Holders of the Notes Claims in settlement of the allowed amount of the Acceleration Makewhole Premium (the "**Acceleration Premium Settlement Amount**").

(f)    In full and final satisfaction of each Notes Claim, each Holder thereof shall receive its Pro Rata share of and interest in 11% of the New Sungard AS Equity (plus the 2% referenced above), in each case, subject to dilution for any Management Incentive Plan that provides awards in the form of New Sungard AS Equity.

(g)    The Allowed amount of the 2022 Term Loan Claims shall include $155 million on account of the Acceleration Makewhole Premium.

(h)    All General Unsecured Claims will be paid in full or otherwise provided such treatment as to render them Unimpaired.

(i)    At the option of the Debtors (with the consent of the Required Consenting Creditors) or the Reorganized Debtors, as applicable, Intercompany Interests shall be either Reinstated or canceled and released without any distribution.

This Term Sheet incorporates the rules of construction as set forth in section 102 of the Bankruptcy Code.

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| **DIP Facility** | Certain of the Consenting Creditors will provide, in the aggregate, up to $100 million in debtor-in-possession financing in the form of a multi-draw DIP Facility of which $50 million may be drawn upon approval of the DIP Facility on an interim basis and an additional up to $50 million may be drawn in increments of no less than $10 million on no more than five (5) occasions subject to the terms and conditions set forth in the term sheet attached to the RSA as **Exhibit C** (collectively, the "**DIP Loans**"). The DIP Facility will allow the Debtors to establish and fund a segregated account with proceeds from the DIP Facility in an amount not to exceed $20 million, which funds shall be available to the Debtors for disbursement to certain non-Debtor affiliates (the "**Group Companies**") through secured intercompany borrowings on an as-needed basis in accordance with the DIP Budget. The Group Companies shall be party to a cash pooling agreement memorializing the cash management arrangement among the Group Companies. Subject to the satisfaction or waiver of the conditions set forth in the documents governing the Exit Term Loan Facility (as defined below), to the extent no DIP Facility is required, all amounts that would have been funded under such DIP Facility shall be funded as the Exit Term Loan Facility as set forth in **Exhibit D-1**. |
| **Exit Conversion of DIP Facility** | On the Plan Effective Date, the loans and unused commitments outstanding under the DIP Facility shall automatically convert into a term loan facility subject to the terms and conditions set forth in the term sheet attached to the RSA as **Exhibit D-1** (the "**Exit Term Loan Facility**"). |
| **New Term Loan** | On the Plan Effective Date, the Reorganized Debtors shall enter into a new senior secured term loan facility in the aggregate principal amount of $300 million on the terms and conditions set forth in the term sheet attached to the RSA as **Exhibit D-2** (the "**New Term Loan**"). |
| **Exit Revolver** | On the Plan Effective Date, the Reorganized Debtors shall enter into the Exit Revolver, the terms of which shall be in form and substance reasonably satisfactory to the Required Consenting Creditors. |

| **TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN** | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Unclassified Non-Voting Claims** | | | |
| **N/A** | **DIP Facility Claims** | Except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, on the Plan Effective Date, so long as the conditions precedent to the conversion of the DIP Facility to the Exit Term Loan Facility have been satisfied or waived, each Holder thereof shall receive its Pro Rata share of term loans issued under the Exit Term Loan Facility.  Any unpaid fees and expenses under the DIP Facility shall be paid in full in cash on the Plan Effective Date.   If the conditions precedent to the conversion of the Exit Term Loan Facility have not been satisfied or waived as of the Effective Date, each Holder of an Allowed DIP Facility Claim shall be repaid in full in cash on account of such DIP Facility Claim. | N/A |
| **N/A** | **Administrative Claims** | Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Administrative Claim, on the Plan Effective Date or as soon as reasonably practicable thereafter, each Holder thereof shall receive payment in full in cash. | N/A |
| **N/A** | **Priority Tax Claims** | Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Plan Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Classified Claims and Interests of the Debtors** | | | |
| **Class 1** | **Other Secured Claims** | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, each Holder thereof shall receive, at the option of the applicable Debtor(s), (with the consent of the Required Consenting Creditors) or Reorganized Debtor(s), as applicable:  (a) payment in full | Unimpaired; deemed to accept |

| TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| | | in Cash; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | |
| **Class 2** | **Other Priority Claims** | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, each Holder thereof shall receive payment in full in Cash. | Unimpaired; deemed to accept |

| **TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN** | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Class 3** | **Credit Agreement Claims** | Except to the extent that a Holder of an Allowed Credit Agreement Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Credit Agreement Claim, each Holder thereof shall receive in its Pro Rata share of and interest in: (i) the New Term Loan; and (ii) 89% of the New Sungard AS Equity, subject to dilution on account of the Management Incentive Plan; *provided*, *however*, that the Acceleration Makewhole Premium Settlement Amount, which otherwise would have been distributable to the Holders of Allowed 2022 Term Loan Claims shall instead be distributed Pro Rata to the Holders of Notes Claims in accordance with Section 3.2(d) of the Plan.[2] Letters of credit outstanding under the Credit Agreement, to the extent undrawn, shall be terminated, cash collateralized, or backstopped in a manner satisfactory to the Credit Agreement Agent on or prior to the Effective Date. | Impaired; entitled to vote |
| **Class 4** | **Notes Claims** | Except to the extent that a Holder of an Allowed Notes Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Notes Claim, each Holder thereof shall receive its Pro Rata share of and interest in: (a) 11% of the New Sungard AS Equity, subject to dilution on account of the Management Incentive Plan; and (b) the Acceleration Makewhole Premium Settlement Amount, subject to dilution on account of the Management Incentive Plan. | Impaired; entitled to vote |

---

[2]   For illustrative purposes only, assuming (i) Allowed Revolver Claims of $36 million; (ii) Allowed 2021 Term Loan Claims of $427 million and (iii) Allowed 2022 Term Loan Claims of $543 million (inclusive of $155 million on account of the Acceleration Makewhole Premium), (x) holders of Allowed Revolver Claims would receive 3.2% of the New Sungard AS Equity, (y) holders of Allowed 2021 Term Loan Claims would receive 37.8% of the New Sungard AS Equity; and (z) holders of Allowed 2022 Term Loan Claims would receive 46.0% of the New Sungard AS Equity (after the transfer of 2% of the New Sungard AS Stock to the holders of Notes Claims in settlement of the allowed amount of the Acceleration Makewhole Premium), in each case subject to dilution for the Management Incentive Plan.

| **TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN** | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Class 5** | **General Unsecured Claims** | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder thereof shall receive, at the election of the Debtors (with the consent of the Required Consenting Creditors) or the Reorganized Debtors, as applicable, either: (a) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; (b) payment in full in Cash on the later of (i) the Effective Date or as soon as reasonably practicable thereafter, or (ii) the date such payment is due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim; or (c) such other treatment rendering such Allowed General Unsecured Claim Unimpaired; *provided* that subject to, and upon the occurrence of, the Effective Date, the Sponsors, in their capacities as such, shall be deemed to have waived all General Unsecured Claims (including any claims for accrued and unpaid management fees payable by the Debtors) other than any claims, rights or defenses arising under or related to any Indemnification Provisions or any D&O Liability Insurance Policies, which shall be fully preserved. For the avoidance of doubt, the foregoing waiver shall not apply to any General Unsecured Claims held by a Sponsor or Affiliate thereof incurred in the ordinary course of business and unrelated to the Sponsors' ownership of Interests in Sungard AS, including General Unsecured Claims on account of existing arms'-length commercial contracts and vendor, customer, and landlord relationships. | Unimpaired; deemed to accept |
| **Class 6** | **Section 510(b) Claims[3]** | Section 510(b) Claims will be canceled, released, discharged, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims. | Impaired; deemed to reject |

---

[3] "**Section 510(b) Claims**" means any Claim against any Debtor: (a) arising from the rescission of a purchase or sale of a Security of any Debtor or an affiliate of any Debtor; (b) for damages arising from the purchase or sale of such a Security; or (c) for reimbursement or contribution Allowed under section 502 of the Bankruptcy Code on account of such a Claim; *provided* that a Section 510(b) Claim shall not include any Claims subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to an Interest.

| **TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN** | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Class 7** | **Intercompany Claims** | On the Effective Date, each Intercompany Claim shall be, at the option of the Debtors (with the consent of the Required Consenting Creditors) or the Reorganized Debtors, as applicable, either Reinstated or canceled and released without any distribution. | Impaired; deemed to reject or Unimpaired; deemed to accept |
| **Class 8** | **Intercompany Interests** | Subject to the Restructuring Transactions, on the Effective Date, Intercompany Interests shall be, at the option of the Debtors (with the consent of the Required Consenting Creditors) or the Reorganized Debtors, as applicable, either Reinstated or cancelled and released without any distribution. | Impaired; deemed to reject or Unimpaired; deemed to accept |
| **Class 9** | **Interests in Sungard AS** | All Interests in Sungard AS will be canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect. | Impaired; deemed to reject |

| **GENERAL PROVISIONS REGARDING THE PLAN** | |
|---|---|
| **Subordination** | The allowance, classification, and treatment of satisfying all Claims and Interests under the Plan takes into consideration any and all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code, or otherwise.  On the Effective Date, any and all subordination rights or obligations that a Holder of a Claim or Interest may have with respect to any distribution to be made under the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be enjoined permanently.  Accordingly, distributions under the Plan to Holders of Allowed Claims (including, for the avoidance of doubt, distributions to Holders of Allowed Claims in Class 3 and Class 4) will not be subject to turnover or payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights *provided*, that any such subordination rights shall be preserved in the event the Confirmation Order is vacated, the Effective Date does not occur in accordance with the terms hereunder or the Plan is revoked or withdrawn. |
| **Restructuring Transactions** | The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and Plan Supplement and the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring (collectively, the "**Restructuring Transactions**").  On the Plan Effective Date, the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring. |

| **GENERAL PROVISIONS REGARDING THE PLAN** | |
|---|---|
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except with respect to the Exit Revolver, Exit Term Loan Facility, the New Term Loan and the New Sungard AS Equity, or as otherwise provided in this Term Sheet or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled, and the obligations of the Debtors and any non-Debtor Affiliates thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Executory Contracts and Unexpired Leases** | The Plan will provide that the executory contracts and unexpired leases that are not assumed or rejected as of the Plan Effective Date (either pursuant to the Plan or a separate motion) will be deemed assumed pursuant to section 365 of the Bankruptcy Code. |
| | The Debtors shall serve rejection notices in respect of each rejected executory contract and unexpired lease on the applicable counterparties in accordance with the milestones contained in the RSA and procedures set forth in the Plan. |
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters related to the Plan and the Restructuring. |
| **Discharge of Claims and Termination of Interests** | Except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan (including the Exit Facility Documents, the New Organizational Documents and the New Operating Agreement): (a) the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of any and all Claims (including any Intercompany Claims resolved or compromised (consistent with the Restructuring Transactions) after the Effective Date by the Reorganized Debtors), Interests (including any Intercompany Interests Reinstated or cancelled and released (consistent with the Restructuring Transactions) after the Effective Date by the Reorganized Debtors), and Causes of Action against the Debtors of any nature whatsoever including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such liability relates to services performed by employees of the Debtors prior to the Effective Date and that arises from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, any interest accrued on Claims or Interests from and after the Petition Date, and all other liabilities against, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, (b) the Plan shall bind all holders of Claims and Interests, (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity |

## GENERAL PROVISIONS REGARDING THE PLAN

| | |
|---|---|
| | of any kind or nature that occurred prior to the Effective Date, in each case regardless of whether or not: (i) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; (iii) the Holder of such a Claim or Interest has accepted, rejected or failed to vote to accept or reject the Plan; or (iv) any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.<br><br>Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities. |
| **Releases by the Debtors** | NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THEIR ESTATES FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THEIR ESTATES, THAT THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, THE FIRST LOAN MODIFICATION AGREEMENT, THE SECOND LOAN MODIFICATION AGREEMENT, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS |

| **GENERAL PROVISIONS REGARDING THE PLAN** |
|---|

COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTORS), ANY INTERCOMPANY TRANSACTION, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE DIP FACILITY DOCUMENTS, THE EXIT FACILITIES, THE EXIT FACILITY DOCUMENTS, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF DEBT (INCLUDING THE EXIT REVOLVER FACILITY, EXIT TERM LOAN FACILITY, AND NEW TERM LOAN) AND/OR SECURITIES (INCLUDING THE NEW SUNGARD AS EQUITY) PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THE EXIT FACILITY DOCUMENTS AND OTHER DOCUMENTS, INSTRUMENTS AND AGREEMENTS SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN AND SHALL NOT RESULT IN A RELEASE, WAIVER, OR DISCHARGE OF ANY OF THE DEBTORS' OR THE REORGANIZED DEBTORS' ASSUMED INDEMNIFICATION PROVISIONS AS SET FORTH IN THE PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE

| **GENERAL PROVISIONS REGARDING THE PLAN** | |
|---|---|
| | RESTRUCTURING AND IMPLEMENTING THE PLAN; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (C) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE DEBTORS' ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE. |
| **Releases by Holders of Claims and Interests** | NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, AND TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THEIR ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, THE FIRST LOAN MODIFICATION AGREEMENT, THE SECOND LOAN MODIFICATION AGREEMENT, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTORS), ANY INTERCOMPANY TRANSACTION, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE DIP FACILITY DOCUMENTS, THE EXIT FACILITIES, THE EXIT FACILITY DOCUMENTS, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF DEBT (INCLUDING THE EXIT REVOLVER FACILITY, EXIT TERM LOAN |

| | |
|---|---|
| **GENERAL PROVISIONS REGARDING THE PLAN** | |

| | |
|---|---|
| | FACILITY, AND NEW TERM LOAN) AND/OR SECURITIES (INCLUDING THE NEW SUNGARD AS EQUITY) PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THE EXIT FACILITY DOCUMENTS AND OTHER DOCUMENTS, INSTRUMENTS, AND AGREEMENTS SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN AND SHALL NOT RESULT IN A RELEASE, WAIVER, OR DISCHARGE OF ANY OF THE DEBTORS' OR THE REORGANIZED DEBTORS' ASSUMED INDEMNIFICATION PROVISIONS AS SET FORTH IN THE PLAN OR (B) OBLIGATIONS UNDER THE CREDIT AGREEMENT AND THE NOTES INDENTURE THAT, BY THEIR EXPRESS TERMS, SURVIVE THE TERMINATION OF THE CREDIT AGREEMENT AND THE NOTES INDENTURE, INCLUDING THE RIGHTS OF THE CREDIT FACILITY AGENT AND THE TRUSTEE TO EXPENSE REIMBURSEMENT, INDEMNIFICATION AND SIMILAR AMOUNTS. |
| | ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS: (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE; (E) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE. |
| **Exculpation** | NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, NO EXCULPATED PARTY SHALL HAVE OR INCUR LIABILITY FOR, AND EACH EXCULPATED PARTY IS RELEASED AND EXCULPATED FROM, ANY CAUSE OF ACTION |

**GENERAL PROVISIONS REGARDING THE PLAN**

FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT AND RELATED PREPETITION TRANSACTIONS, THE DIP FACILITY, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DIP FACILITY, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE DIP FACILITY DOCUMENTS, THE EXIT FACILITIES, THE EXIT FACILITY DOCUMENTS, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF DEBT (INCLUDING THE EXIT REVOLVER FACILITY, EXIT TERM LOAN FACILITY, AND NEW TERM LOAN) AND/OR SECURITIES (INCLUDING THE NEW SUNGARD AS EQUITY) PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.

THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF VOTES ON, AND DISTRIBUTION OF CONSIDERATION PURSUANT TO, THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE EXCULPATION SET FORTH ABOVE DOES NOT RELEASE OR EXCULPATE ANY CLAIM RELATING TO ANY POST-EFFECTIVE DATE OBLIGATIONS OF

| GENERAL PROVISIONS REGARDING THE PLAN | |
|---|---|
| | ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THE EXIT FACILITY DOCUMENTS AND OTHER DOCUMENTS, INSTRUMENTS AND AGREEMENTS SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN. |
| **Injunction** | EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT:  (A) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (B) HAVE BEEN RELEASED PURSUANT TO SECTION 8.2 OF THE PLAN; (C) HAVE BEEN RELEASED PURSUANT TO SECTION 8.3 OF THE PLAN, (D) ARE SUBJECT TO EXCULPATION PURSUANT TO SECTION 8.4 OF THE PLAN, OR (E) ARE OTHERWISE DISCHARGED, SATISFIED, STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS DISCHARGED, RELEASED, EXCULPATED, OR |

| **GENERAL PROVISIONS REGARDING THE PLAN** | |
|---|---|
| | SETTLED PURSUANT TO THE PLAN. |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| **Management Incentive Plan / Management Cash Plan** | Following the Plan Effective Date, the Reorganized Debtors shall adopt and implement either the Management Incentive Plan and/or the Management Cash Plan at the discretion of the New Board. |
| **Tax Structuring** | The Restructuring Transactions and related transactions shall be structured in a tax efficient manner for the Debtors and the Consenting Creditors in accordance with the Plan and Plan Supplement. |
| **Insurance and Surety Bonds** | Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to section 365 of the Bankruptcy Code. |
| | The Debtors or the Reorganized Debtors, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors, officers, managers, employees remain in such positions after the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Reorganized Debtors may deem necessary, including by purchasing any employee liability tail coverage on terms and at an expense reasonably acceptable to the Sponsors and the Required Consenting Creditors. |
| | The Debtors shall continue to satisfy their surety bonds and insurance policies in full (including any D&O Liability Insurance Policies, including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) and continue such programs in the ordinary course of business.  Each of the Debtors' surety bonds and insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date:  (a) the Debtors shall be deemed to have assumed all such surety bonds and insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims; and (b) such surety bonds and insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Reorganized Debtor(s). |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| **Indemnification of Prepetition Directors, Officers, Managers, *et al.*** | Consistent with applicable law, each of the Debtors' indemnification provisions in effect as of the Petition Date, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management, or indemnification agreements, employment contracts, or otherwise providing a basis for any obligation of a Debtor to indemnify, defend, reimburse, or limit the liability of, or to advance fees and expenses to, any of the Debtors' current and former directors, officers, equityholders, managers, officers, members, employees, accountants, investment bankers, attorneys, other agents, and professionals of the Debtors, and such current and former directors', officers', and managers' respective Affiliates (each of the forgoing solely in their capacity as such), as applicable, shall be assumed and reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring on terms no less favorable to such current and former directors, officers, equityholders, managers, officers, members, employees, accountants, investment bankers, attorneys, other professionals, agents of the Debtors, and such current and former directors', officers', and managers' respective Affiliates (each of the forgoing solely in their capacity as such), other agents and professionals of the Debtors, and such current and former directors', officers', and managers' respective Affiliates than the indemnification provisions in place as of the Petition Date. |
| **Director, Officer, Manager, and Employee Tail Insurance Coverage** | The Debtors or the Reorganized Debtors, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and any current and former directors, managers, officers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors, managers, officers, and employees remain in such positions after the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Reorganized Debtors may deem necessary, including by purchasing any employee liability tail coverage.

Reasonable directors and officers insurance policies shall remain in place in the ordinary course during the Chapter 11 Cases and from and after the Plan Effective Date. |
| **Claims of the Debtors** | The Reorganized Debtors, as applicable, shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action released by the Debtors pursuant to the release and exculpation provisions outlined in this Term Sheet. |
| **Vesting of Assets** | Subject to the Restructuring Transactions, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets of the Debtors' Estates will vest in the Reorganized Debtor(s), as applicable, free and clear of all claims, liens, encumbrances, charges and other interests, except as otherwise provided in the Plan. |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| **Additional Plan Provisions and Documentation** | The Plan shall contain other customary provisions for chapter 11 plans of this type. The Plan and all supporting and implementing documentation (including all briefs and other pleadings filed in support thereof, all documents filed as part of the Plan Supplement, and the Confirmation Order) shall be in form and substance acceptable to the Debtors and the Required Consenting Creditors, and solely with respect to the release, exculpation, indemnification, and insurance provisions of the Sponsors, the Sponsors. |
| **Secured Lender Group Representatives Fees and Expenses** | The Debtors shall pay all reasonable and documented fees and expenses of the Secured Lender Group Representatives, in each case in accordance with the terms of their applicable engagement letters. For the avoidance of doubt the obligation to pay such fees and expenses shall be included in the orders approving the DIP Facility and the Plan shall provide that any fees and expenses of the Secured Lender Group Representatives that are unpaid as of the Plan Effective Date shall be paid on the Plan Effective Date. |
| **Crossover Group Representatives Fees and Expenses** | The Debtors shall pay all reasonable and documented fees and expenses of the Crossover Group Representatives, in each case in accordance with the terms of their applicable engagement letters. For the avoidance of doubt the obligation to pay such fees and expenses shall be included in the orders approving the DIP Facility and the Plan shall provide that any fees and expenses of the Crossover Group Representatives unpaid as of the Plan Effective Date shall be paid on the Plan Effective Date. |
| **Credit Facility Agent / Trustee Fees and Expenses** | The Debtors shall pay all reasonable and documented fees and expenses of (i) the Credit Facility Agent and one counsel for the Credit Facility Agent in accordance with the DIP Orders, and (ii) the Trustee in accordance with the Notes Indenture, and if any such fee and/or expense is unpaid as of the Effective Date, such fee and/or expense shall be paid on the Effective Date. |
| **Conditions Precedent to Restructuring** | The following shall be conditions to the Plan Effective Date (the "**Conditions Precedent**"): |

(a)    The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

(b)    the Bankruptcy Court shall have entered the Confirmation Order, which shall (a) have become a Final Order that has not been stayed or modified or vacated and (b) satisfy the RSA Definitive Document Requirements (including that the Confirmation Order shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting Creditors, and solely with respect to any release or exculpation, indemnification, and insurance provision as such pertains to them, the Sponsors), and shall:

    (i)    authorize the Debtors and the Reorganized Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, and other agreements or documents created in connection with the Plan;

**OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING**

| | | |
|---|---|---|
| | (ii) | decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent; |
| | (iii) | authorize the Debtors, as applicable or necessary, to: (a) implement the Restructuring Transactions; (b) distribute the New Sungard AS Equity pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or, with the consent of the Required Consenting Creditors, other exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the Plan, including cash, the New Term Loan, and the New Sungard AS Equity; and (d) enter into any agreements (including the agreements governing the Exit Revolver Facility and Exit Term Loan Facility), transactions, and sales of property as set forth in the Plan Supplement; |
| | (iv) | authorize the implementation of the Plan in accordance with its terms; and |
| | (v) | provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and |
| (c) | | All governmental and material third party approvals and consents, including Bankruptcy Court approval, that are necessary to implement the Restructuring Transactions shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions; |
| (d) | | The DIP Orders shall have been entered by the Bankruptcy Court, and shall not have been stayed or modified or vacated; |
| (e) | | To the extent the Debtors incur the DIP Facility, the Debtors shall not be in default under the DIP Facility or the DIP Orders (or, to the extent that the Debtors are in default on the proposed Effective Date, such default shall have been waived by the DIP Lenders or cured by the Debtors in a manner consistent with the DIP Facility and the DIP Orders); |
| (f) | | The Exit Facility Documents shall have been executed and delivered by all of the entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facilities shall have been waived or satisfied in accordance with the terms thereof, and |

**OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING**

|  | | |
|---|---|---|
| | | the closing of the Exit Facilities shall be deemed to occur concurrently with the occurrence of the Effective Date; |
| | (g) | The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan shall be consistent with the Restructuring Support Agreement and the following conditions shall have been satisfied: (a) the Definitive Documents shall have satisfied the RSA Definitive Document Requirements; (b) the Exit Facility Documents shall be in form and substance reasonably satisfactory to the Exit Term Loan Agent and Exit Revolver Agent (in each case solely with respect to the provisions thereof that affect the rights and duties of the Exit Term Loan Agent or the Exit Revolver Agent, as applicable), and (c) the Exit Revolver Documents shall be in form and substance reasonably satisfactory to the Required Consenting Creditors; |
| | (h) | All conditions precedent to the issuance of the New Sungard AS Equity shall have been satisfied contemporaneously or duly waived; |
| | (i) | The New Operating Agreement shall be in full force and effect concurrently with the occurrence of the Effective Date. |
| | (j) | To the extent required under applicable non-bankruptcy law, the New Organizational Documents shall have been duly filed with the applicable authorities in the relevant jurisdictions. |
| | (k) | The Restructuring Support Agreement shall not have terminated as to all parties thereto and shall remain in full force and effect and the Debtors and the applicable Restructuring Support Parties then party thereto shall be in compliance therewith. |
| | (l) | All professional fees and expenses of Retained Professionals approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in a Professional Fee Escrow Account pending approval by the Bankruptcy Court. |
| | (m) | All professional fees and expenses of the Crossover Group Representatives and the Secured Lender Group Representatives shall have been paid in full in Cash, and the reasonable and documented fees and expenses of the (x) Credit Facility Agent and (y) Trustee shall have been paid in full in Cash in accordance with Section 2.1.2(d) of the Plan. |
| | (n) | The Debtors shall have implemented the Restructuring Transactions, and all transactions contemplated by the Restructuring Support Agreement, in a manner consistent in all respects with the Restructuring Support Agreement and the Plan. |
| | (o) | With respect to all actions, documents and agreements necessary to implement the Plan: (a) all conditions precedent to such documents and agreements (other than any conditions precedent related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements; (b) such |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
| --- | --- |
| | documents and agreements shall have been tendered for delivery to the required parties and been approved by any required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (c) such documents and agreements shall have been effected or executed. |
| | (p) All material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and the transactions contemplated herein shall have been obtained. |
| **Waiver of Conditions Precedent to the Plan Effective Date** | The Debtors (with the prior consent of the Required Consenting Creditors, and, solely with respect to those terms and provisions that impact the release, exculpation, indemnification, and insurance provisions, the Sponsors), may waive any of the conditions to the Effective Date set forth in the Plan (except for the condition to the Effective Date set forth therein) at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan or consummate the Plan. |

| **CORPORATE GOVERNANCE PROVISIONS/SECTION 1145 EXEMPTION** | |
| --- | --- |
| **New Board** | On the Plan Effective Date, the terms of the current members of the board of directors of Sungard AS shall expire, and the board of directors of Reorganized Sungard AS (the "**New Board**") shall be appointed in accordance with the terms and conditions set forth in the corporate governance term sheet attached to the RSA as **Exhibit F** (the "**Corporate Governance Term Sheet**") and the identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing of such. |
| **Management** | Senior management hires and compensation, and any applicable agreements for such management, will be approved by the New Board or, if prior to the Plan Effective Date, be reasonably acceptable to the Required Consenting Creditors. |
| **Governance** | Corporate governance for the Reorganized Debtors, including charters, bylaws, operating agreements, shareholder agreements, or other organization documents, as applicable (the "**New Organizational Documents**"), shall be consistent with the Corporate Governance Term Sheet and section 1123(a)(6) of the Bankruptcy Code (as applicable), and documentation therefor shall be included in the Plan Supplement to the extent known at the time of filing of such. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from SEC registration under applicable law. |

*[Exhibits follow.]*

## EXHIBIT A

## DEFINITIONS

| Term | Definition |
|---|---|
| **Acceleration Makewhole Premium** | As defined in the Credit Agreement. |
| **Administrative Claim** | A Claim, other than DIP Facility Claims, incurred by the Debtors on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code. |
| **Affiliate** | As defined in section 101(2) of the Bankruptcy Code. |
| **Allowed** | With respect to any Claim or Interest:  (a) a Claim or Interest as to which no objection has been filed and that is evidenced by a Proof of Claim or Interest, as applicable, timely filed by the applicable Bar Date, if any, or that is not required to be evidenced by a filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely filed; or (c) a Claim or Interest that is Allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith.  Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date.  No Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable. |
| **Bankruptcy Code** | As defined in the Term Sheet. |
| **Bankruptcy Court** | As defined in the Term Sheet. |
| **Bankruptcy Rules** | The Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, and the general, local, and chambers rules of the Bankruptcy Court. |
| **Cause of Action** | Any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, choate or inchoate, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. |

| Term | Definition |
|---|---|
| | Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code. |
| **Class** | A category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code. |
| **Conditions Precedent** | As defined in the Term Sheet. |
| **Confirmation** | Entry of the Confirmation Order on the docket of the Chapter 11 Cases. |
| **Confirmation Date** | The date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases. |
| **Confirmation Hearing** | The hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order. |
| **Consenting Creditors** | As defined in the RSA. |
| **Consummation** | The occurrence of the Plan Effective Date. |
| **Credit Agreement Claim** | Any Claim against a Debtor arising under, derived from, secured by, based on, or related to the Credit Agreement or any other agreement, instrument or document executed at any time in connection therewith including the Credit Agreement Ancillary Documents and all Obligations (as defined in the Credit Agreement) and any guaranty thereof (which shall include the 2021 Term Loan Claims, 2022 Term Loan Claims, and the Revolver Claims); *provided, however*, that any obligation owing to any Credit Agreement Lender or Affiliate thereof in respect of overdraft and related liabilities arising from treasury, depositary and cash management services, credit card programs, merchant card programs, or any other automated clearing house funds, to the extent constituting a Secured Claim, shall constitute an Other Secured Claim pursuant to Section 1.1.110 of the Plan and not a Credit Agreement Claim. |
| **D&O Liability Insurance Policies** | All unexpired directors', managers', and officers' liability insurance policies (including any "tail policy" and all agreements, documents, or instruments related thereto) of any of the Debtors that have been issued or provide coverage to current and former directors, managers, officers, and employees of the Debtors. |
| **Debtors** | As defined in the Term Sheet. |

| Term | Definition |
| --- | --- |
| **DIP Facility Lender** | Collectively, the lenders party to the DIP Credit Agreement, solely in their capacity as such. |
| **Estate** | The estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case. |
| **Exculpated Parties** | Collectively, each of the following, solely in its capacity as such: (a) the Debtors and Reorganized Debtors; (b) the DIP Facility Lenders; (c) the Credit Agreement Lenders; (d) the Noteholders; (e) the Sponsors; (f) Holders of Interest in Sungard AS; (g) each Agent/Trustee; (h) with respect to the foregoing clauses (a) through (g), each such Entity's current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, control persons, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, participants, managed accounts or funds, fund advisors, predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, investment managers, and other professionals, each in their capacity as such. |
| **Exit Revolver** | As defined in the Term Sheet. |
| **Exit Term Loan Facility** | As defined in the Term Sheet. |
| **General Unsecured Claim** | Any Claim (other than an Administrative Claim, DIP Facility Claim, a Professional Fee Claim, a Secured Tax Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, a Credit Agreement Claim, a Notes Claim, an Intercompany Claim, or a Section 510(b) Claim) against one or more of the Debtors including (a) Claims arising from the rejection of Unexpired Leases and Executory Contracts to which a Debtor is a party, and (b) Claims arising from any litigation or other court, administrative or regulatory proceeding, including damages or judgments entered against, or settlement amounts owing by a Debtor related thereto. |
| **Governmental Unit** | As defined in section 101(27) of the Bankruptcy Code |
| **Holder** | An Entity holding a Claim or Interest in any Debtor. |
| **Impaired** | With respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| **Intercompany Claim** | A Claim held by a Debtor against another Debtor or an Affiliate of a Debtor or any Claim held by an Affiliate of a Debtor against a Debtor. |
| **Intercompany Interest** | An Interest in any Debtor, or a direct or indirect subsidiary of any Debtor, other than an Interest in Sungard AS. |

| Term | Definition |
|---|---|
| **Interest** | Any any equity security as such term is defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security. |
| **Makewhole Amount** | With respect to the 2022 Term Loans, the amount equal to the calculation of the Acceleration Makewhole Premium as defined in and as set forth in the Credit Agreement. |
| **Management Cash Plan** | That certain or those certain long-term cash-based incentive plan(s), if any, adopted by Reorganized Sungard AS or one of its subsidiaries pursuant to which awards will be granted to participants, the terms and conditions of which plans and awards shall be determined at the discretion of the New Board (including with respect to allocation, timing, amount, and structure of the plan(s) and awards) following the Plan Effective Date. |
| **Management Incentive Plan** | That certain management incentive plan, if any, of Reorganized Sungard AS, which management incentive plan (including any and all awards to be granted thereunder) shall be on the terms and conditions to be determined at the discretion of the New Board (including with respect to pool size, allocation, participation, timing, and structure of such awards) following the Plan Effective Date. |
| **New Board** | As defined in the Term Sheet. |
| **New Term Loan** | As defined in the Term Sheet. |
| **New Sungard AS Equity** | The equity Interests in Reorganized Sungard AS issued, distributed, or otherwise transferred pursuant to the Plan. |
| **Noteholders** | The Holders of Notes. |
| **Notes** | The 8.75% Senior Notes due 2022 issued by Sungard Capital pursuant to the Notes Indenture. |
| **Notes Claim** | Any Claim against a Debtor arising under, derived from, based on, or related to the Notes or the Notes Indenture and the guarantees in respect thereof under the Notes Indenture Ancillary Documents. |
| **Notes Indenture** | That certain Indenture, dated as of March 31, 2014, by and among Sungard Capital, as Issuer, the Guarantors named therein, and the Trustee, providing for the issuance of $425,040,000 of Notes, as amended, supplemented, or otherwise modified from time to time. |

| Term | Definition |
| --- | --- |
| **Other Priority Claim** | Any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **Other Secured Claim** | Any Secured Claim against the Debtors, including any Secured Tax Claim, other than a Credit Agreement Claim. |
| **Petition Date** | The date on which each of the Debtors filed its respective petition for relief commencing its Chapter 11 Cases. |
| **Plan** | As defined in the Term Sheet. |
| **Plan Supplement** | Any compilation of documents and forms of documents, schedules, and exhibits, in each case subject to the terms and provisions of the Restructuring Support Agreement (including the RSA Definitive Document Requirements), to be filed no later than the Plan Supplement Filing Date, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement, including the following documents: (a) the New Organizational Documents; (b) the New Operating Agreement; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) a list of retained Causes of Action; (e) to the extent known, the identity of the members of the New Board; (f) the Exit Revolver Documents; (g) the New Term Loan Documents; (h) the Exit Term Loan Documents; (i) an exhibit to the Plan Supplement describing the Restructuring Transactions; (j) the binding agreement, if any, effectuating any acquisition of substantially all of the assets of Sungard AS by a newly formed entity pursuant to a transaction described in the Plan Supplement; and (k) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan, in each case, subject to the RSA Definitive Document Requirements. |
| **Plan Effective Date** | As defined in the RSA. |
| **Priority Tax Claims** | Any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. |
| **Pro Rata** | The proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class. |
| **Professional** | An entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code. |
| **Professional Fee Claim** | All Administrative Claims for the compensation of Retained Professionals and the reimbursement of expenses incurred by such Retained Professionals through and including the Effective Date under sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. |
| **Proof of Claim** | A proof of Claim filed against any of the Debtors in the Chapter 11 Cases. |

| Term | Definition |
|---|---|
| **Reinstated** | With respect to a Claim, leaving such Claim Unimpaired under the Plan. |
| **Released Parties** | Collectively, each of the following, solely in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Estates; (d) the Sponsors; (e) the Consenting Creditors; (f) the Credit Agreement Lenders; (g) the Noteholders; (h) the DIP Facility Lenders; (i) Holders of Interests in Sungard AS; (j) each Agent/Trustee; (k) with respect to the foregoing clauses (a) through (j), each such Entity's current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, control persons, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, participants, managed accounts or funds, fund advisors, predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, investment managers, and other professionals, each in their capacity as such; *provided* that any Holder of a Claim or Interest that opts out of the releases contained in the Plan shall not be a "Released Party." |
| **Releasing Parties** | Collectively, each of the following, solely in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Estates; (d) the Sponsors; (e) the Consenting Creditors; (f) the DIP Facility Lenders; (g) each Agent/Trustee; (h) all Holders of Claims who vote to accept the Plan; (i) all Holders of Claims who are eligible to vote, but abstain from voting on the Plan <u>and</u> who do not opt out of the releases provided by the Plan; (j) all Holders of Claims who vote to reject the Plan <u>and</u> who do not opt out of the releases provided by the Plan; (k) with respect to the foregoing clauses (a) through (j), each such Entity's current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, control persons, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, participants, managed accounts or funds, fund advisors, predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, investment managers, and other professionals, each in their capacity as such; *provided* that any Holder of a Claim or Interest that validly opts out of, or validly objects to, the releases contained in the Plan shall not be a "Releasing Party." |
| **Reorganized Debtors** | The Debtors, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, amalgamation, consolidation, or otherwise, on or after the Effective Date, including any newly formed entity, defined as the "Acquisition Company" under the Plan, that acquires substantially all of the assets of Sungard Capital. |

| Term | Definition |
|---|---|
| **Reorganized Sungard AS** | Sungard AS, as reorganized pursuant to the Plan, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Plan Effective Date, which shall be the ultimate parent of a newly formed entity that acquires substantially all of the assets of Sungard AS, which newly formed entity will be defined as the "Acquisition Company" under the Plan, or any other new corporation or limited liability company that may be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Sungard AS Equity to be distributed pursuant to the Plan. |
| **Required Consenting Creditors** | As defined in the RSA. |
| **Restructuring** | As defined in the Introduction. |
| **Restructuring Transactions** | As defined in the Term Sheet. |
| **RSA** | As defined in the Term Sheet. |
| **SEC** | The Securities and Exchange Commission. |
| **Secured** | When referring to a Claim:  (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim. |
| **Secured Tax Claim** | Any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties. |
| **Securities Act** | The Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law. |
| **Sponsors** | Collectively, (a) the entities that executed the Restructuring Support Agreement in their capacity as Sponsors as defined therein and (b) the GS Entities (as defined in the Plan). |
| **Sungard Capital** | Sungard Availability Services Capital, Inc., a Delaware corporation. |
| **Term Sheet** | As defined in the Introduction. |
| **Unimpaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired. |

## EXHIBIT C

**DIP Term Sheet**

**SUNGARD AVAILABILITY SERVICES CAPITAL, INC.**
**$100.0 MILLION SUPERPRIORITY SENIOR SECURED DEBTOR IN POSSESSION CREDIT FACILITY**
**TERM SHEET**

*The terms set forth in this Summary of Principal Terms and Conditions (the "Term Sheet") are being provided on a confidential basis as part of a comprehensive proposal, each element of which is consideration for the other elements and an integral aspect of the proposed DIP Facility (as defined below).*

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

| | |
|---|---|
| *Borrower:* | Sungard Availability Services Capital, Inc., a Delaware corporation (the "Borrower" or the "Company"), as a debtor and a debtor in possession under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in a case (the "Borrower's Case") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to be filed on no later than May 1, 2019 (such filing date, the "Petition Date") and to be jointly-administered with the Debtor Guarantors' Cases (as defined below). |
| *Guarantors:* | Each of the Borrower's direct and indirect subsidiaries, which are debtors and debtors in possession in jointly administered cases (collectively, the "Debtor Guarantors' Cases" and, together with the Borrower's Case, the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code to be filed contemporaneously and jointly administered with the Borrower's Case (collectively, the "Guarantors"). The Borrower and the Guarantors are referred to herein as "Loan Parties" and each, a "Loan Party", or as "Debtors" and each, a "Debtor". All obligations of the Borrower under the DIP Facility will be unconditionally guaranteed on a joint and several basis by the Guarantors. |
| *Backstop Commitment:* | Funds and/or accounts affiliated with, or managed and/or advised by, the entities set forth on Schedule A (together with their respective successors and permitted assignees, each a "Backstop Party" and collectively, the "Backstop Parties") will, severally and not jointly, backstop (i) the Prepetition Term Loan Allocation (as defined below) in the amounts set forth in the table below (the "Tranche A Backstop Commitments") and (ii) the Prepetition Notes Allocation (as defined below) in the amounts set forth in the table on Schedule A (the "Tranche B Backstop Commitments" and, together with the Tranche A Backstop Commitments, the "Backstop Commitments"). |
| | For the avoidance of doubt, assignments of the DIP Loans are permitted, including without limitation assignments to or from the Backstop Parties. |
| *Administrative Agent:* | A financial institution acceptable to the Backstop Parties (in such capacity, the "DIP Agent"). |

*DIP Lenders:*    (A) All lenders (the "Prepetition Lenders") holding outstanding term loans and/or revolving loans under the Credit Agreement, dated as of March 31, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement") which are party to the Restructuring Support Agreement on or prior to the Petition Date shall be offered the right to participate in an amount up to 87% of the DIP Facility (the "Prepetition Term Loan Allocation") under a separate tranche of the DIP Facility ("Tranche A DIP Facility") on a ratable basis based on the outstanding loans under the Prepetition Credit Agreement held by such Prepetition Lender pursuant to procedures satisfactory to the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement (including the execution of a joinder to the Restructuring Support Agreement by a certain date); provided, however, that for the purposes of determining the allocation of the Prepetition Term Loan Allocation, the amount of the term loans held by each Prepetition Lender shall be deemed to include any amounts due in respect of the Acceleration Makewhole Premium (as defined in the Prepetition Credit Agreement), as applicable, and (B) all holders (the "Prepetition Noteholders") of 8.75% Senior Notes due 2022 (the "Prepetition Senior Notes") issued by the Company, which are party to the Restructuring Support Agreement on or prior to the Petition Date, shall be offered the right to participate in an amount up to 13% of the DIP Facility (the "Prepetition Notes Allocation") under a separate tranche of the DIP Facility (the "Tranche B DIP Facility") on a ratable basis based on the Prepetition Senior Notes held by such Prepetition Noteholder pursuant to procedures satisfactory to the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement (including the execution of a joinder to the Restructuring Support Agreement by a certain date).   Any amounts of the Prepetition Term Loan Allocation not so allocated shall be allocated to the Backstop Parties holding Tranche A Backstop Commitments on a ratable basis based on their respective Tranche A Backstop Commitments and any amounts of the Prepetition Notes Allocation not so allocated shall be allocated to the Backstop Parties holding Tranche B Backstop Commitments on a ratable basis based on their respective Tranche B Backstop Commitments (the "DIP Lenders").

For the avoidance of doubt, the terms and conditions of the loans and commitments under the Tranche A DIP Facility and Tranche B DIP Facility shall be identical, except in the case of determining the "Requisite Lenders" as set forth below.

*DIP Facility:*    A superpriority senior secured debtor in possession term loan facility in an aggregate principal amount of $100.0 million (the "DIP Facility") of which (i) a principal amount of $50.0 million will be available to be drawn in a single drawing on or after the Closing Date (as defined below) upon satisfaction of the conditions set forth in the DIP Loan Documents (as defined below) and the entry of the Interim Order (as defined below) (the loans advanced on such date, the "Initial DIP Loans") and (ii) a principal amount of up to $50.0 million (the "Delayed Draw DIP Facility" and the loans advanced under the Delayed Draw DIP Facility, the "Delayed Draw DIP Loans" and, together with the Initial DIP Loans, the "DIP Loans") will

be available to be drawn in one or more borrowing of at least $10,000,000 per draw after the Closing Date upon satisfaction of the conditions set forth in the DIP Loan Documents, the conditions set forth under "Conditions Precedent to Each DIP Loan" set forth below and the entry of the Final Order (as defined below).   The DIP Loans shall be drawn pro rata between the Tranche A DIP Facility and the Tranche B DIP Facility.   The borrowing of the DIP Loans shall permanently decrease the commitments under the DIP Facility, and once borrowed and repaid, the DIP Loans may not be reborrowed.

*Use of Proceeds:*

In accordance with and subject to the DIP Budget (as defined below) and the DIP Orders (as defined below), the proceeds of the DIP Facility may be used only for the following purposes:   (A) to pay reasonable and documented transaction costs, fees and expenses that are incurred in connection with the restructuring or Chapter 11 Cases, for working capital and general corporate purposes of the Loan Parties, (B) to make adequate protection payments as set forth in the section below entitled "Adequate Protection" and (C) up to $20 million of proceeds shall be applied to fund a segregated domestic account (the "Specified Account") which funds shall be available to the Debtors for disbursement to certain non-Debtor subsidiaries of the Borrower through secured intercompany borrowings evidenced by promissory notes (the "Specified Intercompany Notes") on an as-needed basis in accordance with the DIP Budget.

Notwithstanding the foregoing, no portion or proceeds of the DIP Loans, the Carve-Out (as defined below) or the DIP Collateral (as defined below) or the Prepetition Collateral (as defined below) may be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the agent under the Prepetition Credit Agreement (the "Prepetition Agent") or the other Secured Parties (as defined in the Prepetition Credit Agreement) (the "Prepetition Secured Parties"), or Prepetition Noteholders or the trustee (the "Prepetition Trustee") under the indenture governing the Prepetition Senior Notes, the DIP Agent or the DIP Lenders, other than up to $50,000 in connection with the investigation by an official creditors' committee, within sixty (60) calendar days following the selection of counsel to such committee,   of claims, causes of action, adversary proceedings or other litigation against (i) the Prepetition Agent or the other Prepetition Secured Parties solely concerning the validity, enforceability, perfection, priority or extent of the liens securing such parties' term loans under the Prepetition Credit Agreement (the "Prepetition Liens"), or (ii) Prepetition Noteholders or Prepetition Trustee.   The use of proceeds of the DIP Facility shall in all cases be in accordance with the DIP Budget (including any permitted variances).

*Term:*

Unless converted to the Exit Facility (as defined below), all obligations under the DIP Loan Documents will be due and payable in full in cash on the earliest of: (i) the date that is six months after the Closing Date; (ii) if the Final DIP Order has not been entered by the Bankruptcy Court on or before the applicable Milestone (as defined below), the date of the applicable Milestone; (iii) the date of acceleration of the DIP Loans and the

termination of the DIP Lenders' commitments under the DIP Facility pursuant to the terms of the DIP Loan Agreement; (iv) the date the Bankruptcy Court orders a conversion of the Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the chapter 11 case of any Debtor; or (v) the substantial consummation (as defined in 11 U.S.C. § 1101(2)) of a plan of reorganization of the Debtors (a "Plan"), which has been confirmed by an order entered by the Bankruptcy Court (the "Confirmation Order") (such earliest date, the "Maturity Date").

|  |  |
|---|---|
| *Conversion to Exit Term Loan Facility*: | So long as the Restructuring Support Agreement is in full force and effect, upon the substantial consummation of a Plan, the outstanding principal balance of, and any unpaid and accrued interest on, the DIP Loans and any unused commitments related to the Delayed Draw DIP Facility shall automatically convert into term loans and commitments, as applicable, under an exit term loan facility ("Exit Facility") which shall be subject to, (i) definitive documentation on the terms set forth on the Exit Term Sheet (as defined in the Restructuring Support Agreement) and such other terms to be agreed by the Borrower and the DIP Lenders consistent with the consent rights set forth in the Restructuring Support Agreement, (ii) the Plan being in form and substance consistent in all material respects to the terms set forth in the Restructuring Support Agreement and (iii) the consummation of such Plan. |
| *Amortization*: | None. |
| *DIP Loan Documents*: | The DIP Facility will be initially provided pursuant to the terms of this Term Sheet and may be documented by a Superpriority Senior Secured Debtor in Possession Credit Agreement (the "DIP Loan Agreement") and other guarantee, security and other relevant documentation (together with the DIP Loan Agreement, collectively, the "DIP Loan Documents") reflecting the terms and provisions set forth in this Term Sheet and otherwise in form and substance satisfactory to the DIP Agent and the Backstop Parties consistent with the consent rights under the Restructuring Support Agreement. |
| *Security and Priority:* | All obligations of the Borrower and the Guarantors to the DIP Lenders and to the DIP Agent, including, without limitation, all principal, accrued interest, costs, and fees (collectively, the "DIP Obligations"), shall be:

secured, pursuant to Bankruptcy Code sections 361, 362, 364(c)(2), 364(c)(3) and 364(d), by a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically and properly perfected first priority senior priming lien on, and security interest in (such liens and security interests, the "DIP Liens"), all present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Loan Parties, wherever located, including, without limitation, all accounts, deposit accounts, cash and cash equivalents, inventory, equipment, capital stock in subsidiaries of the Loan Parties, and the proceeds thereof, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, the Specified Account, the Specified Intercompany Notes and all products and proceeds thereof, and subject |

4

to and effective upon entry of the Final Order, the proceeds of any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law, in each case, subject to customary exceptions to be agreed by the Borrower and the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement (all such property, the "DIP Collateral"), which liens and security interests shall be senior to any and all other liens and security interests, including the adequate protection liens granted under the Orders, and the liens granted to the Prepetition Secured Parties, other than the Carve-Out,.  The DIP Liens shall be perfected pursuant to the entry of the DIP Orders, and additional collateral documentation shall not be required.

The DIP Obligations shall also constitute claims entitled to the benefits of Bankruptcy Code section 364(c)(1), having a super-priority over any and all administrative expenses and claims, of any kind or nature whatsoever, including, without limitation, the superpriority claims granted to the DIP Agent and DIP Lenders under the Interim Order and the Final Order, and the administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506 (subject to the entry of the Final Order), 507(a), 507(b), 546, 552 (subject to the entry of the Final Order), 726, 1113 and 1114, and any other provision of the Bankruptcy Code ("DIP Claims"), subject only to the Carve-Out.

| | |
|---|---|
| *Carve-Out:* | The liens and claims of the DIP Lenders shall be subject to a carve-out satisfactory to the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement (the "Carve-Out").   The Carve-Out means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid reasonable fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and any official creditors' committee (the "Creditors' Committee") pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (such amounts in this provision (iii), the "Pre-Trigger Notice Professional Fees"); and (iv) after the date of delivery of the Carve Out Trigger Notice (the "Trigger Date"), Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, |

to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").   Any transaction or success fee shall not be included in the Carve Out, unless otherwise earned by such Professional Person prior to the Trigger Date or earned pursuant to the applicable Professional Person's engagement letter notwithstanding the Trigger Date.   For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Facility and acceleration of the DIP Obligations (including events of default resulting from defaults under the Interim Order or Final Order, as applicable), stating that the Post-Carve Out Trigger Notice Cap has been invoked.

Carve Out Reserves.   On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the unused commitments under the DIP Facility (on a pro rata basis based on the then outstanding unused commitments under the DIP Facility), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.   The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.   On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for DIP Loans under the unused commitments under the DIP Facility (on a pro rata basis based on the then outstanding unused commitments under the DIP Facility), in an amount equal to the Post Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post Carve Out Trigger Notice Cap.   The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.   On the first business day after the DIP Agent gives such notice to such DIP Lenders, notwithstanding anything in the DIP Loan Documents to the contrary, including with respect to the existence of a Default (as defined in the DIP Loan Documents) or Event of Default (as defined hereunder or the DIP Loan Documents), the failure of the Debtors to satisfy any or all of the conditions

precedent for DIP Loans under the DIP Facility, any termination of the commitments under the DIP Facility following an Event of Default, or the occurrence of the Maturity Date, each DIP Lender with an outstanding unused commitment under the DIP Facility (on a pro rata basis based on the then outstanding commitments under the DIP Facility) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility.   All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Agent for the benefit of the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been terminated, in which case any such excess shall be paid to the Prepetition Agent for the benefit of the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.   Notwithstanding anything to the contrary in the DIP Loan Documents, or the DIP Orders, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph, prior to making any payments to the DIP Agent or the Prepetition Agent or other Prepetition Secured Parties, as applicable.   Notwithstanding anything to the contrary in the DIP Loan Documents or DIP Orders, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Loan Documents.   Further, notwithstanding anything to the contrary in the DIP Orders, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial DIP Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.   For the avoidance of doubt and notwithstanding anything

to the contrary in DIP Orders, the DIP Facility, or in the Prepetition Credit Agreement, the Carve Out shall be senior to all liens and claims securing the DIP Facility, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the obligations under the Prepetition Credit Agreement.

<u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

<u>No Direct Obligation To Pay Allowed Professional Fees</u>. None of the DIP Agent, DIP Lenders, or the Prepetition Agent or Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in the DIP Orders or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Agent or Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

<u>Payment of Carve-Out On or After the Termination Declaration Date</u>. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis. Any funding of the Carve-Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under the DIP Orders, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

| | |
|---|---|
| *Interim and Final Orders:* | The order approving the DIP Facility on an interim basis and authorizing the use of prepetition cash collateral, which shall be satisfactory in form and substance to the DIP Agent and the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement (the "<u>Interim Order</u>"), shall authorize and approve (i) the Debtors' entry into the DIP Loan Documents, (ii) the making of the DIP Loans, (iii) the granting of the super-priority claims and liens against the Loan Parties and their assets in accordance with the DIP Loan Documents with respect to the DIP Collateral, (iv) the payment of all fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Agent and the DIP Lenders as described in "Indemnification and Expenses" by the Loan Parties, (v) the payment of all fees and expenses of Akin Gump Strauss Hauer & Feld LLP and PJT Partners LP, as counsel and financial advisor to the Crossover Group (as defined in the Restructuring Support Agreement), respectively, Jones Day and Houlihan Lokey, as counsel and financial advisors to the Secured Lender Group (as defined in the Restructuring Term Sheet) and the Prepetition Agent and Cravath, Swaine & Moore LLP, as counsel to the Prepetition Agent, and (vi) the use of prepetition cash collateral. The order approving the DIP |

8

Facility on a final basis and authorizing the use of prepetition cash collateral shall be in form and substance satisfactory to the DIP Agent and the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement (the "<u>Final Order</u>" and, together with the Interim Order, the "<u>DIP Orders</u>").

| | |
|---|---|
| *Interest:* | Interest on the DIP Loans shall be payable in cash (a) for loans accruing at a rate based on LIBOR, at the end of each Interest Period and for Interest Periods of greater than three months, every three months and (b) for loans accruing at Base Rate, quarterly in arrears.   At all times prior to the occurrence of an Event of Default (as defined below), interest on the outstanding principal amount of all DIP Loans shall accrue at a rate per annum equal to LIBOR plus 7.50% per annum or Base Rate plus 6.50%, at the option of the Borrower. |

As used herein, the term "LIBOR" will have the meaning substantially similar to the definition of "Eurocurrency Rate" under the Prepetition Credit Agreement, the term "Base Rate" will have the meaning substantially similar to such definition in the Prepetition Credit Agreement and the term "Interest Period" will have the meaning substantially similar to such definition in the Prepetition Credit Agreement.

Interest shall be payable in cash and shall be calculated on the basis of the actual number of days elapsed in a 360 day year.

| | |
|---|---|
| *Default Interest:* | During the continuance of an Event of Default, the DIP Loans will bear interest at an additional 2.00% *per annum* and any overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% *per annum*.   Default interest shall be payable in cash on demand. |
| *Undrawn Commitment Payment*: | The Borrower shall pay to the DIP Lenders a commitment payment calculated at a rate per annum equal to 2.50% on the average daily unused portion of the Delayed Draw DIP Facility, payable quarterly in arrears. |
| *Put Option Premium:* | A put option premium in an amount equal to 3.00% of the principal amount of the Backstop Commitments shall be paid to the Backstop Parties ratably based on their respective Backstop Commitments on the Closing Date. The put option premium shall be payable in full in cash on the Closing Date, and shall be fully earned and non-refundable. |
| *Original Issue Discount:* | The DIP Loans shall be made in the form of original issue discount ("<u>OID</u>") of 3.00% of the aggregate amount of such DIP Loans. |
| *Mandatory Prepayments:* | Mandatory prepayments of the DIP Loans shall be required with 100% of net cash proceeds from (A) the sale or other disposition of assets, subject to exceptions to be agreed (which shall not be subject to a reinvestment right); (B) casualty events, subject to exceptions to be agreed; (C) any sale or issuance of debt (other than permitted debt to be agreed) and (D) any sale or issuance of equity securities (other than certain customary permitted |

equity issuances to be agreed).

| | |
|---|---|
| *Optional Prepayments:* | The Debtors may prepay in full or in part the DIP Loans, without premium or penalty, subject to customary notice periods and payment of breakage costs. |

*Conditions Precedent to the Closing:*    The closing date (the "<u>Closing Date</u>") under the DIP Facility shall be subject to the following conditions, which are reasonably satisfactory to the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement.

A. All documentation relating to the DIP Facility shall be in form and substance consistent with this Term Sheet and the Restructuring Support Agreement and reasonably satisfactory to the Backstop Parties and their counsel.

B. The DIP Agent and DIP Lenders shall have received evidence that the Bankruptcy Court shall have entered the Interim Order, which Interim Order shall not have been vacated, reversed, modified, amended or stayed.

C. The Chapter 11 Cases shall have been commenced by the Borrower and the Guarantors and the same shall each be a debtor and a debtor in possession.  All first-day motions and related orders (including, without limitation, any motions related to the DIP Facility, cash management and any critical vendor or supplier motions) entered by the Bankruptcy Court in the Chapter 11 Cases shall, in each case, be in form and substance satisfactory to the DIP Agent and the Backstop Parties and their counsel consistent with the consent rights set forth in the Restructuring Support Agreement.

D. (i) All reasonable and documented out-of-pocket fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Agent and the DIP Lenders on or before the Closing Date and (ii) all reasonable and documented out-of-pocket fees and expenses of Akin Gump Strauss Hauer & Feld LLP and PJT Partners LP, as counsel and financial advisor to the Crossover Group, respectively and Jones Day and Houlihan Lokey, as counsel and financial advisors to the Secured Lender Group, in each case, shall have been paid.

E. The Backstop Parties shall be satisfied that there shall not occur as a result of, and after giving effect to, the initial extension of credit under the DIP Facility, a default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Loan Parties' or their respective subsidiaries' material debt instruments and other material agreements which would permit the counterparty thereto to exercise remedies thereunder (other than any default which the exercise of remedies is stayed by

the Bankruptcy Code).

F.  The DIP Agent shall have received (i) reasonably satisfactory opinions of counsel to the Loan Parties, addressing such customary matters as the Backstop Parties shall request, including, without limitation, the enforceability of all DIP Loan Documents and other customary matters and (ii) officer's certificates, in form and substance, reasonably satisfactory to the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement.

G.  The absence of a material adverse change, or any event or occurrence, other than the commencement of the Chapter 11 Cases and defaults under certain contracts to be identified in writing by the Borrower as disclosed and reasonably satisfactory to the Backstop Parties (consistent with the consent rights set forth in the Restructuring Support Agreement), which could reasonably be expected to result in a material adverse change, in (i) the business, condition (financial or otherwise), operations, performance, properties, contingent liabilities, material agreements or prospects of the Borrower, the Guarantors and their respective subsidiaries, taken as a whole, since December 31, 2018, (ii) the ability of the Borrower or the Guarantors to perform their respective obligations under the DIP Loan Documents or (iii) the ability of the DIP Agent and the DIP Lenders to enforce the DIP Loan Documents (any of the foregoing being a "Material Adverse Change").

H.  There shall exist no action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Chapter 11 Cases and any action, suit, investigation or proceeding arising from the commencement and continuation of the Chapter 11 Cases or the consequences that would normally result from the commencement and continuation of the Chapter 11 Cases) that is not stayed or could reasonably be expected to result in a Material Adverse Change (any such action, suit, investigation, litigation or proceeding, a "Material Litigation").

I.  All necessary governmental and third party consents and approvals necessary in connection with the DIP Facility and the transactions contemplated thereby shall have been obtained (without the imposition of any materially adverse conditions that are not acceptable to the Backstop Parties (consistent with the consent rights set forth in the Restructuring Support Agreement)) and shall remain in effect; and the making of the loans under the DIP Facility shall not violate any material applicable requirement of law and shall not be enjoined temporarily, preliminarily or permanently.

J.  The DIP Agent and each DIP Lender who has requested the same shall have received "know your customer" and similar customary

information.

K.   The DIP Agent and DIP Lenders shall have a valid and perfected lien on and security interest in the DIP Collateral with the priority set forth in this Term Sheet; the Loan Parties shall have delivered uniform commercial code financing statements and shall have executed and delivered any other security agreements, in each case, in suitable form for filing, if applicable; and provisions reasonably satisfactory to the Backstop Parties (consistent with the consent rights set forth in the Restructuring Support Agreement) for the payment of all fees and taxes for such filings shall have been duly made.

L.   The Consenting Noteholders and the Consenting Term Lenders (each as defined in the Restructuring Support Agreement) shall have entered into a Restructuring Support Agreement (the "Restructuring Support Agreement"), in form and substance satisfactory to the Backstop Parties.   The Restructuring Support Agreement shall be in full force and effect as of the Closing Date and shall not have been amended or modified without the prior written consent of the Backstop Parties as set forth in the Restructuring Support Agreement.

M.   The DIP Agent shall have received endorsements naming the DIP Agent, on behalf of the DIP Lenders, as an additional insured and loss payee, as applicable, under all insurance policies to be maintained with respect to the DIP Collateral.

N.   The DIP Agent and the DIP Lenders shall have received a 13-week cash forecast in form and substance reasonably satisfactory to the Backstop Parties (consistent with the consent rights set forth in the Restructuring Support Agreement), which reflects on a line-item basis, the Debtors' (i) weekly projected cash receipts, (ii) weekly projected disbursements (including ordinary course operating expenses, capital expenditures and bankruptcy related expenses) under the Chapter 11 Cases, (iii) the weekly outstanding principal balance of the DIP Loans and (iv) the weekly projected liquidity of the Debtors (the "Initial DIP Budget").

*Conditions Precedent to Each DIP Loan:*

On each date of a borrowing (i) there shall exist no default under the DIP Loan Documents, (ii) the representations and warranties of the Borrower and each Guarantor therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding, (iii) the Borrower shall deliver a notice of borrowing, (iv) the making of such DIP Loan shall not violate any material applicable requirement of law and shall not be enjoined, temporarily, preliminarily or permanently, (v) the Bankruptcy Court shall have entered a Final Order by the applicable Milestone, (vi) the Interim Order or Final Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect

12

without the consent of the Requisite Lenders, (vii) the funding of the DIP Loan complies with the DIP Budget, and (viii) with respect to any borrowing under the Delayed Draw DIP Facility, the aggregate amount of consolidated unrestricted cash and cash equivalents (net of outstanding checks) of the Borrower and its subsidiaries shall not exceed $70 million immediately prior to, and after giving effect to, such borrowing.

*Representations and Warranties:*  The DIP Loan Documents will contain representations and warranties customarily found in loan agreements for similar debtor in possession financings and other representations and warranties agreed upon by the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement (which will be applicable to the Borrower, the Guarantors and their respective subsidiaries and subject to certain exceptions and qualifications to be agreed).

*Financial Covenants*  The DIP Loan Documents will contain the following financial covenants (collectively, the "Financial Covenants"):

*Budget Variance Covenant.*   As of the end of every two week period commencing on April 29, 2019 (i) the sum of the Debtors' actual cash receipts during the applicable Test Period (as defined below) shall not be less than 85% of the projected "cash receipts" for such Test Period as set forth in the DIP Budget and (ii) the sum of the Debtors' actual operating cash disbursements during such Test Period shall not exceed 115% of the projected "operating cash disbursements" (which shall in each case include capital expenditures) for such Test Period as set forth in the DIP Budget.

"Test Period" shall mean, with respect to actual cash receipts and operating cash disbursements, (x) initially, the two-week period commencing on April 29, 2019 and ending on May 10, 2019 and (y) thereafter, each rolling four-week period.[1]

*Minimum Liquidity Covenant.*   (i) Consolidated unrestricted cash and cash equivalents of the Borrower and its subsidiaries plus (ii) unused commitments under the Delayed Draw DIP Facility, shall not be less than $50 million at any time.

*Reporting Covenants, Affirmative Covenants and Negative Covenants:*  The DIP Loan Documents will contain reporting requirements, affirmative covenants and negative covenants customarily found in loan documents for similar debtor in possession financings and other reporting requirements, affirmative covenants and negative covenants agreed upon by the Borrower and the Backstop Parties consistent with consent rights set forth in the Restructuring Support Agreement, including, without limitation, (i) the rolling delivery of an updated 13-week cash forecast in form and substance satisfactory to the Requisite Lenders in their sole discretion (together with the Initial DIP Budget, the "DIP Budget"), which shall specifically identify (x) capital expenditures as a line item; (y) any material amounts included in the updated DIP Budget that were not actually disbursed during a particular week and are carried forward into the updated DIP Budget and (z) any

---

[1] Initial Test Period dates to be updated if Closing Date occurs on or after May 8, 2019.

material amounts that were projected to be collected in the existing DIP Budget but were actually collected prior to the projected period, on or prior to 5:00 p.m. (Eastern Time) on the Wednesday after the end of the last week of each two-week period following the Petition Date (and to the extent any updated DIP Budget is not approved by the Requisite Lenders, the DIP Budget that is then effect shall continue to constitute the DIP Budget for purposes of the DIP Facility); (ii) the delivery of a report on or prior to 5:00 p.m. (Eastern Time) on the Wednesday following the end of each week, which shall include (x) actual cash receipts and operating cash disbursements on an aggregate basis for such immediately preceding week on a cumulative basis for the four-week period through and including the Friday immediately preceding the delivery date of such report, (y) the variance in dollar amounts of such actual receipt and operating cash disbursements for the immediately preceding week and the applicable Test Period and (z) the liquidity of the Debtors as of the Friday immediately preceding the delivery date of such report; (iii) use commercially reasonable efforts to obtain ratings (but not a specific rating); (iv) milestones set forth on Annex I (the "Milestones"); (v) the Debtors shall provide the DIP Lenders' counsel with advance notice and copies of any material motions or other material documents to be filed in the Chapter 11 Cases; (vi) not to permit the existence of any claims, other than those arising under the DIP Facility and the replacement liens and super-priority claims as described in "Adequate Protection" below, entitled to a super-priority under section 364(c)(1) of the Bankruptcy Code and (vii) a prohibition against the Loan Parties refinancing the DIP Loans absent the written consent of the Backstop Lenders consistent with the consent rights as set forth in the Restructuring Support Agreement.

|  |  |
|---|---|
| *Events of Default:* | The DIP Loan Documents will contain events of default customarily found in loan agreements for similar debtor in possession financings and other events of default agreed upon by the Borrower and the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement, including, without limitation, any termination of the use of prepetition cash collateral pursuant to the DIP Orders, as applicable, dismissal or conversion of the Chapter 11 Cases, adverse motions or Bankruptcy Court orders, termination of the Interim Order or the Final Order, as applicable (except in the case of the Interim Order, as a result of the entry of the Final Order), allowance of any claims under Section 506(c) of the Bankruptcy Code, filing of an unacceptable Plan or disclosure statement, termination of the Restructuring Support Agreement in accordance with its terms, and an unapproved sale of the Debtors' assets.

Prior to the execution of the DIP Loan Documents, the events of default under the DIP Facility shall be consistent with the events of default under Section 8.01 of the Prepetition Credit Agreement (other than Sections 8.01(f) or (g) of the Prepetition Credit Agreement with respect to the Debtors) and the events of default set forth in Annex II (collectively, the "Events of Default"). |
| *Remedies*: | The DIP Agent (acting at the direction of the Requisite Lenders) and the DIP Lenders shall have customary remedies, including, without |

limitation, the right to realize on all DIP Collateral, including cash collateral.

The automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated on the Maturity Date, without further notice or order of the Bankruptcy Court, unless the DIP Agent (at the direction of the Requisite Lenders) elects otherwise in a written notice to the Debtors, and the DIP Agent (at the direction of the Requisite Lenders) shall be permitted to exercise all rights and remedies, including with respect to the DIP Collateral, set forth in the Interim Order or the Final Order, as applicable, and the DIP Loan Documents, and as otherwise available at law without further order or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under Bankruptcy Code sections 362 or 105 or otherwise.

In the event any party requests a hearing seeking to prevent the DIP Agent or the DIP Lenders from exercising any of their rights and remedies that arise after an event of default, the sole issue before the Bankruptcy Court at such hearing shall be whether an event of default has occurred and has not been cured or waived. No other issue or argument shall be relevant to any opposition to enforcement of the DIP Agent's and the DIP Lenders' rights.

| | |
|---|---|
| *Adequate Protection:* | As adequate protection for the use of the collateral securing the obligations under the Prepetition Credit Agreement (the "Prepetition Collateral") (i) the Prepetition Secured Parties shall, during the pendency of the Chapter 11 Cases, receive on account of any diminution of value in their interest in the Prepetition Collateral payments in cash on a current basis of all reasonable and documented fees, costs and expenses of (x) the Prepetition Agent and Cravath, Swaine & Moore LLP, as counsel to the Prepetition Agent, (y) Akin Gump Strauss Hauer & Feld LLP and PJT Partners LP, counsel and financial advisor to the Crossover Group, respectively and (z) Jones Day and Houlihan Lokey, counsel and financial advisors to the Secured Lender Group, respectively and (ii) the Prepetition Secured Parties shall, during the pendency of the Chapter 11 Cases, be granted additional and replacement liens on, except as set forth herein, all property of the Debtors' estates which would have constituted collateral securing the obligations under the Prepetition Credit Agreement (the "Existing Adequate Protection Liens") and a super-priority claim pursuant to section 507(b) of the Bankruptcy Code, in each case, of the same relative priority to the post-petition diminution in value of the Prepetition Collateral, subject, in each case, to the Carve-Out (the "Existing Adequate Protection Claims"). Notwithstanding the foregoing, the Prepetition Secured Parties shall be entitled to seek additional forms of adequate protection for any reason, including due to any extension of the Milestones or any failure to satisfy any of them. |
| *Right to Credit Bid:* | Subject to entry of the Final Order, the DIP Lenders and Prepetition Lenders shall have the right to credit bid (either directly or through one or more acquisition vehicles) as part of any asset sale process or plan sponsorship process and shall have the right to credit bid (either directly or through one or more acquisition vehicles) the full amount of their claims during any sale of Debtors' assets (in whole or in part), including without |

limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code; provided, that such relief will be binding on the Debtors' chapter 11 estates and all parties in interest upon entry of the Final Order.

|   |   |
|---|---|
| *Stipulations:* | The DIP Orders shall contain stipulations as to, among other things, the amount and priority of the secured indebtedness under the Prepetition Credit Agreement. |
| *Waivers:* | Debtors will seek entry of a Final Order that provides (i) a waiver of the "equities of the case" exception to section 552(b) of the Bankruptcy Code, (ii) a waiver of the ability to surcharge the DIP Collateral and Prepetition Collateral, including under section 506(c) of the Bankruptcy Code, and (iii) a waiver of the equitable doctrine of "marshaling" with respect to the DIP Collateral and Prepetition Collateral (a "Marshaling Waiver"), in each case, with respect to collateral securing the term loans under the Prepetition Credit Agreement, the Prepetition Lenders and the Prepetition Agent. |
| *Proof of Claim* | The Prepetition Agent and the Prepetition Lenders will not be required to file a proof of claim in connection with the Chapter 11 Cases. |
| *Indemnification and Expenses:* | The Loan Parties will indemnify the DIP Agent, the DIP Lenders, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "Indemnified Person") and hold them harmless from and against all costs, expenses (including reasonable and documented fees, disbursements and other charges of outside counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of its affiliates) that relates to the DIP Facility or the transactions contemplated thereby; provided that, no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted solely from its gross negligence or willful misconduct.  In addition, (a) all reasonable and documented out-of-pocket expenses (including, without limitation, reasonable and documented fees, disbursements and other charges of outside counsel and financial advisors) of the DIP Agent and DIP Lenders in connection with the DIP Facility and the transactions contemplated thereby shall be paid by the Loan Parties from time to time, whether or not the Closing Date occurs, and (b) all reasonable and documented out-of-pocket expenses (including, without limitation, documented fees, disbursements and other charges of outside counsel and financial advisors) of the DIP Agent and the DIP Lenders, for enforcement costs and documentary taxes associated with the DIP Facility and the transactions contemplated thereby will be paid by the Loan Parties. All fees and expenses described above shall be payable by the Loan Parties, on a joint and several basis, whether accrued or incurred prior to, on, or after the Petition Date. |

16

| | |
|---|---|
| *Assignments and Participations:* | Assignments under the DIP Facility are subject to the consent of the DIP Agent (which consent shall not be unreasonably withheld or delayed).   No participation shall include voting rights, other than for matters requiring consent of 100% of the DIP Lenders. |
| *Requisite Lenders under the DIP Facility:* | "Requisite Lenders" shall mean DIP Lenders holding at least 50.1% of the outstanding unused commitments and term loans under the Tranche A DIP Facility; provided that to the extent that at least one member of the Crossover Group (as defined in the Restructuring Support Agreement) and one member of the Secured Lender Group (as defined in the Restructuring Support Agreement) holds at least 6% of the outstanding unused commitments and term loans under the Tranche A DIP Facility, the Requisite Lenders must include at least one member of the Crossover Group (as defined in the Restructuring Support Agreement) and one member of the Secured Lender Group, in each case, who holds at least 6% of the outstanding unused commitments and term loans under the Tranche A DIP Facility. |
| *Amendments:* | Any amendment to the DIP Facility shall be required to be approved by Requisite Lenders, except for provisions customarily requiring approval by affected DIP Lenders. |
| *Miscellaneous:* | The DIP Loan Documents will include (i) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes (subject to customary qualifications)), (ii) waivers of consequential damages and jury trial, and (iii) customary agency, set-off and sharing language agreed upon by the Borrower and the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement. |
| *Governing Law and Submission to Non-Exclusive Jurisdiction:* | State of New York (and to the extent applicable, the Bankruptcy Code). |
| *Counsel to DIP Lenders:* | Akin Gump Strauss Hauer & Feld LLP and Jones Day. |

ANNEX I
CASE MILESTONES

Milestone / Date

1. Entry of Interim Order that is acceptable to the Requisite Lenders: May 8, 2019

2. Entry of Final Order that is acceptable to the Requisite Lenders May 31, 2019

3. Filing of a plan of reorganization that is acceptable to the Requisite Lenders (an "Acceptable Plan") and disclosure statement with respect to the Acceptable Plan (the "Disclosure Statement") with the Bankruptcy Court: May 2, 2019

4. Entry by Bankruptcy Court of an order approving the Disclosure Statement that is acceptable to the Requisite Lenders: May 31, 2019

5. Consummation of the Acceptable Plan: July 31, 2019

ANNEX II
EVENTS OF DEFAULT

(a)      If any Debtor makes any payment on account of any indebtedness existing as of the Petition Date, except for any payments expressly authorized by the DIP Orders and DIP Loan Agreement or any payments set forth in the DIP Budget;

(b)      If the DIP Orders are not entered by the Milestones (or such other period as Term Agent and Requisite Lenders may agree to in writing); or any DIP Order is stayed, revised, revoked, remanded, rescinded, amended, reversed, vacated, or modified in any manner not acceptable to the Requisite Lenders;

(c)      If an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court (i) appointing a trustee under section 1104, or an examiner with enlarged powers relating to the operation of the business of any Debtor under section 1106(b) of the Bankruptcy Code or (ii) terminating any Debtor's exclusive rights to file and solicit acceptances for its plan;

(d)      If any person other than a Debtor shall assert any claim arising under section 506(c) of the Bankruptcy Code against the Prepetition Secured Parties, Prepetition Trustee, Prepetition Noteholders, DIP Agent, DIP Lenders, the DIP Collateral or Prepetition Collateral, and either (i) the same shall remain unopposed by the applicable Debtor for more than 5 business days, or (ii) in any event, any such claim shall not be disallowed, dismissed or withdrawn, with prejudice, within 60 days after the assertion thereof; or if any Prepetition Secured Party, Prepetition Trustee, Prepetition Noteholders, DIP Agent, DIP Lenders, the DIP Collateral or Prepetition Collateral is surcharged pursuant to sections 105, 506(c), 552 or any other section of the Bankruptcy Code;

(e)      If (i) any Debtor shall attempt to invalidate, reduce or otherwise impair the liens or security interests of Prepetition Secured Parties or DIP Agent and DIP Lenders, or their respective claims or rights against any Debtor, or (ii) any Lien or security interest created by the DIP Loan Documents or the DIP Orders shall, for any reason, ceases to be valid.

(f)      If an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

(g)      If an order with respect to the Bankruptcy Case shall be entered without the express prior written consent of the DIP Agent and Requisite Lenders, to revoke, vacate, reverse, stay, modify, supplement or amend the DIP Loan Agreement, any DIP Loan Document or the DIP Orders; or if any Debtor breaches or fails to perform in accordance with the terms of the DIP Orders;

(h)      If a motion shall be filed seeking authority, or an order shall be entered in the Chapter 11 Cases, that permits any Debtor to incur debt or use cash DIP Collateral or Prepetition Collateral in violation of the terms of the DIP Orders;

(i)      Breach of any Milestones;

(j)      Breach of any Financial Covenant under the DIP Facility;

(k)      any termination of the use of prepetition cash collateral pursuant to the DIP Orders;

(l)      the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code (i) to the holder or holders of any security interest to proceed against, including foreclosure (or the granting of a deed in lieu of foreclosure or the like) on, any assets of any of the Debtors that have a

value in excess of $100,000 in the aggregate or (ii) to state or local environmental or regulatory agency or authority to proceed against, including foreclose (or the granting of a deed in lieu of foreclosure or the like) on, any assets of any of the Debtors that have a value in excess of $100,000;

(m)      if any Loan Party shall attempt to refinance the DIP Loans absent the written consent of the Backstop Lenders; and

(n)      the termination of the Restructuring Support Agreement in accordance with its terms.

SCHEDULE A
BACKSTOP PARTIES

| Backstop Party | Total Tranche A Backstop Commitments | Total Tranche B Backstop Commitments | Total Backstop Commitments |
|---|---|---|---|
| | | | |
| Total | $87,000,000 | $13,000,000 | $100,000,000 |

A-1

## **EXHIBIT D-1**

**Exit Term Sheet**

**SUNGARD AVAILABILITY SERVICES CAPITAL, INC.**

**$100.0 MILLION SENIOR SECURED EXIT FACILITY**

**TERM SHEET**

*The terms set forth in this Summary of Principal Terms and Conditions (the "Term Sheet") are being provided on a confidential basis as part of a comprehensive proposal, each element of which is consideration for the other elements and an integral aspect of the proposed Exit Facility (as defined below).*

*All capitalized terms used and not defined herein shall have the meaning assigned to such term under the $100.0 million Superpriority Senior Secured Debtor-in-Possession Credit Facility Term Sheet, attached as Exhibit C to the Restructuring Support Agreement to which this Term Sheet is appended (the "DIP Term Sheet").*

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

| | |
|---|---|
| *Borrower:* | Sungard Availability Services Capital, Inc., a Delaware corporation, or a newly-formed entity that acquires substantially all of the assets of Sungard Availability Services Capital, Inc. pursuant to the Plan (as defined in the Restructuring Support Agreement), which newly-formed entity will be defined as the "Acquisition Company" under the Plan (the "Borrower" or the "Company"). |
| *Guarantors:* | Each of the Borrower's (a) direct and indirect domestic subsidiaries and (b) certain foreign subsidiaries in jurisdictions to be agreed (taking into account (i) applicable law or regulation (including thin capitalization rules and "whitewashing" requirements), (ii) adverse tax consequences to the Borrower or its subsidiaries, (iii) any fiduciary duties of directors that would conflict with the provision of such guarantee, and (iv) any existing material contractual obligation) (collectively, the "Guarantors"). The Borrower and the Guarantors are referred to herein as "Loan Parties" and each, a "Loan Party". All obligations of the Borrower under the Exit Facility will be unconditionally guaranteed on a joint and several basis by the Guarantors. |
| *Exit Agent:* | To the extent the DIP Facility has been entered into during the Chapter 11 Cases (the "DIP to Exit"): |
| | The DIP Agent (in such capacity, the "Exit Agent"). |
| | To the extent the DIP Facility has not been entered into during the Chapter 11 Cases (the "Standalone Exit"): |
| | A financial institution acceptable to the Backstop Parties (as defined in the DIP Term Sheet) (in such capacity, the "Exit Agent"). |

*Lenders:*

Under the DIP to Exit structure, the DIP Lenders (in such capacity, the "Exit Lenders").

Under the Standalone Exit structure, (A) the Prepetition Lenders (as defined in the DIP Term Sheet) holding outstanding term loans and/or revolving loans under the Prepetition Credit Agreement (as defined in the DIP Term Sheet) which are party to the Restructuring Support Agreement on or prior to the Petition Date shall be offered the right to participate in an amount up to 87% of the Exit Facility (as defined below) (the "Standalone Term Loan Allocation") on a ratable basis based on the outstanding loans under the Prepetition Credit Agreement held by such Prepetition Lender pursuant to procedures reasonably satisfactory to the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement; provided, however, that for the purposes of determining the allocation of the Standalone Term Loan Allocation, the amount of the term loans held by each Prepetition Lender shall be deemed to include any amounts due in respect of the Acceleration Makewhole Premium (as defined in the Prepetition Credit Agreement), as applicable; and (B) the Prepetition Noteholders (as defined in the DIP Term Sheet) which are party to the Restructuring Support Agreement on or prior to the Petition Date shall be offered the right to participate in an amount up to 13% of the Exit Facility (the "Standalone Notes Allocation") on a ratable basis based on the Prepetition Senior Notes (as defined in the DIP Term Sheet) held by such Prepetition Noteholder pursuant to procedures satisfactory to the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement.   Under the Standalone Exit structure, commitments under the Exit Facility shall be backstopped by the Backstop Parties and allocated in a manner consistent with the Standalone Term Loan Allocation and Standalone Notes Allocation (in such capacity, the "Exit Lenders").

*Exit Facility:*

Under the DIP to Exit structure, an exit term loan facility in an aggregate principal amount of $100.0 million (the "Exit Facility") of which (i) the principal amount of any DIP Loans outstanding upon the consummation of the Acceptable Plan will be deemed to be borrowed under the Exit Facility (the loans deemed advanced on such date, the "Initial Exit Loans") and (ii) the principal amount of any unused commitments under the Delayed Draw DIP Facility outstanding upon the consummation of the Acceptable Plan will be deemed to be unused and outstanding under the Exit Facility (the "Delayed Draw Exit Facility", the commitments under the Delayed Draw Exit Facility, the "Delayed Draw Exit Commitments"; the loans advanced under the Delayed Draw Exit Facility, the "Delayed Draw Exit Loans, and together with the Initial Exit Loans, the "Exit Loans") and will be available to be drawn in one or more borrowings of at least $10,000,000 per draw after the Exit Date (as defined below) upon satisfaction of the conditions set forth in the Exit Loan Documents (as defined below), including the

conditions set forth under "Conditions Precedent to Each Exit Loan" set forth below. Once borrowed and repaid, the Exit Loans may not be reborrowed.

For the avoidance of doubt, loans and commitments under the Tranche A DIP Facility and Tranche B DIP Facility shall be deemed to be one class of loans and commitments under the Exit Facility.

Under the Standalone Exit structure, an exit term loan facility in an aggregate principal amount of $100.0 million (the "Exit Facility") of which (i) a principal amount of $50.0 million will be available to be drawn in a single drawing on or after the Exit Date (as defined below) upon satisfaction of the conditions set forth in the Exit Loan Documents (the loans advanced on such date, the "Initial Exit Loans") and (ii) a principal amount of up to $50.0 million of the Exit Facility (the "Delayed Draw Exit Facility"; the commitments under the Delayed Draw Exit Facility, the "Delayed Draw Exit Commitments"; the loans advanced under the Delayed Draw Exit Facility, the "Delayed Draw Exit Loans" and, together with the Initial Exit Loans, the "Exit Loans") will be available to be drawn in one or more borrowing of at least $10,000,000 per draw after the Exit Date upon satisfaction of the conditions set forth in the Exit Loan Documents, including the conditions set forth under "Conditions Precedent to Each Exit Loan" set forth below. Once borrowed and repaid, the Exit Loans may not be reborrowed.

In either case of the DIP to Exit structure or the Standalone Exit structure, any unused Delayed Draw Exit Commitments shall automatically terminate on the earlier of (i) the date that is 18 months after the Exit Date and (ii) the date on which the principal amount of all Exit Loans have been repaid in full (the "Delayed Draw Termination Date").

| | |
|---|---|
| *Use of Proceeds:* | The proceeds of the Exit Facility may be used only for the following purposes: (i) to pay reasonable and documented transaction costs, fees and expenses that are incurred in connection with the Exit Facility, the restructuring and the Chapter 11 Cases, and (ii) for working capital and general corporate purposes of the Loan Parties. |
| *Term:* | All obligations under the Exit Loan Documents will be due and payable in full in cash on the date that is 90 days prior to the third anniversary of the Exit Date (the "Maturity Date"). |
| *Amortization*: | None. |
| *Exit Loan Documents*: | The Exit Facility will be documented by a Credit Agreement (the "Exit Loan Agreement") and other guarantee, security and other relevant documentation (together with the Exit Loan Agreement, collectively, the "Exit Loan Documents") reflecting the terms and |

provisions set forth in this Term Sheet and otherwise in form and substance reasonably satisfactory to the Borrower, Exit Agent and the Exit Lenders consistent with the consent rights set forth in the Restructuring Support Agreement.

*Security and Priority:*

All obligations of the Borrower and the Guarantors to the Exit Lenders and to the Exit Agent, including, without limitation, all principal, accrued interest, costs, and fees (collectively, the "Obligations"), shall be secured by liens on all Collateral (as defined below), subject to (i) first priority on all Term Priority Collateral (as defined below) and (ii) second priority on all Revolver Priority Collateral (as defined below), subject only to permitted liens and an intercreditor agreement or intercreditor agreements in form and substance reasonably satisfactory to the Exit Agent and the Exit Lenders consistent with the consent rights set forth in the Restructuring Support Agreement (the "Intercreditor Agreement").

The term "Term Priority Collateral" as used herein means all Collateral that does not constitute Revolver Priority Collateral.

The term "Revolver Priority Collateral" as used herein means all Collateral consisting of accounts, inventory, deposit accounts and cash and cash equivalents.

The property securing the Obligations is collectively referred to as the "Collateral" and shall include, without limitation, but subject to customary exceptions to be agreed between the Borrower and the Exit Lenders consistent with the consent rights set forth in the Restructuring Support Agreement, all present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Loan Parties, wherever located, including, without limitation, all accounts, deposit accounts, cash and cash equivalents, inventory, equipment, capital stock in subsidiaries of the Loan Parties, and the proceeds thereof, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, the Specified Account, the Specified Intercompany Notes and all products and proceeds thereof.

*Interest:*

At all times prior to the occurrence of an Event of Default (as defined below), interest on the outstanding principal amount of all Exit Loans shall accrue at a rate *per annum* equal to LIBOR plus 7.50% *per annum* or Base Rate plus 6.50%, at the option of the Borrower. Interest on the Exit Loans shall be payable in cash (a) for loans accruing at a rate based on LIBOR, at the end of each interest period and for interest periods greater than three months, every three months and (b) for loans accruing at Base Rate quarterly in arrears; provided, at the option of the Borrower, and (i) in the case of interest on any LIBOR Exit Loans, LIBOR plus 2.50% shall be payable in cash and 5.00% shall be payable in kind

and (ii) in the case of interest on any Base Rate Exit Loans, Base Rate plus 1.50% shall be payable in cash and 5.00% shall be payable in kind.

Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year.

| | |
|---|---|
| *Default Interest:* | During the continuance of an Event of Default, the Exit Loans will bear interest at an additional 2.00% *per annum* and any overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% *per annum*. Default interest shall be payable in cash on demand. |
| *Undrawn Commitment Payment:* | The Borrower shall pay to the Exit Lenders a commitment payment calculated at a rate *per annum* equal to 2.50% on the average daily unused portion of the Delayed Draw Exit Facility, payable quarterly in arrears. |
| *Put Option Premium:* | Under the Standalone Exit structure, a put option premium in an amount equal to 3.00% of the principal amount of the Backstop Commitments (as defined in the DIP Term Sheet) shall be paid to the Backstop Parties ratably based on their respective Backstop Commitments on the Exit Date; the put option premium shall be payable in full in cash on the Exit Date, and shall be fully earned and non-refundable. |
| *Original Issue Discount:* | The Exit Loans (other than, for the avoidance of doubt, the DIP Loans which are continued as Initial Exit Loans upon the consummation of the Acceptable Plan and deemed made on the Exit Date) shall be made on or after the Exit Date in the form of original issue discount ("OID") of 3.00% of the aggregate amount of such Exit Loans. |
| *Mandatory Prepayments:* | Mandatory prepayments of the Exit Loans shall be required with (i) 100% of net cash proceeds from (A) the sale or other disposition of assets, subject to exceptions to be agreed (which shall not be subject to a reinvestment right); (B) casualty events, subject to exceptions to be agreed; (C) any sale or issuance of debt (other than permitted debt to be agreed); and (D) any sale or issuance of equity securities (other than certain customary permitted equity issuances to be agreed); and (ii) 85% of excess cash flow. Once prepaid through a mandatory prepayment, the Exit Loans may not be reborrowed. |
| *Optional Prepayments:* | The Loan Parties may prepay in full or in part the Exit Loans, subject to customary notice periods and payment of breakage costs. Once prepaid through an optional prepayment, the Exit Loans may not be reborrowed. |
| *Exit Fee:* | Any repayment of the Exit Loans (including, voluntary prepayments, the excess cash flow mandatory prepayment, any |

|  | other mandatory prepayment and repayment at maturity) shall be subject to a 3.50% fee on the principal amount of such repayment. |
|---|---|
| *Conditions Precedent to the Closing:* | The closing date (the "<u>Exit Date</u>") under the Exit Facility shall be subject to conditions, which are satisfactory to the Exit Lenders consistent with the consent rights set forth in the Restructuring Support Agreement. |
| *Conditions Precedent to Each Exit Loan:* | On each date of a borrowing (i) there shall exist no default under the Exit Loan Documents, (ii) the representations and warranties of the Borrower and each Guarantor therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding, (iii) the making of such Exit Loan shall not violate any material applicable requirement of law and shall not be enjoined, temporarily, preliminarily or permanently, and (iv) with respect to any borrowing under the Delayed Draw Exit Facility, the aggregate amount of consolidated unrestricted cash and cash equivalents of the Borrower and its subsidiaries (net of outstanding checks) shall not exceed $70 million immediately prior to, and after giving effect to, such borrowing. |
| *Representations and Warranties:* | The Exit Loan Documents will contain representations and warranties customarily found in loan agreements for similar financings and other representations and warranties agreed upon by the Borrower and the Exit Lenders consistent with the consent rights set forth in the Restructuring Support Agreement (which will be applicable to the Borrower, the Guarantors and their respective subsidiaries and subject to certain exceptions and qualifications to be agreed by the Borrower and the Exit Lenders consistent with the consent rights set forth in the Restructuring Support Agreement). |
| *Financial Covenants:* | The Exit Loan Documents will contain the following financial covenants: |
|  | <u>*Maintenance Covenant*</u>. The ratio of (x) consolidated funded debt of the Borrower and its subsidiaries less consolidated unrestricted cash and cash equivalents of the Borrower and its subsidiaries to (y) Consolidated EBITDA (to be defined in the Exit Loan Documents, including adjustment for the cash impact of "below the line" lease adjustments) of the Borrower and its subsidiaries on the last Business Day of each quarter shall not exceed (i) a ratio that reflects a 40% cushion to projected Adj. EBITDA minus Book to Cash Lease Impact (row 76 of the BS tab) as set forth in the "Denali MYP" financial model for each quarter ending on or before June 30, 2020 and (ii) a ratio that reflects a 35% cushion to projected Adj. EBITDA minus Book to Cash Lease Impact (row |

76 of the BS tab) as set forth in the "Denali MYP" financial model for each quarter thereafter.

*Minimum Liquidity Covenant*. The sum of (i) consolidated unrestricted cash and cash equivalents of the Borrower and its subsidiaries, plus (ii) the amount of unused commitments under any revolving credit facility plus (iii) the amount of any unused commitments under the Delayed Draw Exit Facility, shall not be less than $27 million on the last Business Day of each month.

|  |  |
|---|---|
| *Reporting Covenants, Affirmative Covenants and Negative Covenants:* | The Exit Loan Documents will contain reporting requirements, affirmative covenants and negative covenants customarily found in loan documents for similar exit financings and other reporting requirements, affirmative covenants and negative covenants agreed upon by the Borrower and the Exit Lenders consistent with the consent rights set forth in the Restructuring Support Agreement, including, without limitation, (i) commercially reasonable efforts to obtain prior to the Exit Date and maintain ratings (but not a specific rating) and (ii) a restriction on the incurrence of certain debt and liens; provided that the Exit Loan Agreement will include the following debt baskets: |

*Credit Facilities Debt Basket*. Debt incurred under revolving credit facilities not to exceed $50 million, which may be secured on a senior basis on the Collateral constituting current assets with the Obligations subject to the Intercreditor Agreement.

*Pari Passu Debt Basket*. Upon the occurrence of the Delayed Draw Termination Date, debt incurred under credit facilities not to exceed the Specified Pari Passu Amount (as defined below), which may be secured on a pari passu basis on the Collateral with the Obligations, subject to the Intercreditor Agreement; provided that immediately prior to the incurrence of such debt, consolidated unrestricted cash and cash equivalents of the Borrower and its subsidiaries (net of outstanding checks) shall be less than $70 million.

"Specified Pari Passu Amount" means the lesser of (x) $50 million and (y) $100 million less the principal amount of Exit Loans outstanding at such time; provided that the Specified Pari Passu Basket shall not be less than zero.

Other than indebtedness incurred under the Credit Facilities Debt Basket, the Pari Passu Debt Basket and certain other customary exceptions, no other debt shall be permitted to be secured on a senior basis to or on a pari passu basis with the Obligations.

|  |  |
|---|---|
| *Events of Default:* | The Exit Loan Documents will contain events of default customarily found in loan agreements for similar exit financings and other events of default agreed upon by the Borrower and the Exit Lenders consistent with the consent rights set forth in the |

Restructuring Support Agreement (each, an "Event of Default").

*Indemnification and Expenses:*   The Loan Parties will indemnify the Exit Agent, the Exit Lenders, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "Indemnified Person") and hold them harmless from and against all costs, expenses (including reasonable and documented fees, disbursements and other charges of outside counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of its affiliates) that relates to the Exit Facility or the transactions contemplated thereby; provided that, no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted solely from its gross negligence or willful misconduct. In addition, (a) all reasonable and documented out-of-pocket expenses (including, without limitation, reasonable and documented fees, disbursements and other charges of outside counsel and financial advisors (including, for the avoidance of doubt, the reasonable and documented fees and expenses of (i) Jones Day and Houlihan Lokey Capital, Inc. as counsel and financial advisor, respectively, to certain Exit Lenders and (ii) Akin Gump Strauss Hauer & Feld LLP as counsel to, and PJT Partners LP, and DH Capital, LLC as financial advisors to, certain Exit Lenders)) of the Exit Agent and Exit Lenders in connection with the Exit Facility and the transactions contemplated thereby shall be paid by the Loan Parties from time to time, and (b) all reasonable and documented out-of-pocket expenses (including, without limitation, reasonable and documented fees, disbursements and other charges of (x) one outside counsel for the Exit Agent and (y) one outside counsel for the Exit Lenders, taken as a whole, and such local counsel as the Exit Agent and Exit Lenders deem reasonably advisable) of the Exit Agent and the Exit Lenders, for enforcement costs and documentary taxes associated with the Exit Facility and the transactions contemplated thereby will be paid by the Loan Parties.

*Assignments and Participations:*   Assignments under the Exit Facility are subject to the consent of the Exit Agent (which consent shall not be unreasonably withheld or delayed). No participation shall include voting rights, other than for matters requiring consent of 100% of the Exit Lenders.

*Requisite Lenders under the Exit Facility:*   "Requisite Lenders" shall mean Exit Lenders holding at least 50.1% of the outstanding unused Delayed Draw Exit Commitments and Exit Loans under the Exit Facility.

| | |
|---|---|
| *Amendments; Modifications; Waivers or Consents:* | Any amendment or other modification to the Exit Loan Documents, and any waiver or consent required or permitted by the Exit Loan Documents, shall be required to be approved by the Requisite Lenders, except for the following amendments, modifications, waivers or consents: (a) until the second anniversary of the Exit Date, any amendment or modification to, or waiver or consent in respect of, the Specified Provisions (as defined below) shall require the approval of Lenders holding at least 66.7% of the outstanding unused Delayed Draw Exit Commitments and Exit Loans under the Exit Facility and (b) any amendment or modification to, or waiver or consent in respect of, usual and customary provisions that require approval by each affected Exit Lender or all Exit Lenders, as applicable (which provisions shall include, for the avoidance of doubt, protections in respect of (x) the pro rata sharing, (y) waterfall priority and (z) subordination) shall require approval by each affected Exit Lender or all Exit Lenders, as applicable. |
| | "Specified Provisions" shall mean, collectively, (a) any covenants limiting the Loan Parties' incurrence of permitted liens and permitted indebtedness and the Loan Parties' making of permitted investments and/or restricted payments, (b) any financial covenants and (c) the conditions precedent for each borrowing under the Exit Facility. |
| *Miscellaneous:* | The Exit Loan Documents will include (i) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes (subject to customary qualifications)), (ii) waivers of consequential damages and jury trial, and (iii) customary agency, set-off and sharing language to be agreed upon by the Borrower and the Exit Lenders consistent with the consent rights set forth in the Restructuring Support Agreement. |
| *Governing Law and Submission to Non-Exclusive Jurisdiction:* | State of New York |

# **EXHIBIT D-2**

**Exit Term Sheet**

**SUNGARD AVAILABILITY SERVICES CAPITAL, INC.**

**$300.0 MILLION SENIOR SECURED TERM LOAN FACILITY**

**TERM SHEET**

*The terms set forth in this Summary of Principal Terms and Conditions (the "Term Sheet") are being provided on a confidential basis as part of a comprehensive proposal, each element of which is consideration for the other elements and an integral aspect of the proposed Term Loan Facility (as defined below).*

*All capitalized terms used and not defined herein shall have the meaning assigned to such term under the $100.0 million Senior Secured Exit Facility Term Sheet, attached as Exhibit D-1 to the Restructuring Support Agreement to which this Term Sheet is appended (the "Exit Term Sheet").*

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

| | |
|---|---|
| *Borrower:* | Sungard Availability Services Capital, Inc., a Delaware corporation, or a newly-formed entity that acquires substantially all of the assets of Sungard Availability Services Capital, inc. pursuant to the Plan (as defined in the Restructuring Support Agreement), which newly-formed entity will be defined as the "Acquisition Company" under the Plan (the "Borrower" or the "Company"). |
| *Guarantors:* | Each of the Borrower's (a) direct and indirect domestic subsidiaries and (b) certain foreign subsidiaries in jurisdictions to be agreed (taking into account (i) applicable law or regulation (including thin capitalization rules and "whitewashing" requirements), (ii) adverse tax consequences to the Borrower or its subsidiaries, (iii) any fiduciary duties of directors that would conflict with the provision of such guarantee, and (iv) any existing material contractual obligation) (collectively, the "Guarantors"). The Borrower and the Guarantors are referred to herein as "Loan Parties" and each, a "Loan Party". All obligations of the Borrower under the Term Loan Facility will be unconditionally guaranteed on a joint and several basis by the Guarantors. |
| *Administrative Agent:* | A financial institution acceptable to the Term Loan Lenders consistent with the consent rights set forth in the Restructuring Support Agreement (in such capacity, the "Term Loan Agent"). |
| *Lenders:* | Each lender under that certain Credit Agreement, dated as of March 31, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "Existing Credit Agreement", and the term loans and revolving loans outstanding thereunder, the "Existing Loans"), among Sungard Availability Services Capital, |

Inc., the lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, the "Term Loan Lenders").

| | |
|---|---|
| *Term Loan Facility:* | A term loan facility in an aggregate principal amount of $300.0 million (the "Term Loan Facility", and, the loans deemed advanced under the Term Loan Facility the "Term Loans") consisting of Existing Loans to be deemed borrowed under the Term Loan Agreement in like principal amount. Once repaid, the Term Loans may not be reborrowed. |
| *Term:* | All obligations under the Term Loan Documents will be due and payable in full in cash on the date that is forty-two months after the Closing Date (as defined below) (the "Maturity Date"). |
| *Amortization:* | None. |
| *Term Loan Documents:* | The Term Loan Facility will be documented by a Credit Agreement (the "Term Loan Agreement") and other guarantee, security and other relevant documentation (together with the Term Loan Agreement, collectively, the "Term Loan Documents") reflecting the terms and provisions set forth in this Term Sheet and otherwise in form and substance reasonably satisfactory to the Borrower, the Term Loan Agent and the Term Loan Lenders consistent with the consent rights set forth in the Restructuring Support Agreement. |
| *Security and Priority:* | All obligations of the Borrower and the Guarantors to the Term Lenders and to the Term Agent, including, without limitation, all principal, accrued interest, costs, and fees (collectively, the "Obligations"), shall be secured by liens on all Collateral (as defined below), subject to (i) second priority on all Term Priority Collateral (as defined below) and (ii) third priority on all Revolver Priority Collateral (as defined below), subject only to permitted liens and an intercreditor agreement or intercreditor agreements in form and substance reasonably satisfactory to the Term Loan Agent and the Term Loan Lenders consistent with the consent rights set forth in the Restructuring Support Agreement (the "Intercreditor Agreement"). |

The term "Term Priority Collateral" as used herein means all Collateral that does not constitute Revolver Priority Collateral.

The term "Revolver Priority Collateral" as used herein means all Collateral consisting of accounts, inventory, deposit accounts and cash and cash equivalents.

The property securing the Obligations is collectively referred to as the "Collateral" and shall include, without limitation, but subject to customary exceptions to be agreed between the Borrower and the Term Loan Lenders consistent with the consent rights set forth in the Restructuring Support Agreement, all present and after

acquired property (whether tangible, intangible, real, personal or mixed) of the Loan Parties, wherever located, including, without limitation, all accounts, deposit accounts, cash and cash equivalents, inventory, equipment, capital stock in subsidiaries of the Loan Parties, and the proceeds thereof, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, the Specified Account, the Specified Intercompany Notes and all products and proceeds thereof.

For the avoidance of doubt, the Collateral shall include all property which secures the obligations under the Exit Facility.

*Interest:*

At all times prior to the occurrence of an Event of Default (as defined below), interest on the outstanding principal amount of all Term Loans shall accrue at a rate *per annum* equal to LIBOR plus 6.50% *per annum* or Base Rate plus 5.50%, at the option of the Borrower. Interest on the Term Loans shall be payable (a) for loans accruing at a rate based on LIBOR, at the end of each interest period and for interest periods of greater than three months, every three months and (b) for loans accruing at Base Rate, quarterly in arrears and (i) in the case of interest on any LIBOR Term Loans, LIBOR plus 4.00% shall be payable in cash and 2.50% shall be payable in kind and (ii) in the case of interest on any Base Rate Term Loans, Base Rate plus 3.00% shall be payable in cash and 2.50% shall be payable in kind.

Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year.

*Default Interest:*

During the continuance of an Event of Default, the Term Loans will bear interest at an additional 2.00% *per annum* and any overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% *per annum*. Default interest shall be payable in cash on demand.

*Mandatory Prepayments:*

Mandatory prepayments of the Term Loans shall be required with (i) 100% of net cash proceeds from (A) the sale or other disposition of assets, subject to exceptions to be agreed (which shall not be subject to a reinvestment right); provided that if (i) consolidated unrestricted cash and cash equivalents of the Borrower and its subsidiaries plus (ii) the amount of any unused commitments under any revolving credit facility plus (iii) the amount of any unused commitments under the Delayed Draw Exit Facility ("Consolidated Liquidity") is less than $75 million (the "Liquidity Threshold") at the time such prepayment is required, then the Borrower may retain an amount equal to the difference between the Liquidity Threshold less Consolidated Liquidity at such time (B) casualty events, subject to exceptions to be agreed; (C) any sale or issuance of debt (other than permitted debt to be agreed);

and (D) any sale or issuance of equity securities (other than certain customary permitted equity issuances to be agreed, including net cash proceeds from the sale or issuance of equity securities up to $20 million) and (ii) 85% of excess cash flow. Once prepaid through a mandatory prepayment, the Term Loans may not be reborrowed.

Notwithstanding anything herein to the contrary, no mandatory prepayments of the Term Loans shall be required to the extent the applicable proceeds are required to be applied to make mandatory prepayments under the Exit Facility or any other credit facility that is secured on a senior basis in right of security to the Term Loan Facility.

*Optional Prepayments:*

The Loan Parties may prepay in full or in part the Term Loans, subject to customary notice periods and payment of breakage costs. Once prepaid through an optional prepayment, the Term Loans may not be reborrowed.

*Prepayment Premium*:

Any optional prepayments (i) on or prior to the first anniversary of the Closing Date shall be subject to a 2.00% premium on the principal amount of such prepayment and (ii) after the first anniversary of the Closing Date and on or prior to the second anniversary of the Closing Date shall be subject to a 1.00% premium on the principal amount of such prepayment.

*Conditions Precedent to the Closing:*

The closing date (the "Closing Date") under the Term Loan Facility shall be subject to conditions, which are reasonably satisfactory to the Term Loan Lenders consistent with the consent rights set forth in the Restructuring Support Agreement.

*Representations and Warranties:*

The Term Loan Documents will contain representations and warranties customarily found in loan agreements for similar financings and other representations and warranties agreed upon by the Borrower and the Term Loan Lenders consistent with the consent rights set forth in the Restructuring Support Agreement (which will be applicable to the Borrower, the Guarantors and their respective subsidiaries and subject to certain exceptions and qualifications to be agreed upon by the Borrower and the Term Loan Lenders consistent with the consent rights set forth in the Restructuring Support Agreement).

*Financial Covenants:*

The Term Loan Documents will contain the following financial covenants:

*Maintenance Covenant*. The same maintenance covenant as under the Exit Facility.

*Minimum Liquidity Covenant*. The same minimum liquidity covenant as under the Exit Facility.

*Reporting Covenants, Affirmative Covenants and Negative Covenants:*

The Term Loan Documents will contain reporting requirements, affirmative covenants and negative covenants customarily found in loan documents for similar financings and other reporting requirements, affirmative covenants and negative covenants agreed upon by the Borrower and the Term Loan Lenders consistent with the consent rights set forth in the Restructuring Support Agreement, including, without limitation, (i) commercially reasonable efforts to obtain prior to the Closing Date and maintain ratings (but not a specific rating) and (ii) a restriction on the incurrence of certain debt and liens; provided that the Term Loan Agreement will include the following debt baskets:

*Credit Facilities Debt Basket*. Debt incurred under revolving credit facilities not to exceed $50 million, which may be secured on a senior basis on the Collateral constituting current assets with the Obligations subject to the Intercreditor Agreement.

*Exit Facility Debt Basket*. Debt incurred under the Exit Facility not to exceed (i) $100 million plus (ii) any interest and fees capitalized to the principal of the debt incurred under the Exit Facility less (iii) any amounts prepaid or repaid under the Exit Facility, which may be secured on a senior basis on the Collateral with the Obligations subject to the Intercreditor Agreement.

*Senior Debt Basket*. Upon the occurrence of the Delayed Draw Termination Date (as defined in the Exit Term Sheet), debt incurred under credit facilities not to exceed the Specified Senior Amount (as defined below), which may be secured on a senior basis on the Collateral with the Obligations, subject to the Intercreditor Agreement; provided that immediately prior to the incurrence of such debt, consolidated unrestricted cash and cash equivalents of the Borrower and its subsidiaries (net of outstanding checks) shall be less than $70 million.

"Specified Senior Amount" means the lesser of (x) $50 million and (y) $100 million less the principal amount of Exit Loans (as defined in the Exit Facility) outstanding at such time; provided that the Specified Senior Basket shall not be less than zero; provided, further, upon the termination of the Exit Facility, the Specified Senior Amount shall be $50 million.

Other than indebtedness incurred under the Credit Facilities Debt Basket, the Exit Facility Debt Basket, the Senior Debt Basket and certain other customary exceptions, no other debt shall be permitted to be secured on a senior basis with the Obligations.

*Events of Default:*

The Term Loan Documents will contain events of default customarily found in loan agreements for similar financings and other events of default agreed upon by the Term Loan Lenders consistent with the consent rights set forth in the Restructuring Support Agreement (each, an "Event of Default").

| | |
|---|---|
| *Indemnification and Expenses:* | The Loan Parties will indemnify the Term Loan Agent, the Term Loan Lenders, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "<u>Indemnified Person</u>") and hold them harmless from and against all costs, expenses (including reasonable and documented fees, disbursements and other charges of outside counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of its affiliates) that relates to the Term Loan Facility or the transactions contemplated thereby; <u>provided</u> that, no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted solely from its gross negligence or willful misconduct. In addition, (a) all reasonable and documented out-of-pocket expenses (including, for the avoidance of doubt, the reasonable and documented fees and expenses of (i) Jones Day and Houlihan Lokey Capital, Inc. as counsel and financial advisor, respectively, to certain Exit Lenders and (ii) Akin Gump Strauss Hauer & Feld LLP as counsel to, and PJT Partners LP, and DH Capital, LLC as financial advisors to, certain Exit Lenders) of the Term Loan Agent and Term Loan Lenders in connection with the Term Loan Facility and the transactions contemplated thereby shall be paid by the Loan Parties from time to time, and (b) all reasonable and documented out-of-pocket expenses (including, without limitation, reasonable and documented fees, disbursements and other charges of (x) one outside counsel for the Term Loan Agent and (y) one outside counsel for the Term Loan Lenders, taken as a whole, and such local counsel as the Term Loan Agent and Term Loan Lenders deem reasonably advisable) of the Term Loan Agent and the Term Loan Lenders, for enforcement costs and documentary taxes associated with the Term Loan Facility and the transactions contemplated thereby will be paid by the Loan Parties. |
| *Assignments and Participations:* | Assignments under the Term Loan Facility are subject to the consent of the Term Loan Agent (which consent shall not be unreasonably withheld or delayed). No participation shall include voting rights, other than for matters requiring consent of 100% of the Term Loan Lenders. |
| *Requisite Lenders under the Term Loan Facility:* | "<u>Requisite Lenders</u>" shall mean Term Loan Lenders holding at least 50.1% of the outstanding Term Loans under the Term Loan Facility. |

| | |
|---|---|
| *Amendments; Modifications; Waivers or Consents:* | Any amendment or other modification to the Term Loan Documents, and any waiver or consent required or permitted by the Term Loan Documents, shall be required to be approved by the Requisite Lenders, except for the following amendments, modifications, waivers or consents: (a) until the second anniversary of the Closing Date, any amendment or modification to, or waiver or consent in respect of, the Specified Provisions (as defined below) shall require the approval of Lenders holding at least 66.7% of the outstanding Term Loans under the Term Loan Facility and (b) any amendment or modification to, or waiver or consent in respect of, usual and customary provisions that require approval by each affected Term Loan Lender or all Term Loan Lenders, as applicable (which provisions shall include, for the avoidance of doubt, protections in respect of (x) the pro rata sharing, (y) waterfall priority and (z) subordination) shall require approval by each affected Term Loan Lender or all Term Loan Lenders, as applicable. |
| | "Specified Provisions" shall mean, collectively, (a) any covenants limiting the Loan Parties' incurrence of permitted liens and permitted indebtedness and the Loan Parties' making of permitted investments and/or restricted payments, (b) any financial covenants and (c) the conditions precedent for each borrowing under the Term Loan Facility. |
| *Miscellaneous:* | The Term Loan Documents will include (i) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes (subject to customary qualifications)), (ii) waivers of consequential damages and jury trial, and (iii) customary agency, set-off and sharing language to be agreed upon by the Borrower and the Term Loan Lenders consistent with the consent rights set forth in the Restructuring Support Agreement. |
| *Governing Law and Submission to Non-Exclusive Jurisdiction:* | State of New York |

## EXHIBIT E

**Form of Joinder**

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**")[1] by and among Sungard Availability Services Capital, Inc. ("**Sungard AS**") and its Affiliates and subsidiaries bound thereto and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date hereof and any further date specified in the Agreement.

Date Executed:

**[CONSENTING CREDIT AGREEMENT LENDER]**

**[CONSENTING NOTEHOLDER]**

[INSERT ENTITY NAME]

_____

Name:
Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Revolver Loans | |
| L/C Obligations | |
| 2021 Term Loans | |
| 2022 Term Loans | |

---

[1]    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Notes | |
| Company Interests | |

**<u>EXHIBIT F</u>**

**Corporate Governance Term Sheet**

**Term Sheet**
**for**
**Sungard Availability Services**
**Corporate Governance**

The following term sheet (this "***Term Sheet***") presents certain preliminary material terms in respect of the capital structure and corporate governance of Sungard Availability Services, Ltd., a Delaware corporation that would be reflected in the limited liability company agreement (the "***Operating Agreement***") of the parent company of reorganized Sungard Availability Services Capital, Inc. ("***Sungard AS***" to be entered into following the consummation of a plan of reorganization (the "***Plan***") of Sungard AS and its direct and indirect domestic subsidiaries (collectively, the "***Debtors***").  This Term Sheet is not legally binding or an exhaustive list of all the terms and conditions in respect of the capital structure and corporate governance of Sungard AS nor does it constitute an offer to sell or buy, nor the solicitation of an offer to sell or buy, any securities of Sungard AS or the Debtors.  Any such offer or solicitation shall only be made in compliance with all applicable laws.  Without limiting the generality of the foregoing, this Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of definitive documentation.  This Term Sheet shall be attached to, and incorporated into, the Plan.  This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any other rule of similar import.

*THIS TERM SHEET IS BEING PROVIDED AS PART OF A PROPOSED COMPREHENSIVE RESTRUCTURING TRANSACTION, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING OF THE DEBTORS.  NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS, OR DEFENSES OF EACH OF THE RECIPIENTS.*

| | |
|---|---|
| **General:** | Sungard AS will be a Delaware limited liability company managed by a board of managers (the "***New Board***"), which will be responsible for overseeing the operation of Sungard AS' business.  Sungard AS will be managed on a day-to-day basis by its Chief Executive Officer and other senior executive officers with oversight from the New Board. |
| **New Sungard AS Equity:** | The Operating Agreement will provide that each ownership interest in Sungard AS be evidenced by an ownership interest (on a percentage basis) (such ownership interest, the "***New Sungard AS Equity***" and each holder thereof, a "***Member***"). |
| **Board of Managers:** | A majority of the managers then in office and all of the Major Holder Managers then in office will constitute a quorum; provided that if a quorum is initially not met for any meeting, any subsequent meeting on the same or related subjects shall only require a majority of the managers then in office for a quorum.  The Operating Agreement will provide that the New Board will initially be comprised of seven (7) managers.  The initial New Board as of the Closing will be comprised of the following, in each case for initial terms of two (2) years and until their successors are elected: |

i.      The Chief Executive Officer of Sungard AS;

ii.     One (1) manager appointed by Carlyle;

iii.    One (1) manager appointed by Angelo Gordon;

iv.    One (1) manager appointed by GSO;

v.     One (1) manager appointed by FS/KKR; and

vi.    Two (2) independent managers appointed by holders of a majority of the pro forma equity party to the restructuring support agreement.

The managers set forth in clauses (ii), (iii), (iv) and (v) above and below are the "***Major Holder Managers***."

At each annual meeting thereafter, managers will be elected as follows:

i.      One (1) manager who is the Chief Executive Officer of Sungard;

ii.     One (1) manager appointed by Carlyle so long as Carlyle holds more than 10% of the New Sungard AS Equity;

iii.    One (1) manager appointed by Angelo Gordon so long as Angelo Gordon holds more than 10% of the New Sungard AS Equity;

iv.    One (1) manager appointed by GSO so long as GSO holds more than 10% of the New Sungard AS Equity;

v.     One (1) manager appointed by FS/KKR so long as FS/KKR holds more than 10% of the New Sungard AS Equity; and

vi.    The remaining managers (initially two (2)) will be independent managers elected by the Members holding a majority of the New Sungard AS Equity at such annual meeting of the Members  (the "***Independent Managers***").

In the event that any Member is no longer entitled to designate one or more managers pursuant to clauses (ii), (iii), (iv) or (v) above, then the relevant Major Holder Manager shall resign and the manager position shall be filled by a majority of the remaining Managers and at the next annual meeting of the Members, such manager position will become an additional Independent Manager and will be elected by the Members holding a majority of the New Sungard AS Equity at such annual meeting of the Members.

The New Board will elect a Chairperson from among the Independent Managers or from any of the Major Holder Managers as long as such Major Holder Manager is not an employee of the Member entitled to appoint such Major Holder Manager (or one of its Affiliates); however,

2

such Chairperson will not also serve as the Chief Executive Officer of Sungard AS. Subject to the above, upon the resignation, removal for cause, death or incapacity of a manager, the remaining term of such manager may be served by a successor designated by the Member who designated such manager, or in the case of a manager elected by the Members holding a majority of the New Sungard AS Equity, by the New Board, to serve until the next annual meeting of the Members; *provided, however*, that if such manager is the Chief Executive Officer of Sungard AS, such manager's position will remain vacant until a new Chief Executive Officer is appointed.

For purposes of determining a Member's manager designation rights, the percentage of New Sungard AS Equity will be calculated prior to giving any effect to any dilution under Sungard AS' then existing Management Incentive Plan (as defined below) or similar management equity issuances and will be aggregated with any holdings of such Member's Affiliates. Only the Independent Managers and the Major Holder Managers who are not full-time employees of the entity entitled to appoint such Major Holder Manager will receive compensation for service on the New Board (other than customary indemnification and expense reimbursement that will be provided to all managers). For purposes of this Term Sheet, (i) "*Affiliate*" means any person who directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified and (ii) "*control*" means the possession, directly or indirectly, of the power to direct, or to cause the direction of, the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. In order to nominate an Independent Manager for election, a Member (together with its Affiliates) must own at least 5% of the New Sungard AS Equity (a "*5% Member*").

The approval of a majority of the New Board, with such majority to include (w) three (3) of the four (4) Major Holder Managers (if there are 4 Major Holder Managers), (x) two (2) of the three (3) Major Holder Managers (if there are 3 Major Holder Managers) or (y) one (1) of the two (2) Major Holder Managers (if there are 2 Major Holder Managers), shall be required for the approval of any matter by the New Board; provided that the following matters will also require the approval of either (x) all of the Major Holder Managers then in office or (y) at least one Independent Manager ( *"Super-Majority Board Approval"*):

(i)      any transaction involving the sale, transfer, lease or other disposition of all or substantially all of Sungard AS' assets or properties or any merger, recapitalization, consolidation or restructuring or any other transaction that would result in a change of control of Sungard;

(ii)     incurrence of indebtedness in excess of $10 million;

(iii)    any related party transaction; and

(iv)     approvals made with respect to management compensation, setting targets related to annual incentive programs, and the design and

3

allocation of any asset sale bonus program, company sale bonus program and any management incentive plan or any other equity-based bonus program.

The New Board shall meet at least once every calendar quarter of Sungard AS' fiscal year.  Any Major Holder Manager that is not a full-time employee of the entity appointing such Major Holder Manager may invite one or more employees (who are under appropriate confidentiality obligations) of the entity that appoints such Major Holder Manager to attend meetings of the New Board and to otherwise receive materials of the New Board.

**Transfer Restrictions:**     Except for transfers to a Member's Affiliates or as is otherwise expressly set forth herein and subject to compliance with all applicable federal securities and other laws, New Sungard AS Equity will only be transferrable by the Members during the fifteen (15) day period immediately following the release of the audited consolidated financial statements and the quarterly unaudited consolidated financial statements (each such period, which may be waived by the New Board in its sole discretion, a "***Transfer Period***").

In addition to any other restrictions on Transfer of New Sungard AS Equity set forth herein and compliance with applicable securities laws, the Operating Agreement will provide language to restrict any sale, exchange, assignment, pledge, encumbrance, or other transfer (each, a "***Transfer***") of New Sungard AS Equity (i) that would result in Sungard AS' obligation to register with the Securities and Exchange Commission or under the Securities Exchange Act of 1934, as amended and (ii) to a direct or indirect competitor of the Debtors (other than a Transfer pursuant to the drag-along rights described below).

**Board Approval (Transfers):**     Majority approval of the disinterested Managers required for acquisitions of ownership interests that put a Member, together with its Affiliates, at or over 25% of the New Sungard AS Equity; provided, that this approval requirement shall not apply to any Member that holds, together with its Affiliates, 20% or more of the New Sungard AS Equity at the Closing; provided further, that this approval requirement will be eliminated two years after the Closing.

**Right of First Offer:**     The Operating Agreement will contain a Right of First Offer provision pursuant to which any Member wishing to Transfer any of its New Sungard AS Equity (a "***Transferring Member***") to a party that is not an Affiliate of such Member must first offer to Transfer such New Sungard AS Equity to all of the 5% Members.  Further, in the event of a proposed Transfer pursuant to the Right of First Offer, at the request of the purchasing Member, Sungard AS and the Transferring Member will enter into a customary confidentiality agreement and Sungard AS will disclose all material non-public information to such Transferring Member without any cleansing provision.  The Right of First Offer provision shall expire after one year with respect to all Transfers by 5%

4

Members; provided that (i) prior to such expiration the New Board may extend such provision for one additional 3 month period with respect to all Transfers by 5% Members in its sole discretion and (ii) if such additional 3 month period is approved, prior to the expiration of such additional 3 month period, the New Board, upon Super-Majority Board Approval, may extend such provision for one additional 3 month period with respect to all Transfers by 5% Members in its sole discretion.

**Tag Along Rights:** If a Member (alone or acting in concert with other Members) proposes to Transfer to any purchaser (other than to an Affiliate of any transferring Member) in one or a series of related transactions, New Sungard AS Equity representing a majority or more of the outstanding New Sungard AS Equity on a fully-diluted basis, then the transferring Member will give written notice to Sungard AS prior to the closing of such Transfer and the other Members will have the right (but not the obligation) to include in such sale up to all of the New Sungard AS Equity held by such other Members.  If the proposed purchaser elects to purchase less than all of the New Sungard AS Equity offered for sale as a result of the other Members' exercise of their respective tag along rights, the transferring Member and each Member exercising its tag along rights will have the right to include its pro rata portion of New Sungard AS Equity to be Transferred to the proposed purchaser on the same terms and conditions as the Transferring Member, including, without limitation, in exchange for a pro rata share of all consideration received by the transferring Member.

**Drag Along Rights:** If (i) one or more Members owning 60% of the outstanding New Sungard AS Equity on a fully-diluted basis (the "***Selling Members***") proposes to sell, in one or a series of related transactions, New Sungard AS Equity representing all of the outstanding New Sungard AS Equity, to any purchaser or 'group' of purchasers (other than to an affiliate of a Selling Member, or (ii) the New Board has approved and seeks to consummate any transaction involving the sale, transfer, lease or other disposition of all or substantially all of Sungard AS' assets or properties or any merger, recapitalization, consolidation or restructuring or any other transaction that would result in a change of control of Sungard AS (which transaction approved by the New Board has been consented to by Members owning a majority of the outstanding New Sungard AS Equity on a fully-diluted basis), the other Members, at the election of the Selling Members or the New Board, as applicable, will be required to include the pro rata portion of their New Sungard AS Equity in such sale and/or vote their New Sungard AS Equity and take any other reasonable actions in furtherance thereof on the same terms and conditions applicable to the Selling Members (if applicable).

**Pre-Emptive Rights:** Until an initial public offering (if any) by Sungard AS occurs, if Sungard AS issues any securities, except for Excluded Issuances, each 5% Member that is an accredited investor will have a right of first refusal to purchase that number of such equity or equity-linked securities on the same terms and conditions as would allow them to maintain their fully-diluted equity interests percentage ownership interests in Sungard AS.  In the event that

a Member does not subscribe for its pro rata share of such equity or equity-linked securities, the other subscribing Members may subscribe for such shares on a pro rata basis.  There will be a customary 'emergency' exception to the pre-emptive rights, with a catch up provision.

"***Excluded Issuances***" will mean the issuance of securities (i) pursuant to or issued upon the exercise of options granted under the Management Incentive Plan, (ii) in consideration for M&A and related transactions, (iii) pursuant to conversion or exchange rights included in equity interests previously issued, (iv) in connection with an equity interests split, division or dividend or similar transaction or reorganization, (v) as equity kickers of 5% or less to financing sources in any one transaction or series of related transactions, (vi) pursuant to other customary or agreed upon excluded transactions to the extent set forth in the Operating Agreement or (vii) which are debt securities and are issued in exchange for outstanding indebtedness of Sungard AS or in any similar transaction.

**Information Rights:**    Sungard AS will provide or make available to each Member (which may not be shared by such Member), on Intralinks or another secure electronic data site:

(i)    The most recent audited consolidated financial statements and financial information (including an income statement, balance sheet and statement of cash flows); and

(ii)    The most recent quarterly unaudited consolidated financial statements and financial information (including an income statement, balance sheet and statement of cash flows).

In no event will any financial information required to be furnished be required to include any information required by, or to be prepared or approved in accordance with, or otherwise be subject to, any provision of Section 404 of the Sarbanes-Oxley Act of 2002 or any rules, regulations, or accounting guidance adopted pursuant to that section.

Subject to execution of customary confidentiality agreements (including on a click-through basis), Sungard AS will also make available the information and reports set forth in clauses (i) and (ii) above to the prospective third party transferees identified by a Member during each Transfer Period subject to Sungard AS' confirmation that such prospective transferee would be eligible to acquire New Sungard AS Equity (and such prospective third party transferees may not share such information).

Each 5% Member who is a 5% Member as of the Effective Date (an "***Initial 5% Member***") shall have regular and reasonable access (under an obligation of confidentiality) to (a) management of Sungard AS, (b) quarterly update calls starting with the first full quarter after emergence and (c) such other information as such Member shall reasonably request. Each Initial 5% Member shall have the opportunity, on a quarterly basis, to sign a customary confidentiality agreement and receive the relevant New Board materials for such quarter (with redactions for privilege).

**Corporate Opportunities;**
**Fiduciary Duties:**
The Operating Agreement will provide for the renunciation of Sungard AS' interest in business opportunities that are presented to managers or Members and the disclaimer of fiduciary duties of the managers and Members, in each case, other than such managers or Members that are employees, consultants or officers of the Debtors.

**Non-Voting Equity**
**Securities:**
The Operating Agreement will contain provisions prohibiting the issuance of non-voting equity securities and otherwise conforming any equity issued to the requirements of section 1123(a)(6) of the Bankruptcy Code.

**Amendments:**
The Operating Agreement may not be amended, terminated or otherwise modified or waived without the approval of the New Board and either (A) (i) a majority of the outstanding New Sungard AS Equity on a fully-diluted basis and (ii) all of the Major Holder Managers then in office or (B) 75% of the outstanding New Sungard AS Equity on a fully-diluted basis; provided that any amendment of the pre-emptive rights set forth in the Operating Agreement shall also require the approval of each 5% Member who is then entitled to pre-emptive rights and any amendment of the information rights set forth in the Operating Agreement shall also require the approval of each Initial 5% Member.  Notwithstanding the foregoing, no amendment of the Operating Agreement that disproportionately and adversely affects a Member (other than in *de minimis* respects, and for the avoidance of doubt, without giving effect to any Member's specific tax or economic position, any other matters personal to a Member or any rights given to Members owning a certain level of New Sungard AS Equity and not to such affected Member specifically) shall be effective against a Member without such Member's consent.

**Liquidation:**
In any liquidation, dissolution or winding up of Sungard AS, all available assets will be distributed to Members of the New Sungard AS Equity on a pro rata basis.

**Other Terms:**
The Operating Agreement will also provide for other customary terms, including, without limitation, the time, place and manner of calling of regular and special meetings of Members and managers, actions may be taken by the New Board or the Members without a meeting, the titles and duties of officers of Sungard and the manner of appointment, removal and replacement thereof, and indemnification and exculpation of managers, officers and other appropriate persons.

For the avoidance of doubt, Sungard AS will not be a public reporting company as of the Closing.

Sungard AS will file an election to be treated as an association taxable as a corporation for federal and state income tax purposes.

New Sungard AS Equity will be subject to dilution as a result of any issuances of New Sungard AS Equity not in contravention of the Operating Agreement.

Other than as expressly required pursuant to the Delaware Limited Liability Company Act or as set forth in this Term Sheet, the approval of the Members shall not be required for the taking of any actions by the Debtors.

## <u>EXHIBIT G</u>

**Provision for Transfer Agreement**

The undersigned ("**<u>Transferee</u>**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**<u>Agreement</u>**"),[2] by and among Sungard Availability Services Capital, Inc. ("**<u>Sungard AS</u>**") and its Affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**<u>Transferor</u>**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

**[CONSENTING CREDIT AGREEMENT LENDER] [CONSENTING NOTEHOLDER]**

[INSERT ENTITY NAME]

_____

Name:
Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Revolver Loans | |
| 2021 Term Loans | |
| 2022 Term Loans | |
| Notes | |

---

[2]   Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Company Interests | |

## EXHIBIT B

**Evidentiary Support for First Day Pleadings**

**A.    Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion")**

49.    The Debtors have filed several purely administrative or procedural First Day Pleadings, including a motion to jointly administer the Company's bankruptcy cases.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  Joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Also, joint administration will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.  Moreover, joint administration will not adversely affect the Debtors' respective constituencies because this Motion seeks only administrative, not substantive, consolidation of the Debtors' estates.  Parties in interest will not be harmed by the relief requested; instead, parties in interest will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.

**B.    Debtors' Motion for Entry of Interim and Final Orders (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief (the "Case Management Motion")**

50.    Pursuant to the Case Management Motion, the Debtors seek entry of interim and final orders approving and implementing the notice, case management, and administrative procedures (the "Case Management Procedures").  The proposed Case Management Procedures, among other things: (a) establish requirements for filing and serving Court Filings; (b) limit service of Court Filings to those parties that have an interest in the subject matter thereof; (c) authorize electronic service; and (d) fix initial Omnibus Hearing date and articulate mandatory guidelines for the scheduling of hearings and objection deadlines.  Given the size and complexity of these

chapter 11 cases, implementing the Case Management Procedures will facilitate the fair and efficient administration of these cases and promote judicial economy.

    **C.**    **Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, (II) Waving the Same Upon Confirmation of the Debtors' Prepackaged Plan, (III) Waiving Requirements to File Lists of Equity Holders, and (IV) Granting Related Relief (the "<u>Schedules and Statements Extension Motion</u>")**

    51.    The Debtors have also filed another purely administrative or procedural First Day Pleading seeking entry of an order: (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>") by 30 days, for a total of 44 days from the date of the commencement of these chapter 11 cases (the "<u>Petition Date</u>"),[11] without prejudice to the Debtors' ability to request additional extensions; (b) extending the deadline by which the Debtors must file their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Federal Rule of Bankruptcy Procedure 2015.3 (the "<u>2015.3 Reports</u>") to the later of: (i) 30 days after the meeting of creditors (the "<u>341 Meeting</u>") to be held pursuant to section 341 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>") and (ii) 44 days from the Petition Date; (c) waiving the requirement to file the Schedules and Statements and the 2015.3 Reports if the *Joint Prepackaged Plan of Reorganization of Sungard Availability Services Capital, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, modified, or supplemented, the

---

[11]    For the avoidance of doubt, the extension requested herein will not affect in any way the Debtors' ability to comply with the milestones set forth in either the Restructuring Support Agreement.

"Plan"), filed contemporaneously herewith, is confirmed on or before the deadline, as the same

may be extended; (d) waiving the requirements to (i) file lists of equity security holders (the "List")

within fourteen (14) days of the Petition Date, as set forth in rule 1007(a)(3) of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules"), and (ii) provide notice of the commencement

of these chapter 11 cases and the 341 Meeting of creditors (the "Notice of Commencement") to

equity security holders, as set forth in Bankruptcy Rule 2002(d) and Rule 1007-1 of the Local

Bankruptcy Rules for the Southern District of New York (the "Local Rules"); and (e) granting

related relief.

52.     *First*, given the size and complexity of the Debtors' business and financial affairs,

and the critical matters that the Debtors' management and professionals were required to address

prior to the commencement of these chapter 11 cases, the Debtors were not in a position to

complete the Schedules and Statements as of the Petition Date.  *Second*, no party in interest will

experience prejudice by the Court granting the Debtors' request for an extension.  The Debtors

will work cooperatively with the U.S. Trustee and any other necessary parties in these chapter 11

cases to provide access to relevant information regarding the business and financial affairs of the

Debtors and their non-Debtor subsidiaries.

53.     Moreover, I have been informed that the request for a final waiver of the

requirement to file the 2015.3 Reports is appropriate in a prepackaged case.  As explained above,

the Debtors have already negotiated the Plan and solicited votes from those parties impaired under

the Plan and entitled to vote thereon.  Accordingly, the primary justifications for requiring the

filing of the 2015.3 Reports do not exist in this case.  Requiring the 2015.3 Reports to be filed

other than as requested in the SOFA/Schedules Extension Motion would only impose an additional

administrative burden on and expense to the Debtors' estate, without any corresponding benefit to

parties in interest.  In addition, the Debtors are requesting a waiver of the section 341 meeting,

obviating the need to file a 2015.3 Report, which is due seven days before the meeting of creditors.

54.      I believe that the relief requested in the SOFA/Schedules Extension Motion is in

the best interests of the Debtors' estates, their creditors, and all other parties in interest and will

enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

Accordingly, on behalf of the Debtors, I respectfully submit that the Bankruptcy Court should

approve the SOFA/Schedules Extension Motion.

> **D.** **Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix, (II) File a Consolidated List of the 30 Largest Unsecured Creditors, and (III) Redact Certain Personal Identification Information for Individual Creditors (the "<u>Creditor Matrix Motion</u>")**

55.      The Debtors have filed another purely administrative or procedural First Day

Pleading requesting that the Court enter an order authorizing the Debtors to: prepare a consolidated

list of creditors in lieu of submitting separate mailing matrices for each Debtor, (b) file a

consolidated list of the Debtors' 30 largest unsecured creditors, and (c) redact certain personal

identification information for individual creditors.

56.      *First*, In light of the Debtors' goal of emerging from chapter 11 as swiftly as

possible, the Debtors submit that filing a creditor matrix as to each Debtor entity is an unnecessary

use of estate resources. Specifically, maintaining a single consolidated list of creditors will benefit

the Debtors and their estates by allowing the Debtors to more efficiently provide required notices

to parties in interest and reduce the potential for duplicate mailings.  Indeed, many of the Debtors'

creditors overlap and thus, to the extent that the Debtors are required to maintain separate mailing

matrices, a substantial number of parties likely would receive multiple copies of the same notice.

Therefore, the Debtors have requested to file a consolidated creditor matrix.

57.    *Second*, mailing initial notices of bankruptcy through the Debtors' proposed claims and noticing agent, Prime Clerk, to parties in interest will maximize efficiency in administering these chapter 11 cases and will ease administrative burdens that would otherwise fall upon the Bankruptcy Court and the U.S. Trustee.

58.    *Third*, the list of creditors may include information of individual creditors—many of whom are the Debtors' employees—with personal information; such information can be used to perpetrate identity theft.  The Debtors therefore, propose to provide, under seal, an un-redacted version of the Creditor Matrix to the Court, the U.S. Trustee, and any official committee of unsecured creditors appointed in these chapter 11 cases.  Accordingly, I respectfully submit that the Bankruptcy Court should approve the Creditor Matrix Motion.

### E.    Debtors' Application for an Entry of an Order (I) Authorizing and Approving the Appointment of Prime Clerk LLC as Claims and Noticing Agent, Effective *Nunc Pro Tunc* to the Petition Date, and (II) Granting Related Relief (the "<u>Claims Agent Application</u>")

59.    The Debtors have also sought entry of an order (a) approving the retention and employment by the Debtors of Prime Clerk LLC ("<u>Prime Clerk</u>") as claims and noticing agent in these chapter 11 cases including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases, and (b) granting related relief.[12]  Although the Debtors have not yet filed their schedules of assets and liabilities, the Debtors anticipate that there will be thousands of entities to be noticed in these chapter 11 cases.  Given the number of anticipated claimants and the complexity of the Debtors' business, the Debtors submit that the appointment of Prime Clerk as claims and noticing agent is both required by Local Rule 5075-1(b) and is otherwise in the best interests of the Debtors' estates

---

[12]   The Claims Agent Application is supported by a separate declaration of Benjamin J. Steele of Prime Clerk.

and their creditors because the distribution of notices and the processing of claims will be expedited, and the the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

**F.      Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Continue to Operate their Cash Management System, Honor Certain Prepetition Obligations Related Thereto, and Maintain Existing Business Forms and (II) Honor Their Intercompany Transactions And Grant Superpriority Administrative Expense Status to Postpetition Intercompany Transactions (the "Cash Management Motion")**

60.      The Debtors seek entry of an order to:  (a) (i) operate their cash management system (the "Cash Management System"); (ii) honor certain prepetition obligations related thereto; and (iii) maintain existing business forms; and (b) (i) honor intercompany transactions in the ordinary course of business on a postpetition basis and (ii) grant superpriority administrative expense status to postpetition intercompany transactions.

61.      The Debtors maintain an integrated, centralized cash management system that is comparable to the centralized cash management systems used by similarly situated companies to manage the cash flow of operating units in a cost-effective and efficient manner.  The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds from their operations and to facilitate cash monitoring, forecasting, and reporting. The Debtors' treasury department maintains daily oversight over the Cash Management System and utilizes cash management control protocols for entering, processing, and releasing funds, including in connection with intercompany transactions.  Additionally, the Debtors' accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

62.      The Cash Management System is comprised of approximately seven Debtor-owned and controlled bank accounts (each a "Bank Account" and collectively, the "Bank

Accounts"). Two of the Bank Accounts are held at Bank of America, N.A. ("Bank of America"),

four Bank Accounts at J.P. Morgan Chase Bank, N.A. ("Chase"), and one Bank Account at PNC

Bank, N.A. ("PNC") (collectively, the "Cash Management Banks"). As of the Petition Date, the

Debtors have approximately $14.5 million in cash on hand.

63.    The Cash Management System is based on a central concentration collection

account maintained at Chase (the "Concentration Account"). The Concentration Account serves

as the Debtors' centralized operating account for the Cash Management System. Funds are swept

daily into the Concentration Account from the Debtors' deposit account at Bank of America.

These funds are then disbursed from the Concentration Account to several Bank Accounts

maintained at Chase and PNC, which each have designated functions:

(a)    The Debtors maintain an account at Chase used to fund various corporate accounts payable (the "Chase AP and Benefits Funding Account").

(b)    The Debtors maintain two payroll accounts at Chase (the "Chase US Payroll Funding Account" and the "Chase VeriCenter Payroll Funding Account," collectively, the "Payroll Accounts"). The Company uses funds in the Payroll Accounts to fund U.S. payroll payments and the VeriCenter business unit payroll payments.

(c)    The Debtors maintain a collateral account at PNC (the "PNC Pcard Collateral Account"). The Debtors utilize funds in the PNC Pcard Collateral Account to collateralize the purchase card program.

(d)    The Debtors maintain a lockbox account with Bank of America (the "Lockbox Account"). Customers of the Debtors are directed to send check payments to the Lockbox Account. All funds received through the Lockbox Account are deposited into the Concentration Account.

64.    The Debtors' Cash Management System facilitates the timely and efficient

collection, management, and disbursement of funds used in the the Debtors' business. Because of

the nature of the Debtors' business and the disruption to the business that would result if the

Debtors were forced to close their existing bank accounts, it is critical that the existing Cash

Management System remain in place.

65.     In the ordinary course of business the Debtors incur periodic service charges and other fees in connection with maintaining the Cash Management System (collectively, the "Bank Fees").  The Debtors incur approximately $4,500 per month on account of the Bank Fees in the aggregate.  Historically, the Bank Fees have been *de minimis* and have been debited directly out of the Debtors' Bank Accounts.  Accordingly, as of the Petition Date, the Debtors estimate that they do not currently owe their Cash Management Banks any amounts on account of unpaid Bank Fees.  The Debtors seek authority to continue paying the Bank Fees, including the prepetition Bank Fees, in the ordinary course on a postpetition basis, consistent with historical practices.

66.     As part of their Cash Management System, the Debtors use various preprinted business forms (the "Business Forms") in the ordinary course.  To minimize expenses to their estates and avoid confusion during the pendency of these chapter 11 cases, the Debtors request that the Bankruptcy Court authorize the Debtors' continued use of all existing preprinted correspondence and business forms (including, without limitation, letterhead, checks, and other Business Forms) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms.  The Debtors submit that once they have exhausted their existing stock of Business Forms, they shall ensure that any new Business Forms are clearly labeled "Debtor In Possession" and, with respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor In Possession."

### G. Debtors' Motion Seeking Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and (II) Granting Related Relief (the "NOL Motion")

67.     The Debtors seek entry of interim and final orders:    (a) approving certain notification and hearing procedures (the "Procedures") related to certain transfers of Debtor Sungard Availability Services Capital, Inc.'s common stock or any Beneficial Ownership[13] therein (any such record or Beneficial Ownership of common stock, the "Common Stock"); (b) directing that any purchase, sale, or other transfer of Common Stock in violation of the Procedures shall be null and void *ab initio*; and (c) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the date of the commencement of these chapter 11 cases to consider approval of the NOL Motion on a final basis

68.     As of the Debtors' fiscal tax year ending December 31, 2018, the Debtors estimate that they have approximately $187 million of U.S. federal net operating losses ("NOLs," and together with certain other tax attributes, "Tax Attributes") and $14 million of state NOLs. The Debtors may generate additional tax losses in the 2019 tax year.  These NOLs and certain other Tax Attributes provide the potential for material future tax savings or other tax structuring possibilities in these chapter 11 cases.  The NOLs and certain other Tax Attributes are of significant value to the Debtors and their estates because the Debtors may be able to carry forward such Tax

---

[13]  "Beneficial Ownership" will be determined in accordance with the applicable rules of section 382 of the Internal Revenue Code of 1986, as amended (the "IRC"), and the Treasury Regulations thereunder (other than Treasury Regulations section 1.382-2T(h)(2)(i)(A)) and includes direct, indirect, and constructive ownership (*e.g.*, (1) a holding company would be considered to beneficially own all equity securities owned by its subsidiaries, (2) a partner in a partnership would be considered to beneficially own its proportionate share of any equity securities owned by such partnership, (3) an individual and such individual's family members may be treated as one individual, (4) persons and entities acting in concert to make a coordinated acquisition of equity securities may be treated as a single entity, and (5) a holder would be considered to beneficially own equity securities that such holder has an Option to acquire).  An "Option" to acquire stock includes all interests described in Treasury Regulations section 1.382-4(d)(9), including any contingent purchase right, warrant, convertible debt, put, call, stock subject to risk of forfeiture, contract to acquire stock, or similar interest, regardless of whether it is contingent or otherwise not currently exercisable.

Attributes to offset taxable income or directly offset federal tax liability in future years. In addition, the Debtors may be able to utilize such Tax Attributes to offset taxable income generated by transactions consummated during these chapter 11 cases. The value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

69.     Implementation of the Procedures is necessary and appropriate to enforce the automatic stay and, critically, to preserve the value of the Tax Attributes for the benefit of the Debtors' estates. Under section 382 of the IRC, certain transfers of Common Stock prior to the consummation of a chapter 11 plan could cause the termination or limit the use of the Tax Attributes. As stated above, as of the end of the Debtors' fiscal tax year ending December 31, 2018, the Debtors estimate that they have as much as approximately $187 million of U.S. federal NOLs and $14 million of state NOLs, which translate to the potential for material future tax savings (including in post-emergence years) or other potential tax structuring opportunities in these chapter 11 cases. The termination or limitation of the Tax Attributes could be materially detrimental to all parties in interest. Thus, granting the relief requested herein will preserve the Debtors' flexibility in operating their business during the pendency of these chapter 11 cases and also implementing an exit plan that makes full and efficient use of the Tax Attributes, maximizing the value of their estates.

70.     Additionally, the Procedures do not bar all transfers of Common Stock. The Debtors seek to establish the Procedures only to monitor those types of transactions that would pose a serious risk under the ownership change test pursuant to section 382 of the IRC or corresponding provisions of state law and to preserve the Debtors' ability to seek substantive relief if it appears that a proposed transfer could jeopardize the Debtors' utilization of the Tax Attributes. Because of the Tax Attributes' importance to the Debtors' restructuring, and consequently to all

parties in interest, the benefits of implementing the Procedures outweighs subjecting a limited

number of transfers to the Procedures.

### H. Debtors' Motion Seeking Entry of an Order Authorizing, but not Directing, the Debtors to Continue Their Prepetition Business Operations, Policies, and Practices and Pay Related Claims in the Ordinary Course of Business on a Postpetition Basis (the "All Claims Motion").

71.     The Debtors seek entry of an order: (a) authorizing, but not directing, the Debtors

to continue their prepetition business operations, policies, and programs and to pay Ordinary

Course Claims (as defined herein), on a postpetition basis in the ordinary course of business; and

(b) granting related relief.

72.     In the ordinary course of business, the Debtors incur numerous fixed, liquidated,

and undisputed obligations (collectively, the "Ordinary Course Claims") to a variety of creditors,

including employees, utilities, insurers, governmental authorities, taxing authorities, ordinary

course goods and services providers, shippers, lien claimants, and numerous other vendors and

unsecured creditors (collectively, the "Ordinary Course Creditors").  The Ordinary Course Claims

fall into two principal categories: trade claims (the "Trade Claims") which include but are not

limited to insurance policies, taxes and fees, surety bonds, landlords, and utility services; and

employee compensation and benefit claims (the "Employee Compensation and Benefit Claims")

which include but are not limited to unpaid wages, temporary staff compensation; payroll

processing fees, reimbursable expenses.

73.     The Plan provides that the Debtors will satisfy all Ordinary Course Claims in full

in cash in the ordinary course of business, subject to provisions of the Bankruptcy Code with

respect to allowance of such claims.  Therefore, because such amounts will be paid as set forth in

the Plan, the relief requested in the All Claims Motion will merely affect the timing of payments

to the Debtors' Ordinary Course Creditors.  Authorizing the Debtors to pay undisputed prepetition

Ordinary Course Claims of the Ordinary Course Creditors as such claims become due and payable in the ordinary course of business will minimize any disruption to the Debtors' business, allow for a smooth and expeditious reorganization in these chapter 11 cases, and lay the groundwork for an essential element of the Plan, which leaves such claims unimpaired.

**I.     Debtors' Motion For Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing Plan and Disclosure Statement Objection and Reply Deadlines and Related Procedures, (III) Approving the Solicitation Procedures, (IV) Approving the Combined Hearing Notice, (V) Directing That a Meeting of Creditors Not Be Convened, and (VI) Granting Related Relief (the "Combined Hearing Motion").**

74.     Pursuant to the Combined Hearing Motion, the Debtors seek entry of an order: (a) scheduling a combined hearing (the "Combined Hearing") on the adequacy of the Disclosure Statement and confirmation of the Plan; (b) establishing a deadline for objections to the adequacy of the Disclosure Statement and confirmation of the Plan (the "Objection Deadline") and approving related procedures;(c) establishing a deadline to file a combined pleading in support of confirmation of the Plan and replying to any objections (the "Reply Deadline"); (d) approving the solicitation procedures regarding votes to accept or reject the Plan (the "Solicitation Procedures"); (e) approving the form and manner of notice of the Combined Hearing (the "Combined Hearing Notice") and the form and manner of the Publication Notice (as defined herein); (f) directing that the United States Trustee for the Southern District of New York (the "U.S. Trustee") not convene a meeting of creditors (the "Creditors' Meeting") under section 341 of the Bankruptcy Code if the Effective Date of the Plan occurs within 75 days after the Petition Date; and (g) granting related relief.

75.     In connection with the foregoing, the Debtors respectfully request that the Bankruptcy Court approve the following schedule (the "Proposed Confirmation Schedule"), subject to the Bankruptcy Court's availability:

| Event | Date |
|---|---|
| Voting Record Date | March 29, 2019 |
| Commencement of Solicitation | April 5, 2019 |
| Voting Deadline | April 26, 2019<br>at 5:00 p.m., prevailing Eastern Time |
| Objection Deadline | April 30, 2019<br>at 5:00 p.m., prevailing Eastern Time |
| Reply Deadline | May 1, 2019<br>at 4:00 p.m., prevailing Eastern Time |
| Combined Hearing | May 2, 2019<br>at 10:00 a.m., prevailing Eastern Time |

76.     I have been informed that a debtor is typically required to provide notice of a hearing to consider the adequacy of the disclosure statement and a hearing to consider confirmation of a plan to all creditors and equity holders.  I have also been advised that beginning on April 2, 2019, the Debtors caused their Solicitation Agent to serve the Combined Hearing Notice on, among other parties, Holders of Class 3 Credit Agreement Claims, Holders of Class 4 Notes Claims, banks, the core notice parties, directors and officers, insurance providers, landlords, taxing authorities, professionals, and shareholders. in advance of the commencement of the solicitation of the Plan on April 5, 2019.  As a courtesy, the Debtors hand-delivered (and provided by email) a copy of the Plan, Disclosure Statement, and Combined Notice to the U.S. Trustee on April 3, 2019. The Solicitation Packages included the Debtors' solicitation cover letter, the Disclosure Statement, the Plan, the exhibits to the Disclosure Statement, and an appropriate Ballot.

77.     I was also advised that the Combined Hearing Notice provided notice that the Debtors anticipated filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, White Plains on

May 1, 2019.  The Combined Hearing Notice also notified parties that if chapter 11 cases were commenced, the Debtors anticipated that a hearing would be held on May 2, 2019, before the Honorable Robert D. Drain in the United States Bankruptcy Court for the Southern District of New York, White Plains to consider (a) the adequacy of the information contained in the Disclosure Statement and (b) confirmation of the Plan.

78.     I was also advised that the Combined Hearing Notice set forth the deadline and procedures for filing objections to the adequacy of the Disclosure Statement and confirmation of the Plan, the manner in which the Disclosure Statement and the Plan and other pleadings filed in these chapter 11 cases can be obtained or viewed electronically, and a summary of the treatment of each class under the Plan.  In addition, the Combined Hearing Notice noted the possible waiver of the meeting of creditors pursuant to section 341 of the Bankruptcy Code.

79.     I believe that the relief requested in the Combined Hearing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Bankruptcy Court should approve the Combined Hearing Motion.

## <u>EXHIBIT C</u>

### Committees Organized Prepetition

| Prepetition Committee | Counsel | Members |
|---|---|---|
| Crossover Group | Akin Gump Strauss Hauer & Feld LLP<br>1 Bryant Park<br>New York, New York 10036 | An ad hoc group of secured lenders and unsecured noteholders. |
| Secured Lender Group | Jones Day<br>250 Vesey Street<br>New York, New York 10281 | An ad hoc group of secured lenders. |

## EXHIBIT D

### Consolidated List of the Holders of the Debtors' 30 Largest Unsecured Claims

Pursuant to Local Rule 1007-2(a)(4), the following is a consolidated list of the Debtors' creditors holding the 30 largest unsecured claims (the "Consolidated Creditor List") based on the Debtors' unaudited books and records as of the Petition Date.  The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 30 largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
|---|---|---|---|---|---|---|---|
| | | | | | **Amount of claim** If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| 1 | Gartner Inc. | P.O. BOX 911319 Dallas, TX 75391 | Trade | | | | $2,560,792.82 |
| 2 | Dell Marketing L.P. | Attn: Scott Minor Scott.Minor@dell.com 1-610-608-4212 One Dell Way Mail Stop 8129 Round Rock, TX 78682 | Trade | | | | $1,528,643.68 |
| 3 | Element Critical | | Trade | | | | $1,102,258.51 |
| 4 | Veritas Technologies LLC | Attn: Don Harrison Donald.Harrison@veritas.com (856) 372 – 0360 500 East Middlefield Road Mountain View, CA 94043 | Trade | | | | $783,310.22 |
| 5 | Mulesoft, Inc. | 77 GEARY STREET St 400 San Francisco, CA 94108 | Trade | | | | $640,286.01 |
| 6 | Russo Family Limited Partnership | P.O. BOX 15012 Newark, NJ 07191 | Trade | | | | $299,840.65 |

---

14     The Debtors reserve the right to assert setoff and other rights with respect to any of the claims listed herein.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
| 7 | Intech Construction, Inc. | Attn: Ron Podlesny RPodlesny@intechconstruction.com 215-243-4957 3020 Market Street Philadelphia, PA 19104 | Trade | | | | $240,211.00 |
| 8 | 410 Commerce LLC | 71 HUDSON ST Hackensack, NJ 07601 | Trade | | | | $225,912.56 |
| 9 | Access IT Group, Inc | Attn: Mark Spencer marks@accessitgroup.com 610-783-5200 x204 2000 Valley Forge Circle Suite 106 King of Prussia, PA 19406 | Trade | | | | $215,427.20 |
| 10 | Curvature, Inc. | Attn: Ari Fischbein AFischbein@curvature.com 516.351.0520 10420,Harris Oaks Blvd Suite C Charlotte NC 28269 | Trade | | | | $206,705.22 |
| 11 | G4S Secure Solutions (USEA) Inc. | Attn: James Kimmel james.kimmel@usa.g4s.com 646-895-3902 1395 University Blvd. Jupiter, FL 33458 | Trade | | | | $182,840.07 |
| 12 | 1500 Net-WORKS Associates, L.P. | C/O NIGHTINGALE REALTY, LLC 1430 BROADWAY, SUITE 1605 New York, NY 10018 | Trade | | | | $163,991.69 |
| 13 | Oracle America, Inc. | Attn: Katrina Gody katrina.gody@oracle.com 1(888)545-4577 500 Oracle Parkway Redwood Shores, CA 94065 | Trade | | | | $157,881.82 |
| 14 | Microland, Limited | Attn: Deepanjan Biswas DeepanjanB@microland.com +44-7725257948 1B Ecospace, Bellandur Outer Ring Road Bangalore, India 560103 | Trade | | | | $148,773.01 |
| 15 | D&B | P.O. BOX 75434 Chicago, IL 60675 | Trade | | | | $148,630.04 |
| 16 | The Collective Group, LLC. | 9433 BEE CAVES ROAD BUILDING III, SUITE 200 Austin, TX 78733 | Trade | | | | $134,062.05 |
| 17 | Xactly Corporation | DEPT CH 16399 Palatine, IL 60055 | Trade | | | | $131,032.25 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
|---|---|---|---|---|---|---|---|
| 18 | Nexii Labs Inc | Attn: Srini Unnava srini.unnava@nexiilabs.com 91-9848361224 2050 Brunswick Plaza-1 State Highway 27 Suite#201 North Brunswick, NJ-08902 | Trade | | | | $126,368.00 |
| 19 | 760 Washington Avenue LLC | 71 HUDSON STREET Hackensack, NJ 07601 | Trade | | | | $121,346.92 |
| 20 | Cisco Systems, Inc. | PO BOX 742927 Los Angeles, CA 90074 | Trade | | | | $117,299.64 |
| 21 | Haynes Mechanical Systems Inc. | Attn: Scott Day sday@haynesmechanical.com 303-710-6531 5654 Greenwood Plaza Blvd Greenwood Village, CO 80111 | Trade | | | | $86,190.22 |
| 22 | DLA Piper LLP (US) | PO BOX 75190 Baltimore, MD 21275 | Professional Services | | | | $82,832.93 |
| 23 | ABB. Inc. | 305 GREGSON DRIVE Cary, NC 27511 | Trade | | | | $80,155.88 |
| 24 | Iron Mountain Off-Site Data Protection | P.O. BOX 915026 Dallas, TX 75391 | Trade | | | | $71,753.09 |
| 25 | McCollister's Transportation Group | PO BOX 37794 Baltimore, MD 21297 | Trade | | | | $67,040.88 |
| 26 | Cannella Roofing Inc. | 783 MARKET STREET Paterson, NJ 07513 | Trade | | | | $65,500.00 |
| 27 | VSS LLC | 201 E Baltimore St. Suite 1400 Baltimore, MD 21202 | Trade | | | | $64,130.00 |
| 28 | FIS Avantgard LLC | PO BOX 40949 Jacksonville, FL 32203 | Trade | | | | $64,015.03 |
| 29 | EMC Corporation | Attn: Lucien Shelton lucien.shelton@dell.com 303-601-3133 176 South Street Hopkinton, MA 01748 | Trade | | | | $63,289.63 |
| 30 | Parkway Corporation | 150 N. BROAD STREET Philadelphia, PA 19102 | Trade | | | | $60,274.29 |

## <u>EXHIBIT E</u>

**Consolidated List of the Holders of the Debtors' Largest Secured Claims**

Pursuant to Local Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

|  | **Name of Creditor** | **Creditor Name, and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted** | **Amount of Claim** | **Collateral Description and Value** |
|---|---|---|---|---|
| 1. | JP Morgan Chase (Prepetition Term Loan B, Extending Facility) | c/o Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, NY, 10019 Attn: Paul H. Zumbro, Stephen M. Kessing | $420.7 million | All or substantially all of the Debtors' assets |
| 2. | JP Morgan Chase (Prepetition Term Loan B due 2020) | c/o Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, NY, 10019 Attn: Paul H. Zumbro, Stephen M. Kessing | $379.9 million | All or substantially all of the Debtors' assets |
| 3. | JP Morgan Chase (Prepetition Revolver) | c/o Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, NY, 10019 Attn: Paul H. Zumbro, Stephen M. Kessing | $45.5 million | All or substantially all of the Debtors' assets |

**<u>EXHIBIT F</u>**

**Summary of the Debtors' Assets and Liabilities**

Pursuant to Local Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis.  The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with their affiliated debtors and non-debtors as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Assets and Liabilities | Amount |
|---|---|
| Total Assets<br>(Book Value as of 2/28/2019) | $496 million |
| Total Liabilities<br>(Book Value as of 2/28/2019) | $1.4 billion |

## **EXHIBIT G**

### **Summary of the Publicly Held Securities of the Debtors**

Pursuant to Local Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held, and the approximate number of holders thereof as of the Petition Date.

| Loan/Bond/Debenture | Number of Holders |
| --- | --- |
| Notes | Approximately 100 |

# EXHIBIT H

## Summary of the Debtors' Property Held by Third Parties

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

Certain property of the Debtors' is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors, or agents.  Through these arrangements, the Debtors' ownership interest is not affected.  In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical.

## **EXHIBIT I**

**Summary of the Debtors' Property From Which the Debtors Operates Its Business**

Pursuant to Local Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operates their business as of the Petition Date.

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 11650 Great Oaks Way | Alpharetta | GA | USA | Leased |
| 175 Admiral Cochrane Dr., Unit 203 | Annapolis | MD | USA | Leased |
| 3431 N. Windsor Dr. | Aurora | CO | USA | Leased |
| 410 Commerce Boulevard | Carlstadt | NJ | USA | Leased |
| 760 Washington Avenue | Carlstadt | NJ | USA | Leased |
| 777 Central Boulevard | Carlstadt | NJ | USA | Leased |
| 2335 South Ellis Street | Chandler | AZ | USA | Leased |
| 155 Montrose West Avenue | Copley | OH | USA | Leased |
| 6803 International Way | Cypress | CA | USA | Owned |
| 37890 Interchange Drive | Farmington Hills | MI | USA | Leased |
| 3001 Red Hawk Drive | Grand Prairie | TX | USA | Owned |
| 774 Walker Road | Great Falls | VA | USA | Leased |
| 12025 North Freeway Technology Drive Ground Floor | Houston | TX | USA | Leased |
| 12175 North Freeway Technology Center Ground Floor | Houston | TX | USA | Leased |
| 1180 Kentucky Avenue | Indianapolis | IN | USA | Owned |
| 300 Primera Boulevard | Lake Mary | FL | USA | Leased |
| 23-10 43rd Avenue | Long Island City | NY | NUSA | Leased |

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 250 Locke Drive | Marlborough | MA | USA | Leased |
| 260 Locke Drive | Marlborough | MA | USA | Leased |
| 1055 Spring Street NW | Atlanta | GA | USA | Leased |
| 3100 Arnold Lane | Northbrook | IL | USA | Owned |
| 1500 Spring Garden Street | Philadelphia | PA | USA | Leased |
| 401 N. Broad Street | Philadelphia | PA | USA | Leased |
| 11085 Sun Center Drive | Rancho Cordova | CA | USA | Leased |
| 1001 E. Campbell Rd. | Richardson | TX | USA | Leased |
| 1725 Comstock St. | Santa Clara | CA | USA | Leased |
| 7499 East Paradise lane | Scottsdale | NV | USA | Leased |
| 5600 United Drive | Smyrna | GA | USA | Owned |
| 70 Inner Belt Rd. | Somerville | MA | USA | Leased |
| 605 Fairview Avenue North | St. Paul | MN | USA | Owned |
| 550 East 84th Ave., Suite E5 | Thornton | CO | USA | Leased |
| 680 E. Swedesford Road | Wayne | PA | USA | Leased |

## **EXHIBIT J**

**Location of the Debtors' Substantial Assets, Books and Records,
and Nature and Location of the Debtors' Assets Outside the United States**

Pursuant to Local Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

| The Debtors' Assets | Location |
| --- | --- |
| Books & Records | 680 Swedesford Road<br>Wayne, PA 19087 |

## EXHIBIT K

### Summary of Legal Actions against the Debtors

Pursuant to Local Rule 1007-2(a)(11), the following lists material actions and proceedings pending or threatened against The Company or its properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date.  This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these chapter 11 cases.

| Entity | Counterparty | Nature of the Claim | Status |
|--------|-------------|--------------------|--------|
| Sungard AS | Adam Burtt | EEOC litigation | Not yet filed, but the company has been put on notice |
| Sungard AS | Realtime Data LLC | Patent litigation related to deduplication of data used in services | In the discovery phase |

## EXHIBIT L

### The Debtors' Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| *Andrew Stern*, Chief Executive Officer | Mr. Stern previously served at USinternetworking, Inc. ("USi"), the original cloud-computing and software-as-a-service company, as Chief Executive Officer from 2000 to 2008, Chief Operating Officer from 1999 to 2000, and Executive Vice President and Chief Financial Officer from 1998 to 1999. Mr. Stern also chaired USi's board. Prior to joining USi, Mr. Stern was Executive Vice President, Strategy and Reinsurance Operations, at USF&G, a $14 billion asset multi-line insurance company. Previously, Mr. Stern was Vice President and Partner at Booz-Allen & Hamilton, a management and IT consulting firm. Mr. Stern holds a Bachelor of Science degree in electrical engineering from the Massachusetts Institute of Technology and a Master of Business Administration degree from the University of Chicago. | June 2010 |
| *Alfred Binford*, Executive Vice President, Worldwide Sales & Solution<br><br>Sungard AS, Sungard Availability Services Holdings, LLC ("Sungard Holdings"), and Sungard Availability Services LP ("Sungard LP") | Mr. Binford has more than 20 years of executive leadership experience in sales and business operations in the technology, outsourcing, and telecommunications industries. Mr. Binford joined the Company from Pearson PLC, a multinational publishing and education company, where he served as Managing Director for Business Development within their North America Unit. Previously, Mr. Binford held executive leadership roles with Amdocs, Vodafone, Unisys, and EDS, and earlier in his career, at AT&T and Verizon. Mr. Binford earned a Bachelor's degree from the State University of New York, and his Master of Business Administration degree in Marketing from Fairleigh Dickinson University. During his career, he has enjoyed supporting community activities, including currently serving as a Trustee for Marygrove College in Detroit Michigan, where he was also formerly Chairman | January 2017 |
| *Josh Crowe*, Chief Technology Officer of Sungard AS, Sungard Holdings, and Sungard LP | Mr. Crowe has over two decades of experience within the field. Before joining the Company, Mr. Crowe served as Senior Vice President, Product Development for Internap, a global provider of data center and cloud solutions, and served in roles as Vice President of Software Development and Cloud Services at Savvis (now CenturyLink), a telecommunication company member of the S&P 500 and in the Fortune 500. Mr. Crowe holds a Bachelor's degree from Missouri State University and Master's degrees in both business administration and information management from Washington University in St. Louis. | February 2014 |

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| *Andy Dzerovych*, Executive Vice President, Global Operations of the Company | Mr. Dzerovych has more than 30 years of IT experience in product and technology strategy, managed services, and network and computing infrastructure. Prior to joining the Company, Mr. Dzerovych served as Senior Vice President, Business Service Delivery at AT&T. Previously, Mr. Dzerovych served as President and Chief Executive Officer of AT&T Solutions and AT&T Datacomm, as well as various other roles in customer service, operations, sales, and IT at AT&T. Mr. Dzerovych holds a Bachelor of Science in Engineering Sciences from Harvard University and a Master of Science in Computer Science from Stevens Institute of Technology. | May 2014 |
| *Eric Koza*, Chief Restructuring Officer of Sungard AS | Prior to assuming this position, Mr. Koza advised the Debtors and their non-Debtor affiliates in his capacity as Managing Director of AlixPartners beginning on November 26, 2018. Mr. Koza has more than 20 years of experience serving in senior management positions, as a financial advisor, principal investor, and director of public and private companies. Mr. Koza was recently recognized as Chief Restructuring Officer of Turnaround Management Association's 2018 Transaction of the Year, Mega Company, and was named one of the industry's top "People to Watch" by Turnarounds & Workouts 2018. Mr. Koza earned a Bachelor of Science from Boston College, a Master of Business Administration from Boston University, and is a CFA charterholder. | February 2019 |
| *Susan Lynch*, Executive Vice President and Chief Financial Officer of Sungard AS, Sungard Holdings, and Sungard LP | Ms. Lynch has more than 20 years of experience in Chief Financial Officer and senior finance roles within the technology, aerospace, and defense and industrial manufacturing industries. Most recently, Ms. Lynch was Executive Vice President and Chief Financial Officer, Global Information Solutions at Hitachi, Ltd., a $6 billion worldwide division that is Hitachi, Ltd.'s focal point for storage infrastructure solutions, software, and consulting services. Before joining Hitachi Data Systems in 2007, Ms. Lynch served as Vice President and Chief Financial Officer at Raytheon Technical Services Company. Previously, Ms. Lynch held a broad range of senior management roles at Honeywell International, including assistant Corporate Controller, Global Business Services, Director of Business, Analysis and Planning, and Chief Financial Officer for the Latin American Region. Ms. Lynch holds a bachelor's degree in accounting and business administration from MidAmerica Nazarene University in Olathe, Kansas, and was voted Alumna of the Year by the school in 2006. She is a Certified Public Accountant, a founding member of the Honeywell Women's Leadership Group and the Hitachi Data Systems Women's Leadership Group. Ms. Lynch was recognized as Female Executive of the Year at the 2013 Stevie Awards, which honors women in business, and is hailed as one of the world's premier business awards | April 2016 |

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| *Bill Price*, General Counsel & Chief Administration Officer of Sungard AS, Sungard Holdings, and Sungard LP | Mr. Price has more than 25 years of broad corporate, legal, and operating experience. Previously, Mr. Price was Senior Vice President and Assistant General Counsel at AT&T where he managed the enterprise sales and Sterling Commerce (sold to IBM) legal teams, which were responsible for over $40 billion in annual revenues. Before AT&T, Mr. Price served 10 years as Senior Vice President, General Counsel and Secretary of USi. Mr. Price began his career associated with a number of New York law firms representing clients in a variety of areas including venture capital, private equity, mergers and acquisitions, commercial transactions, and litigation. Mr. Price earned a Bachelor of Arts in Economics from St. Lawrence University and a law degree from Syracuse University. | January 2011 |
| *Kathy Schneider*, Chief Marketing Officer of the Company | Ms. Schneider has more than two decades of technology and business-to-business marketing experience at both pre-IPO and Fortune 500 companies. Ms. Schneider also has leadership responsibility for the Company's European and North American Customer 28 Advisory Boards. Ms. Schneider joined the Company from Level 3 Communications, where she was Senior Vice President, Product and Marketing – EMEA. Prior to joining Level 3 Communications, Ms. Schneider was with Critero as Senior Vice President, Marketing & Communications, a publicly-traded technology company specializing in digital marketing and big data. Previously, Ms. Schneider worked at Dell Inc. in a variety of marketing leadership roles in the U.S. and EMEA. Ms. Schneider graduated with honors from Georgetown University in Washington D.C. with a Bachelor's degree in International Politics. Upon graduating, she moved to Mexico City to work in brand management for Kraft Foods. Ms. Schneider earned her Master of Business Administration from UCLA's Anderson School of Management in Los Angeles. | August 2017 |

## <u>EXHIBIT M</u>

**The Debtors' Payroll for the 30 Day Period
Following the Filing of the Debtors' Chapter 11 Petitions**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained the Debtors.

| Payments | Payment Amount |
|---|---|
| Payments to employees (not including officers, directors, and stockholders) | $16.4 million |
| Payments to officers, directors, and stockholders | $4.4 million |
| Payments to financial and business consultants | $100,000 |

## <u>EXHIBIT N</u>

**The Debtors' Estimated Cash Receipts and Disbursements for the
Thirty (30) Day Period Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
|------|--------|
| Cash Receipts | $47.0 million |
| Cash Disbursements | $53.3 million |
| Net Cash Loss | $6.3 million |
| Unpaid Obligations (excluding professional fees) | $25.4 million |
| Unpaid Receivables (excluding professional fees) | $74.4 million |