Jonathan S. Henes, P.C.
Emily E. Geier (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Ryan Blaine Bennett, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SUNGARD AVAILABILITY SERVICES CAPITAL, INC. *et al.,*[1] | ) | Case No. 19-22915 (RDD) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Sungard Availability Services Capital, Inc. ("Sungard AS") and the other above-captioned debtors and debtors-in-possession (collectively, with Sungard AS, the "Debtors," and together with the Debtors' non-debtor affiliates, collectively, the "Company"), respectfully state the following in support of this motion (this "DIP Motion"):

---

[1]   The last four digits of the Debtors' tax identification number are Sungard Availability Services Capital, Inc. (7677); Sungard Availability Services Holdings, LLC (6403); Sungard Availability Services Technology, LLC (9118); Inflow LLC (9489); Sungard Availability Services, LP (6195); Sungard Availability Services Vericenter Inc. (4039); Sungard Availability Network Solutions, Inc. (1034).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  50 Main Street, Suite 1014, White Plains, NY 10606.

**Preliminary Statement**

1.      Over the course of several months, the Debtors, their advisors, and their major stakeholders from nearly all levels of the capital structure—including an ad hoc group of prepetition secured lenders  (the "Secured Lender Group"), an ad hoc crossholding group of prepetition secured lenders and noteholders (the "Crossover Group"), and their prepetition private equity sponsors (the "Sponsors," and collectively with the Debtors, the Secured Lender Group, and the Crossover Group, the "RSA Parties")—worked diligently and in good faith to negotiate the terms of the Debtors' comprehensive restructuring.  These negotiations successfully resulted in a deal in principle, the material terms of which were set forth in a restructuring support agreement (the "RSA") entered into prepetition by the Debtors and the foregoing stakeholders, which hold in the aggregate over 75% of the principal amount outstanding of the Debtors' prepetition funded debt obligations.  These efforts culminated in the commencement by the Debtors of the above-captioned chapter 11 cases (the "Cases") following the successful solicitation of a fully consensual prepackaged chapter 11 plan of reorganization (the "Plan").  Altogether, the Plan will result in the reduction of the Debtors' funded debt obligations by approximately $900 million.

2.      The Plan is the centerpiece of a series of interdependent agreements and financing commitments, each one critical to the others and necessary for the Debtors' reorganization.  One such financing commitment is the senior secured super-priority debtor in possession credit facility, the DIP Facility, proposed to be entered into by the Debtors, the DIP Lenders and the DIP Agent on the terms set forth in the DIP Loan Documents.  Considering the highly consensual nature of the Debtors' Cases, the Debtors intend to confirm the Plan and emerge from chapter 11 as expeditiously as possible—in which case the DIP Facility may not be necessary to fund the Debtors' operations through bankruptcy.  During the negotiations leading up to the execution of

the RSA, uncertainty surrounding the Debtors' available liquidity and their ability to financially weather these bankruptcy proceedings led the RSA Parties to seek access to postpetition funding for the Debtors. The Debtors and the other RSA Parties recognized it would be prudent and in the best interests of preserving the Company's going-concern value to have access to the DIP Facility, if needed. The RSA, the Plan, and the DIP Orders provide the flexibility the Debtors need to either fund operations during these Cases, if necessary, or to draw upon the financing commitments contemplated therein upon emergence. The requested relief will ensure the Debtors have continued access to liquidity both during the pendency of these Cases and following the Debtors' emergence from bankruptcy through the streamlined transactions described herein.

3.      Irrespective of whether the Debtors' draw on the DIP Facility, the relief sought by this DIP Motion is highly valuable to the Debtors and will provide: (a) the assurance of an available postpetition debtor-in-possession financing commitment to draw on, if necessary, in the form of a non-amortizing multiple-draw term loan facility in a fully committed amount of $100 million, (b) the consensual use of the Cash Collateral of the Prepetition Secured Parties ("Cash Collateral," and together with the DIP Facility, the "DIP Financing"),[2] and (c) a commitment for exit financing. Notably, if as anticipated, these Cases last for a short duration, the DIP Facility will unlikely be drawn and, subject to the satisfaction of applicable conditions, the DIP Lenders will instead directly fund the Exit Term Loan. The DIP Facility, if incurred, will be secured by first priority liens on, and security interests in, all of the Debtors' unencumbered assets as of the date hereof (the "Petition Date") and super-priority priming liens on, and security interests in, all of the Debtors' assets that are encumbered as of the Petition Date. Having access to the DIP Financing, including the use of Cash Collateral, on the first day of these Cases is a prerequisite for the Debtors'

---

[2]    "Cash Collateral" has the meaning set forth in section 363(a) of the Bankruptcy Code.

major stakeholders to support the Plan and is critical for the success of the Debtors' reorganization efforts.

4.      The DIP Lenders have also agreed to provide the Debtors with exit financing.  In short, all borrowings and undrawn commitments under the DIP Facility will, upon the satisfaction of applicable conditions, be converted into a senior secured term loan exit facility (the "Exit Term Loan").  In addition to the Exit Term Loan, upon emergence, the reorganized Debtors (a) intend to have access to a $50 million third-party senior secured revolver facility (the "Exit Revolver") and (b) will have issued a $300 million senior secured takeback term loan facility (the "New Term Loan," and together with the Exit Term Loan and Exit Revolver, collectively, the "Exit Facilities").  Together, it is anticipated that the aggregate amounts committed under the Exit Facilities will be $450 million.  These exit commitments, including the DIP Lenders' agreement to, upon satisfaction of applicable conditions, convert their outstanding claims under the DIP Facility into claims under the Exit Term Loan (rather than seeking to be paid in cash in full), provide the Debtors at the outset of these Cases with a clear and reliable path to emerge from chapter 11 in an expeditious manner with a stronger balance sheet.

5.      In addition to being a critical component of the RSA, the Plan and the related interdependent agreements, the use of Cash Collateral, is both necessary to provide working capital during the pendency of these Cases and is vital to the Debtors' emergence from bankruptcy as a reorganized business enterprise.  Without access to Cash Collateral and, if necessary, the DIP Facility, the Debtors may not have sufficient cash on hand to maintain uninterrupted business operations, provide ongoing service to their customers, or pay their employees while they restructure their businesses.  Such a disruption in operations would likely have a grave and immediate impact on the Debtors' businesses and negatively impact their restructuring efforts.

6.     As described in greater detail herein and in the Greene Declaration,[3] the DIP Financing is the result of a robust marketing process and negotiation process led by the Debtors' investment banker, Centerview Partners LLC ("Centerview").  In this case, obtaining access to postpetition financing was difficult because all, or substantially all, of the Debtors' U.S. assets, and a part of the Debtors' foreign assets are encumbered by valid and perfected first-priority liens. In order to avoid a protracted and expensive priming fight, the Debtors would need either to (a) obtain the consent of the Prepetition Secured Parties to the priming of their liens or (b) locate a third-party lender willing to provide postpetition financing on an unsecured basis.  Because neither option was available, and in the exercise of sound business judgment, the Debtors negotiated extensively with the Secured Lender Group and Crossover Group, at arms'-length and in good faith, for access to critical and necessary postpetition financing, including the use of Cash Collateral, in the form of the DIP Financing.  The Secured Lender Group and Crossover Group have reviewed and commented on, and consent to the entry of, the Interim Order and the DIP Loan Documents pursuant to the terms of the RSA and Plan.  Thus, as set forth in the Koza Declaration,[4] the DIP Financing pending before the Court is the Debtors' best and only available option and one supported by all of the Debtors' major constituencies.

7.     For the reasons set forth herein, the Debtors believe that the authority to obtain DIP Financing, including the use of Cash Collateral, is in the best interests of the Debtors, their

---

[3]   The "Greene Declaration" refers to the *Declaration of Samuel Greene in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors (A) To Obtain Postpetition Financing and (B) To Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, filed contemporaneously herewith.

[4]   The "Koza Declaration" refers to the *Declaration of Eric Koza in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors (A) To Obtain Postpetition Financing and (B) To Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, filed contemporaneously herewith.

estates, and their creditors.    Accordingly, the Debtors respectfully request approval of the

DIP Motion and authority to enter into the DIP Financing and to use Cash Collateral, as more fully

detailed herein and in the Greene Declaration and the Koza Declaration, subject to the terms and

conditions set forth in the orders granting such relief.

## Jurisdiction and Venue

8.       The United States Bankruptcy Court for the Southern District of New York

(the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference from the United States District Court for the Southern*

*District of New York*, dated January 31, 2012.  The Debtors confirm their consent, pursuant to Rule

7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a

final order by the Court in connection with this DIP Motion to the extent that it is later determined

that the Court, absent consent of the parties, cannot enter final orders or judgments in connection

herewith consistent with Article III of the United States Constitution.

9.       Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.       The statutory bases for the relief requested herein are sections 105, 361, 362, 363,

364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of title 11 of the United States Code

(the "Bankruptcy Code"), Bankruptcy Rules 2002-1, 4001-2, 9006-1, 9013-1, and 9014-1, and

Rule 9014-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local

Bankruptcy Rules").

**<u>Relief Requested</u>**

11.      By this DIP Motion, the Debtors request entry of an interim order, substantially in

the form attached hereto as **<u>Exhibit 1</u>** (the "<u>Interim Order</u>"),[5] and a final order (the "<u>Final Order</u>,"

and together with the Interim Order, the "<u>DIP Orders</u>") granting, among other things, the following

relief:

- ***DIP Facility***:  authority to obtain a senior secured, superpriority, multiple-draw term credit facility in a principal amount of $50 million on an interim basis and an aggregate amount of $100 million pursuant to the terms and conditions of that certain DIP Term Sheet attached as <u>Exhibit A</u> to the Interim Order (the "<u>DIP Term Sheet</u>"), and as may be further memorialized by a Superpriority Senior Secured Debtor-In-Possession Credit Agreement (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "<u>DIP Loan Agreement</u>"), between Sungard AS (the "<u>Borrower</u>"), and each of the Debtors as guarantors (the "<u>Guarantors</u>"), the relevant lenders (collectively, the "<u>DIP Lenders</u>"), Cortland Capital Market Services LLC, as administrative agent and collateral agent (in such capacities, the "<u>DIP Agent</u>" and, together with the DIP Lenders, collectively, the "<u>DIP Parties</u>"), and other agents and entities from time to time party thereto, substantially in the form of the DIP Term Sheet (the "<u>DIP Facility</u>") **(Interim Order ¶ 7)**;

- ***DIP Loan Documents***:  authority to execute and deliver all agreements, documents, and instruments contemplated by the DIP Orders, the DIP Term Sheet, and the DIP Loan Agreement (collectively, the "<u>DIP Loan Documents</u>"), and to take all actions necessary, appropriate, or required to comply with the Debtors' obligations under the DIP Loan Documents and under the DIP Orders **(Interim Order ¶ 7)**;

- ***DIP Liens and Claims***:  authority to grant the DIP Agent, for its own benefit and the benefit of the DIP Lenders, super-priority priming liens in the DIP Collateral (as defined below) securing the DIP Facility, and super-priority claims in respect of the obligations under the DIP Facility, each subject to the Carve-Out (as defined below) **(Interim Order ¶¶ 9-10)**;

- ***Cash Collateral***:  authority to use the Cash Collateral of the Prepetition Secured Parties (as defined below) **(Interim Order ¶ 15)**;

- ***Adequate Protection***:  approval of the Adequate Protection Obligations (as defined below) to be provided to the Prepetition Secured Parties, to protect the Prepetition Secured Parties' interests in the Cash Collateral, as well as to compensate for any

---

[5]    A redline of the changes to the Interim DIP Order to the version shared with the Bankruptcy Court on April 26, 2019 is attached hereto as **<u>Exhibit 2</u>**.

decline in, or diminution of, the value of the Prepetition Secured Parties' interest in the Prepetition Collateral (as defined below) **(Interim Order ¶ 16)**;

- *Automatic Stay*: modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the DIP Orders **(Interim Order ¶ 7)**;

- *Final Hearing*: scheduling by the Court of a final hearing (the "Final Hearing"), if necessary, to consider entry of the Final Order granting the relief requested in this DIP Motion on a final basis **(Interim Order ¶ 37)**; and

- *Immediate Effectiveness*: waiver of any applicable stay, including under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order (including a waiver pursuant to Bankruptcy Rule 6004(h) **(Interim Order ¶ 36)**.

**Concise Statement Pursuant to Local Bankruptcy Rule 4001-2**

12.     Pursuant to Bankruptcy Rules 4001(b), (c) and (d), and Local Bankruptcy Rule 4001-2, the following is a concise statement and summary of the proposed material terms of the DIP Financing as provided in the DIP Term Sheet and DIP Orders:[6]

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| **DIP Parties**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Debtor Parties**:<br><br>*Borrower*: Sungard AS.<br><br>*Guarantors*: The DIP Guarantors (collectively with the Borrower, the "Loan Parties").<br><br>**Lending Parties**:<br><br>*DIP Agent*: Cortland Capital Market Services LLC.<br><br>*DIP Lenders*: Includes lenders from time to time party to the DIP Loan Agreement that are (i) lenders under the Prepetition Credit Agreement under one tranche of the DIP Facility (the "Tranche A DIP Facility"); and (ii) certain holders of Prepetition Notes under a separate tranche of the DIP Facility (the "Tranche B DIP Facility").<br><br>*DIP Backstop Parties*: Certain entities, as set forth on Schedule A to the DIP Term Sheet providing the Backstop Commitments (as defined in the DIP Term Sheet). |
| **Maturity**<br><br>*Local Bankruptcy Rule 4001-2(a)(10);* | Maturity Date: Unless converted to the Exit Term Loan, all obligations under the DIP Loan Documents will be due and payable in full in cash on the earliest of: (i) the date that is six months after the Closing Date (as defined below); (ii) if the Final Order has not been entered by the Court on or before the applicable Milestone (as defined below), |

---

[6]   This summary is intended only to assist the Court by reference to the DIP Term Sheet and the DIP Orders, and is qualified in its entirety by the terms of the DIP Loan Documents, each as may be modified by the DIP Orders. Capitalized terms used in this statement but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Loan Documents or DIP Orders, as applicable.

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B)* | the date of the applicable Milestone; (iii) the date of acceleration of the DIP Loans (as defined below) and the termination of the DIP Lenders' commitments under the DIP Facility pursuant to the terms of the DIP Loan Agreement; (iv) the date the Court orders a conversion of the Cases to a chapter 7 liquidation or the dismissal of the chapter 11 case of any Debtor; or (v) the substantial consummation (as defined in 11 U.S.C. § 1101(2) of the Bankruptcy Code) of the Plan), which has been confirmed by an order entered by the Court (the "<u>Confirmation Order</u>") (such earliest date, the "<u>Maturity Date</u>"). |
| **<u>Use of Proceeds</u>** <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | **<u>DIP Facility</u>**.  In accordance with and subject to the DIP Budget (as defined below) and the DIP Orders (as defined below), the proceeds of the DIP Facility may be used only for the following purposes:  (A) to pay reasonable and documented transaction costs, fees and expenses that are incurred in connection with the restructuring or Cases, for working capital and general corporate purposes of the Loan Parties, (B) to make adequate protection payments as set forth in the DIP Orders and (C) up to $20 million of proceeds shall be applied to fund a segregated domestic account (the "<u>Specified Account</u>") which funds shall be available to the Debtors for disbursement to certain non-Debtor subsidiaries of the Borrower through secured intercompany borrowings evidenced by promissory notes (the "<u>Specified Intercompany Notes</u>") on an as-needed basis in accordance with the DIP Budget.  **(Interim Order ¶ 7(c))** |
| **<u>Interest Rates</u>** <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | **<u>Interest Rate</u>**.  Interest is payable at (a) LIBOR plus 7.50%; or (b) the Base Rate[7] plus 6.50%; at the option of the Borrower, in each case payable in cash. <br><br> **<u>Default Rate</u>**.  Non-default interest rate plus an additional 2.00% on the DIP Loans and all overdue amounts (interest, fees).  Default interest shall be payable in cash on demand. |
| **<u>DIP Commitments</u>** <br><br> *Local Bankruptcy Rule 4001-2(a)(1);* <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | **<u>DIP Commitments</u>**.  Total aggregate commitment of $100 million comprised of (i) the $87 million Tranche A DIP Facility and (ii) the $13 million Tranche B DIP Facility to be disbursed ratably between the Tranche A DIP Facility and Tranche B DIP Facility as Initial DIP Loans in the amount of $50 million (or lesser amount approved by the Court and set forth in the Interim Order, the loans advanced on such date, the "<u>Initial DIP Loans</u>") (and, upon entry of the Final Order, additional draws of up to an aggregate amount $100 million less the amount of the Initial DIP Loans actually borrowed (the "<u>Delayed Draw DIP Facility</u>" and the loans advanced under the Delayed Draw DIP Facility, the "<u>Delayed Draw DIP Loans</u>" and, together with the Initial DIP Loans, the "<u>DIP Loans</u>").  Any amount not so allocated to the Tranche A DIP Facility or Tranche B DIP Facility shall be allocated to the DIP Backstop Parties in accordance with the terms of the DIP Loan Documents.  **(Interim Order (a))** |
| **<u>Conditions</u>** <br><br> *Local Bankruptcy Rule 4001-2(a)(2);* <br><br> *Local Bankruptcy Rule 4001-2(h);* | **<u>Closing Conditions.</u>**  Usual and customary conditions to effectiveness of the DIP Facility reasonably satisfactory to the DIP Backstop Parties consistent with the consent rights set forth in the RSA, including, without limitation, the DIP Backstop Parties' reasonable satisfaction with the Debtors' cash management arrangements, monthly financial forecasts, all documentation related to the DIP Facility, and the Debtors' |

---

[7]   "<u>Base Rate</u>" equals the higher of (a) the Federal Reserve Bank of New York's federal funds rate plus 0.5% and (b) the Prepetition Agent's prime rate in effect at that time.

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B)* | postpetition financing budget,[8] effectiveness of the RSA, no events reasonably expected to cause a material adverse change, entry of an Interim Order, stipulation to the validity of Prepetition Liens and security interests, no appointment of trustee or examiner, payment of costs and fees, and accuracy of representations and warranties.<br><br>**Funding Conditions.**   Each withdrawal by the Borrower from the DIP Loan Disbursement Account is subject to usual and customary funding conditions, including delivery of a Committed Loan Notice, accuracy of representations, and no defaults under the DIP loan documents. |
| **Fees & Payments**<br><br>*Local Bankruptcy Rule 4001-2(a)(3);*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Commitment Payment.**   Cash payment equal to 2.50% of the average daily unused portion of the Delayed Draw DIP Facility payable quarterly in arrears.<br><br>**Administrative Fee.**[9]<br><br>**Put Option Premium.**   A put option premium equal to 3.00% of the principal amount of the backstopped commitments.<br><br>**Upfront Fee.**   3.00% of the committed amount of the DIP Loans in the form of an original issue discount.<br><br>**Professionals' Fees and Expenses**.   Payment of reimbursable fees, costs, and expenses as set forth in the section below entitled "Adequate Protection."<br>**(Interim Order ¶¶ 16(c), 25)** |
| **Liens and Priorities**<br><br>*Local Bankruptcy Rule 4001-2(a)(4);*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP Liens**.   As security for the DIP Obligations, effective and perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral (as defined below), the following security interests and liens are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "DIP Collateral"), subject to payment of the Carve-Out (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP Loan Documents, the "DIP Liens"):<br><br>    (a)     **First Lien on Unencumbered Property**.   Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically and properly perfected first priority senior security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), including, without limitation, any unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise) and any investment of such cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment |

---

[8]   A copy of the Initial DIP Budget is attached to the Interim Order as <u>Exhibit B</u>.

[9]   Due to the sensitive commercial nature of the Fee Letter (as defined in the DIP Loan Documents) and the confidentiality provisions contained therein, the Debtors have not attached a copy of the Fee Letter to this Motion. Upon request, the Debtors will make copies of the Fee Letter available to the Court and the U.S. Trustee on a confidential basis.

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
|---|

intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests (including equity interests in subsidiaries of each Debtor),  money, investment property, the Specified Account, the Specified Intercompany Notes, intercompany claims, claims arising on account of transfers of value from a Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition Date, causes of action, including causes of action arising under Bankruptcy Code section 549 (but excluding all other Avoidance Actions), all products and proceeds of the foregoing and, subject to the Final DIP Order, all proceeds and property recovered in respect of Avoidance Actions.

(b)   <u>Liens Priming the Prepetition Liens</u>.  Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all property of the Debtors including, without limitation, the Prepetition Collateral, Cash Collateral, and any investment of such cash and cash equivalents, accounts, deposit accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests (including equity interests in subsidiaries of each Debtor), money, investment property, causes of action, and all products and proceeds of the foregoing, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, that is subject to any liens securing the Prepetition Loan Obligations; <u>provided</u> that such liens shall be immediately junior to any liens that were senior to the liens securing the Prepetition Loan Obligations as of the Petition Date.

(c)   <u>Liens Junior to Certain Other Liens</u>.  Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all prepetition and postpetition property of the Debtors, whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date that are senior to the liens securing the Prepetition Loan Obligations or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) that are senior to the liens securing the Prepetition Loan Obligations, which security interests and liens in favor of the DIP Agent and the DIP Lenders are junior only to such valid, perfected and unavoidable liens.

<u>DIP Facility Priorities</u>.  The DIP Obligations shall also constitute claims entitled to the benefits of Bankruptcy Code section 364(c)(1), having a super-priority over any and all administrative expenses and claims, of any kind or nature whatsoever, including, without limitation, the superpriority claims granted to the DIP Agent and DIP Lenders under the Interim Order and the Final Order, and the administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506 (subject to the entry of the Final Order), 507(a), 507(b), 546, 552 (subject to the entry of the Final Order),

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
|---|

726, 1113 and 1114, and any other provision of the Bankruptcy Code ("DIP Superpriority Claims"), subject only to the Carve-Out. **(Interim Order ¶ 9)**

**Adequate Protection.** Subject only to the Carve-Out and the terms of this Interim Order, pursuant to Bankruptcy Code sections 361, 363(e) and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition diminution in value of such interests (each such diminution, a "Diminution in Value"), resulting from, among other things, the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve-Out, the Debtors' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties, is hereby granted the following (collectively, the "Adequate Protection Obligations"):

(a) **Adequate Protection Liens**. As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of this Interim Order (the "Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and if authorized in the Final Order, all proceeds or property recovered from Avoidance Actions.

(b) **Adequate Protection Superpriority Claims.** As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), allowed administrative expense claims in each of the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any postpetition Diminution in Value (the "Adequate Protection Superpriority Claims"), except the Carve-Out and the DIP Superpriority Claims. Subject to the Carve-Out and the DIP Superpriority Claims in all respects, the Adequate Protection Superpriority Claims will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (if authorized in the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114. The Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Superpriority Claims under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Requisite Lenders, in each case as provided in the DIP Loan Documents.

(c) **Fees and Expenses.** As further adequate protection, the Debtors are authorized and directed to pay all reasonable and documented fees and expenses (the "Adequate Protection Fees"), whether incurred before or after the Petition Date, of (a) one counsel (Cravath, Swaine & Moore LLP) for the Prepetition Agent; (b) one counsel (Akin Gump) and the financial advisors (PJT Partners LP and DH Capital, LLC) for the Crossover Group; and (c) one counsel (Jones Day) and one financial advisor (Houlihan Lokey) for the Secured Lender Group in accordance with Paragraph 25 of the Interim Order. None of the Adequate Protection Fees shall be subject to separate approval by this Court or the U.S. Trustee Guidelines and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise see the Court's approval of any such payments. **(Interim Order ¶ 16)**

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| **Carve-Out**<br><br>*Local Bankruptcy Rule 4001-2(a)(5)*<br><br>*Local Bankruptcy Rule 4001-2(d)* | As set forth in the Interim Order, customary for postpetition financings of this size, providing for a carve-out (the "<u>Carve-Out</u>") from pre- and postpetition claims, liens and interests for:<br><br>• fees to the Clerk of the Court and to the U.S. Trustee;<br><br>• any chapter 7 trustee fees incurred by a trustee under section 726(b) of the Bankruptcy Code, subject to a $50,000 cap;<br><br>• all unpaid fees, costs, disbursements and expenses (the "<u>Debtors' Professional Fees</u>") of professionals retained by the Debtors in these Cases pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "<u>Debtors' Professionals</u>") or retained by any Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtors' Professionals, the "<u>Professionals</u>" and the fees and expenses of such Professionals, the "<u>Professional Fees</u>") that are incurred at any time before or on the first business day after the delivery of a Carve-Out Trigger Notice by the DIP Agent on behalf of the DIP Lenders and are allowed by the Court (whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice) and remain unpaid after application of any available funds remaining in the Debtors' estates for such Professionals, subject to the Investigation Budget Cap (the "<u>Pre-Carve-Out Amounts</u>"); and<br><br>• after the first business day following the delivery by the DIP Agent of the Carve-Out Trigger Notice (the "<u>Trigger Date</u>"), to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of all Professional Fees of Professionals not to exceed $2,000,000 incurred on and after the Trigger Date (this amount being the "<u>Post Carve-Out Trigger Notice Cap</u>") (plus all unpaid fees, costs, disbursements, and expenses of the Professionals allowed by the Court at any time that were incurred on or prior to the first business day following the delivery of the Carve-Out Trigger Notice).<br><br>For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Facility and acceleration of the DIP Obligations (including events of default resulting from defaults under the Interim Order or Final Order, as applicable), stating that the Post-Carve Out Trigger Notice Cap has been invoked.<br><br>The Debtors shall fund a segregated account (the "<u>Carve-Out Reserves</u>") in an aggregate amount equal to the Pre-Carve-Out Amounts and the Post-Carve-Out Amounts in trust for the Professionals not subject to control, foreclosure, or sweeping by the DIP Agent or DIP Lenders (it being understood that the DIP Agent on behalf of the DIP Lenders shall have a lien and security interest in any residual amount of such segregated account) immediately on the day in which a Carve-Out Trigger Notice is given to the Debtors.  **(Interim Order ¶ 11)** |
| **Covenants**<br><br>*Local Bankruptcy Rule 4001-2(a)(8);* | **DIP Facility Affirmative Covenants**.  Usual and customary for financings of this type, including delivery of financial statements, delivery of cash flow forecasts, delivery of certain weekly performance reports, a rolling seven-week budget (together with the Initial DIP Budget, the "<u>DIP Budget</u>") and weekly variance reports setting |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B)* | forth cash receipts and expenditures and variances from the Initial DIP Budget or subsequent budget updates.

**DIP Facility Negative Covenants**.  Usual and customary for financings of this type, including not to permit the existence of any claims, other than those arising under the DIP Facility and the replacement liens and super-priority claims as described herein entitled to a super-priority under section 364(c)(1) of the Bankruptcy Code and a prohibition against the DIP Parties refinancing the DIP Loans absent the written consent of the DIP Backstop Parties consistent with the consent rights as set forth in the RSA.

**DIP Facility Financial Covenants.**  Beginning with the end of every two week period commencing on April 29, 2019 (i) the sum of the Debtors' actual cash receipts during the applicable Test Period (as defined below) shall not be less than 85% of the projected "cash receipts" for such Test Period as set forth in the DIP Budget and (ii) the sum of the Debtors' actual operating cash disbursements during such Test Period shall not exceed 115% of the projected "operating cash disbursements" (which shall in each case include capital expenditures) for such Test Period as set forth in the DIP Budget. Additionally, the Borrower shall not permit (i) consolidated unrestricted cash and cash equivalents of the Borrower and its subsidiaries (ii) unused commitments under the Delayed Draw DIP Facility to be less than $50 million at any time.

"Test Period" shall mean, with respect to actual cash receipts and operating cash disbursements, (x) initially, the two-week period commencing on April 29, 2019 and ending on May 10, 2019 and (y) thereafter, each rolling four-week period. |
| **Limitations on Use of DIP Facility and Cash Collateral**

*Fed. R. Bankr. P. 4001-2(a)(9)* | No portion of the Carve-Out, any Cash Collateral or proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of, (i) any of the DIP Lenders' liens or claims, or the initiation or prosecution of any claim or action against any DIP Lender, including any claim under chapter 5 of the Bankruptcy Code, in respect of the Prepetition Credit Documents (as defined below) and (ii) any claims or causes of actions against the Prepetition Secured Parties, their respective advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof, and/or challenging any lien of the Prepetition Secured Parties under the Prepetition Credit Documents; *provided* that, in each case, such limitations shall not apply to any investigation of the Prepetition Obligations and Prepetition Liens by a Committee in an aggregate amount for all Committees not to exceed $50,000 (the "Investigation Budget Cap"). **(Interim Order ¶ 26)** |
| **Events of Default**

*Local Bankruptcy Rule 4001-2(a)(10); Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP Facility**.  The DIP Loan Documents will contain events of default customarily found in loan agreements for similar debtor in possession financings and other events of default agreed upon by the Borrower and the DIP Backstop Parties  consistent with the consent rights set forth in the RSA, including, without limitation, any termination of the use of prepetition cash collateral pursuant to the DIP Orders, as applicable, dismissal or conversion of the Cases, adverse motions or Court orders, termination of the Interim Order or the Final Order, as applicable (except in the case of the Interim Order, as a result of the entry of the Final Order), allowance of any claims under Section 506(c) of the Bankruptcy Code, filing of an unacceptable Plan or disclosure statement, termination of the Restructuring Support Agreement in accordance with its terms, and an unapproved sale of the Debtors' assets.

Prior to the execution of the DIP Loan Documents, the events of default under the DIP Facility shall be consistent with the events of default under Section 8.01 of the Prepetition Credit Agreement (other than Sections 8.01(f) or (g) of the Prepetition |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | Credit Agreement with respect to the Debtors) and the events of default set forth in Annex II to the DIP Term Sheet (collectively, the "Events of Default"). |
| **Milestones**<br><br>*Local Bankruptcy Rule 4001-2(a)(12);*<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(v-vi)* | The DIP Loan Documents will contain the following deadlines with respect to the Cases:<br><br>• Entry of the Interim Order that is acceptable to the Requisite Lenders: May 8, 2019.<br>• Entry of the Final Order that is acceptable to the Requisite Lenders May 31, 2019.<br>• Filing of a plan of reorganization that is acceptable to the Requisite Lenders (an "Acceptable Plan") and disclosure statement with respect to the Acceptable Plan (the "Disclosure Statement") with the Court: May 2, 2019.<br>• Entry by Court of an order approving the Disclosure Statement that is acceptable to the Requisite Lenders: May 31, 2019.<br>• Consummation of the Acceptable Plan: July 31, 2019.<br><br>**(DIP Term Sheet Annex I)**<br><br>"Requisite Lenders" means DIP Lenders holding at least 50.1% of the outstanding unused commitments and term loans under the Tranche A DIP Facility; provided that to the extent that at least one member of the Crossover Group and one member of the Secured Lender Group holds at least 6% of the outstanding unused commitments and term loans under the Tranche A DIP Facility, the Requisite Lenders must include at least one member of the Crossover Group and one member of the Secured Lender Group, in each case, who holds at least 6% of the outstanding unused commitments and term loans under the Tranche A DIP Facility. |
| **Repayment**<br>*Local Bankruptcy Rule 4001-2(a)(13)* | **Optional Prepayment.** The Debtors may prepay in full or in part the DIP Loans, without premium or penalty, subject to customary notice periods and payment of breakage costs.<br><br>**Mandatory Repayment.** 100% of net cash proceeds from (a) the sale or other disposition of assets, subject to exceptions to be agreed (which shall not be subject to a reinvestment right); (b) casualty events, subject to exceptions to be agreed; (c) any sale or issuance of debt (other than permitted debt to be agreed) and (d) any sale or issuance of equity securities (other than certain customary permitted equity issuances to be agreed). |
| **Joint Liability**<br>*Local Bankruptcy Rule 4001-2(a)(14);*<br>*Local Bankruptcy Rule 4001-2(e)* | All obligations of the Borrower will be unconditionally guaranteed, on a joint and several basis, by the other Loan Parties. |
| **Automatic Stay**<br><br>*Local Bankruptcy Rule 4001-2(c);*<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | The Interim Order provides for the lifting of the automatic stay to allow the DIP Agent and DIP Lenders to exercise (i) upon the occurrence of an Event of Default all rights and remedies under the DIP Loan Documents (other than rights and remedies against the DIP Collateral) and (ii) upon the occurrence and during the continuance of an Event of Default, and three (3) business days' prior written notice, all rights and remedies against the DIP Collateral provided for in the DIP Loan Documents. **(Interim Order ¶ 21)** |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| **Acknowledgements**<br><br>*Local Bankruptcy Rule 4001-2(f);*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii)* | The Debtors make certain customary admissions and stipulations with respect to the aggregate amount of prepetition indebtedness owing to the Prepetition Secured Parties and the validity, enforceability and priority of the liens and security interests granted to the Prepetition Agent to secure such indebtedness. **(Interim Order ¶ 5)** |
| **Waivers and Consents**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(v);*<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vii-x)* | Upon execution and delivery of the DIP Loan Documents, the Debtors' obligations under the DIP Loan Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their terms. No obligation, payment, transfer, or grant of security under the DIP Loan Documents or the Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d), 548, and 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim. **(Interim Order ¶ 7(e))**<br><br>**Indemnification**.  Usual and customary for financings of this type, including reasonable fees, charges and disbursements of the DIP Parties.<br><br>**506(c) Waiver**.  Subject to entry of the Final Order (if necessary), no costs or expenses of administration shall be surcharged against or recovered from or against any or all of the DIP Agent, DIP Lenders, the Prepetition Secured Parties, the DIP Collateral and the Prepetition Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or otherwise. **(Interim Order ¶ 12)**<br><br>**Marshaling Waiver**.  The equitable doctrine of "marshaling" shall be waived with respect to the DIP Collateral and Prepetition Collateral pursuant to the terms of the Final Order (if necessary). **(Interim Order ¶ 13)**<br><br>**552 Waiver**:  Each of the DIP Agent, DIP Lenders, and the Prepetition Secured Parties are entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code, and, upon entry of the Final Order, the "equities of the case" exception will not apply. **(Interim Order ¶ 14)** |

## Key Provisions

13.    As a condition to obtaining the proposed financing, the DIP Parties have required, and the Debtors have agreed to, certain provisions that may be considered key provisions to be highlighted to the Court.  These provisions include the following:

- Proceeds of Avoidance Actions.  The super-priority claims shall be chargeable against each of the Debtors and, subject to entry of the Final Order, the DIP Liens shall include liens on the proceeds of the Debtors' claims and causes of action (but not on the actual claims and causes of action themselves) arising under chapter 5 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law. **(Interim Order ¶ 9)**.

16

- <u>Automatic Stay Relief</u>.  The Interim Order provides for the lifting of the automatic stay to allow the DIP Agent and DIP Lenders to exercise (i) upon the occurrence of an Event of Default all rights and remedies under the DIP Loan Documents (other than rights and remedies against the DIP Collateral) and (ii) upon the occurrence and during the continuance of an Event of Default, and three (3) days' prior written notice, all rights and remedies against the DIP Collateral provided for in the DIP Loan Documents. **(Interim Order ¶ 21)**.

- <u>Carve-Out</u>.  The DIP Financing provides for a Carve-Out for the Clerk of the Court, any trustee appointed under Bankruptcy Code section 726(b), and Professional Fees. The Carve-Out is subject to a $50,000 cap in the case of a trustee and a cap of $2,000,000 with respect to Professional Fees incurred by Professional Persons retained by the Debtors and Professional Persons retained by the Creditor's Committee at any time after the first business day after the occurrence and during the continuance of an Event of Default and delivery of a Carve-Out Trigger Notice by the DIP Agent. **(Interim Order ¶ 11)**.  The Carve-Out does not provide for disparate treatment of the Debtors' and the Creditors' Committee's professionals and therefore is in compliance with Local Bankruptcy Rule 4001-2(d).

- <u>506(c) Waiver</u>.  Subject to the entry of the Final Order, no costs or expenses of administration shall be surcharged or otherwise imposed against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.  **(Interim Order ¶ 12)**.

- <u>Fees and Payments</u>.  As detailed above, the Debtors have agreed, subject to the Court's approval, to pay certain fees, payments and expenses of the DIP Parties in connection with the DIP Financing.  **(Interim Order ¶¶ 7(d), 25)**.

- <u>Creditor's Committee Investigation</u>.  The Debtors have agreed that the limitations on the use of Cash Collateral or proceeds of the DIP Facility or Carve-Out to fund challenges to the Prepetition Secured Parties' liens or claims shall not apply to the Creditor Committee's investigations, if any, in an aggregate amount not to exceed $50,000.  The Interim Order also provides that each of the Debtors' Stipulations (as defined in the Interim Order) shall be binding upon all parties, including any Creditor's Committee, unless a party in interest has filed an adversary proceeding or contested matter with respect to any such Debtors' Stipulation (as defined in the Interim Order) by the earlier of 60 days from the date of entry of the Final Order in accordance with Local Bankruptcy Rule 4001-2(f) and entry of a final order confirming the Plan. **(Interim Order ¶ 27(a))**.

- <u>Adequacy of the DIP Budget</u>.  The Borrower is required to deliver to the DIP Lenders a budget commencing with the week that includes the Petition Date and a forecast for the seven (7) weeks following the Petition Date.  To the extent necessary, such budget will be updated and extended every four weeks until the Maturity Date.  The Debtors believe that the DIP Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the financing or the budget.  **(Interim Order ¶ 7(c))**.

**Background**[10]

14.     The Company is a leading provider of information technology production and recovery services for companies in the financial services, manufacturing, retail, healthcare, business services, transportation, telecommunications, utilities, and government sectors across North America, Europe, and India.  The Debtors' core business segments involve providing managed information technology, information availability consulting, business continuity management software, and disaster recovery services.  The Debtors and their non-Debtor affiliates own and/or operate over 80 data centers and recovery locations worldwide, and provide services to approximately 3,250 customers in nine countries with approximately 2,500 employees.  The Debtors are headquartered in Wayne, Pennsylvania, and have corporate offices in the United Kingdom, Canada, Ireland, France, India, Belgium, Luxembourg, and Poland.  The Debtors' business segments generated approximately $977 million in net revenue in fiscal year 2018.  As of the Petition Date, the Debtors' funded debt obligations totaled approximately $1.3 billion consisting of a revolver facility, one term loan with two tranches, and one issuance of unsecured notes.

15.     On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy

---

[10]   A detailed description of the Debtors and their business, and the facts and circumstances supporting this DIP Motion are set forth in the *Declaration of Eric Koza, Chief Restructuring Officer at Sungard Availability Services Capital, Inc.(I) in Support of Chapter 11 Petitions and First Day Pleadings and (II) Pursuant to Local Bankruptcy Rule 1007-2* (the "First Day Declaration"), filed contemporaneously with this DIP Motion and incorporated by reference herein.

Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated. Additional information regarding the Debtors and their prepetition operations and capital structure is set forth in the First Day Declaration, filed contemporaneously herewith.

## **Prepetition Capital Structure**

16.     As of the Petition Date, the Debtors' capital structure consisted of outstanding funded-debt obligations in the aggregate principal amount of approximately $1.3 billion, consisting of the Revolver Loans, the 2021 Term Loan, the 2022 Term Loan, (each as defined herein, and collectively, the "Prepetition Secured Indebtedness"), and the Unsecured Notes. The following table summarizes the Debtors' outstanding funded-debt obligations:

| Funded Debt | Maturity | Approximate Principal Amount Outstanding (m) |
|---|---|---|
| Revolver | Sep. 30, 2020 | $      35.0 |
| 2021 Tranche B Loan | Sep. 30, 2021 | $     421.0 |
| 2022 Tranche B Loan | Oct. 01, 2022 | $     380.0 |
| Unsecured Notes | Apr. 01, 2022 | $     425.0 |
| | Total: | $  1,261.0 |

## I.      Secured Debt

17.     All of the Debtors' secured debt was borrowed pursuant to that certain Credit Agreement dated as of March 31, 2014 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "Prepetition Credit Agreement," and together with the other Loan Documents (as defined in the Credit Agreement), the "Prepetition Credit Documents") by and between Sungard AS, as borrower, each lender from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative agent (the "Prepetition Agent," and together with the lenders under the Credit Agreement (the "Prepetition Lenders"), the "Prepetition Secured Parties"). The secured debt obligations issued under the Credit Agreement consist of: (a) the Revolver Loans; (b) the 2021

Term Loan; and (c) the 2022 Term Loan (collectively with all accrued and unpaid interest, the Acceleration Makewhole Premium (defined herein), and certain fees, costs, expenses, indemnification obligations, charges and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Credit Documents, the "<u>Prepetition Loan Obligations</u>").  Pursuant to the Prepetition Credit Documents, the Prepetition Loan Obligations are secured by valid, binding, perfected and enforceable first priority liens on and security interests in (the "<u>Prepetition Liens</u>") the "Collateral" under and as defined in the Prepetition Credit Documents (collectively, the "<u>Prepetition Collateral</u>")

### A. Revolver Loans.

18.    On July 19, 2017, Sungard AS entered into that certain Loan Modification Agreement and Refinancing Amendment (the "<u>First Loan Modification Agreement</u>"), which provided for, among other things, the extension of the maturity, from March 8, 2018 to September 30, 2020, of approximately $46 million of the Company's $250 million of revolving credit commitments, with the ability to increase such revolving credit commitments to up to $125 million (the borrowings thereunder, the "<u>Revolver Loans</u>").  As of the date hereof, there are approximately $35 million of outstanding borrowings under the Revolver Loans, as well as an additional $10.5 million in outstanding letters of credit.  Interest under the Revolver Loans accrues at Sungard AS's option, at either (i) LIBOR plus the applicable rate (ranging from 5.25% to 6.00%) plus certain costs related to compliance with European banking institutions, if applicable, or (ii) the greater of (a) the Federal Reserve Bank of New York's federal funds rate plus 0.5% and (b) the Prepetition Agent's prime rate plus, in each case, the applicable rate (ranging from 4.25% to 5.00%).  In addition, the Revolver Loans have a commitment fee ranging from 0.850% to 1.000%

on the undrawn portion of the Revolver Loans.  Obligations under the Revolver Loans are *pari passu* with obligations of the 2021 Term Loan and 2022 Term Loan.

### B.  2021 Term Loan.

19.     The First Loan Modification Agreement also extended the maturity of approximately $471 million in principal face value of approximately $896 million of the Debtors' Tranche B Term Loans (as defined in the Credit Agreement) maturing in March 31, 2019 to September 30, 2021 (the "2021 Term Loan").  As of the date hereof, approximately $421 million in aggregate principal amount of the 2021 Term Loan remains outstanding, accruing interest. Interest on the 2021 Tranche B Loan accrues at Sungard AS's option, at either (i) LIBOR plus 7.00% per annum with a 1.00% LIBOR floor plus certain costs related to compliance with European banking institutions, if applicable, or (ii) the greater of (a) the Federal Reserve Bank of New York's federal funds rate plus 0.5% and (b) the Prepetition Agent's prime rate, plus, in each case, 6.00% per annum.

### C.  2022 Term Loan.

20.     On January 4, 2018, Sungard AS entered into that certain Loan Modification Agreement and Refinancing Amendment by and among Sungard AS, the subsidiary guarantors party thereto, the Prepetition Agent, and the lenders party from time to time thereto (the "Second Loan Modification Agreement"), to, among other things:  (a) extend the maturity of the remaining approximately $425 million term loan due March 31, 2019 to October 1, 2022; and (b) modify and amend certain other provisions of the Credit Agreement (the "2022 Term Loan").  The 2022 Term Loan bears interest, at Sungard AS's option, at either (i) LIBOR plus 10.00% per annum with a 1.00% LIBOR floor plus certain costs related to compliance with European banking institutions,

if applicable, or (ii) the greater of (a) the Federal Reserve Bank of New York's federal funds rate plus 0.5% and (b) the Prepetition Agent's prime rate, plus, in each case, 9.00% per annum.

21.     Pursuant to the terms of the Second Loan Modification Agreement, the Credit Agreement includes several key provisions regarding the Debtors' obligation to pay a make-whole premium (the "Makewhole Premium").  The Makewhole Premium becomes due and owing upon default (as specified in the Credit Agreement) on the 2022 Term Loan by Sungard AS, including the filing of a chapter 11 petition.  As of the Petition Date, the amount of the Makewhole Premium, calculated pursuant to the Second Loan Modification Agreement, is approximately $155 million dollars.

## II.     Unsecured Obligations.

### A.  The Unsecured Notes.

22.     Sungard AS issued approximately $425 million in aggregate principal amount of 8.750% senior unsecured notes (the Prepetition Notes") under that certain indenture, dated March 31, 2014 (as amended, supplemented, or otherwise modified from time to time, the "Prepetition Indenture"), with the Bank of New York Mellon, as indenture trustee (the "Prepetition Trustee").  The Prepetition Notes mature in April 2022 and, prior to the Petition Date, required semiannual coupon payments on April 1 and October 1 of $18.6 million.  As of the Petition Date, approximately $425 million in aggregate principal amount of Unsecured Notes remains outstanding.

## Proposed Postpetition Financing

### A.     The Debtors' Need for DIP Financing and Development of the DIP Budget.

23.     To continue operating in the ordinary course and to effectuate an efficient and expeditious restructuring, the Debtors need immediate access to liquidity.  As described in greater detail below and in the Greene Declaration and Koza Declaration, the Debtors, with the assistance

of their advisors, analyzed their cash needs in order to determine the liquidity levels necessary to maintain the Debtors' operations during the pendency of these Cases.  In undertaking this analysis, the Debtors and their advisors considered the Debtors' near-term projected financial performance, including demand for the Debtors' services and the cost of supplying such services.  The Debtors' management also conferred with key operational divisions to understand essential business metrics in both the near- and long-term.

24.    As part of the Debtors' financial review and analysis, the Debtors, with the assistance of their financial advisor, AlixPartners, LLP ("Alix," and together with its affiliate AP Services, LLC, collectively "Alix Partners") developed an initial seven-week budget, a copy of which is attached as Exhibit B to the Interim Order (the "Initial DIP Budget"). The Initial DIP Budget incorporates a number of factors and reasonable assumptions, including the effect of the chapter 11 filing on the Debtors' operations, material cash disbursements, required vendor/supplier payments, cash flows from the Debtors' ongoing operations, and the cost of necessary goods and materials.   Furthermore, the Initial DIP Budget includes all of the expenditures for which the Debtors seek authority to pay pursuant to various "first day" pleadings, if approved by the Court.[11]

25.    With the consent of the Prepetition Secured Parties, the Debtors will use Cash Collateral to fund working capital, capital expenditures, and other general corporate purposes. Cash Collateral, however, may be insufficient to fund the costs associated with the Debtors' restructuring, particularly if it extends beyond an abbreviated timeframe.  Therefore, the Debtors, with the assistance of their advisors, have determined that the additional postpetition financing

---

[11]    For the avoidance of doubt, the Debtors shall be subject to the DIP Budget only to the extent these chapter 11 cases extend beyond two weeks from the Petition Date.

provided by the DIP Financing is necessary to backstop the liquidity provided by Cash Collateral and cover any shortfall in working capital for the Debtors' businesses, fund adequate protection payments, and satisfy the costs associated with consummating the Plan and completing the Debtors' restructuring.   As such, the DIP Financing is fundamental to the preservation and maintenance of the Debtors' going-concern value during these Cases and critical for the Debtors' successful reorganization.

26.     Absent an ability to demonstrate that the Debtors have the means available to operate in the ordinary course and procure goods and services that are vital to ongoing business operations, customers may seek alternatives and vendors and suppliers may refuse to do business with the Debtors.  Moreover, absent access to the funds available under the DIP Financing, the Debtors will almost certainly lack sufficient liquidity to continue their business operations in the ordinary course beyond a short time period in chapter 11 through emergence to the material detriment of customers, creditors, employees, and other parties in interest, jeopardizing the success of the Debtors' reorganization.  Therefore, the Debtors have an immediate need to be able to access the DIP Financing on an interim basis and throughout the pendency of these Cases.

**B.     The Debtors' Efforts to Obtain Postpetition Financing.**

27.     In December, 2018, the Debtors engaged Centerview as their investment banker to assist the Debtors with evaluating their financing needs and strategic alternatives.  As described more fully in the Greene Declaration, prior to the Petition Date, the Debtors and their advisors surveyed various sources of potential debtor-in-possession financing to fund the Debtors' ongoing business operations and the chapter 11 process.  In consultation with the Debtors and their other advisors, Centerview developed a list of the most likely parties who would be willing to provide debtor-in-possession financing in order to create a competitive environment and establish a process to most efficiently raise the necessary capital on the best term available in the market.  Because

24

substantially all of the Debtors' assets are encumbered and subject to validly perfected first priority

liens, Centerview's strategy to obtain the best source of financing from the market was reflective

of the practical realities of the Debtors' existing capital structure.  In other words, Centerview

evaluated (a) engaging in a priming fight with the Prepetition Secured Parties' whose liens would

be primed, (b) obtaining the consent of the party holding the secured interests to have their liens

primed, or (c) locating a third-party postpetition lender willing to provide debtor-in-possession

financing on an unsecured basis.

28.     As a result of these practicalities, Centerview's debtor-in-possession financing

marketing process involved contacting two unrelated third parties, as well as approaching certain

Prepetition Secured Parties.  Ultimately, Centerview was unable to garner interest from any

unrelated third party.  Nevertheless, as part of their overall restructuring negotiations with the

Debtors, the Secured Lender Group and Crossover Group indicated a willingness to provide

debtor-in-possession and exit financing.  The Debtors and their advisors engaged with the Secured

Lender Group and Crossover Group and their respective advisors in good faith, arm's-length

negotiations regarding the terms of the DIP Financing.

29.     In developing the terms of the DIP Financing, the Debtors were able to rely on

the Secured Lender Group's and Crossover Group's familiarity with the Debtors' businesses and

capital structure, thereby avoiding significant legal fees associated with negotiating,

memorializing, and reviewing new financing documents from any alternative third-party lender.

Additionally, the proposed DIP Financing allows the Debtors to avoid the need to engage in a

costly and time-consuming priming fight at the outset of these Cases.  Finally, the DIP Financing

serves as an important component of the Debtors' overall restructuring efforts because it provides

the Debtors with a clear source of financing, both during the pendency of these Cases and

following the effective date of the Plan, and the stability and certainty that they can emerge from these Cases in a timely and expeditious manner.

30.     Accordingly, the Debtors believe that the DIP Financing pending approval before the Court is the Debtors' best — and only — available option.

### C.    The DIP Facilities.

31.     As described above and in the Greene Declaration, the Debtors and the DIP Lenders engaged in extensive, good faith, and arm's-length negotiations with respect to the terms and conditions of the proposed DIP Financing as memorialized in the DIP Term Sheet.  The DIP Facility allows the Debtors to draw up to $50 million upon entry of the Interim Order and, upon entry of the Final Order, make additional draws in the aggregate not to exceed $100 million (inclusive of the initial draw), subject to the conditions set forth in the DIP Loan Documents.

32.     The proceeds of the DIP Facility provide the Debtors with the ability to fund their operations and meet their administrative obligations during these Cases, and emerge on a timely basis as a reorganized business enterprise.

### D.    Use of Cash Collateral.

33.     The DIP Financing also provides the Debtors with immediate access to the use of Cash Collateral on a consensual basis, subject to the terms and conditions of the DIP Loan Documents and the DIP Orders.  Coupled with the liquidity provided under the DIP Facility, immediate access to the Cash Collateral will (a) ensure that the Debtors have sufficient working capital to, among other things, pay their employees, vendors, landlords, and service providers, (b) enable the Debtors to honor their prepetition obligations under and in accordance with the proposed "first-day" relief if approved by the Court, and (c) satisfy the administrative expenses of these Cases.  By providing the Debtors with the immediate ability to use Cash Collateral in whichever of the Debtors' accounts it is currently held, the DIP Financing also ensures that the

Debtors avoid unnecessary business disruptions that would otherwise be costly and potentially damaging to the business.

### E.     Forms of Adequate Protection.

34.     After extensive arms' length, and good faith negotiations, the Prepetition Secured Parties have agreed to consent to the use of their Prepetition Collateral, including Cash Collateral, subject to the provision by the Debtors of adequate protection.  Among other things, the adequate protection contemplated by the DIP Financing is designed to protect the Prepetition Secured Parties' interests in the Debtors' property from any diminution in value caused by the Debtors' use of the Prepetition Collateral, including Cash Collateral, during the pendency of these Cases.  Specifically, the Debtors have agreed to provide the following forms of adequate protection:

- *Adequate Protection Liens*:  The Debtors will grant the Prepetition Agent, for the benefit of the Prepetition Secured Parties, a security interest in and lien on all of the Prepetition Collateral, subordinate only to the Carve-Out, any existing valid and perfected liens senior to the liens of the Prepetition Secured Parties, and the DIP Liens.

- *Adequate Protection Claims*:  Subject to the Carve-Out and the claims of the DIP Lenders, the Prepetition Agent, on behalf of the Prepetition Secured Parties, will be granted an adequate protection super-priority claim against the Debtors as provided in sections 503(b) and 507(b) of the Bankruptcy Code with priority in payment over any and all administrative expenses and all other claims asserted against the Debtors.

- *Adequate Protection Payments*:  The Debtors will pay certain reasonable fees and expenses of the Prepetition Secured Parties.

35.     The Adequate Protection Obligations are conferred separately to each of the (a) lenders under the Credit Agreement and (b) Prepetition Agent.  Notably, the Adequate Protection Obligations do not include a requirement that the Debtors make current interest payments on the Prepetition Secured Indebtedness during the pendency of the Cases.

**Basis for Relief**

## I.     The DIP Financing Should be Approved Pursuant to Section 364(c) of the Bankruptcy Code.

36.     The Debtors propose to obtain financing under the proposed DIP Financing by providing security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c).  *See In re Crouse Grp. Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (holding that secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

37.     Courts generally have set forth a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code.   Specifically, courts consider whether:

      a.      the debtor is unable to obtain unsecured credit under section 364(b) (*i.e.*, by allowing a lender only an administrative claim);

      b.      the credit transaction is necessary to preserve estate assets; and

      c.      the terms of the transaction are fair, reasonable, and adequate under the circumstances of the debtor-borrower and the proposed lender.

*See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37–39 (Bankr. S.D.N.Y. 1990); *Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.)*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse*, 71 B.R. at 549.

38.     As described in greater detail below and in the Greene Declaration, the Debtors, together with their advisors, sought and marketed alternative sources of postpetition financing to determine whether the Debtors could obtain debtor-in-possession financing as an administrative

expense.   No parties were willing to provide postpetition financing solely on an unsecured, administrative priority basis.  Furthermore, and as described in the Greene Declaration, the Debtors do not believe they can adequately protect, preserve, and maximize the value of their estates without access to postpetition financing.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Financing are fair, reasonable, and adequate.

39.     Where, as here, a debtor is unable to obtain unsecured credit, section 364(c)(1) of the Bankruptcy Code provides that the debtor may obtain credit secured by an administrative expense claim having priority "over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]."  11 U.S.C. § 364(c)(1).  As described above and in the Greene Declaration, the Debtors are unable to obtain unsecured credit.  Therefore, approving the DIP Superpriority Claim in favor of the DIP Lenders is appropriate under the circumstances.

II.     **The DIP Financing Should be Approved Pursuant to Section 364(d)(1) of the Bankruptcy Code.**

A.     **Cause Exists to Authorize Financing under Section 364 of the Bankruptcy Code.**

40.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, a debtor may be authorized to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on encumbered property without the consent of the existing lienholders if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  Consent by the secured creditors subject to priming, however, obviates the need to show adequate protection.  *See, e.g.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the super-priority lien, those creditors relieved the debtor of having to demonstrate that they were adequately protected").  Accordingly, the Debtors may incur "priming" liens under the DIP

Financing if the Debtors are unable to obtain unsecured or junior secured credit and either (a) the "primed" party has consented, or (b) such "primed" party's interests in collateral are adequately protected.

41.     Here, the "primed" parties have provided the requisite consent because the Prepetition Secured Parties have consented to the proposed DIP Facility and the priming liens granted thereunder as part of the Adequate Protection Obligations.

> **B.     The Debtors are Unable to Obtain Unsecured or Junior Secured Credit.**

42.     To show that credit is not obtainable on an unsecured basis, the Debtors need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by subsections 364(c) or (d) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co., Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Anchor Savings*, 99 B.R. at 120 n.4 (noting that the debtor satisfied the requirement of section 364(d) by "approach[ing] all lenders reasonably likely to be willing to make a junior or unsecured loan"); *Ames*, 115 B.R. at 37–40 (holding that the debtor must show that it made a reasonable effort to seek other sources of financing under subsections 364(a) and (b) of the Bankruptcy Code). Moreover, the Bankruptcy Code and courts do not require debtors to "seek credit from every possible lender before concluding that such credit is unavailable." *Snowshoe*, 789 F.2d at 1088; *see also In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (finding that "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing" where the debtor "suffers some financial stress and has little or no unencumbered property"), *aff'd sub nom. Anchor Savings*, 99 B.R. at 117; *In  Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) ("Given the 'time is of the essence' nature of this type of financing, we would not require this or any debtor to contact a seemingly infinite number of possible lenders."); *but see Crouse Group*, 71 B.R. at 550 (noting the "relative ease" of establishing the

unavailability of unsecured credit, but denying the motion where the debtor only approached one potential lender, and did not contact two large prepetition lenders).

43.     As noted above, after a thorough and competitive marketing process, the Debtors believe that there are no alternative sources of financing reasonably available and no alternative sources of financing available on better terms than those being provided by the DIP Financing. No party that Centerview communicated with as part of the marketing process, and no other party that Centerview was aware of, was interested in providing, or willing to provide, postpetition financing to the Debtors on an unsecured basis.  Indeed, no party was willing to provide postpetition financing on anything other than a "priming" basis with respect to substantially all of the Debtors' assets, which "priming" liens likely would not have been consented to by the Prepetition Secured Parties and would have subjected to the Debtors' to a protracted and expensive priming dispute.  Thus, providing the DIP Lenders with a super-priority administrative claim and priming liens is reasonable and appropriate here as it will allow the Debtors to obtain on a consensual basis the critical financing they need to fund their operations and appropriately administer their Cases.  Therefore, the Debtors submit that they satisfy the requirements of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors.

**III.     The Proposed Forms of Adequate Protection With Respect to Cash Collateral Are Fair and Appropriate.**

44.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting

replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See*, *e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding" (citations omitted)).

45.     As described above, the proposed Adequate Protection Obligations set forth in the Interim Order have been consented to and, the Debtors believe, are sufficient to protect the Prepetition Secured Parties from any diminution in value to the Prepetition Collateral, including Cash Collateral.  In light of the foregoing, the Debtors submit that the proposed Adequate Protection Obligations being provided for the benefit of the Prepetition Secured Parties is appropriate.

## IV.     The Use of Cash Collateral Is Warranted and Should Be Approved.

46.     The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code, which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

47.     It is essential to the Debtors' successful reorganization and the going concern value of their businesses that they have sufficient funds to operate in the ordinary course.  Absent the use of Cash Collateral, the Debtors will not have sufficient working capital to (a) make payments to employees, vendors, or suppliers, (b) satisfy ordinary operating costs, and (c) fund the administrative costs of these Cases.  Furthermore, as discussed above, and in accordance with section 363(c)(2) of the Bankruptcy Code, the Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral, subject to the provisions of the Forms of Adequate Protection on the terms and conditions set forth in the Interim Order.  Accordingly, the Debtors submit that the use of Cash Collateral is in the best interests of the Debtors' estates and should be approved.

## V.     The Scope of the Carve-Out Is Appropriate.

48.     The Adequate Protection Obligations are subject to the Carve-Out.  Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Cases would be restricted.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve-Out protects against administrative insolvency during the course of these Cases by ensuring that assets remain for the payment of the Clerk of the

Court, U.S. Trustee fees, and professional fees of the Debtors and any official committee appointed under section 1102 of the Bankruptcy Code in these Cases.

**VI.      The Debtors Should be Authorized to Make the DIP Payments.**

49.      In connection with negotiating the DIP Financing, the Debtors agreed, subject to Court approval, to pay certain fees, expenses and other payments arising under the DIP Loan Documents or the DIP Orders (the "DIP Payments").  Specifically, the Debtors will pay certain upfront and commitment payments to the DIP Lenders, an administrative arranger and agency fee in favor of the DIP Agent, and certain put option premiums to the DIP Backstop Parties in connection with the Backstop Commitment, and the fees and expenses of counsel and other professionals retained as provided for in the DIP Loan Documents.

50.      The amounts the Debtors have agreed to pay and other obligations under the DIP Loan Documents, and proposed DIP Orders are reasonable and represent the most favorable terms to the Debtors on which the DIP Lenders would agree to make available the DIP Financing.  The Debtors considered the amounts described above when determining in their sound business judgment that the DIP Financing constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute their Cases, and paying these fees and payments in order to obtain the DIP Financing is in the best interests of the Debtors' estates, creditors, and other parties in interest.

51.      Courts routinely authorize debtors to pay amounts similar to those the Debtors propose to pay, where the associated financing is, in the debtor's business judgment, beneficial to the debtors' estates.  *See, e.g.*, *In re InSight Health Servs. Holdings Corp.*, Case No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.0% DIP closing fee); *In re NR Liquidation III Co. (f/k/a Neff Corp.)*, Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1% DIP and exit facility fee); *In re Lear Corp.*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y.

Aug. 4, 2009) (approving 5.0% up front fee and a 1.0% exit/conversion fee); *In re Gen. Growth Props., Inc.*, Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75% exit fee); *In re Aleris Int'l Inc.*, Case No. 09-10478 (BLS) (Bankr. D. Del. Mar. 18, 2009) (approving 3.5% exit fee and 3.5% front-end net adjustment against each lender's initial commitment); *In re Tronox Inc.*, Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Jan. 13, 2009) (approving an up-front 3% facility fee); *In re Lyondell Chem. Co.*, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) (approving exit fee of 3%); *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. Jan. 28, 2008) (approving a 2.5% fees related to refinancing and extending a postpetition financing facility); *In re DJK Residential, Inc.*, Case No. 08-10375 (JMP) (Bankr. S.D.N.Y. Feb. 29, 2008) (approving 3% fee in connection with postpetition financing). Accordingly, the Court should authorize the Debtors to make the DIP Payments provided under the DIP Loan Documents and proposed DIP Orders in connection with entering into those agreements.

**VII.       Good Faith under Section 364(e) of the Bankruptcy Code.**

52.       Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

53.       As explained above, in the Greene Declaration, and in the First Day Declaration, the DIP Financing is the result of the Debtors' reasonable and informed determination that the DIP

Lenders offered the most favorable (and only) terms on which postpetition financing was available for these Cases. Further, the DIP Financing is the result of extended arm's-length, good faith negotiations between the Debtors, on one hand, and the DIP Lenders on the other. The terms and conditions of the DIP Financing are fair and reasonable, and the proceeds of the DIP Financing will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by section 364(e) of the Bankruptcy Code.

## VIII. Failure to Obtain Immediate Interim Access to the DIP Financing, Including the Use of Cash Collateral, Would Cause Immediate and Irreparable Harm.

54.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *See* Bankruptcy Rules 4001(b)(2) and 4001(c)(2) & Local Bankruptcy Rule 4001-2(g). Furthermore, section 363(c)(3) of the Bankruptcy Code authorizes the Court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).

55.    Failure to obtain access to the DIP Facility and access to Cash Collateral would result in immediate and irreparable harm to the Debtors and their stakeholders, and cause a diminution in value to the Debtors' estates. Without the approval of the DIP Financing and the

use of Cash Collateral, the Debtors likely would be unable to provide a clear, strong message to the Debtors' customers, vendors, employees, and contract counterparties that operations are appropriately funded and that the bankruptcy filing will not impact the Debtors' businesses operationally.  Furthermore, the Debtors require access to additional liquidity provided under the DIP Financing to fund their operations, preserve and maximize the value of their estates, and administer these Cases.  Finally, a condition precedent to the effectiveness of the Plan and of the consensual restructuring contemplated thereby requires entry and approval of the DIP Financing and access to Cash Collateral.

56.     Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code, Bankruptcy Rule 4001(b), and Local Bankruptcy Rule 4001-2(g), the Debtors request that the Court conduct an expedited hearing on this DIP Motion, and enter the Interim Order authorizing the Debtors to obtain credit under the DIP Financing, including the use Cash Collateral, all on an interim basis, pending approval on a final basis after the Final Hearing (if necessary).

**IX.     The Automatic Stay Should Be Modified on a Limited Basis.**

57.     The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to grant the security interests and liens described above to the DIP Parties and the Prepetition Secured Parties, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens.  Paragraph 7(d) of the Interim Order further provides that the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise all rights and remedies provided for in the DIP Loan Documents and the Interim Order.  Stay modifications of this kind are ordinary and standard features for the use of cash collateral, and in the Debtors' business judgment, are reasonable and fair under the present circumstances.  Accordingly, the Debtors request that the Court grant the requested relief from that automatic stay as provided in the DIP Orders.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

58.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after

the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."

For the reasons discussed above, granting the relief requested herein is integral to the Debtors'

ability to transition their operations into these Cases.  Failure to receive such authorization and

other relief during the first 21 days of these Cases would severely disrupt the Debtors' operations

at this critical juncture.  Furthermore, the relief requested is necessary in order for the Debtors to

operate their business in the ordinary course and preserve the ongoing value of the Debtors'

operations and maximize the value of their estates for the benefit of all stakeholders.  Accordingly,

the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of

Bankruptcy Rule 6003 to support granting the relief requested herein.

**Reservation of Rights**

59.     Nothing contained herein is intended, or should be construed, as an admission

regarding the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute

any claim, or an approval or assumption of any agreement, contract, or policy under section 365

of the Bankruptcy Code.  The Debtors expressly reserve their right to contest any claim related to

the relief sought herein.  Likewise, if the Court grants the relief sought herein, any payment made

pursuant to an order of the Court is not intended to be nor should it be construed as an admission

as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Request for a Final Hearing**

60.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that

the Court set a date, which is no sooner than 15 days after the date of this DIP Motion and no later

than 25 days after the entry of the Interim Order, to hold a hearing (if necessary) to consider entry

of the Final Order and the permanent approval of the relief requested in this DIP Motion.[12]  The

Debtors also request authority to serve a copy of the signed Interim Order, which fixes the time

and date for the filing of objections, if any, to entry of the Final Order, by first class mail upon the

notice parties listed below, and further request that the Court deem service thereof sufficient notice

of the hearing on the Final Order under Bankruptcy Rule 4001(c)(2).

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

61.     To implement the foregoing successfully, the Debtors request that the Court enter

an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and

that the Debtors have established cause to exclude such relief from the 14-day stay period under

Bankruptcy Rule 6004(h).

### Notice

62.     The Debtors will provide notice of this Motion to:  (a) the Office of the

United States Trustee for the Southern District of New York, Attn.:  Greg M. Zipes, Esq.;

(b) the Holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis);

(c) counsel to the Crossover Group, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park,

Bank of America Tower, New York, NY 10036 Attn:  Philip Dublin and Naomi Moss; (d) the

Crossover Group; (e) counsel to the Secured Lender Group, Jones Day, 250 Vesey Street, New

York, NY 10281 Attn: Scott J. Greenberg, Esq., Michael J. Cohen, Esq., and Steven A.

Domanowski, Esq.; (f) the Secured Lender Group; (g) counsel to the Sponsors, Paul, Weiss,

Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019

Attn:  Brian S. Hermann and Jacob A. Adlerstein; (h) counsel to the Credit Facility Agent, Cravath,

---

[12]   The DIP Term Sheet requires that the Final Order be entered no later than 30 days after the Petition Date.  *See*
DIP Term Sheet Annex I.

Swaine & Moore LLP, 825 Eighth Avenue, New York, New York 10019, Attn:  Paul H. Zumbro and Stephen M. Kessing, (i) the United States Attorney's Office for the Southern District of New York;  (j) the Internal Revenue Service;  (k) the United States Securities and Exchange Commission;  (l) the Environmental Protection Agency and all similar state environmental agencies;  (m) the attorneys general in the states where the Debtors conduct their business operations; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## **No Prior Request**

63.     No prior request for the relief sought in this DIP Motion has been made to this or any other court.


[*Remainder of page left intentionally blank*]

WHEREFORE, for the reasons set forth herein, the First Day Declaration, the Koza Declaration, and the Greene Declaration, the Debtors respectfully request that this Court enter the Interim Order and the Final Order (if necessary) granting the relief requested herein on an interim and final basis, respectively, and granting such other and further relief as is just and proper.

Dated:  May 1, 2019  
New York, New York

*/s/ Jonathan S. Henes, P.C.*
Jonathan S. Henes, P.C.
Emily E. Geier (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Ryan Blaine Bennett, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200


*Proposed Counsel to the Debtors and Debtors in Possession*

## **Exhibit 1**

**Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SUNGARD AVAILABILITY SERVICES | ) | Case No. 19-22915 (RDD) |
| CAPITAL, INC. *et al.,*[1] | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS**
**(A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE**
**CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO**
**PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,**
**(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "DIP Motion") of Sungard Availability Services Capital, Inc. ("Sungard AS") and its affiliated debtors, each as a debtor and debtor in possession (collectively with Sungard AS, the "Debtors") in the above-captioned cases (the "Cases") before the United States Bankruptcy Court for the Southern District of New York (the "Court"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 4001-2, 9006-1, 9013-1, 9014-1 and 9014-2 of the local bankruptcy rules for the Southern District of New York (the "Local Bankruptcy Rules") seeking, among other things:

(a)    authorization for Sungard AS, in its capacity as borrower (the "Borrower"), to obtain postpetition financing (the "DIP Facility"), and for each of the other Debtors to guarantee

---

[1]    The last four digits of the Debtors tax identification number are:  Sungard Availability Services Capital, Inc. (7677); Sungard Availability Services Holdings, LLC (6403); Sungard Availability Services Technology, LLC (9118); Inflow LLC (9489); Sungard Availability Services, LP (6195); Sungard Availability Services VeriCenter, Inc. (4039); Sungard Availability Network Solutions Inc. (1034).  The location of the Debtors service address for purposes of these chapter 11 cases is:  50 Main Street, Suite 1014, White Plains, NY 10606.

unconditionally (the "Guarantors"), on a joint and several basis, the Borrower's obligations in connection with the DIP Facility, consisting of a superpriority senior secured multiple-draw term loan credit facility in the aggregate principal amount of up to $100,000,000 comprised of (a) the $87,000,000 Tranche A DIP Facility (as defined below) and (b) the $13,000,000 Tranche B DIP Facility (as defined below) to be drawn ratably between the Tranche A DIP Facility and Tranche B DIP Facility, including, (i) term loans in the aggregate principal amount of up to $50,000,000 (the "Initial DIP Loans"), which term loans will be available to the Debtors in a single draw in accordance with the terms substantially set forth in the DIP Facility Term Sheet attached hereto as **Exhibit A** (the "DIP Term Sheet") upon entry of this order (the "Interim Order") and (ii) term loans in an aggregate principal amount of up to an additional $50,000,000 (the "Delayed Draw DIP Loans" and, together with the Initial DIP Loans, the "DIP Loans"), which term loans will be available to the Debtors in one or more draws in increments of at least $10,000,000 per draw, upon entry of, and subject to the terms of, the Final Order (as defined below) and subject to satisfaction of the conditions set forth in the DIP Term Sheet and all other terms and conditions of the DIP Loan Documents (as defined below).

(b)    authorization for the Debtors to enter into a Superpriority Senior Secured Debtor-In-Possession Credit Agreement among the Borrower, the Guarantors, the relevant lenders (collectively, the "DIP Lenders"),[2] and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "DIP Agent" and, together with the DIP Lenders, the "DIP Parties") (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "DIP Loan Agreement"; together with this Interim Order, the Final Order, and all

---

[2]    The DIP Lenders include the lenders under the Prepetition Credit Agreement (as defined below) lending under one tranche of the DIP Facility (the "Tranche A DIP Facility") and certain holders of Prepetition Notes (as defined below) lending under a separate tranche of the DIP Facility (the "Tranche B DIP Facility") that are each parties to the Restructuring Support Agreement, dated April 1, 2019 (the "RSA").

2

agreements, documents, and instruments delivered or executed in connection therewith, including

the DIP Term Sheet and other guarantee and security documentation, collectively, the "DIP Loan

Documents"), and to perform such other and further acts as may be required in connection with

the DIP Loan Documents;

(c)     authorization for the Debtors to use the DIP Loans, the proceeds thereof, and the

Prepetition Collateral (as defined below), including Cash Collateral (as defined below), to provide

working capital for, and for other general corporate purposes of, the Debtors, including for

payment of any Adequate Protection Obligations (as defined below), for payment of reasonable

and documented transaction costs, fees and expenses incurred in connection with the restructuring

or the Cases, and for funding the Specified Account (as defined in the DIP Term Sheet), which

funds shall be available to the Debtors for disbursement to certain non-Debtor subsidiaries of

Sungard AS through secured intercompany borrowings (the "Specified Intercompany Notes") on

an as needed basis;

(d)     the granting of adequate protection to the Prepetition Secured Parties (as defined

below), under the Credit Agreement, dated as of March 31, 2014 (as amended, restated,

amended and restated, waived, supplemented, or otherwise modified from time to time, the

"Prepetition Credit Agreement" and, together with all related collateral and security documents,

the "Prepetition Credit Documents"), by and among Sungard AS, as the borrower, the guarantors

party thereto, the lenders party thereto (the "Prepetition Lenders"), JPMorgan Chase Bank, N.A.,

as Administrative Agent (in such capacity, the "Prepetition Agent" and, together with the

Prepetition Lenders, the "Prepetition Secured Parties");

(e)     the granting of valid, enforceable, binding, non-avoidable and fully perfected first

priority priming liens on and senior security interests in all of the property, assets and other

3

interests in property and assets of the Debtors, whether such property is presently owned or after-acquired, and each Debtor's "estate" as created by Bankruptcy Code section 541, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date (as defined below), subject only to the (x) Carve-Out (as defined below) and (y) other valid and unavoidable liens perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)) on the terms and conditions set forth herein and in the DIP Loan Documents;

(f)      the granting of superpriority administrative expense claims against each of the Debtors' estates to the DIP Agent and the DIP Lenders with respect to the DIP Obligations (as defined below) over any and all administrative expenses of any kind or nature subject and subordinate only to the payment of the Carve-Out on the terms and conditions set forth herein and in the DIP Loan Documents;

(g)      if authorized in the Final Order, the waiver of the Debtors' and the estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c);

(h)      if authorized in the Final Order, authorization for the DIP Agent, the DIP Lenders and the Prepetition Secured Parties to be entitled to all of the rights and benefits of Bankruptcy Code section 552(b), and for the "equities of the case" exception under Bankruptcy Code section 552(b) to not apply to such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable;

(i)      pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the DIP Motion be held before this Court to consider entry of this Interim Order, among other things, (1) authorizing Sungard AS, on an interim basis, to borrow from the DIP Lenders a

principal amount of up to $50,000,000 in Initial DIP Loans (subject to any limitations of borrowing

set forth in the DIP Term Sheet); (2) authorizing the Guarantors to guaranty the DIP Obligations,

(3) authorizing the Debtors' use of Prepetition Collateral (including Cash Collateral), (4) granting

the adequate protection described in this Interim Order, and (5) authorizing the Debtors to execute

and deliver the DIP Documents to which they are a party and to perform their respective

obligations thereunder and such other and further acts as may be necessary or appropriate in

connection therewith;

(j)       that this Court schedule a final hearing (the "Final Hearing") to consider

(if necessary) entry of a final order (the "Final Order") authorizing, among other things, Sungard

AS, on a final basis, to borrow from the DIP Lenders under the DIP Loan Documents up to an

aggregate principal amount not to exceed $100,000,000 in DIP Loans, and the continued use of

Cash Collateral, as set forth in the DIP Motion and the DIP Loan Documents.

Due and appropriate notice of the DIP Motion, the relief requested therein and the Interim

Hearing having been served by the Debtors on, among others, (a) the United States Trustee for the

Southern District of New York (the "U.S. Trustee"); (b) Cravath, Swaine & Moore LLP, counsel

to the Prepetition Agent; (c) Carter Ledyard & Millburn LLP, counsel to the Prepetition Trustee

(as defined below); (d) Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), counsel to certain

of the DIP Lenders and the Crossover Group (as defined in the RSA); (e) Jones Day, counsel to

certain of the DIP Lenders and the Secured Lender Group (as defined in the RSA); (f) creditors

holding the thirty (30) largest unsecured claims as set forth in the consolidated list filed with the

Debtors' petitions; (g) those parties requesting notice pursuant to Bankruptcy Rule 2002; (h) the

Office of the United States Attorney General for the states in which the Debtors operate; and (i)

5

the Internal Revenue Service, in compliance with Bankruptcy Rules 4001(b) and (c) and the Local Bankruptcy Rules.

The Interim Hearing having been held by this Court on May 2, 2019.

Upon the record at the Interim Hearing and upon the Court's consideration of the DIP Motion, the exhibits thereto; the *Declaration of Eric Koza, Chief Restructuring Officer at Sungard Availability Services Capital, Inc.(I) In Support of Debtors' Chapter 11 Petitions and First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* (the "First Day Declaration"), the *Declaration of Eric Koza in Support of the the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors (A) To Obtain Postpetition Financing and (B) To Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Koza Declaration"), and the *Declaration of Samuel Greene in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors (A) To Obtain Postpetition Financing and (B) To Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Greene Declaration"); and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Disposition*.  The DIP Motion is GRANTED on an interim basis in accordance with the terms of this Interim Order.  Any objections to the DIP Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservation of rights included therein, are hereby denied and overruled.

2.      *Jurisdiction*.  This Court has core jurisdiction over the Cases commenced on May 1, 2019 (the "Petition Date"), the DIP Motion, and the parties and property affected hereby

pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtors are continuing to operate their businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed for any Debtor.

3. *No Committee.* As of the date hereof, the U.S. Trustee has not appointed any statutory committee in the Cases.

4. *Notice.* Under the circumstances, the notice given by the Debtors of the DIP Motion, the relief requested therein, and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and the Local Bankruptcy Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

5. *Debtors' Stipulations.* Without prejudice to the rights of any other non-Debtor party-in-interest with standing, but subject to the limitations thereon contained in Paragraphs 26 and 27 of this Interim Order, the Debtors represent, admit, stipulate, and agree as follows:

(a)   Prepetition Loan Obligations. As of the Petition Date, the Debtors, without defense, counterclaim, or offset of any kind were jointly and severally indebted and liable to the Prepetition Secured Parties under the Prepetition Credit Documents in the aggregate amount of $1,006 million, which consists of (a) Term Loans (as defined in the Prepetition Credit Agreement) in an aggregate principal amount equal to $801 million, *plus* (b) Revolving Credit Loans (as defined in the Prepetition Credit Agreement) in an aggregate principal amount equal to $35 million, *plus* (c) $15 million on account of accrued and unpaid interest as of the Petition Date, *plus* (d) $155 million on account of the Acceleration Makewhole Premium (as defined in the Prepetition Credit Agreement) ((a), (b), (c) and (d), collectively, the "Prepetition Loan Obligations

Amount"), plus any additional accrued and unpaid interest, premium, if any, and certain fees, costs, expenses, indemnification obligations, charges and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Credit Documents (collectively, including the Prepetition Loan Obligations Amount, the "<u>Prepetition Loan Obligations</u>").

(b)    <u>Prepetition Liens</u>.  Pursuant to the Prepetition Credit Documents, the Prepetition Loan Obligations are secured by valid, binding, perfected and enforceable first priority liens on and security interests in (the "<u>Prepetition Liens</u>") the "Collateral" under and as defined in the Prepetition Credit Documents (collectively, the "<u>Prepetition Collateral</u>").  The Prepetition Liens (i) are valid, binding, perfected, and enforceable first priority liens and security interests in the Prepetition Collateral, (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind, (iii) as of the Petition Date, are subject and/or subordinate only to valid, perfected, and unavoidable liens and security interests existing as of the Petition Date that are senior in priority to the Prepetition Liens as permitted by the terms of the Prepetition Credit Documents, and (iv) constitute the legal, valid, and binding obligation of the Debtors, enforceable in accordance with the terms of the applicable Prepetition Credit Documents.

(c)    <u>Prepetition Collateral</u>.  Subject to certain exclusions and conditions set forth in the Prepetition Credit Documents, the Prepetition Collateral consists of, among other things, (i) the equity interests held by the Debtors, (ii) the debt securities held by the Debtors and any notes or instruments evidencing such debt securities, (iii) the Debtors' accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property,

8

the books and records pertaining to the foregoing and all collateral securities and guarantees given with respect to any of the foregoing, (iv) the Debtor's copyrights, patents, trademarks, licenses and other intellectual property, (v) certain of the Debtors' land and the premises thereon, and certain improvements, personal property and rents related thereto, and, to the extent not otherwise included in (i) through (v), all proceeds and products of any and all of the foregoing.

(d)     Cash Collateral.   Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date, and the proceeds of any of the foregoing is the Prepetition Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").

(e)     Prepetition Notes.   Pursuant to an Indenture dated as of March 31, 2014 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified from time to time, the "Prepetition Indenture"), by and among Sungard AS, the subsidiary guarantors named therein (the "Notes Guarantors"), and The Bank of New York Mellon, as trustee (the "Prepetition Trustee"), Sungard AS issued 8.750% senior notes due April 1, 2022 (the "Prepetition Notes") in aggregate principal amount equal to $425,000,000.  The Notes Guarantors jointly and severally guaranteed payment of the Prepetition Notes.  As of the Petition Date, the Debtors, without defense, counterclaim, or offset of any kind were jointly and severally liable to the Prepetition Trustee and the holders of the Prepetition Notes (the "Prepetition Noteholders") under the Prepetition Indenture in the aggregate principal amount of not less than $425,000,000, plus accrued and unpaid interest, premium if any, and certain fees, costs, expenses, indemnification obligations, charges and all other obligations of whatever nature owing, whether or not contingent, whenever

arising, accrued, accruing, due, owing or chargeable under the Prepetition Indenture (the "Prepetition Notes Obligations").

6.    *Findings Regarding the DIP Facility and Use of Cash Collateral.*

(a)    Good cause has been shown for the entry of this Interim Order.

(b)    The Debtors have an immediate need to obtain the DIP Facility and to use the Cash Collateral to (solely to the extent consistent with the DIP Budget (plus permitted variances as set forth in this Interim Order and the DIP Loan Documents)), among other things, (i) permit the orderly continuation of their businesses; (ii) pay certain Adequate Protection Obligations; and (iii) pay the costs of administration of their estates and satisfy other working capital and general corporate purposes of the Debtors.  The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern values of the Debtors and to the Debtors' successful reorganization.  The Debtors will not have sufficient sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business throughout the Cases without access to the DIP Facility and authorized use of Cash Collateral.

(c)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Loan Documents and are unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors also are unable to obtain secured credit allowable under Bankruptcy Code sections 364(c)(1), 364(c)(2), and 364(c)(3) for the purposes set forth in the DIP Loan Documents without the Debtors granting to the DIP Agent and the DIP Lenders, subject to the Carve-Out as provided

for herein, the DIP Liens (as defined below) and the DIP Superpriority Claims (as defined below) under the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

(d)     The DIP Facility has been negotiated in good faith and at arm's-length among the Debtors, the DIP Agent and certain Prepetition Lenders and Prepetition Noteholders that have committed to backstop the DIP Loans (collectively, the "DIP Backstop Parties"), and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Loan Documents including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Loan Documents and all other obligations under the DIP Loan Documents (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e).  The DIP Obligations, the DIP Liens and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise and any liens or claims granted to the DIP Agent or the DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

(e)     This Interim Order shall take effect and be fully enforceable immediately upon execution hereof.  Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.

7.      *Authorization of the DIP Facility and the DIP Loan Documents.*

(a)      The Debtors are hereby expressly authorized and empowered to enter into, and execute and deliver, the DIP Loan Documents, and such additional documents, instruments, certificates and agreements as may be required or requested by the DIP Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Loan Documents.  To the extent not entered into as of the date hereof, the Debtors shall negotiate the DIP Loan Documents in good faith and in all respects such DIP Loan Documents shall be consistent with the terms of the DIP Term Sheet and otherwise acceptable to the DIP Agent and the DIP Backstop Parties consistent with the consent rights under the RSA.  Upon entry of this Interim Order and until execution and delivery of the DIP Loan Agreement and other DIP Loan Documents required or requested by the DIP Parties, the Debtors shall be bound by (x) the terms and conditions and other provisions set forth in the DIP Term Sheet, with the same force and effect as if duly executed and delivered to the DIP Agent by the Debtors, and (y) this Interim Order, and this Interim Order and the DIP Term Sheet shall govern and control the DIP Facility.  Upon execution and delivery of the DIP Loan Agreement and other DIP Loan Documents, (a) the DIP Term Sheet shall be superseded by the DIP Loan Agreement and other DIP Loan Documents, and (b) this Interim Order, the DIP Loan Agreement, and other DIP Loan Documents shall govern and control the DIP Facility.  Upon execution and delivery thereof, the DIP Loan Documents shall constitute valid and binding obligations of the Debtors enforceable in accordance with their terms.  To the extent there exists any conflict among the terms and conditions of the DIP Motion, the DIP Loan Documents, and this Interim Order, the terms and conditions of this Interim Order shall govern and control.  To the

extent there is a conflict between the terms and conditions of the DIP Motion and the DIP Loan Documents, the terms and conditions of the DIP Loan Documents shall govern.

(b)    Upon entry of this Interim Order, the Borrower is hereby authorized to borrow, and the Guarantors are hereby authorized to guaranty, borrowings up to an aggregate principal amount of $50,000,000 in Initial DIP Loans, subject to and in accordance with this Interim Order.

(c)    In accordance with the terms of this Interim Order and the DIP Loan Documents, proceeds of the DIP Loans shall be used solely for the purposes permitted under the DIP Loan Documents, this Interim Order and in accordance with the DIP Budget (as defined in the DIP Term Sheet; provided that the term of the DIP Budget shall be seven (7) weeks, commencing on April 29, 2019), plus permitted variances as set forth in this Interim Order and the DIP Loan Documents; provided, further, that the Debtors shall only be subject to the DIP Budget to the extent the Debtors have not emerged from these Cases within two weeks of the Petition Date.  A copy of the Initial DIP Budget (as defined in the DIP Term Sheet) is attached hereto as **Exhibit B**.

(d)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by Bankruptcy Code section 362 is hereby lifted to the extent necessary, to perform all acts and to make, execute and deliver all instruments and documents (including, without limitation, the DIP Loan Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby or the DIP Term Sheet), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility including, without limitation:

(i)    the execution, delivery and performance of the DIP Loan Documents, including, without limitation, the DIP Loan Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby;

(ii)      the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Loan Documents (in each case in accordance with the terms of the applicable DIP Loan Documents and in such form as the Debtors, the DIP Agent and the Requisite Lenders (as defined in the DIP Term Sheet) may agree), it being understood that no further approval of the Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Loan Documents or the DIP Obligations that do not shorten the maturity of the extensions of credit thereunder or modify the commitments or the rate of interest payable thereunder;

(iii)      the non-refundable payment to each of the DIP Lenders, the DIP Agent, and the DIP Backstop Parties, as applicable, of the fees referred to in the DIP Loan Documents, including all reasonable costs and expenses as may be due from time to time, including, without limitation, the put option premium payable to the Backstop Parties, and the fees and expenses of counsel and other professionals retained as provided for in the DIP Loan Documents and this Interim Order (including, for the avoidance of doubt, (a) Jones Day (as counsel) and Houlihan Lokey Capital, Inc. (as financial advisor) to certain of the DIP Lenders and the Secured Lender Group (as defined in the RSA) and (b) Akin Gump (as counsel) and PJT Partners LP and DH Capital, LLC (as financial advisors) to certain of the DIP Lenders and the Crossover Group (as defined in the RSA)), which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payment be required to file with respect thereto any interim or final fee application with the Court; and

14

(iv)    the performance of all other acts required under or in connection with the DIP Loan Documents.

(e)    Upon execution and delivery of the DIP Loan Documents, such DIP Loan Documents shall constitute valid, binding and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Interim Order for all purposes during the Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any Case. No obligation, payment, transfer or grant of security under the DIP Loan Agreement, the other DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under Bankruptcy Code sections 502(d), 548 or 549 or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.  All payments or proceeds remitted (a) to the DIP Agent on behalf of any DIP Lender or (b) to or on behalf of the Prepetition Secured Parties, in each case pursuant to the DIP Loan Documents, the provisions of this Interim Order or any subsequent order of this Court, shall be received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) (if authorized in the Final Order) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (if authorized in the Final Order).

(f)    The Guarantors hereby are authorized and directed to jointly, severally and unconditionally guarantee, and upon entry of this Interim Order shall be deemed to have guaranteed, in full all of the DIP Obligations of the Borrower.

15

8.      *Reporting Requirements/Access to Records.*  The Debtors shall provide the advisors

to the Crossover Group and Secured Lender Group with all reporting and other information

required to be provided to the DIP Agent under the DIP Loan Documents.  In addition to, and

without limiting, whatever rights to access the DIP Agent and the DIP Lenders have under the DIP

Loan Documents, upon reasonable notice, at reasonable times during normal business hours, the

Debtors shall permit representatives, agents, and employees of the DIP Agent and DIP Lenders to:

(i) have access to and inspect the Debtors' assets; (ii) examine the Debtors' books and records;

and (iii) discuss the Debtors' affairs, finances, and condition with the Debtors' officers and

financial advisors.

9.      *DIP Superpriority Claims.*  Pursuant to Bankruptcy Code section 364(c)(1), all of

the DIP Obligations shall constitute allowed superpriority administrative expense claims against

each of the Debtors' estates (the "DIP Superpriority Claims") (without the need to file any proof

of claim) with priority over any and all administrative expenses, adequate protection claims,

diminution claims and all other claims against the Debtors, now existing or hereafter arising, of

any kind whatsoever, including, without limitation, all administrative expenses of the kind

specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative

expenses or other claims arising under Bankruptcy Code sections 105, 326, 327, 328, 330, 331,

361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 or otherwise, whether

or not such expenses or claims may become secured by a judgment lien or other non-consensual

lien, levy or attachment, which allowed claims shall for the purposes of Bankruptcy Code

section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code

section 503(b) and which shall be payable from and have recourse to all prepetition and

postpetition property of the Debtors and all proceeds thereof, including, without limitation, if

authorized in the Final Order, any proceeds or property recovered in connection with the pursuit

of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any

(the "Avoidance Actions"), subject only to the payment of the Carve-Out to the extent specifically

provided for herein.  Except as set forth in this Interim Order, no other superpriority claims shall

be granted or allowed in these Cases.

10.     *DIP Liens*.  As security for the DIP Obligations, effective and perfected upon the

date of this Interim Order, and without the necessity of the execution, recordation of filings by the

Debtors of mortgages, security agreements, control agreements, pledge agreements, financing

statements or other similar documents, or the possession or control by the DIP Agent or any DIP

Lender of, or over, any DIP Collateral (as defined below), the following security interests and liens

are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Agent and the DIP

Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as

the "DIP Collateral"), subject to payment of the Carve-Out (all such liens and security interests

granted to the DIP Agent, for the benefit of the DIP Lenders, pursuant to this Interim Order and

the DIP Loan Documents, the "DIP Liens"):

(a)     First Lien on Unencumbered Property.  Pursuant to Bankruptcy Code

section 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected, non-

avoidable, automatically and properly perfected first priority senior security interest in

and lien upon all property of the Debtors, whether existing on the Petition Date or

thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected

and non-avoidable liens (or perfected after the Petition Date to the extent permitted by

Bankruptcy Code section 546(b)), including, without limitation, any unencumbered cash

of the Debtors (whether maintained with the DIP Agent or otherwise) and any

investment of such cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests (including equity interests in subsidiaries of each Debtor), money, investment property, the Specified Account, the Specified Intercompany Notes, intercompany claims, claims arising on account of transfers of value from a Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition Date, causes of action, including causes of action arising under Bankruptcy Code section 549 (but excluding all other Avoidance Actions), all products and proceeds of the foregoing and, subject to the Final DIP Order, all proceeds and property recovered in respect of Avoidance Actions; <u>provided</u>, for the avoidance of doubt and notwithstanding anything to the contrary contained herein, with respect to non-residential leases of real property, unless the applicable lease expressly permits the granting of liens on such lease, the liens granted pursuant to this Interim Order shall attach solely to the proceeds of such lease and not to the subject lease itself.

(b)    <u>Liens Priming the Prepetition Liens</u>.  Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all property of the Debtors including, without

limitation, the Prepetition Collateral, Cash Collateral, and any investment of such cash and cash equivalents, accounts, deposit accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests (including equity interests in subsidiaries of each Debtor), money, investment property, causes of action, and all products and proceeds of the foregoing, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, that is subject to any liens securing the Prepetition Loan Obligations; provided that such liens shall be immediately junior to any liens that were senior to the liens securing the Prepetition Loan Obligations as of the Petition Date (including, for the avoidance of doubt, any prepetition tax liens held by the Maricopa County Treasurer); provided, further, for the avoidance of doubt and notwithstanding anything to the contrary contained herein, with respect to non-residential leases of real property, unless the applicable lease expressly permits the granting of liens on such lease, the liens granted pursuant to this Interim Order shall attach solely to the proceeds of such lease and not to the subject lease itself.

(c) Liens Junior to Certain Other Liens.   Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected security

interest in and lien upon all prepetition and postpetition property of the Debtors, whether

now existing or hereafter acquired, that is subject to valid, perfected and unavoidable

liens in existence immediately prior to the Petition Date that are senior to the liens

securing the Prepetition Loan Obligations or to valid and unavoidable liens in existence

immediately prior to the Petition Date that are perfected subsequent to the Petition Date

as permitted by Bankruptcy Code section 546(b) that are senior to the liens securing the

Prepetition Loan Obligations, which security interests and liens in favor of the DIP

Agent and the DIP Lenders are junior only to such valid, perfected and unavoidable

liens.

11. *Carve-Out.*

(a)   Priority of Carve-Out.  For purposes hereof, the "Carve-Out" shall mean the

sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of

the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to

31 U.S.C. § 3717 without regard to the notice set forth in (iii) (below); (ii) all reasonable

fees and expenses up to $50,000 incurred by a trustee under Bankruptcy Code

section 726(b) without regard to the notice set forth in (iii) (below); (iii) to the extent

allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid

reasonable fees and expenses (the "Allowed Professional Fees") incurred by persons or

firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy

Code   (the "Debtor Professionals")   and   any   official   creditors'   committee

(the "Creditors' Committee") pursuant to section 328 or 1103 of the Bankruptcy Code

(the   "Committee Professionals"   and,   together   with   the   Debtor   Professionals,

the "Professional Persons") at any time before or on the first business day following

delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (such amounts in this provision (iii), the "Pre-Trigger Notice Professional Fees"); and (iv) after the date of delivery of the Carve-Out Trigger Notice (the "Trigger Date"), Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). Any transaction or success fee shall not be included in the Carve-Out, unless otherwise earned by such Professional Person prior to the Trigger Date or earned pursuant to the applicable Professional Person's engagement letter notwithstanding the Trigger Date. For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Agent by email (or other electronic means) to the Debtors and their lead counsel, counsel to the Crossover Group, counsel to the Secured Lender Group, the U.S. Trustee, and lead counsel to the Creditors' Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Facility and acceleration of the DIP Obligations (including events of default resulting from defaults under the Interim Order or Final Order, as applicable), stating that the Post-Carve Out Trigger Notice Cap is invoked.

(b) Carve-Out Reserves. On the day on which a Carve-Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee, counsel to the Crossover Group and counsel to the Secured

21

Lender Group (the "Termination Declaration Date"), the Carve-Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the unused commitments under the DIP Facility (on a pro rata basis based on the then outstanding unused commitments under the DIP Facility), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve-Out Trigger Notice shall also (i) be deemed a request by the Debtors for DIP Loans under the unused commitments under the DIP Facility (on a pro rata basis based on the then outstanding unused commitments under the DIP Facility), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.

On the first business day after the DIP Agent gives such notice to such DIP Lenders, notwithstanding anything in the DIP Loan Documents to the contrary, including with respect to the existence of a Default (as defined in the DIP Loan Documents) or Event of Default (as defined hereunder, in the DIP Term Sheet or the DIP Loan Documents), the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the commitments under the DIP Facility following an Event of Default, or the occurrence of the Maturity Date (as defined in the DIP Term Sheet), each DIP Lender with an outstanding unused commitment under the DIP Facility (on a pro rata basis based on the then outstanding commitments under the DIP Facility) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Agent for the benefit of the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  All funds in the Post Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post Carve Out Trigger Notice Reserve has not been reduced to zero, to

pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have

been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have

been terminated, in which case any such excess shall be paid to the Prepetition Agent

for the benefit of the Prepetition Secured Parties in accordance with their rights and

priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP

Loan Documents, or the DIP Orders, if either of the Carve Out Reserves is not funded

in full in the amounts set forth in this paragraph, then, any excess funds in one of the

Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-

Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up

to the applicable amount set forth in this paragraph, prior to making any payments to the

DIP Agent or the Prepetition Agent or other Prepetition Secured Parties, as applicable.

Notwithstanding anything to the contrary in the DIP Loan Documents or DIP Orders,

following delivery of a Carve-Out Trigger Notice, the DIP Agent and the Prepetition

Agent shall not sweep or foreclose on cash (including cash received as a result of the

sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have

been fully funded, but shall have a security interest in any residual interest in the Carve

Out Reserves, with any excess paid to the DIP Agent for application in accordance with

the DIP Loan Documents.  Further, notwithstanding anything to the contrary in the DIP

Orders, (i) disbursements by the Debtors from the Carve Out Reserves shall not

constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the

Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the

priority of the Carve-Out, and (iii) in no way shall the Initial DIP Budget, DIP Budget,

Carve-Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the

foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in DIP Orders, the DIP Facility, or in the Prepetition Credit Agreement, the Carve-Out shall be senior to all liens and claims securing the DIP Facility, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the obligations under the Prepetition Credit Agreement.

(c)   <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

(d)   <u>No Direct Obligation to Pay Allowed Professional Fees</u>.  None of the DIP Agent, DIP Lenders, or the Prepetition Agent or Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in the DIP Orders or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Agent or Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)   <u>Payment of Carve-Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  Any funding of the Carve-Out shall be added

25

to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under the DIP Orders, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

12.    *Limitation on Charging Expenses Against Collateral*.   If authorized in the Final Order, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve-Out), the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders pursuant to Bankruptcy Code sections 105(a) or 506(c) or any similar principle of law or equity, without the prior written consent of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders.

13.    *No Marshaling/Application of Proceeds*.   If authorized in the Final Order, the DIP Agent and the Prepetition Agent shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition Collateral in accordance with the provisions of the DIP Loan Documents and the Prepetition Credit Documents, as applicable, and in no event shall the DIP Agent, the DIP Lenders or any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral.

14.    *Equities of the Case.*   If authorized in the Final Order, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b), and the "equities of the case" exception under Bankruptcy Code

section 552(b) shall not apply to such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable.

15.     *Use of Cash Collateral*.   The Debtors are hereby authorized to use all Cash Collateral of the Prepetition Secured Parties, but solely for the purposes set forth in this Interim Order and in accordance with the DIP Budget (plus permitted variances as set forth in this Interim Order and the DIP Loan Documents) including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of this Interim Order through and including the date of the Final Hearing.   Except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral.

16.     *Adequate Protection for the Prepetition Secured Parties*.   Subject only to the Carve-Out and the terms of this Interim Order, pursuant to Bankruptcy Code sections 361, 363(e) and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition diminution in value of such interests (each such diminution, a "Diminution in Value"), resulting from, among other things, the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve-Out, the Debtors' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties, is hereby granted the following (collectively, the "Adequate Protection Obligations"):

(a)     Adequate Protection Liens.   As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in and

27

liens as of the date of this Interim Order (the "Adequate Protection Liens"), without the

necessity of the execution by the Debtors (or recordation or other filing) of security

agreements, control agreements, pledge agreements, financing statements, mortgages, or

other similar documents, on all DIP Collateral and if authorized in the Final Order, all

proceeds or property recovered from Avoidance Actions.  Subject to the terms of this

Interim Order, the Adequate Protection Liens shall be subordinate only to the

(A) Carve-Out, (B) the DIP Liens and (C) other valid, perfected and unavoidable liens, if

any, existing as of the Petition Date that are senior in priority to the Prepetition Liens of

the Prepetition Secured Parties as permitted by the terms of the Prepetition Credit

Documents.  The Adequate Protection Liens shall otherwise be senior to all other security

interests in, liens on, or claims against any of the DIP Collateral (including, for the

avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit

of the Debtors and their estates under Bankruptcy Code section 551).

　　　　(b)　　　Adequate Protection Superpriority Claims.  As further adequate protection,

and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), allowed

administrative expense claims in each of the Cases ahead of and senior to any and all other

administrative expense claims in such Cases to the extent of any postpetition Diminution

in Value (the "Adequate Protection Superpriority Claims"), except the Carve-Out and the

DIP Superpriority Claims.  Subject to the Carve-Out and the DIP Superpriority Claims in

all respects, the Adequate Protection Superpriority Claims will not be junior to any claims

and shall have priority over all administrative expense claims against each of the Debtors,

now existing or hereafter arising, of any kind or nature whatsoever, including, without

limitation, administrative expense claims of the kinds specified in or ordered pursuant to

28

Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (if authorized in the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114.  The Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Superpriority Claims under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Requisite Lenders, in each case as provided in the DIP Loan Documents.

(c)      Fees and Expenses.   As further adequate protection, the Debtors are authorized and directed to pay all reasonable and documented fees and expenses (the "Adequate Protection Fees"), whether incurred before or after the Petition Date, of (a) one counsel (Cravath, Swaine & Moore LLP) for the Prepetition Agent; (b) one counsel (Akin Gump) and the financial advisors (PJT Partners LP and DH Capital, LLC) for the Crossover Group; and (c) one counsel (Jones Day) and one financial advisor (Houlihan Lokey) for the Secured Lender Group in accordance with Paragraph 25 herein.  None of the Adequate Protection Fees shall be subject to separate approval by this Court or the U.S. Trustee Guidelines and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise see the Court's approval of any such payments.

17.     *Section 507(b) Reservation*.  Subject to the Carve-Out, nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the

Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties against any diminution in value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

18.     *Insurance.* At all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date.

19.     *Reservation of Rights of the DIP Agent, DIP Lenders and Prepetition Secured Parties.* Subject to the Carve-Out, notwithstanding any other provision in this Interim Order to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of any of the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right to seek additional adequate protection at and following the Final Hearing; provided, that, any such further or different adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Agent and the DIP Lenders granted under this Interim Order and the DIP Loan Documents; (b) any of the rights of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties to (i) request modification of the automatic stay of Bankruptcy Code section 362, (ii) request dismissal of any of the Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Cases, (iii) seek to propose, subject to the provisions of Bankruptcy Code section 1121, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties. The delay in or failure of

the DIP Agent, the DIP Lenders and/or the Prepetition Secured Parties to seek relief or otherwise

exercise their rights and remedies shall not constitute a waiver of any of the DIP Agent's, the DIP

Lenders' or the Prepetition Secured Parties' rights and remedies.

20.     *Debtors' Reservation of Rights.*   The entry of this Interim Order and the grant of

adequate protection to the Prepetition Secured Parties pursuant to the terms hereof shall be without

prejudice to the rights of the Debtors to, following the occurrence of an Event of Default (as

defined in the DIP Term Sheet), seek authority to use the Prepetition Collateral, including Cash

Collateral, without the consent of the Prepetition Secured Parties, and the Prepetition Secured

Parties reserve all of their respective rights with respect to contesting any such motion or request

by the Debtors or any other person; <u>provided</u> that the fees and expenses incurred by the

Debtors in connection with seeking such authority shall, only to the extent the

Carve-Out Trigger Notice has been delivered to the Debtors as set forth in Paragraph 11 herein,

reduce the amount of the Post-Carve Out Trigger Notice Cap.

21.     *Remedies Upon the Termination Date.*   The Debtors shall immediately provide

notice to counsel to the DIP Agent and the DIP Lenders, counsel to the Crossover Group and

counsel to the Secured Lender Group and counsel to the Creditors' Committee (if any), of the

occurrence of any Event of Default, at which time the Debtors' ability to use Cash Collateral

hereunder shall terminate and the DIP Obligations shall become due and payable.   Upon the

occurrence of an Event of Default following the giving of not less than three (3) business days'

advance written notice, which may be by email, (the "<u>Enforcement Notice</u>") to counsel to the

Debtors, counsel to the Crossover Group, counsel to the Secured Lender Group and counsel to the

Creditors' Committee (if any) (the "<u>Notice Period</u>"), subject to the Carve-Out, the DIP Agent (at

the direction of the Requisite Lenders) and the DIP Lenders may exercise any rights and remedies

against the DIP Collateral available to them under this Interim Order, the DIP Loan Documents and applicable non-bankruptcy law, including but not limited to terminating all commitments to extend credit under the DIP Facility.  The only permissible basis for the Debtors, the Creditors' Committee (if any), or any other party to contest, challenge or object to an Enforcement Notice shall be solely with respect to the validity of the Event of Default giving rise to such Enforcement Notice (*i.e.* whether such Event of Default validly occurred and has not been cured or waived in accordance with this Interim Order).  Notwithstanding anything to the contrary contained herein, the DIP Agent or DIP Lenders may only enter onto any leased premises of any debtors following an event of default in accordance with (i) a separate written agreement by and between the DIP Agent and any applicable landlords, (ii) applicable non-bankruptcy law, or (iii) a further order of this court after notice and a hearing, provided that such hearing shall be on an expedited basis to the extent requested by the DIP Agent or DIP Lenders.  The automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated with respect to the DIP Agent at the end of the Notice Period, without further notice or order of the Court, unless the DIP Agent (at the direction of the Requisite Lenders) elects otherwise in a written notice, which may be by email, to the Debtors, counsel to the Crossover Group, counsel to the Secured Lender Group and counsel to the Creditors' Committee (if any), and the DIP Agent (at the direction of the Requisite Lenders) shall, subject to the Carve-Out, be permitted to exercise all rights and remedies set forth herein and in the DIP Loan Documents, as applicable, and as otherwise available at law against the DIP Collateral, without any further order of or application or motion to the Court, and without restriction or restraint by any stay under Bankruptcy Code sections 362 or 105, or otherwise, against the enforcement of the liens and security interests in the DIP Collateral, or any other rights

and remedies granted to the DIP Agent or the DIP Lenders with respect thereto pursuant to the

DIP Loan Documents or this Interim Order.

22.     *No Waiver for Failure to Seek Relief*.  The failure or delay of the DIP Agent to

exercise rights and remedies under this Interim Order, the DIP Loan Documents, or applicable

law, as the case may be, shall not constitute a waiver of their respective rights hereunder,

thereunder or otherwise.

23.     *Perfection of the DIP Liens and Adequate Protection Liens.*

(a)   Subject to the limitations in Paragraph 27(a) of this Interim Order, the DIP

Agent and the Prepetition Agent are hereby authorized, but not required, to file or record

financing statements, intellectual property filings, mortgages, depository account

control agreements, notices of lien or similar instruments in any jurisdiction in order to

validate and perfect the liens and security interests granted hereunder.  Whether or not

the DIP Agent or the Prepetition Agent shall (at the direction of the applicable

required lenders) choose to file such financing statements, intellectual property filings,

mortgages, notices of lien or similar instruments, such liens and security interests shall

be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to

challenge, dispute or subordination as of the date of entry of this Interim Order.  If the

DIP Agent or the Prepetition Agent (at the direction of the applicable required lenders)

determines to file or execute any financing statements, agreements, notice of liens or

similar instruments, the Debtors shall cooperate and assist in any such execution and/or

filings as reasonably requested by the DIP Agent or the Prepetition Agent (at the

direction of the applicable required lenders), and the automatic stay shall be modified to

allow such filings.

(b)   A certified copy of this Interim Order may, in the discretion of the DIP Agent or the Prepetition Agent (at the direction of the applicable required lenders), be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c)   Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law.  Any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Term Sheet or this Interim Order, subject to applicable law.  Notwithstanding anything to the contrary contained herein, this paragraph 23(c) shall not apply to any provision of an executory contract or unexpired lease by and between the Debtors and 401 North Broad Lessee, LLC.

24.   *Preservation of Rights Granted Under this Interim Order.*

(a)   Unless and until all DIP Obligations are indefeasibly paid in full, in cash, and all commitments to extend credit under the DIP Facility are terminated, the

Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Credit Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral; <u>and</u> (ii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, except as set forth in Paragraph 23.

(b)   Other than as set forth in this Interim Order, neither the DIP Liens nor the Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Cases or arising after the Petition Date, and neither the DIP Liens nor the Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(c)   In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the DIP Parties or the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits afforded in Bankruptcy Code section 363(m).

(d)   Unless and until all DIP Obligations, Prepetition Loan Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash, and all

commitments to extend credit under the DIP Facility are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly (i) except as permitted under the DIP Loan Documents and with the prior written consent of the DIP Agent, the Requisite Lenders, the Prepetition Agent and the Prepetition Secured Parties (x) any modification, stay, vacatur, or amendment of this Interim Order, (y) a priority claim for any administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a) or 507(b)) in any of the Cases, equal or superior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, or the Prepetition Loan Obligations, or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Loan Documents, any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens or the Prepetition Liens, as the case may be; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Loan Documents and this Interim Order; (iv) except as set forth in the DIP Loan Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Cases; or (vi) an order appointing a chapter 11 trustee in any of the Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Cases.

(e)   Notwithstanding any order dismissing any of the Cases entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the

Adequate Protection Superpriority Claims and the other administrative claims granted pursuant to this Interim Order, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims and the other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(f)   Except as expressly provided in this Interim Order or in the DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and all other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Loan Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to Bankruptcy Code section 363(b) or (iii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Loan Documents shall continue in these Cases, in any successor cases if these

Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Superpriority Claims and all other rights and remedies of the DIP Parties and the Prepetition Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the Requisite Lenders).

25.    *Expenses and Indemnification.*

(a)  The Debtors are authorized and directed to pay all (i) reasonable and documented out-of-pocket expenses (including, but not limited to, reasonable legal prepetition and postpetition fees and expenses of one outside counsel (Norton Rose Fulbright US LLP) for the DIP Agent and certain DIP Lenders, "DIP Counsel")) incurred in connection with the DIP Facility and the transactions contemplated thereby, as and to the extent provided in the DIP Loan Documents, whether or not the DIP Facility is successfully consummated, and (ii) reasonable and documented prepetition and postpetition out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of DIP Counsel) of the DIP Agent, for enforcement costs and documentary taxes associated with the DIP Facility and the transactions contemplated thereby.  The Debtors shall be jointly and severally obligated to pay all fees and expenses described above, which obligations shall form a part of the DIP Obligations and shall be paid without the necessity for filing any application with or obtaining further order of the Court.  Any fee statement or invoice submitted by the DIP

Agent to any Debtor, the Committee (if appointed), counsel to the Crossover Group, counsel to the Secured Lender Group or the U.S. Trustee with respect to the fees or expenses incurred by DIP Counsel may be redacted or summarized to preserve any applicable attorney/client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law.  The Debtors shall pay the fees, expenses and disbursements set forth in this Paragraph 25 and those of (a) one counsel (Cravath, Swaine & Moore LLP) for the Prepetition Agent; (b) one counsel (Akin Gump) and the financial advisors (PJT Partners LP and DH Capital, LLC) for the Crossover Group; (c) one counsel (Jones Day) and one financial advisor (Houlihan Lokey) for the Secured Lender Group as set forth in Paragraph 16(c); and (d) the Prepetition Trustee in accordance with the Prepetition Indenture as set forth in the RSA no later than five (5) days (the "Review Period") after the receipt by counsel for the Debtors, counsel for the Committee, if appointed, counsel for the Crossover Group, counsel for the Secured Lender Group and the U.S. Trustee of each of the invoices therefor (the "Invoiced Fees") (which invoices may be redacted or summarized to preserve any applicable attorney-client or work product privilege or protection) and without the necessity of filing formal fee applications, including such amounts arising before the Petition Date; provided, that the foregoing parties may dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, (i) the Debtors pay in full all Invoiced Fees other than the Disputed Invoiced Fees and (ii) a Debtor, the Committee, the Crossover Group, the Secured Lender Group or the U.S. Trustee notifies the submitting party in writing setting forth the specific objections to the Disputed Invoiced

Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least ten (10) days prior written notice to the submitting party of any hearing on such motion or other pleading). The Debtors shall pay any Disputed Invoiced Fees promptly after approval (and to the extent approved) by the Court. Notwithstanding anything to the contrary in this paragraph, for the avoidance of doubt, the Debtors shall pay the reasonable and documented fees and expenses of (a) Jones Day (as counsel) and Houlihan Lokey Capital, Inc. (as financial advisor) to certain of the DIP Lenders and the Secured Lender Group (as defined in the RSA) and (b) Akin Gump (as counsel) and PJT Partners LP and DH Capital, LLC (as financial advisors) to certain of the DIP Lenders and the Crossover Group (as defined in the RSA) no later than the Effective Date (as defined in the Plan).

(b)   In addition, the Debtors will indemnify the DIP Lenders, the DIP Agent and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each an "Indemnified Person") and hold them harmless from and against all costs, expenses (including but not limited to reasonable and documented legal fees and expenses) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility; provided, that, no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence, fraud, or willful misconduct of such person (or their related persons). No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the

Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in an final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence, fraud, or willful misconduct, and in no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages.

26.    *Limitation on Use of DIP Facility Proceeds, DIP Collateral and Cash Collateral.* Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve-Out or proceeds thereof may be used: (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence support or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding or other litigation of any type (i) against any of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Prepetition Trustee or the Prepetition Noteholders (each in their capacities as such), and each of their respective officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Prepetition Trustee or the Prepetition Noteholders (each in their capacities as such) under the DIP Loan Documents, the Prepetition Credit Documents, the Prepetition Indenture or this Interim Order, including, without limitation, for the payment of any services rendered by the professionals

retained by the Debtors or any Creditors' Committee (if any) in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral or seeking affirmative relief against any of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Prepetition Trustee or the Prepetition Noteholders related to the DIP Obligations, the Prepetition Loan Obligations, or the Prepetition Notes Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations or the DIP Agent's and the DIP Lenders' liens or security interests in the DIP Collateral, the Prepetition Loan Obligations or the Prepetition Liens or the Prepetition Notes Obligations, as applicable; or (iii) for monetary, injunctive, or other affirmative relief against the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Prepetition Trustee or Prepetition Noteholders, or the DIP Agent's, the DIP Lenders', the Prepetition Secured Parties' respective liens on or security interests in the DIP Collateral or the Prepetition Collateral that would impair the ability of any of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, Prepetition Trustee or Prepetition Noteholders, as applicable, to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations or the Prepetition Loan Obligations, to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Loan Obligations, by or on behalf of the Prepetition Trustee and the Prepetition Noteholders related to the Prepetition Notes Obligations,

or by or on behalf of the DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions (as defined herein) related to the DIP Obligations, the DIP Liens, the Prepetition Loan Obligations, the Prepetition Liens, or the Prepetition Notes Obligations; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens or any other rights or interests of the DIP Agent or the DIP Lenders related to the DIP Obligations or the DIP Liens, (y) any of the Prepetition Liens or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Loan Obligations or the Prepetition Liens, or (z) any rights or interests of the Prepetition Trustee or Prepetition Noteholders related to the Prepetition Notes Obligations; provided, that, no more than $50,000 of the proceeds of the DIP Facility, the DIP Collateral or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by the Creditors' Committee, if appointed, solely to investigate, within the Challenge Period (as defined below), the claims, causes of action, adversary proceedings or other litigation against (i) the Prepetition Agent or the other Prepetition Secured Parties solely concerning the legality, validity, priority, perfection, enforceability or extent of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Loan Obligations, or (ii) the Prepetition Trustee or Prepetition Noteholders.

27.    *Effect of Stipulations on Third Parties.*

(a)    The Debtors' acknowledgments, stipulations, admissions, waivers and releases set forth in this Interim Order shall be binding on the Debtors, their estates and their respective representatives, successors, and assigns, and all parties in interest in these Cases, including the

Creditors' Committee (if any), or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), unless (a) such party, in each case, obtains requisite standing, and has duly filed an adversary proceeding or contested matter, as applicable (each, a "Challenge"), challenging the validity, perfection, priority, extent or enforceability of the Prepetition Liens, the Prepetition Loan Obligations, the Prepetition Notes Obligations or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Prepetition Agent or the other Prepetition Secured Parties in connection with any matter related to the Prepetition Collateral, the Prepetition Liens, or the Prepetition Loan Obligations, or the Prepetition Trustee or the Prepetition Noteholders in connection with any matter related to the Prepetition Notes Obligations by no later than the earlier of (i) the effective date of a chapter 11 plan for the Debtors or (ii) (x) with respect to any Creditors' Committee, the date that is sixty (60) days after entry of the Final Order or (y) with respect to other parties in interest, no later than the date that is seventy-five (75) days after the entry of the Final Order (the time period established by the later of the foregoing clauses (i) and (ii), the "Challenge Period"); provided, that, in the event that, prior to the expiration of the Challenge Period, (x) these Cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these Cases, then, in each such case, the Challenge Period shall be extended for a period of 60 days solely with respect to any Trustee, commencing on the occurrence of either of the events described in the foregoing clauses (x) and (y); and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any Challenge.  If no such Challenge is timely filed prior to the expiration of the Challenge Period, without further order of this Court (x) the Prepetition Loan Obligations and Prepetition Notes Obligations shall constitute allowed claims, not subject to any Claims and

Defenses (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in these Cases and any subsequent chapter 7 cases, if any; (y) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and of the priority specified in Paragraph 5(b), not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery; and (z) the Prepetition Loan Obligations, the Prepetition Liens on the Prepetition Collateral, the Prepetition Secured Parties, the Prepetition Notes Obligations, the Prepetition Trustee and the Prepetition Noteholders shall not be subject to any other or further challenge and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period).  If any such Challenge is timely filed prior to the expiration of the Challenge Period, (a) the stipulations and admissions contained in this Interim Order shall nonetheless remain binding and preclusive on the Creditors' Committee (if any) and any other party in these cases, including any Trustee, except as to any stipulations or admissions that are (1) specifically and expressly challenged in such Challenge and (2) invalidated or modified as set forth in a final, non-appealable order of a court of competent jurisdiction and (b) any Claims and Defenses not brought in such Challenge shall be forever barred; provided, that, if and to the extent any Challenges to a particular stipulation or admission are withdrawn, denied or overruled by a final

non-appealable order, such stipulation also shall be binding on the Debtors' estates and all parties in interest.

(b)    Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any Creditors' Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge (including a Challenge) with respect to the Prepetition Credit Documents, the Prepetition Loan Obligations, the Prepetition Indenture or the Prepetition Notes Obligations.

28.    *Release*.  Subject to the rights and limitations set forth in Paragraphs 26 and 27 of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Lenders, the DIP Agent, the Prepetition Agent, the Prepetition Secured Parties, the Prepetition Trustee, the Prepetition Noteholders and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof with respect

to or relating to the DIP Obligations, the DIP Liens, the Prepetition Loan Obligations, the

Prepetition Liens, or the Prepetition Notes Obligations as applicable, including, without limitation,

(i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all

claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and

causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability

of the liens or claims of the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition

Secured Parties, the Prepetition Trustee and the Prepetition Noteholders.

29.    *Surety*.  Nothing in this Interim Order shall in any way prime or affect the rights of

Westchester Fire Insurance Company or its past, present or future parents, subsidiaries or affiliates

(the "Surety") as to: (a) any funds it is holding and/or being held for it presently or in the future,

whether in trust, as security, or otherwise, including any proceeds due or to become due any of the

Debtors or their non-debtor affiliates in relation to contracts bonded by the Surety; (b) any

substitutions or replacements of said funds including accretions to and interest earned on said

funds; or (c) any letter of credit related to any indemnity, collateral trust, bond or agreements

between or involving the Surety and any of the Debtors or any of the Debtors' non-debtor affiliates

(collectively (a) to (c), the "Surety Assets").   Nothing in this Interim Order shall affect the rights

of the Surety under any current or future indemnity, collateral trust, or related agreements between

or involving the Surety and any of the Debtors or any of the Debtors' non-debtor affiliates as to

the Surety Assets or otherwise, including, but not limited to, the Agreement of Indemnity executed

by Sungard AS on or about March 28, 2014, and the Rider to Agreement of Indemnity executed

by Sungard AS on or about April 23, 2014.  In addition, nothing in this Interim Order shall prime

or otherwise impact: (x) current or future setoff and/or recoupment rights and/or the lien rights of

the Surety or of any party to whose rights the Surety has or may become subrogated;  and/or (y)

any existing or future subrogation or other common law rights of the Surety.  To the extent that

any Surety Assets are being held by the Debtors and are used by the Debtors as part of cash

collateral, a concomitant replacement trust claim or replacement lien shall be granted to the Surety

equal to the amount of the use of those funds with any replacement trust fund claim to be equal to

the amount of trust funds used, and any replacement lien to have the same priority, amount, extent

and validity as existed as of the Petition Date.  In addition, notwithstanding anything in this Interim

Order to the contrary, the rights, claims and defenses of the Debtors and of the Surety, including,

but not limited to, the Surety's rights under any properly perfected liens and claims and/or claim

for equitable rights of subrogation, and rights of the Debtors and of any successors in interest to

any of the Debtors, and any creditors, to object to any such liens, claims and/or equitable

subrogation and other rights, are fully preserved.  Nothing herein is an admission by the Surety or

the Debtors, or a determination by the Bankruptcy Court, regarding any claims under any bonds,

and the Surety and the Debtors reserve any and all rights, remedies and defenses in connection

therewith. Notwithstanding anything herein to the contrary, and subject to the terms herein, the

Debtors hereby agree that, during the pendency of these proceedings, the Debtors shall, in

accordance with and subject to applicable law, reimburse the Surety for attorneys' fees incurred

and to be incurred by the Surety.

30.     *Credit Bidding*.  The DIP Agent (at the direction of the Requisite Lenders), and

the Prepetition Agent (at the direction of the requisite amount of Prepetition Lenders), shall have

the right to credit bid (either directly or through one or more acquisition vehicles), up to the full

amount of their respective claims, including, for the avoidance of doubt, Adequate Protection

Superpriority Claims, if any, in any sale of all or any portion of the Prepetition Collateral or the

DIP Collateral, including, without limitation, sales occurring pursuant to Bankruptcy Code section

363 or included as part of any restructuring plan subject to confirmation under Bankruptcy Code

section 1129(b)(2)(A)(ii)-(iii); provided, that prior to the expiration of the Challenge Period, the

right to object to any credit bid put forth by the Prepetition Lenders is hereby preserved.

31.     *Conditions Precedent*.  No DIP Lender shall have any obligation to make any DIP

Loan under the respective DIP Loan Documents unless the conditions precedent to making such

extensions of credit under the applicable DIP Loan Documents have been satisfied in full or waived

in accordance with such DIP Loan Documents.

32.     *Binding Effect; Successors and Assigns*.  The DIP Loan Documents and the

provisions of this Interim Order, including all findings herein, shall be binding upon all parties in

interest in these Cases, including without limitation, the DIP Agent, the DIP Lenders, the

Prepetition Secured Parties, any Creditors' Committee appointed in these Cases, and the Debtors

and their respective successors and assigns (including any chapter 7 or chapter 11 trustee

hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed

pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal

representative of any of the Debtors or with respect to the property of the estate of any of the

Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, and the Prepetition

Secured Parties, provided, that, except to the extent expressly set forth in this Interim Order, the

Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to

extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates

of the Debtors.  In determining to make any loan (whether under the DIP Loan Agreement, a

promissory note or otherwise) to permit the use of Cash Collateral or in exercising any rights or

remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the

DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not (i) be deemed to be in

control of the operations of the Debtors, or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates.

33.     *Limitation of Liability*.   In determining to make any loan under the DIP Loan Documents, permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not solely by reason thereof be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Interim Order or in the DIP Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders or any Prepetition Secured Party of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

34.     *No Third Party Rights*.   Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party or incidental beneficiary.

35.     *Retention of Jurisdiction*.   This Bankruptcy Court shall have and retain exclusive jurisdiction to enforce the terms of this Interim Order and to adjudicate any and all matters arising from or related to the interpretation or implementation of this Interim Order, including with respect to any and all disputes or matters under, arising out of or in connection with either the DIP Loans or the DIP Loan Documents.

36. *No Requirement to File Claim for DIP Obligations*. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the DIP Agent nor any DIP Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Loan Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses; and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority or enforceability of any of the DIP Loan Documents or of any indebtedness, liabilities or obligations arising at any time thereunder or prejudice or otherwise adversely affect the DIP Agent's or any DIP Lender's rights, remedies, powers or privileges under any of the DIP Loan Documents, this Interim Order or applicable law.

37. *Effectiveness*. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

38. *Final Hearing*. The Final Hearing is scheduled for [DATE] at [TIME], prevailing Eastern time, before this Court. The Debtors shall promptly transmit copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to any

Creditors' Committee after the same has been appointed, or Creditors' Committee counsel, if the same shall have been appointed.  Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file a written objection; which shall be served upon (a) counsel to the Debtors, (b) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York, 10036, Attn: Philip C. Dublin, Esq. and Naomi Moss, Esq., counsel to certain of the DIP Lenders and the Crossover Group; (c) Jones Day, 250 Vesey Street, New York, New York 10281, Attn: Scott J. Greenberg, Esq., Michael J. Cohen, Esq., and Steven Domanowski, Esq., counsel to certain of the DIP Lenders and the Secured Lender Group; (d) Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, New York 10019, Attn: Stephen Castro, Esq. and Christy Rivera, Esq., counsel to the DIP Agent and certain of the DIP Lenders; (e) Cravath, Swaine & Moore LLP, counsel to the Prepetition Agent; (f) Carter Ledyard & Millburn LLP, 2 Wall Street, New York, New York 10005, Attn: James Gadsden, Esq., counsel to the Prepetition Trustee; and (g) the U.S. Trustee, and shall be filed with the Clerk of the United States Bankruptcy Court, District of New York, in each case to allow actual receipt by the foregoing no later than [DATE] at [TIME], prevailing Eastern time.  The Final Hearing shall be cancelled, and the relief set forth in this Interim Order shall not be granted on a final basis, if the Effective Date has occurred prior to the occurrence of the Final Hearing.

Dated: _____, 2019
            White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit A to Interim Order</u>**

**DIP Term Sheet**

**SUNGARD AVAILABILITY SERVICES CAPITAL, INC.**
**$100.0 MILLION SUPERPRIORITY SENIOR SECURED DEBTOR IN POSSESSION CREDIT FACILITY**
**TERM SHEET**

*The terms set forth in this Summary of Principal Terms and Conditions (the "Term Sheet") are being provided on a confidential basis as part of a comprehensive proposal, each element of which is consideration for the other elements and an integral aspect of the proposed DIP Facility (as defined below).*

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

| | |
|---|---|
| *Borrower:* | Sungard Availability Services Capital, Inc., a Delaware corporation (the "Borrower" or the "Company"), as a debtor and a debtor in possession under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in a case (the "Borrower's Case") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to be filed on no later than May 1, 2019 (such filing date, the "Petition Date") and to be jointly-administered with the Debtor Guarantors' Cases (as defined below). |
| *Guarantors:* | Each of the Borrower's direct and indirect subsidiaries, which are debtors and debtors in possession in jointly administered cases (collectively, the "Debtor Guarantors' Cases" and, together with the Borrower's Case, the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code to be filed contemporaneously and jointly administered with the Borrower's Case (collectively, the "Guarantors"). The Borrower and the Guarantors are referred to herein as "Loan Parties" and each, a "Loan Party", or as "Debtors" and each, a "Debtor". All obligations of the Borrower under the DIP Facility will be unconditionally guaranteed on a joint and several basis by the Guarantors. |
| *Backstop Commitment:* | Funds and/or accounts affiliated with, or managed and/or advised by, the entities set forth on Schedule A (together with their respective successors and permitted assignees, each a "Backstop Party" and collectively, the "Backstop Parties") will, severally and not jointly, backstop (i) the Prepetition Term Loan Allocation (as defined below) in the amounts set forth in the table below (the "Tranche A Backstop Commitments") and (ii) the Prepetition Notes Allocation (as defined below) in the amounts set forth in the table on Schedule A (the "Tranche B Backstop Commitments" and, together with the Tranche A Backstop Commitments, the "Backstop Commitments"). |
| | For the avoidance of doubt, assignments of the DIP Loans are permitted, including without limitation assignments to or from the Backstop Parties. |
| *Administrative Agent:* | A financial institution acceptable to the Backstop Parties (in such capacity, the "DIP Agent"). |

1

*DIP Lenders:*

(A) All lenders (the "Prepetition Lenders") holding outstanding term loans and/or revolving loans under the Credit Agreement, dated as of March 31, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement") which are party to the Restructuring Support Agreement on or prior to the Petition Date shall be offered the right to participate in an amount up to 87% of the DIP Facility (the "Prepetition Term Loan Allocation") under a separate tranche of the DIP Facility ("Tranche A DIP Facility") on a ratable basis based on the outstanding loans under the Prepetition Credit Agreement held by such Prepetition Lender pursuant to procedures satisfactory to the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement (including the execution of a joinder to the Restructuring Support Agreement by a certain date); provided, however, that for the purposes of determining the allocation of the Prepetition Term Loan Allocation, the amount of the term loans held by each Prepetition Lender shall be deemed to include any amounts due in respect of the Acceleration Makewhole Premium (as defined in the Prepetition Credit Agreement), as applicable, and (B) all holders (the "Prepetition Noteholders") of 8.75% Senior Notes due 2022 (the "Prepetition Senior Notes") issued by the Company, which are party to the Restructuring Support Agreement on or prior to the Petition Date, shall be offered the right to participate in an amount up to 13% of the DIP Facility (the "Prepetition Notes Allocation") under a separate tranche of the DIP Facility (the "Tranche B DIP Facility") on a ratable basis based on the Prepetition Senior Notes held by such Prepetition Noteholder pursuant to procedures satisfactory to the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement (including the execution of a joinder to the Restructuring Support Agreement by a certain date).   Any amounts of the Prepetition Term Loan Allocation not so allocated shall be allocated to the Backstop Parties holding Tranche A Backstop Commitments on a ratable basis based on their respective Tranche A Backstop Commitments and any amounts of the Prepetition Notes Allocation not so allocated shall be allocated to the Backstop Parties holding Tranche B Backstop Commitments on a ratable basis based on their respective Tranche B Backstop Commitments (the "DIP Lenders").

For the avoidance of doubt, the terms and conditions of the loans and commitments under the Tranche A DIP Facility and Tranche B DIP Facility shall be identical, except in the case of determining the "Requisite Lenders" as set forth below.

*DIP Facility:*

A superpriority senior secured debtor in possession term loan facility in an aggregate principal amount of $100.0 million (the "DIP Facility") of which (i) a principal amount of $50.0 million will be available to be drawn in a single drawing on or after the Closing Date (as defined below) upon satisfaction of the conditions set forth in the DIP Loan Documents (as defined below) and the entry of the Interim Order (as defined below) (the loans advanced on such date, the "Initial DIP Loans") and (ii) a principal amount of up to $50.0 million (the "Delayed Draw DIP Facility" and the loans advanced under the Delayed Draw DIP Facility, the "Delayed Draw DIP Loans" and, together with the Initial DIP Loans, the "DIP Loans") will

2

be available to be drawn in one or more borrowing of at least $10,000,000 per draw after the Closing Date upon satisfaction of the conditions set forth in the DIP Loan Documents, the conditions set forth under "Conditions Precedent to Each DIP Loan" set forth below and the entry of the Final Order (as defined below).   The DIP Loans shall be drawn pro rata between the Tranche A DIP Facility and the Tranche B DIP Facility.   The borrowing of the DIP Loans shall permanently decrease the commitments under the DIP Facility, and once borrowed and repaid, the DIP Loans may not be reborrowed.

*Use of Proceeds:*

In accordance with and subject to the DIP Budget (as defined below) and the DIP Orders (as defined below), the proceeds of the DIP Facility may be used only for the following purposes:   (A) to pay reasonable and documented transaction costs, fees and expenses that are incurred in connection with the restructuring or Chapter 11 Cases, for working capital and general corporate purposes of the Loan Parties, (B) to make adequate protection payments as set forth in the section below entitled "Adequate Protection" and (C) up to $20 million of proceeds shall be applied to fund a segregated domestic account (the "Specified Account") which funds shall be available to the Debtors for disbursement to certain non-Debtor subsidiaries of the Borrower through secured intercompany borrowings evidenced by promissory notes (the "Specified Intercompany Notes") on an as-needed basis in accordance with the DIP Budget.

Notwithstanding the foregoing, no portion or proceeds of the DIP Loans, the Carve-Out (as defined below) or the DIP Collateral (as defined below) or the Prepetition Collateral (as defined below) may be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the agent under the Prepetition Credit Agreement (the "Prepetition Agent") or the other Secured Parties (as defined in the Prepetition Credit Agreement) (the "Prepetition Secured Parties"), or Prepetition Noteholders or the trustee (the "Prepetition Trustee") under the indenture governing the Prepetition Senior Notes, the DIP Agent or the DIP Lenders, other than up to $50,000 in connection with the investigation by an official creditors' committee, within sixty (60) calendar days following the selection of counsel to such committee,   of claims, causes of action, adversary proceedings or other litigation against (i) the Prepetition Agent or the other Prepetition Secured Parties solely concerning the validity, enforceability, perfection, priority or extent of the liens securing such parties' term loans under the Prepetition Credit Agreement (the "Prepetition Liens"), or (ii) Prepetition Noteholders or Prepetition Trustee.   The use of proceeds of the DIP Facility shall in all cases be in accordance with the DIP Budget (including any permitted variances).

*Term:*

Unless converted to the Exit Facility (as defined below), all obligations under the DIP Loan Documents will be due and payable in full in cash on the earliest of: (i) the date that is six months after the Closing Date; (ii) if the Final DIP Order has not been entered by the Bankruptcy Court on or before the applicable Milestone (as defined below), the date of the applicable Milestone; (iii) the date of acceleration of the DIP Loans and the

termination of the DIP Lenders' commitments under the DIP Facility pursuant to the terms of the DIP Loan Agreement; (iv) the date the Bankruptcy Court orders a conversion of the Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the chapter 11 case of any Debtor; or (v) the substantial consummation (as defined in 11 U.S.C. § 1101(2)) of a plan of reorganization of the Debtors (a "<u>Plan</u>"), which has been confirmed by an order entered by the Bankruptcy Court (the "<u>Confirmation Order</u>") (such earliest date, the "<u>Maturity Date</u>").

| | |
|---|---|
| *Conversion to Exit Term Loan Facility*: | So long as the Restructuring Support Agreement is in full force and effect, upon the substantial consummation of a Plan, the outstanding principal balance of, and any unpaid and accrued interest on, the DIP Loans and any unused commitments related to the Delayed Draw DIP Facility shall automatically convert into term loans and commitments, as applicable, under an exit term loan facility ("<u>Exit Facility</u>") which shall be subject to, (i) definitive documentation on the terms set forth on the Exit Term Sheet (as defined in the Restructuring Support Agreement) and such other terms to be agreed by the Borrower and the DIP Lenders consistent with the consent rights set forth in the Restructuring Support Agreement, (ii) the Plan being in form and substance consistent in all material respects to the terms set forth in the Restructuring Support Agreement and (iii) the consummation of such Plan. |
| *Amortization*: | None. |
| *DIP Loan Documents*: | The DIP Facility will be initially provided pursuant to the terms of this Term Sheet and may be documented by a Superpriority Senior Secured Debtor in Possession Credit Agreement (the "<u>DIP Loan Agreement</u>") and other guarantee, security and other relevant documentation (together with the DIP Loan Agreement, collectively, the "<u>DIP Loan Documents</u>") reflecting the terms and provisions set forth in this Term Sheet and otherwise in form and substance satisfactory to the DIP Agent and the Backstop Parties consistent with the consent rights under the Restructuring Support Agreement. |
| *Security and Priority*: | All obligations of the Borrower and the Guarantors to the DIP Lenders and to the DIP Agent, including, without limitation, all principal, accrued interest, costs, and fees (collectively, the "<u>DIP Obligations</u>"), shall be: |

secured, pursuant to Bankruptcy Code sections 361, 362, 364(c)(2), 364(c)(3) and 364(d), by a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically and properly perfected first priority senior priming lien on, and security interest in (such liens and security interests, the "<u>DIP Liens</u>"), all present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Loan Parties, wherever located, including, without limitation, all accounts, deposit accounts, cash and cash equivalents, inventory, equipment, capital stock in subsidiaries of the Loan Parties, and the proceeds thereof, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, the Specified Account, the Specified Intercompany Notes and all products and proceeds thereof, and subject

4

to and effective upon entry of the Final Order, the proceeds of any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law, in each case, subject to customary exceptions to be agreed by the Borrower and the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement (all such property, the "DIP Collateral"), which liens and security interests shall be senior to any and all other liens and security interests, including the adequate protection liens granted under the Orders, and the liens granted to the Prepetition Secured Parties, other than the Carve-Out,.  The DIP Liens shall be perfected pursuant to the entry of the DIP Orders, and additional collateral documentation shall not be required.

The DIP Obligations shall also constitute claims entitled to the benefits of Bankruptcy Code section 364(c)(1), having a super-priority over any and all administrative expenses and claims, of any kind or nature whatsoever, including, without limitation, the superpriority claims granted to the DIP Agent and DIP Lenders under the Interim Order and the Final Order, and the administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506 (subject to the entry of the Final Order), 507(a), 507(b), 546, 552 (subject to the entry of the Final Order), 726, 1113 and 1114, and any other provision of the Bankruptcy Code ("DIP Claims"), subject only to the Carve-Out.

|  |  |
|---|---|
| *Carve-Out:* | The liens and claims of the DIP Lenders shall be subject to a carve-out satisfactory to the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement (the "Carve-Out").   The Carve-Out means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid reasonable fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and any official creditors' committee (the "Creditors' Committee") pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (such amounts in this provision (iii), the "Pre-Trigger Notice Professional Fees"); and (iv) after the date of delivery of the Carve Out Trigger Notice (the "Trigger Date"), Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, |

to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").   Any transaction or success fee shall not be included in the Carve Out, unless otherwise earned by such Professional Person prior to the Trigger Date or earned pursuant to the applicable Professional Person's engagement letter notwithstanding the Trigger Date.   For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Facility and acceleration of the DIP Obligations (including events of default resulting from defaults under the Interim Order or Final Order, as applicable), stating that the Post-Carve Out Trigger Notice Cap has been invoked.

Carve Out Reserves.   On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the unused commitments under the DIP Facility (on a pro rata basis based on the then outstanding unused commitments under the DIP Facility), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.   The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.   On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for DIP Loans under the unused commitments under the DIP Facility (on a pro rata basis based on the then outstanding unused commitments under the DIP Facility), in an amount equal to the Post Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post Carve Out Trigger Notice Cap.   The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.   On the first business day after the DIP Agent gives such notice to such DIP Lenders, notwithstanding anything in the DIP Loan Documents to the contrary, including with respect to the existence of a Default (as defined in the DIP Loan Documents) or Event of Default (as defined hereunder or the DIP Loan Documents), the failure of the Debtors to satisfy any or all of the conditions

precedent for DIP Loans under the DIP Facility, any termination of the commitments under the DIP Facility following an Event of Default, or the occurrence of the Maturity Date, each DIP Lender with an outstanding unused commitment under the DIP Facility (on a pro rata basis based on the then outstanding commitments under the DIP Facility) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Agent for the benefit of the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been terminated, in which case any such excess shall be paid to the Prepetition Agent for the benefit of the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP Loan Documents, or the DIP Orders, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph, prior to making any payments to the DIP Agent or the Prepetition Agent or other Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Loan Documents or DIP Orders, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Loan Documents.    Further, notwithstanding anything to the contrary in the DIP Orders, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial DIP Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything

7

to the contrary in DIP Orders, the DIP Facility, or in the Prepetition Credit Agreement, the Carve Out shall be senior to all liens and claims securing the DIP Facility, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the obligations under the Prepetition Credit Agreement.

<u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

<u>No Direct Obligation To Pay Allowed Professional Fees</u>.   None of the DIP Agent, DIP Lenders, or the Prepetition Agent or Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.   Nothing in the DIP Orders or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Agent or Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

<u>Payment of Carve-Out On or After the Termination Declaration Date</u>. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.   Any funding of the Carve-Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under the DIP Orders, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

| | |
|---|---|
| *Interim and Final Orders:* | The order approving the DIP Facility on an interim basis and authorizing the use of prepetition cash collateral, which shall be satisfactory in form and substance to the DIP Agent and the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement (the "<u>Interim Order</u>"), shall authorize and approve (i) the Debtors' entry into the DIP Loan Documents, (ii) the making of the DIP Loans, (iii) the granting of the super-priority claims and liens against the Loan Parties and their assets in accordance with the DIP Loan Documents with respect to the DIP Collateral, (iv) the payment of all fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Agent and the DIP Lenders as described in "Indemnification and Expenses" by the Loan Parties, (v) the payment of all fees and expenses of Akin Gump Strauss Hauer & Feld LLP and PJT Partners LP, as counsel and financial advisor to the Crossover Group (as defined in the Restructuring Support Agreement), respectively, Jones Day and Houlihan Lokey, as counsel and financial advisors to the Secured Lender Group (as defined in the Restructuring Term Sheet) and the Prepetition Agent and Cravath, Swaine & Moore LLP, as counsel to the Prepetition Agent, and (vi) the use of prepetition cash collateral.   The order approving the DIP |

Facility on a final basis and authorizing the use of prepetition cash collateral shall be in form and substance satisfactory to the DIP Agent and the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement (the "<u>Final Order</u>" and, together with the Interim Order, the "<u>DIP Orders</u>").

*Interest:*

Interest on the DIP Loans shall be payable in cash (a) for loans accruing at a rate based on LIBOR, at the end of each Interest Period and for Interest Periods of greater than three months, every three months and (b) for loans accruing at Base Rate, quarterly in arrears.   At all times prior to the occurrence of an Event of Default (as defined below), interest on the outstanding principal amount of all DIP Loans shall accrue at a rate per annum equal to LIBOR plus 7.50% per annum or Base Rate plus 6.50%, at the option of the Borrower.

As used herein, the term "LIBOR" will have the meaning substantially similar to the definition of "Eurocurrency Rate" under the Prepetition Credit Agreement, the term "Base Rate" will have the meaning substantially similar to such definition in the Prepetition Credit Agreement and the term "Interest Period" will have the meaning substantially similar to such definition in the Prepetition Credit Agreement.

Interest shall be payable in cash and shall be calculated on the basis of the actual number of days elapsed in a 360 day year.

*Default Interest:*

During the continuance of an Event of Default, the DIP Loans will bear interest at an additional 2.00% *per annum* and any overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% *per annum*.   Default interest shall be payable in cash on demand.

*Undrawn Commitment Payment*:

The Borrower shall pay to the DIP Lenders a commitment payment calculated at a rate per annum equal to 2.50% on the average daily unused portion of the Delayed Draw DIP Facility, payable quarterly in arrears.

*Put Option Premium:*

A put option premium in an amount equal to 3.00% of the principal amount of the Backstop Commitments shall be paid to the Backstop Parties ratably based on their respective Backstop Commitments on the Closing Date. The put option premium shall be payable in full in cash on the Closing Date, and shall be fully earned and non-refundable.

*Original Issue Discount:*

The DIP Loans shall be made in the form of original issue discount ("<u>OID</u>") of 3.00% of the aggregate amount of such DIP Loans.

*Mandatory Prepayments:*

Mandatory prepayments of the DIP Loans shall be required with 100% of net cash proceeds from (A) the sale or other disposition of assets, subject to exceptions to be agreed (which shall not be subject to a reinvestment right); (B) casualty events, subject to exceptions to be agreed; (C) any sale or issuance of debt (other than permitted debt to be agreed) and (D) any sale or issuance of equity securities (other than certain customary permitted

9

equity issuances to be agreed).

*Optional Prepayments:*  The Debtors may prepay in full or in part the DIP Loans, without premium or penalty, subject to customary notice periods and payment of breakage costs.

*Conditions Precedent to the Closing:*  The closing date (the "<u>Closing Date</u>") under the DIP Facility shall be subject to the following conditions, which are reasonably satisfactory to the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement.

A.  All documentation relating to the DIP Facility shall be in form and substance consistent with this Term Sheet and the Restructuring Support Agreement and reasonably satisfactory to the Backstop Parties and their counsel.

B.  The DIP Agent and DIP Lenders shall have received evidence that the Bankruptcy Court shall have entered the Interim Order, which Interim Order shall not have been vacated, reversed, modified, amended or stayed.

C.  The Chapter 11 Cases shall have been commenced by the Borrower and the Guarantors and the same shall each be a debtor and a debtor in possession.  All first-day motions and related orders (including, without limitation, any motions related to the DIP Facility, cash management and any critical vendor or supplier motions) entered by the Bankruptcy Court in the Chapter 11 Cases shall, in each case, be in form and substance satisfactory to the DIP Agent and the Backstop Parties and their counsel consistent with the consent rights set forth in the Restructuring Support Agreement.

D.  (i) All reasonable and documented out-of-pocket fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Agent and the DIP Lenders on or before the Closing Date and (ii) all reasonable and documented out-of-pocket fees and expenses of Akin Gump Strauss Hauer & Feld LLP and PJT Partners LP, as counsel and financial advisor to the Crossover Group, respectively and Jones Day and Houlihan Lokey, as counsel and financial advisors to the Secured Lender Group, in each case, shall have been paid.

E.  The Backstop Parties shall be satisfied that there shall not occur as a result of, and after giving effect to, the initial extension of credit under the DIP Facility, a default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Loan Parties' or their respective subsidiaries' material debt instruments and other material agreements which would permit the counterparty thereto to exercise remedies thereunder (other than any default which the exercise of remedies is stayed by

10

the Bankruptcy Code).

F.    The DIP Agent shall have received (i) reasonably satisfactory opinions of counsel to the Loan Parties, addressing such customary matters as the Backstop Parties shall request, including, without limitation, the enforceability of all DIP Loan Documents and other customary matters and (ii) officer's certificates, in form and substance, reasonably satisfactory to the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement.

G.    The absence of a material adverse change, or any event or occurrence, other than the commencement of the Chapter 11 Cases and defaults under certain contracts to be identified in writing by the Borrower as disclosed and reasonably satisfactory to the Backstop Parties (consistent with the consent rights set forth in the Restructuring Support Agreement), which could reasonably be expected to result in a material adverse change, in (i) the business, condition (financial or otherwise), operations, performance, properties, contingent liabilities, material agreements or prospects of the Borrower, the Guarantors and their respective subsidiaries, taken as a whole, since December 31, 2018, (ii) the ability of the Borrower or the Guarantors to perform their respective obligations under the DIP Loan Documents or (iii) the ability of the DIP Agent and the DIP Lenders to enforce the DIP Loan Documents (any of the foregoing being a "Material Adverse Change").

H.    There shall exist no action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Chapter 11 Cases and any action, suit, investigation or proceeding arising from the commencement and continuation of the Chapter 11 Cases or the consequences that would normally result from the commencement and continuation of the Chapter 11 Cases) that is not stayed or could reasonably be expected to result in a Material Adverse Change (any such action, suit, investigation, litigation or proceeding, a "Material Litigation").

I.    All necessary governmental and third party consents and approvals necessary in connection with the DIP Facility and the transactions contemplated thereby shall have been obtained (without the imposition of any materially adverse conditions that are not acceptable to the Backstop Parties (consistent with the consent rights set forth in the Restructuring Support Agreement)) and shall remain in effect; and the making of the loans under the DIP Facility shall not violate any material applicable requirement of law and shall not be enjoined temporarily, preliminarily or permanently.

J.    The DIP Agent and each DIP Lender who has requested the same shall have received "know your customer" and similar customary

11

information.

K.  The DIP Agent and DIP Lenders shall have a valid and perfected lien on and security interest in the DIP Collateral with the priority set forth in this Term Sheet; the Loan Parties shall have delivered uniform commercial code financing statements and shall have executed and delivered any other security agreements, in each case, in suitable form for filing, if applicable; and provisions reasonably satisfactory to the Backstop Parties (consistent with the consent rights set forth in the Restructuring Support Agreement) for the payment of all fees and taxes for such filings shall have been duly made.

L.  The Consenting Noteholders and the Consenting Term Lenders (each as defined in the Restructuring Support Agreement) shall have entered into a Restructuring Support Agreement (the "Restructuring Support Agreement"), in form and substance satisfactory to the Backstop Parties.   The Restructuring Support Agreement shall be in full force and effect as of the Closing Date and shall not have been amended or modified without the prior written consent of the Backstop Parties as set forth in the Restructuring Support Agreement.

M.  The DIP Agent shall have received endorsements naming the DIP Agent, on behalf of the DIP Lenders, as an additional insured and loss payee, as applicable, under all insurance policies to be maintained with respect to the DIP Collateral.

N.  The DIP Agent and the DIP Lenders shall have received a 13-week cash forecast in form and substance reasonably satisfactory to the Backstop Parties (consistent with the consent rights set forth in the Restructuring Support Agreement), which reflects on a line-item basis, the Debtors' (i) weekly projected cash receipts, (ii) weekly projected disbursements (including ordinary course operating expenses, capital expenditures and bankruptcy related expenses) under the Chapter 11 Cases, (iii) the weekly outstanding principal balance of the DIP Loans and (iv) the weekly projected liquidity of the Debtors (the "Initial DIP Budget").

*Conditions Precedent to Each DIP Loan:*

On each date of a borrowing (i) there shall exist no default under the DIP Loan Documents, (ii) the representations and warranties of the Borrower and each Guarantor therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding, (iii) the Borrower shall deliver a notice of borrowing, (iv) the making of such DIP Loan shall not violate any material applicable requirement of law and shall not be enjoined, temporarily, preliminarily or permanently, (v) the Bankruptcy Court shall have entered a Final Order by the applicable Milestone, (vi) the Interim Order or Final Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect

without the consent of the Requisite Lenders, (vii) the funding of the DIP Loan complies with the DIP Budget, and (viii) with respect to any borrowing under the Delayed Draw DIP Facility, the aggregate amount of consolidated unrestricted cash and cash equivalents (net of outstanding checks) of the Borrower and its subsidiaries shall not exceed $70 million immediately prior to, and after giving effect to, such borrowing.

*Representations and Warranties:*    The DIP Loan Documents will contain representations and warranties customarily found in loan agreements for similar debtor in possession financings and other representations and warranties agreed upon by the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement (which will be applicable to the Borrower, the Guarantors and their respective subsidiaries and subject to certain exceptions and qualifications to be agreed).

*Financial Covenants*    The DIP Loan Documents will contain the following financial covenants (collectively, the "Financial Covenants"):

*Budget Variance Covenant*.   As of the end of every two week period commencing on April 29, 2019 (i) the sum of the Debtors' actual cash receipts during the applicable Test Period (as defined below) shall not be less than 85% of the projected "cash receipts" for such Test Period as set forth in the DIP Budget and (ii) the sum of the Debtors' actual operating cash disbursements during such Test Period shall not exceed 115% of the projected "operating cash disbursements" (which shall in each case include capital expenditures) for such Test Period as set forth in the DIP Budget.

"Test Period" shall mean, with respect to actual cash receipts and operating cash disbursements, (x) initially, the two-week period commencing on April 29, 2019 and ending on May 10, 2019 and (y) thereafter, each rolling four-week period.[1]

*Minimum Liquidity Covenant*.   (i) Consolidated unrestricted cash and cash equivalents of the Borrower and its subsidiaries plus (ii) unused commitments under the Delayed Draw DIP Facility, shall not be less than $50 million at any time.

*Reporting Covenants, Affirmative Covenants and Negative Covenants:*    The DIP Loan Documents will contain reporting requirements, affirmative covenants and negative covenants customarily found in loan documents for similar debtor in possession financings and other reporting requirements, affirmative covenants and negative covenants agreed upon by the Borrower and the Backstop Parties consistent with consent rights set forth in the Restructuring Support Agreement, including, without limitation, (i) the rolling delivery of an updated 13-week cash forecast in form and substance satisfactory to the Requisite Lenders in their sole discretion (together with the Initial DIP Budget, the "DIP Budget"), which shall specifically identify (x) capital expenditures as a line item; (y) any material amounts included in the updated DIP Budget that were not actually disbursed during a particular week and are carried forward into the updated DIP Budget and (z) any

---

[1] Initial Test Period dates to be updated if Closing Date occurs on or after May 8, 2019.

material amounts that were projected to be collected in the existing DIP Budget but were actually collected prior to the projected period, on or prior to 5:00 p.m. (Eastern Time) on the Wednesday after the end of the last week of each two-week period following the Petition Date (and to the extent any updated DIP Budget is not approved by the Requisite Lenders, the DIP Budget that is then effect shall continue to constitute the DIP Budget for purposes of the DIP Facility); (ii) the delivery of a report on or prior to 5:00 p.m. (Eastern Time) on the Wednesday following the end of each week, which shall include (x) actual cash receipts and operating cash disbursements on an aggregate basis for such immediately preceding week on a cumulative basis for the four-week period through and including the Friday immediately preceding the delivery date of such report, (y) the variance in dollar amounts of such actual receipt and operating cash disbursements for the immediately preceding week and the applicable Test Period and (z) the liquidity of the Debtors as of the Friday immediately preceding the delivery date of such report; (iii) use commercially reasonable efforts to obtain ratings (but not a specific rating); (iv) milestones set forth on Annex I (the "Milestones"); (v) the Debtors shall provide the DIP Lenders' counsel with advance notice and copies of any material motions or other material documents to be filed in the Chapter 11 Cases; (vi) not to permit the existence of any claims, other than those arising under the DIP Facility and the replacement liens and super-priority claims as described in "Adequate Protection" below, entitled to a super-priority under section 364(c)(1) of the Bankruptcy Code and (vii) a prohibition against the Loan Parties refinancing the DIP Loans absent the written consent of the Backstop Lenders consistent with the consent rights as set forth in the Restructuring Support Agreement.

| | |
|---|---|
| *Events of Default:* | The DIP Loan Documents will contain events of default customarily found in loan agreements for similar debtor in possession financings and other events of default agreed upon by the Borrower and the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement, including, without limitation, any termination of the use of prepetition cash collateral pursuant to the DIP Orders, as applicable, dismissal or conversion of the Chapter 11 Cases, adverse motions or Bankruptcy Court orders, termination of the Interim Order or the Final Order, as applicable (except in the case of the Interim Order, as a result of the entry of the Final Order), allowance of any claims under Section 506(c) of the Bankruptcy Code, filing of an unacceptable Plan or disclosure statement, termination of the Restructuring Support Agreement in accordance with its terms, and an unapproved sale of the Debtors' assets. |
| | Prior to the execution of the DIP Loan Documents, the events of default under the DIP Facility shall be consistent with the events of default under Section 8.01 of the Prepetition Credit Agreement (other than Sections 8.01(f) or (g) of the Prepetition Credit Agreement with respect to the Debtors) and the events of default set forth in Annex II (collectively, the "Events of Default"). |
| *Remedies*: | The DIP Agent (acting at the direction of the Requisite Lenders) and the DIP Lenders shall have customary remedies, including, without |

limitation, the right to realize on all DIP Collateral, including cash collateral.

The automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated on the Maturity Date, without further notice or order of the Bankruptcy Court, unless the DIP Agent (at the direction of the Requisite Lenders) elects otherwise in a written notice to the Debtors, and the DIP Agent (at the direction of the Requisite Lenders) shall be permitted to exercise all rights and remedies, including with respect to the DIP Collateral, set forth in the Interim Order or the Final Order, as applicable, and the DIP Loan Documents, and as otherwise available at law without further order or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under Bankruptcy Code sections 362 or 105 or otherwise.

In the event any party requests a hearing seeking to prevent the DIP Agent or the DIP Lenders from exercising any of their rights and remedies that arise after an event of default, the sole issue before the Bankruptcy Court at such hearing shall be whether an event of default has occurred and has not been cured or waived. No other issue or argument shall be relevant to any opposition to enforcement of the DIP Agent's and the DIP Lenders' rights.

*Adequate Protection:*

As adequate protection for the use of the collateral securing the obligations under the Prepetition Credit Agreement (the "Prepetition Collateral") (i) the Prepetition Secured Parties shall, during the pendency of the Chapter 11 Cases, receive on account of any diminution of value in their interest in the Prepetition Collateral payments in cash on a current basis of all reasonable and documented fees, costs and expenses of (x) the Prepetition Agent and Cravath, Swaine & Moore LLP, as counsel to the Prepetition Agent, (y) Akin Gump Strauss Hauer & Feld LLP and PJT Partners LP, counsel and financial advisor to the Crossover Group, respectively and (z) Jones Day and Houlihan Lokey, counsel and financial advisors to the Secured Lender Group, respectively and (ii) the Prepetition Secured Parties shall, during the pendency of the Chapter 11 Cases, be granted additional and replacement liens on, except as set forth herein, all property of the Debtors' estates which would have constituted collateral securing the obligations under the Prepetition Credit Agreement (the "Existing Adequate Protection Liens") and a super-priority claim pursuant to section 507(b) of the Bankruptcy Code, in each case, of the same relative priority to the extent of the post-petition diminution in value of the Prepetition Collateral, subject, in each case, to the Carve-Out (the "Existing Adequate Protection Claims"). Notwithstanding the foregoing, the Prepetition Secured Parties shall be entitled to seek additional forms of adequate protection for any reason, including due to any extension of the Milestones or any failure to satisfy any of them.

*Right to Credit Bid:*

Subject to entry of the Final Order, the DIP Lenders and Prepetition Lenders shall have the right to credit bid (either directly or through one or more acquisition vehicles) as part of any asset sale process or plan sponsorship process and shall have the right to credit bid (either directly or through one or more acquisition vehicles) the full amount of their claims during any sale of Debtors' assets (in whole or in part), including without

15

limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code; provided, that such relief will be binding on the Debtors' chapter 11 estates and all parties in interest upon entry of the Final Order.

| | |
|---|---|
| *Stipulations:* | The DIP Orders shall contain stipulations as to, among other things, the amount and priority of the secured indebtedness under the Prepetition Credit Agreement. |
| *Waivers:* | Debtors will seek entry of a Final Order that provides (i) a waiver of the "equities of the case" exception to section 552(b) of the Bankruptcy Code, (ii) a waiver of the ability to surcharge the DIP Collateral and Prepetition Collateral, including under section 506(c) of the Bankruptcy Code, and (iii) a waiver of the equitable doctrine of "marshaling" with respect to the DIP Collateral and Prepetition Collateral (a "Marshaling Waiver"), in each case, with respect to collateral securing the term loans under the Prepetition Credit Agreement, the Prepetition Lenders and the Prepetition Agent. |
| *Proof of Claim* | The Prepetition Agent and the Prepetition Lenders will not be required to file a proof of claim in connection with the Chapter 11 Cases. |
| *Indemnification and Expenses:* | The Loan Parties will indemnify the DIP Agent, the DIP Lenders, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "Indemnified Person") and hold them harmless from and against all costs, expenses (including reasonable and documented fees, disbursements and other charges of outside counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of its affiliates) that relates to the DIP Facility or the transactions contemplated thereby; provided that, no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted solely from its gross negligence or willful misconduct.   In addition, (a) all reasonable and documented out-of-pocket expenses (including, without limitation, reasonable and documented fees, disbursements and other charges of outside counsel and financial advisors) of the DIP Agent and DIP Lenders in connection with the DIP Facility and the transactions contemplated thereby shall be paid by the Loan Parties from time to time, whether or not the Closing Date occurs, and (b) all reasonable and documented out-of-pocket expenses (including, without limitation, documented fees, disbursements and other charges of outside counsel and financial advisors) of the DIP Agent and the DIP Lenders, for enforcement costs and documentary taxes associated with the DIP Facility and the transactions contemplated thereby will be paid by the Loan Parties. All fees and expenses described above shall be payable by the Loan Parties, on a joint and several basis, whether accrued or incurred prior to, on, or after the Petition Date. |

| | |
|---|---|
| *Assignments and Participations:* | Assignments under the DIP Facility are subject to the consent of the DIP Agent (which consent shall not be unreasonably withheld or delayed).   No participation shall include voting rights, other than for matters requiring consent of 100% of the DIP Lenders. |
| *Requisite Lenders under the DIP Facility:* | "Requisite Lenders" shall mean DIP Lenders holding at least 50.1% of the outstanding unused commitments and term loans under the Tranche A DIP Facility; provided that to the extent that at least one member of the Crossover Group (as defined in the Restructuring Support Agreement) and one member of the Secured Lender Group (as defined in the Restructuring Support Agreement) holds at least 6% of the outstanding unused commitments and term loans under the Tranche A DIP Facility, the Requisite Lenders must include at least one member of the Crossover Group (as defined in the Restructuring Support Agreement) and one member of the Secured Lender Group, in each case, who holds at least 6% of the outstanding unused commitments and term loans under the Tranche A DIP Facility. |
| *Amendments:* | Any amendment to the DIP Facility shall be required to be approved by Requisite Lenders, except for provisions customarily requiring approval by affected DIP Lenders. |
| *Miscellaneous:* | The DIP Loan Documents will include (i) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes (subject to customary qualifications)), (ii) waivers of consequential damages and jury trial, and (iii) customary agency, set-off and sharing language agreed upon by the Borrower and the Backstop Parties consistent with the consent rights set forth in the Restructuring Support Agreement. |
| *Governing Law and Submission to Non-Exclusive Jurisdiction:* | State of New York (and to the extent applicable, the Bankruptcy Code). |
| *Counsel to DIP Lenders:* | Akin Gump Strauss Hauer & Feld LLP and Jones Day. |

ANNEX I
CASE MILESTONES

Milestone / Date

1. Entry of Interim Order that is acceptable to the Requisite Lenders: May 8, 2019

2. Entry of Final Order that is acceptable to the Requisite Lenders May 31, 2019

3. Filing of a plan of reorganization that is acceptable to the Requisite Lenders (an "Acceptable Plan") and disclosure statement with respect to the Acceptable Plan (the "Disclosure Statement") with the Bankruptcy Court: May 2, 2019

4. Entry by Bankruptcy Court of an order approving the Disclosure Statement that is acceptable to the Requisite Lenders: May 31, 2019

5. Consummation of the Acceptable Plan: July 31, 2019

ANNEX II
EVENTS OF DEFAULT

(a)      If any Debtor makes any payment on account of any indebtedness existing as of the Petition Date, except for any payments expressly authorized by the DIP Orders and DIP Loan Agreement or any payments set forth in the DIP Budget;

(b)      If the DIP Orders are not entered by the Milestones (or such other period as Term Agent and Requisite Lenders may agree to in writing); or any DIP Order is stayed, revised, revoked, remanded, rescinded, amended, reversed, vacated, or modified in any manner not acceptable to the Requisite Lenders;

(c)      If an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court (i) appointing a trustee under section 1104, or an examiner with enlarged powers relating to the operation of the business of any Debtor under section 1106(b) of the Bankruptcy Code or (ii) terminating any Debtor's exclusive rights to file and solicit acceptances for its plan;

(d)      If any person other than a Debtor shall assert any claim arising under section 506(c) of the Bankruptcy Code against the Prepetition Secured Parties, Prepetition Trustee, Prepetition Noteholders, DIP Agent, DIP Lenders, the DIP Collateral or Prepetition Collateral, and either (i) the same shall remain unopposed by the applicable Debtor for more than 5 business days, or (ii) in any event, any such claim shall not be disallowed, dismissed or withdrawn, with prejudice, within 60 days after the assertion thereof; or if any Prepetition Secured Party, Prepetition Trustee, Prepetition Noteholders, DIP Agent, DIP Lenders, the DIP Collateral or Prepetition Collateral is surcharged pursuant to sections 105, 506(c), 552 or any other section of the Bankruptcy Code;

(e)      If (i) any Debtor shall attempt to invalidate, reduce or otherwise impair the liens or security interests of Prepetition Secured Parties or DIP Agent and DIP Lenders, or their respective claims or rights against any Debtor, or (ii) any Lien or security interest created by the DIP Loan Documents or the DIP Orders shall, for any reason, ceases to be valid.

(f)      If an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

(g)      If an order with respect to the Bankruptcy Case shall be entered without the express prior written consent of the DIP Agent and Requisite Lenders, to revoke, vacate, reverse, stay, modify, supplement or amend the DIP Loan Agreement, any DIP Loan Document or the DIP Orders; or if any Debtor breaches or fails to perform in accordance with the terms of the DIP Orders;

(h)      If a motion shall be filed seeking authority, or an order shall be entered in the Chapter 11 Cases, that permits any Debtor to incur debt or use cash DIP Collateral or Prepetition Collateral in violation of the terms of the DIP Orders;

(i)      Breach of any Milestones;

(j)      Breach of any Financial Covenant under the DIP Facility;

(k)      any termination of the use of prepetition cash collateral pursuant to the DIP Orders;

(l)      the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code (i) to the holder or holders of any security interest to proceed against, including foreclosure (or the granting of a deed in lieu of foreclosure or the like) on, any assets of any of the Debtors that have a

value in excess of $100,000 in the aggregate or (ii) to state or local environmental or regulatory agency or authority to proceed against, including foreclose (or the granting of a deed in lieu of foreclosure or the like) on, any assets of any of the Debtors that have a value in excess of $100,000;

(m)      if any Loan Party shall attempt to refinance the DIP Loans absent the written consent of the Backstop Lenders; and

(n)      the termination of the Restructuring Support Agreement in accordance with its terms.

SCHEDULE A
BACKSTOP PARTIES

| Backstop Party | Total Tranche A Backstop Commitments | Total Tranche B Backstop Commitments | Total Backstop Commitments |
|---|---|---|---|
|  |  |  |  |
| Total | $87,000,000 | $13,000,000 | $100,000,000 |

A-1

## **Exhibit B to Interim Order**

### **Budget**

# Preliminary DIP Budget

|  | WEEK 18 | WEEK 19 | WEEK 20 | WEEK 21 | WEEK 22 | WEEK 23 | WEEK 24 | WEEKS 18-24 |
|---|---|---|---|---|---|---|---|---|
|  | 4/29 | 5/6 | 5/13 | 5/20 | 5/27 | 6/3 | 6/10 | 4/29 |
| ($ in millions) | 5/5 | 5/12 | 5/19 | 5/26 | 6/2 | 6/9 | 6/16 | 6/16 |
| **US Cash Flows** | *Petition* | *Post-Petition* | *Post-Petition* | *Post-Petition* | *Post-Petition* | *Post-Petition* | *Emergence* | *Forecast* |
| Cash receipts | $10.0 | $10.0 | $10.0 | $10.0 | $10.0 | $10.0 | $10.0 | $69.8 |
| Operating Disbursements | (16.4) | (4.3) | (8.3) | (4.8) | (11.4) | (3.1) | (5.2) | (53.6) |
| Employee Related Disbursements | (0.6) | (7.2) | (0.5) | (3.1) | (7.2) | (0.5) | (7.2) | (26.1) |
| Net Intercompany | 1.5 | - | (2.0) | - | - | - | 1.5 | 1.0 |
| **Total Operating and Employee Disbursements** | **(15.5)** | **(11.5)** | **(10.8)** | **(7.9)** | **(18.6)** | **(2.0)** | **(12.4)** | **(78.7)** |
| **OPERATING CASH FLOW** | **($5.6)** | **($1.5)** | **($0.8)** | **$2.1** | **($8.6)** | **$8.0** | **($2.5)** | **($8.9)** |
| Interest and Financing | (4.9) | - | - | - | (0.7) | - | (0.8) | (7.0) |
| Professional fees | (3.4) | (0.4) | (0.9) | (0.5) | (0.8) | (1.3) | (19.6) | (26.8) |
| Utility deposit | (1.2) | - | - | - | - | - | 1.2 | |
| Other restructuring costs | - | - | - | - | - | - | (1.8) | (1.8) |
| Network deposit | (0.8) | - | - | - | - | - | 0.8 | |
| International funds escrow | (20.0) | - | - | - | - | - | 20.0 | |
| **Total Non-operating Costs** | **(30.2)** | **(0.4)** | **(0.9)** | **(0.5)** | **(1.5)** | **(1.3)** | **(0.1)** | **(40.1)** |
| **NET CASH FLOW** | **($35.8)** | **($1.9)** | **($1.7)** | **$1.6** | **($10.1)** | **$6.7** | **($2.6)** | **($50.5)** |
| **US Cash Balance** | | | | | | | | |
| Beginning Balance | $14.6 | $27.3 | $25.3 | $33.3 | $34.9 | $34.5 | $41.2 | 14.6 |
| (+) Net Cash Flows | (35.8) | (1.9) | (1.7) | 1.6 | (10.1) | 6.7 | (2.6) | (50.5) |
| (+) Exit Facility Draws | 48.5 | - | 9.7 | - | 9.7 | - | - | 67.9 |
| **Ending Cash Balance** | **$27.3** | **$25.3** | **$33.3** | **$34.9** | **$34.5** | **$41.2** | **$38.7** | **$38.1** |
| Outstanding Check Float | (2.6) | (2.6) | (2.6) | (2.6) | (2.6) | (2.6) | (2.6) | (2.6) |
| **US Cash Balance, net of checks** | $24.7 | $22.8 | $30.7 | $32.3 | $32.0 | $38.7 | $36.1 | $35.5 |
| **Rest of World ("ROW") Cash Balance** | $37.8 | $41.5 | $45.4 | $38.0 | $41.5 | $37.7 | $40.0 | $40.6 |
| **Worldwide ("WW") Cash Balance** | **$62.6** | **$64.3** | **$76.1** | **$70.3** | **$73.5** | **$76.4** | **$76.1** | **$76.1** |
| **Exit Facility Availability** | $48.5 | $48.5 | $38.8 | $38.8 | $29.1 | $29.1 | $29.1 | $29.1 |
| **Total Worldwide Liquidity excluding Revolver** | $111.1 | $112.8 | $114.9 | $109.1 | $102.6 | $105.5 | $105.2 | $105.2 |
| *Illustrative Revolver Availability* | - | - | - | - | - | - | $39.5 | $39.5 |
| *Restricted Cash* | $20.0 | $20.0 | $20.0 | $20.0 | $20.0 | $20.0 | - | - |
| **Exit Facility** | | | | | | | | |
| Beginning Balance | - | 50.0 | 50.0 | 60.0 | 60.0 | 70.0 | 70.0 | - |
| (+) Draw | 48.5 | - | 9.7 | - | 9.7 | - | - | 67.9 |
| (+) OID | 1.5 | - | 0.3 | - | 0.3 | - | - | 2.1 |
| **Ending Exit Facility Balance** | **$50.0** | **$50.0** | **$60.0** | **$60.0** | **$70.0** | **$70.0** | **$70.0** | **$70.0** |

Row labels (left margin groupings): Cash Flows, Liquidity, Exit Facility

© 2018 Sungard Availability Services, all rights reserved

1

**<u>Exhibit 2</u>**

**Redline of Interim DIP Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SUNGARD AVAILABILITY SERVICES CAPITAL, INC. *et al.,*[1] | ) | Case No. 19—————22915 (RDD) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS**
**(A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE**
**CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO**
**PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,**
**(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "DIP Motion") of Sungard Availability Services Capital, Inc. ("Sungard AS") and its affiliated debtors, each as a debtor and debtor in possession (collectively with Sungard AS, the "Debtors") in the above-captioned cases (the "Cases") before the United States Bankruptcy Court for the Southern District of New York (the "Court"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 4001-2, 9006-1, 9013-1, 9014-1 and 9014-2 of the local bankruptcy rules for the Southern District of New York (the "Local Bankruptcy Rules") seeking, among other things:

(a)    authorization for Sungard AS, in its capacity as borrower (the "Borrower"), to obtain postpetition financing (the "DIP Facility"), and for each of the other Debtors to guarantee

---

[1]    The last four digits of the Debtors tax identification number are:  Sungard Availability Services Capital, Inc. (7677); Sungard Availability Services Holdings, LLC (6403); Sungard Availability Services Technology, LLC (9118); Inflow LLC (9489); Sungard Availability Services, LP (6195); Sungard Availability Services VeriCenter, Inc. (4039); Sungard Availability Network Solutions Inc. (1034).  The location of the Debtors service address for purposes of these chapter 11 cases is:  50 Main Street, Suite 1014, White Plains, NY 10606.

unconditionally (the "Guarantors"), on a joint and several basis, the Borrower's obligations in

connection with the DIP Facility, consisting of a superpriority senior secured multiple-draw term

loan credit facility in the aggregate principal amount of up to $100,000,000 comprised of (a) the

$87,000,000 Tranche A DIP Facility (as defined below) and (b) the $13,000,000 Tranche B DIP

Facility (as defined below) to be drawn ratably between the Tranche A DIP Facility and Tranche B

DIP Facility, including, (i) term loans in the aggregate principal amount of up to $50,000,000

(the "Initial DIP Loans"), which term loans will be available to the Debtors in a single draw in

accordance with the terms substantially set forth in the DIP Facility Term Sheet attached hereto as

**Exhibit A** (the "DIP Term Sheet") upon entry of this order (the "Interim Order") and (ii) term

loans in an aggregate principal amount of up to an additional $50,000,000 (the "Delayed Draw

DIP Loans" and, together with the Initial DIP Loans, the "DIP Loans"), which term loans will be

available to the Debtors in one or more draws in increments of at least $10,000,000 per draw, upon

entry of, and subject to the terms of, the Final Order (as defined below) and subject to satisfaction

of the conditions set forth in the DIP Term Sheet and all other terms and conditions of the DIP

Loan Documents (as defined below).

(b)    authorization for the Debtors to enter into a Superpriority Senior Secured Debtor-

In-Possession Credit Agreement among the Borrower, the Guarantors, the relevant lenders

(collectively, the "DIP Lenders"),[2] and Cortland Capital Market Services LLC, as administrative

agent (in such capacity, the "DIP Agent" and, together with the DIP Lenders, the "DIP Parties")

(as amended, restated or otherwise modified from time to time in accordance with the terms

thereof, the "DIP Loan Agreement"; together with this Interim Order, the Final Order, and all

---

[2]    The DIP Lenders include the lenders under the Prepetition Credit Agreement (as defined below) lending under one tranche of the DIP Facility (the "Tranche A DIP Facility") and certain holders of Prepetition Notes (as defined below) lending under a separate tranche of the DIP Facility (the "Tranche B DIP Facility") that are each parties to the Restructuring Support Agreement, dated April 1, 2019 (the "RSA").

agreements, documents, and instruments delivered or executed in connection therewith, including

the DIP Term Sheet and other guarantee and security documentation, collectively, the "DIP Loan

Documents"), and to perform such other and further acts as may be required in connection with

the DIP Loan Documents;

(c)       authorization for the Debtors to use the DIP Loans, the proceeds thereof, and the

Prepetition Collateral (as defined below), including Cash Collateral (as defined below), to provide

working capital for, and for other general corporate purposes of, the Debtors, including for

payment of any Adequate Protection Obligations (as defined below), for payment of reasonable

and documented transaction costs, fees and expenses incurred in connection with the restructuring

or the Cases, and for funding the Specified Account (as defined in the DIP Term Sheet), which

funds shall be available to the Debtors for disbursement to certain non-Debtor subsidiaries of

Sungard AS through secured intercompany borrowings (the "Specified Intercompany Notes") on

an as needed basis;

(d)       the granting of adequate protection to the Prepetition Secured Parties (as defined

below), under the Credit Agreement, dated as of March 31, 2014 (as amended, restated,

amended and restated, waived, supplemented, or otherwise modified from time to time, the

"Prepetition Credit Agreement" and, together with all related collateral and security documents,

the "Prepetition Credit Documents"), by and among Sungard AS, as the borrower, the guarantors

party thereto, the lenders party thereto (the "Prepetition Lenders"), JPMorgan Chase Bank, N.A.,

as Administrative Agent (in such capacity, the "Prepetition Agent" and, together with the

Prepetition Lenders, the "Prepetition Secured Parties");

(e)       the granting of valid, enforceable, binding, non-avoidable and fully perfected first

priority priming liens on and senior security interests in all of the property, assets and other

3

interests in property and assets of the Debtors, whether such property is presently owned or after-acquired, and each Debtor's "estate" as created by Bankruptcy Code section 541, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date (as defined below), subject only to the (x) Carve-Out (as defined below) and (y) other valid and unavoidable liens perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)) on the terms and conditions set forth herein and in the DIP Loan Documents;

(f)       the granting of superpriority administrative expense claims against each of the Debtors' estates to the DIP Agent and the DIP Lenders with respect to the DIP Obligations (as defined below) over any and all administrative expenses of any kind or nature subject and subordinate only to the payment of the Carve-Out on the terms and conditions set forth herein and in the DIP Loan Documents;

(g)       if authorized in the Final Order, the waiver of the Debtors' and the estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c);

(h)       if authorized in the Final Order, authorization for the DIP Agent, the DIP Lenders and the Prepetition Secured Parties to be entitled to all of the rights and benefits of Bankruptcy Code section 552(b), and for the "equities of the case" exception under Bankruptcy Code section 552(b) to not apply to such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable;

(i)       pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the DIP Motion be held before this Court to consider entry of this Interim Order, among other things, (1) authorizing Sungard AS, on an interim basis, to borrow from the DIP Lenders a

principal amount of up to $50,000,000 in Initial DIP Loans (subject to any limitations of borrowing

set forth in the DIP Term Sheet); (2) authorizing the Guarantors to guaranty the DIP Obligations,

(3) authorizing the Debtors' use of Prepetition Collateral (including Cash Collateral), (4) granting

the adequate protection described in this Interim Order, and (5) authorizing the Debtors to execute

and deliver the DIP Documents to which they are a party and to perform their respective

obligations thereunder and such other and further acts as may be necessary or appropriate in

connection therewith;

(j)      that this Court schedule a final hearing (the "Final Hearing") to consider

(if necessary) entry of a final order (the "Final Order") authorizing, among other things, Sungard

AS, on a final basis, to borrow from the DIP Lenders under the DIP Loan Documents up to an

aggregate principal amount not to exceed $100,000,000 in DIP Loans, and the continued use of

Cash Collateral, as set forth in the DIP Motion and the DIP Loan Documents.

Due and appropriate notice of the DIP Motion, the relief requested therein and the Interim

Hearing having been served by the Debtors on, among others, (a) the United States Trustee for the

Southern District of New York (the "U.S. Trustee"); (b) Cravath, Swaine & Moore LLP, counsel

to the Prepetition Agent; (c) Carter Ledyard & Millburn LLP, counsel to the Prepetition Trustee

(as defined below); (d) Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), counsel to certain

of the DIP Lenders and the Crossover Group (as defined in the RSA); (e) Jones Day, counsel to

certain of the DIP Lenders and the Secured Lender Group (as defined in the RSA); (f) creditors

holding the thirty (30) largest unsecured claims as set forth in the consolidated list filed with the

Debtors' petitions; (g) those parties requesting notice pursuant to Bankruptcy Rule 2002; (h) the

Office of the United States Attorney General for the states in which the Debtors operate; and (i)

the Internal Revenue Service, in compliance with Bankruptcy Rules 4001(b) and (c) and the Local Bankruptcy Rules.

The Interim Hearing having been held by this Court on May 2, 2019.

Upon the record at the Interim Hearing and upon the Court's consideration of the DIP Motion, the exhibits thereto; the *Declaration of Eric Koza, Chief Restructuring Officer at Sungard Availability Services Capital, Inc.(I) In Support of Debtors' Chapter 11 Petitions and First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* (the "First Day Declaration"), the *Declaration of Eric Koza in Support of the the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors (A) To Obtain Postpetition Financing and (B) To Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Koza Declaration"), and the *Declaration of Samuel Greene in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors (A) To Obtain Postpetition Financing and (B) To Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Greene Declaration"); and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Disposition*.  The DIP Motion is GRANTED on an interim basis in accordance with the terms of this Interim Order.  Any objections to the DIP Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservation of rights included therein, are hereby denied and overruled.

2.      *Jurisdiction*.  This Court has core jurisdiction over the Cases commenced on May 1, 2019 (the "Petition Date"), the DIP Motion, and the parties and property affected hereby

pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Debtors are continuing to operate their businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed for any Debtor.

3.      *No Committee.*  As of the date hereof, the U.S. Trustee has not appointed any statutory committee in the Cases.

4.      *Notice*.  Under the circumstances, the notice given by the Debtors of the DIP Motion, the relief requested therein, and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and the Local Bankruptcy Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

5.      *Debtors' Stipulations*.  Without prejudice to the rights of any other non-Debtor party-in-interest with standing, but subject to the limitations thereon contained in Paragraphs 26 and 27 of this Interim Order, the Debtors represent, admit, stipulate, and agree as follows:

(a)      Prepetition Loan Obligations.  As of the Petition Date, the Debtors, without defense, counterclaim, or offset of any kind were jointly and severally indebted and liable to the Prepetition Secured Parties under the Prepetition Credit Documents in the aggregate amount of $1,006 million, which consists of (a) Term Loans (as defined in the Prepetition Credit Agreement) in an aggregate principal amount equal to $801 million, *plus* (b) Revolving Credit Loans (as defined in the Prepetition Credit Agreement) in an aggregate principal amount equal to $35 million, *plus* (c) $15 million on account of accrued and unpaid interest as of the Petition Date, *plus* (d) $155 million on account of the Acceleration Makewhole Premium (as defined in the Prepetition Credit Agreement) ((a), (b), (c) and (d), collectively, the "Prepetition Loan Obligations

7

Amount"), plus any additional accrued and unpaid interest, premium, if any, and certain fees, costs, expenses, indemnification obligations, charges and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Credit Documents (collectively, including the Prepetition Loan Obligations Amount, the "Prepetition Loan Obligations").

(b)     Prepetition Liens.  Pursuant to the Prepetition Credit Documents, the Prepetition Loan Obligations are secured by valid, binding, perfected and enforceable first priority liens on and security interests in (the "Prepetition Liens") the "Collateral" under and as defined in the Prepetition Credit Documents (collectively, the "Prepetition Collateral").  The Prepetition Liens (i) are valid, binding, perfected, and enforceable first priority liens and security interests in the Prepetition Collateral, (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind, (iii) as of the Petition Date, are subject and/or subordinate only to valid, perfected, and unavoidable liens and security interests existing as of the Petition Date that are senior in priority to the Prepetition Liens as permitted by the terms of the Prepetition Credit Documents, and (iv) constitute the legal, valid, and binding obligation of the Debtors, enforceable in accordance with the terms of the applicable Prepetition Credit Documents.

(c)     Prepetition Collateral.  Subject to certain exclusions and conditions set forth in the Prepetition Credit Documents, the Prepetition Collateral consists of, among other things, (i) the equity interests held by the Debtors, (ii) the debt securities held by the Debtors and any notes or instruments evidencing such debt securities, (iii) the Debtors' accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property,

the books and records pertaining to the foregoing and all collateral securities and guarantees given with respect to any of the foregoing, (iv) the Debtor's copyrights, patents, trademarks, licenses and other intellectual property, (v) certain of the Debtors' land and the premises thereon, and certain improvements, personal property and rents related thereto, and, to the extent not otherwise included in (i) through (v), all proceeds and products of any and all of the foregoing.

(d)    Cash Collateral.    Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date, and the proceeds of any of the foregoing is the Prepetition Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").

(e)    Prepetition Notes.    Pursuant to an Indenture dated as of March 31, 2014 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified from time to time, the "Prepetition Indenture"), by and among Sungard AS, the subsidiary guarantors named therein (the "Notes Guarantors"), and The Bank of New York Mellon, as trustee (the "Prepetition Trustee"), Sungard AS issued 8.750% senior notes due April 1, 2022 (the "Prepetition Notes") in aggregate principal amount equal to $425,000,000.  The Notes Guarantors jointly and severally guaranteed payment of the Prepetition Notes.  As of the Petition Date, the Debtors, without defense, counterclaim, or offset of any kind were jointly and severally liable to the Prepetition Trustee and the holders of the Prepetition Notes (the "Prepetition Noteholders") under the Prepetition Indenture in the aggregate principal amount of not less than $425,000,000, plus accrued and unpaid interest, premium if any, and certain fees, costs, expenses, indemnification obligations, charges and all other obligations of whatever nature owing, whether or not contingent, whenever

arising, accrued, accruing, due, owing or chargeable under the Prepetition Indenture (the "Prepetition Notes Obligations").

6.      *Findings Regarding the DIP Facility and Use of Cash Collateral.*

(a)      Good cause has been shown for the entry of this Interim Order.

(b)      The Debtors have an immediate need to obtain the DIP Facility and to use the Cash Collateral to (solely to the extent consistent with the DIP Budget (plus permitted variances as set forth in this Interim Order and the DIP Loan Documents)), among other things, (i) permit the orderly continuation of their businesses; (ii) pay certain Adequate Protection Obligations; and (iii) pay the costs of administration of their estates and satisfy other working capital and general corporate purposes of the Debtors.  The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern values of the Debtors and to the Debtors' successful reorganization.  The Debtors will not have sufficient sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business throughout the Cases without access to the DIP Facility and authorized use of Cash Collateral.

(c)      The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Loan Documents and are unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors also are unable to obtain secured credit allowable under Bankruptcy Code sections 364(c)(1), 364(c)(2), and 364(c)(3) for the purposes set forth in the DIP Loan Documents without the Debtors granting to the DIP Agent and the DIP Lenders, subject to the Carve-Out as provided

for herein, the DIP Liens (as defined below) and the DIP Superpriority Claims (as defined below) under the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

(d)     The DIP Facility has been negotiated in good faith and at arm's-length among the Debtors, the DIP Agent and certain Prepetition Lenders and Prepetition Noteholders that have committed to backstop the DIP Loans (collectively, the "DIP Backstop Parties"), and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Loan Documents including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Loan Documents and all other obligations under the DIP Loan Documents (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e).  The DIP Obligations, the DIP Liens and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise and any liens or claims granted to the DIP Agent or the DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

(e)     This Interim Order shall take effect and be fully enforceable immediately upon execution hereof.  Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.

11

7.      *Authorization of the DIP Facility and the DIP Loan Documents.*

(a)      The Debtors are hereby expressly authorized and empowered to enter into, and execute and deliver, the DIP Loan Documents, and such additional documents, instruments, certificates and agreements as may be required or requested by the DIP Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Loan Documents.  To the extent not entered into as of the date hereof, the Debtors shall negotiate the DIP Loan Documents in good faith and in all respects such DIP Loan Documents shall be consistent with the terms of the DIP Term Sheet and otherwise acceptable to the DIP Agent and the DIP Backstop Parties consistent with the consent rights under the RSA.  Upon entry of this Interim Order and until execution and delivery of the DIP Loan Agreement and other DIP Loan Documents required or requested by the DIP Parties, the Debtors shall be bound by (x) the terms and conditions and other provisions set forth in the DIP Term Sheet, with the same force and effect as if duly executed and delivered to the DIP Agent by the Debtors, and (y) this Interim Order, and this Interim Order and the DIP Term Sheet shall govern and control the DIP Facility.  Upon execution and delivery of the DIP Loan Agreement and other DIP Loan Documents, (a) the DIP Term Sheet shall be superseded by the DIP Loan Agreement and other DIP Loan Documents, and (b) this Interim Order, the DIP Loan Agreement, and other DIP Loan Documents shall govern and control the DIP Facility.  Upon execution and delivery thereof, the DIP Loan Documents shall constitute valid and binding obligations of the Debtors enforceable in accordance with their terms.  To the extent there exists any conflict among the terms and conditions of the DIP Motion, the DIP Loan Documents, and this Interim Order, the terms and conditions of this Interim Order shall govern and control.  To the

extent there is a conflict between the terms and conditions of the DIP Motion and the DIP Loan Documents, the terms and conditions of the DIP Loan Documents shall govern.

(b)     Upon entry of this Interim Order, the Borrower is hereby authorized to borrow, and the Guarantors are hereby authorized to guaranty, borrowings up to an aggregate principal amount of $50,000,000 in Initial DIP Loans, subject to and in accordance with this Interim Order.

(c)     In accordance with the terms of this Interim Order and the DIP Loan Documents, proceeds of the DIP Loans shall be used solely for the purposes permitted under the DIP Loan Documents, this Interim Order and in accordance with the DIP Budget (as defined in the DIP Term Sheet; provided that the term of the DIP Budget shall be seven (7) weeks, commencing on April 29, 2019), plus permitted variances as set forth in this Interim Order and the DIP Loan Documents; provided, further, that the Debtors shall only be subject to the DIP Budget to the extent the Debtors have not emerged from these Cases within two weeks of the Petition Date.  A copy of the Initial DIP Budget (as defined in the DIP Term Sheet) is attached hereto as **Exhibit B**.

(d)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by Bankruptcy Code section 362 is hereby lifted to the extent necessary, to perform all acts and to make, execute and deliver all instruments and documents (including, without limitation, the DIP Loan Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby or the DIP Term Sheet), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility including, without limitation:

(i)     the execution, delivery and performance of the DIP Loan Documents, including, without limitation, the DIP Loan Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby;

(ii) the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Loan Documents (in each case in accordance with the terms of the applicable DIP Loan Documents and in such form as the Debtors, the DIP Agent and the Requisite Lenders (as defined in the DIP Term Sheet) may agree), it being understood that no further approval of the Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Loan Documents or the DIP Obligations that do not shorten the maturity of the extensions of credit thereunder or modify the commitments or the rate of interest payable thereunder;

(iii) the non-refundable payment to each of the DIP Lenders, the DIP Agent, and the DIP Backstop Parties, as applicable, of the fees referred to in the DIP Loan Documents, including all reasonable costs and expenses as may be due from time to time, including, without limitation, the put option premium payable to the Backstop Parties, and the fees and expenses of counsel and other professionals retained as provided for in the DIP Loan Documents and this Interim Order (including, for the avoidance of doubt, (a) Jones Day (as counsel) and Houlihan Lokey Capital, Inc. (as financial advisor) to certain of the DIP Lenders and the Secured Lender Group (as defined in the RSA) and (b) Akin Gump (as counsel) and PJT Partners LP and DH Capital, LLC (as financial advisors) to certain of the DIP Lenders and the Crossover Group (as defined in the RSA)), which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payment be required to file with respect thereto any interim or final fee application with the Court; and

(iv)    the performance of all other acts required under or in connection with the DIP Loan Documents.

(e)    Upon execution and delivery of the DIP Loan Documents, such DIP Loan Documents shall constitute valid, binding and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Interim Order for all purposes during the Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any Case. No obligation, payment, transfer or grant of security under the DIP Loan Agreement, the other DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under Bankruptcy Code sections 502(d), 548 or 549 or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.  All payments or proceeds remitted (a) to the DIP Agent on behalf of any DIP Lender or (b) to or on behalf of the Prepetition Secured Parties, in each case pursuant to the DIP Loan Documents, the provisions of this Interim Order or any subsequent order of this Court, shall be received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) (if authorized in the Final Order) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (if authorized in the Final Order).

(f)    The Guarantors hereby are authorized and directed to jointly, severally and unconditionally guarantee, and upon entry of this Interim Order shall be deemed to have guaranteed, in full all of the DIP Obligations of the Borrower.

8.     *Reporting Requirements/Access to Records*.  The Debtors shall provide the advisors to the Crossover Group and Secured Lender Group with all reporting and other information required to be provided to the DIP Agent under the DIP Loan Documents.  In addition to, and without limiting, whatever rights to access the DIP Agent and the DIP Lenders have under the DIP Loan Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Agent and DIP Lenders to: (i) have access to and inspect the Debtors' assets; (ii) examine the Debtors' books and records; and (iii) discuss the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors.

9.     *DIP Superpriority Claims*.  Pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates (the "DIP Superpriority Claims") (without the need to file any proof of claim) with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b) and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, if

authorized in the Final Order, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "Avoidance Actions"), subject only to the payment of the Carve-Out to the extent specifically provided for herein.  Except as set forth in this Interim Order, no other superpriority claims shall be granted or allowed in these Cases.

10.    *DIP Liens*.  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral (as defined below), the following security interests and liens are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "DIP Collateral"), subject to payment of the Carve-Out (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP Loan Documents, the "DIP Liens"):

(a)    First Lien on Unencumbered Property.  Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically and properly perfected first priority senior security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), including, without limitation, any unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise) and any

investment of such cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests (including equity interests in subsidiaries of each Debtor), money, investment property, the Specified Account, the Specified Intercompany Notes, intercompany claims, claims arising on account of transfers of value from a Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition Date, causes of action, including causes of action arising under Bankruptcy Code section 549 (but excluding all other Avoidance Actions), all products and proceeds of the foregoing and, subject to the Final DIP Order, all proceeds and property recovered in respect of Avoidance Actions; provided, for the avoidance of doubt and notwithstanding anything to the contrary contained herein, with respect to non-residential leases of real property, unless the applicable lease expressly permits the granting of liens on such lease, the liens granted pursuant to this Interim Order shall attach solely to the proceeds of such lease and not to the subject lease itself.

(b)  <u>Liens Priming the Prepetition Liens</u>.  Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all property of the Debtors including, without

18

limitation, the Prepetition Collateral, Cash Collateral, and any investment of such cash and cash equivalents, accounts, deposit accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests (including equity interests in subsidiaries of each Debtor), money, investment property, causes of action, and all products and proceeds of the foregoing, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, that is subject to any liens securing the Prepetition Loan Obligations; provided that such liens shall be immediately junior to any liens that were senior to the liens securing the Prepetition Loan Obligations as of the Petition Date. (including, for the avoidance of doubt, any prepetition tax liens held by the Maricopa County Treasurer); provided, further, for the avoidance of doubt and notwithstanding anything to the contrary contained herein, with respect to non-residential leases of real property, unless the applicable lease expressly permits the granting of liens on such lease, the liens granted pursuant to this Interim Order shall attach solely to the proceeds of such lease and not to the subject lease itself.

(c)    Liens Junior to Certain Other Liens.    Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected security

interest in and lien upon all prepetition and postpetition property of the Debtors, whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date that are senior to the liens securing the Prepetition Loan Obligations or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) that are senior to the liens securing the Prepetition Loan Obligations, which security interests and liens in favor of the DIP Agent and the DIP Lenders are junior only to such valid, perfected and unavoidable liens.

11.     *Carve-Out.*

        (a)   Priority of Carve-Out.  For purposes hereof, the "Carve-Out" shall mean the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 without regard to the notice set forth in (iii) (below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Bankruptcy Code section 726(b) without regard to the notice set forth in (iii) (below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid reasonable fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and any official creditors' committee (the "Creditors' Committee") pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following

delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (such amounts in this provision (iii), the "Pre-Trigger Notice Professional Fees"); and (iv) after the date of delivery of the Carve-Out Trigger Notice (the "Trigger Date"), Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  Any transaction or success fee shall not be included in the Carve-Out, unless otherwise earned by such Professional Person prior to the Trigger Date or earned pursuant to the applicable Professional Person's engagement letter notwithstanding the Trigger Date.  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Agent by email (or other electronic means) to the Debtors and their lead counsel, counsel to the Crossover Group, counsel to the Secured Lender Group, the U.S. Trustee, and lead counsel to the Creditors' Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Facility and acceleration of the DIP Obligations (including events of default resulting from defaults under the Interim Order or Final Order, as applicable), stating that the Post-Carve Out Trigger Notice Cap is invoked.

(b)  Carve-Out Reserves.  On the day on which a Carve-Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee, counsel to the Crossover Group and counsel to the Secured

Lender Group (the "Termination Declaration Date"), the Carve-Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the unused commitments under the DIP Facility (on a pro rata basis based on the then outstanding unused commitments under the DIP Facility), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve-Out Trigger Notice shall also (i) be deemed a request by the Debtors for DIP Loans under the unused commitments under the DIP Facility (on a pro rata basis based on the then outstanding unused commitments under the DIP Facility), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.

On the first business day after the DIP Agent gives such notice to such DIP Lenders, notwithstanding anything in the DIP Loan Documents to the contrary, including with respect to the existence of a Default (as defined in the DIP Loan Documents) or Event of Default (as defined hereunder, in the DIP Term Sheet or the DIP Loan Documents), the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the commitments under the DIP Facility following an Event of Default, or the occurrence of the Maturity Date (as defined in the DIP Term Sheet), each DIP Lender with an outstanding unused commitment under the DIP Facility (on a pro rata basis based on the then outstanding commitments under the DIP Facility) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Agent for the benefit of the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  All funds in the Post Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post Carve Out Trigger Notice Reserve has not been reduced to zero, to

pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have

been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have

been terminated, in which case any such excess shall be paid to the Prepetition Agent

for the benefit of the Prepetition Secured Parties in accordance with their rights and

priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP

Loan Documents, or the DIP Orders, if either of the Carve Out Reserves is not funded

in full in the amounts set forth in this paragraph, then, any excess funds in one of the

Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-

Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up

to the applicable amount set forth in this paragraph, prior to making any payments to the

DIP Agent or the Prepetition Agent or other Prepetition Secured Parties, as applicable.

Notwithstanding anything to the contrary in the DIP Loan Documents or DIP Orders,

following delivery of a Carve-Out Trigger Notice, the DIP Agent and the Prepetition

Agent shall not sweep or foreclose on cash (including cash received as a result of the

sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have

been fully funded, but shall have a security interest in any residual interest in the Carve

Out Reserves, with any excess paid to the DIP Agent for application in accordance with

the DIP Loan Documents.  Further, notwithstanding anything to the contrary in the DIP

Orders, (i) disbursements by the Debtors from the Carve Out Reserves shall not

constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the

Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the

priority of the Carve-Out, and (iii) in no way shall the Initial DIP Budget, DIP Budget,

Carve-Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the

foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in DIP Orders, the DIP Facility, or in the Prepetition Credit Agreement, the Carve-Out shall be senior to all liens and claims securing the DIP Facility, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the obligations under the Prepetition Credit Agreement.

(c)  <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

(d)  <u>No Direct Obligation to Pay Allowed Professional Fees</u>.  None of the DIP Agent, DIP Lenders, or the Prepetition Agent or Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in the DIP Orders or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Agent or Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)  <u>Payment of Carve-Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  Any funding of the Carve-Out shall be added

25

to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under the DIP Orders, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

12.      *Limitation on Charging Expenses Against Collateral*.   If authorized in the Final Order, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve-Out), the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders pursuant to Bankruptcy Code sections 105(a) or 506(c) or any similar principle of law or equity, without the prior written consent of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders.

13.      *No Marshaling/Application of Proceeds*.   If authorized in the Final Order, the DIP Agent and the Prepetition Agent shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition Collateral in accordance with the provisions of the DIP Loan Documents and the Prepetition Credit Documents, as applicable, and in no event shall the DIP Agent, the DIP Lenders or any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral.

14.      *Equities of the Case.*   If authorized in the Final Order, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b), and the "equities of the case" exception under Bankruptcy Code

section 552(b) shall not apply to such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable.

15.    *Use of Cash Collateral*.    The Debtors are hereby authorized to use all Cash Collateral of the Prepetition Secured Parties, but solely for the purposes set forth in this Interim Order and in accordance with the DIP Budget (plus permitted variances as set forth in this Interim Order and the DIP Loan Documents) including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of this Interim Order through and including the date of the Final Hearing.    Except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral.

16.    *Adequate Protection for the Prepetition Secured Parties*.    Subject only to the Carve-Out and the terms of this Interim Order, pursuant to Bankruptcy Code sections 361, 363(e) and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition diminution in value of such interests (each such diminution, a "Diminution in Value"), resulting from, among other things, the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve-Out, the Debtors' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties, is hereby granted the following (collectively, the "Adequate Protection Obligations"):

(a)    Adequate Protection Liens.    As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in and

liens as of the date of this Interim Order (the "Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and if authorized in the Final Order, all proceeds or property recovered from Avoidance Actions. Subject to the terms of this Interim Order, the Adequate Protection Liens shall be subordinate only to the

(A) Carve-Out, (B) the DIP Liens and (C) other valid, perfected and unavoidable liens, if any, existing as of the Petition Date that are senior in priority to the Prepetition Liens of the Prepetition Secured Parties as permitted by the terms of the Prepetition Credit Documents. The Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551).

(b) Adequate Protection Superpriority Claims. As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), allowed administrative expense claims in each of the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any postpetition Diminution in Value (the "Adequate Protection Superpriority Claims"), except the Carve-Out and the DIP Superpriority Claims. Subject to the Carve-Out and the DIP Superpriority Claims in all respects, the Adequate Protection Superpriority Claims will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to

Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (if authorized in the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114. The Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Superpriority Claims under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Requisite Lenders, in each case as provided in the DIP Loan Documents.

(c)    <u>Fees and Expenses</u>.   As further adequate protection, the Debtors are authorized and directed to pay all reasonable and documented fees and expenses (the "<u>Adequate Protection Fees</u>"), whether incurred before or after the Petition Date, of (a) one counsel (Cravath, Swaine & Moore LLP) for the Prepetition Agent; (b) one counsel (Akin Gump) and the financial advisors (PJT Partners LP and DH Capital, LLC) for the Crossover Group; and (c) one counsel (Jones Day) and one financial advisor (Houlihan Lokey) for the Secured Lender Group in accordance with Paragraph 25 herein.   None of the Adequate Protection Fees shall be subject to separate approval by this Court or the U.S. Trustee Guidelines and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise see the Court's approval of any such payments.

17.    *Section 507(b) Reservation*.  Subject to the Carve-Out, nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the

Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties against any diminution in value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

18.    *Insurance.*  At all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date.

19.    *Reservation of Rights of the DIP Agent, DIP Lenders and Prepetition Secured Parties.*  Subject to the Carve-Out, notwithstanding any other provision in this Interim Order to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of any of the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right to seek additional adequate protection at and following the Final Hearing; provided, that, any such further or different adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Agent and the DIP Lenders granted under this Interim Order and the DIP Loan Documents; (b) any of the rights of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties to (i) request modification of the automatic stay of Bankruptcy Code section 362, (ii) request dismissal of any of the Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Cases, (iii) seek to propose, subject to the provisions of Bankruptcy Code section 1121, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.  The delay in or failure of

the DIP Agent, the DIP Lenders and/or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Agent's, the DIP Lenders' or the Prepetition Secured Parties' rights and remedies.

20.    *Debtors' Reservation of Rights.*    The entry of this Interim Order and the grant of adequate protection to the Prepetition Secured Parties pursuant to the terms hereof shall be without prejudice to the rights of the Debtors to, following the occurrence of an Event of Default (as defined in the DIP Term Sheet), seek authority to use the Prepetition Collateral, including Cash Collateral, without the consent of the Prepetition Secured Parties, and the Prepetition Secured Parties reserve all of their respective rights with respect to contesting any such motion or request by the Debtors or any other person; <u>provided</u> that the fees and expenses incurred by the Debtors in connection with seeking such authority shall, only to the extent the

Carve-Out Trigger Notice has been delivered to the Debtors as set forth in Paragraph 11 herein, reduce the amount of the Post-Carve Out Trigger Notice Cap.

21.    *Remedies Upon the Termination Date.*    The Debtors shall immediately provide notice to counsel to the DIP Agent and the DIP Lenders, counsel to the Crossover Group and counsel to the Secured Lender Group and counsel to the Creditors' Committee (if any), of the occurrence of any Event of Default, at which time the Debtors' ability to use Cash Collateral hereunder shall terminate and the DIP Obligations shall become due and payable.    Upon the occurrence of an Event of Default following the giving of not less than three (3) business days' advance written notice, which may be by email, (the "<u>Enforcement Notice</u>") to counsel to the Debtors, counsel to the Crossover Group, counsel to the Secured Lender Group and counsel to the Creditors' Committee (if any) (the "<u>Notice Period</u>"), subject to the Carve-Out, the DIP Agent (at the direction of the Requisite Lenders) and the DIP Lenders may exercise any rights and remedies

against the DIP Collateral available to them under this Interim Order, the DIP Loan Documents and applicable non-bankruptcy law, including but not limited to terminating all commitments to extend credit under the DIP Facility.  The only permissible basis for the Debtors, the Creditors' Committee (if any), or any other party to contest, challenge or object to an Enforcement Notice shall be solely with respect to the validity of the Event of Default giving rise to such Enforcement Notice (*i.e.* whether such Event of Default validly occurred and has not been cured or waived in accordance with this Interim Order).  Notwithstanding anything to the contrary contained herein, the DIP Agent or DIP Lenders may only enter onto any leased premises of any debtors following an event of default in accordance with (i) a separate written agreement by and between the DIP Agent and any applicable landlords, (ii) applicable non-bankruptcy law, or (iii) a further order of this court after notice and a hearing, provided that such hearing shall be on an expedited basis to the extent requested by the DIP Agent or DIP Lenders.  The automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated with respect to the DIP Agent at the end of the Notice Period, without further notice or order of the Court, unless the DIP Agent (at the direction of the Requisite Lenders) elects otherwise in a written notice, which may be by email, to the Debtors, counsel to the Crossover Group, counsel to the Secured Lender Group and counsel to the Creditors' Committee (if any), and the DIP Agent (at the direction of the Requisite Lenders) shall, subject to the Carve-Out, be permitted to exercise all rights and remedies set forth herein and in the DIP Loan Documents, as applicable, and as otherwise available at law against the DIP Collateral, without any further order of or application or motion to the Court, and without restriction or restraint by any stay under Bankruptcy Code sections 362 or 105, or otherwise, against the enforcement of the liens and security interests in the DIP Collateral, or any other rights

and remedies granted to the DIP Agent or the DIP Lenders with respect thereto pursuant to the DIP Loan Documents or this Interim Order.

22.     *No Waiver for Failure to Seek Relief.*  The failure or delay of the DIP Agent to exercise rights and remedies under this Interim Order, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise.

23.     *Perfection of the DIP Liens and Adequate Protection Liens.*

(a)   Subject to the limitations in Paragraph 27(a) of this Interim Order, the DIP Agent and the Prepetition Agent are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder.  Whether or not the DIP Agent or the Prepetition Agent shall (at the direction of the applicable required lenders) choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Interim Order.  If the DIP Agent or the Prepetition Agent (at the direction of the applicable required lenders) determines to file or execute any financing statements, agreements, notice of liens or similar instruments, the Debtors shall cooperate and assist in any such execution and/or filings as reasonably requested by the DIP Agent or the Prepetition Agent (at the direction of the applicable required lenders), and the automatic stay shall be modified to allow such filings.

33

(b)   A certified copy of this Interim Order may, in the discretion of the DIP Agent or the Prepetition Agent (at the direction of the applicable required lenders), be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c)   Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law.  Any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Term Sheet or this Interim Order, subject to applicable law.  Notwithstanding anything to the contrary contained herein, this paragraph 23(c) shall not apply to any provision of an executory contract or unexpired lease by and between the Debtors and 401 North Broad Lessee, LLC.

24.   *Preservation of Rights Granted Under this Interim Order*.

(a)   Unless and until all DIP Obligations are indefeasibly paid in full, in cash, and all commitments to extend credit under the DIP Facility are terminated, the

Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Credit Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral; <u>and</u> (ii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, except as set forth in Paragraph 23.

(b)   Other than as set forth in this Interim Order, neither the DIP Liens nor the Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Cases or arising after the Petition Date, and neither the DIP Liens nor the Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(c)   In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the DIP Parties or the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits afforded in Bankruptcy Code section 363(m).

(d)   Unless and until all DIP Obligations, Prepetition Loan Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash, and all

commitments to extend credit under the DIP Facility are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly (i) except as permitted under the DIP Loan Documents and with the prior written consent of the DIP Agent, the Requisite Lenders, the Prepetition Agent and the Prepetition Secured Parties (x) any modification, stay, vacatur, or amendment of this Interim Order, (y) a priority claim for any administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a) or 507(b)) in any of the Cases, equal or superior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, or the Prepetition Loan Obligations, or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Loan Documents, any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens or the Prepetition Liens, as the case may be; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Loan Documents and this Interim Order; (iv) except as set forth in the DIP Loan Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Cases; or (vi) an order appointing a chapter 11 trustee in any of the Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Cases.

(e)    Notwithstanding any order dismissing any of the Cases entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the

Adequate Protection Superpriority Claims and the other administrative claims granted pursuant to this Interim Order, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims and the other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(f)   Except as expressly provided in this Interim Order or in the DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and all other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Loan Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to Bankruptcy Code section 363(b) or (iii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Loan Documents shall continue in these Cases, in any successor cases if these

Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Superpriority Claims and all other rights and remedies of the DIP Parties and the Prepetition Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the Requisite Lenders).

25.     *Expenses and Indemnification.*

(a)  The Debtors are authorized and directed to pay all (i) reasonable and documented out-of-pocket expenses (including, but not limited to, reasonable legal prepetition and postpetition fees and expenses of one outside counsel (Norton Rose Fulbright US LLP) for the DIP Agent and certain DIP Lenders, "DIP Counsel")) incurred in connection with the DIP Facility and the transactions contemplated thereby, as and to the extent provided in the DIP Loan Documents, whether or not the DIP Facility is successfully consummated, and (ii) reasonable and documented prepetition and postpetition out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of DIP Counsel) of the DIP Agent, for enforcement costs and documentary taxes associated with the DIP Facility and the transactions contemplated thereby.  The Debtors shall be jointly and severally obligated to pay all fees and expenses described above, which obligations shall form a part of the DIP Obligations and shall be paid without the necessity for filing any application with or obtaining further order of the Court.  Any fee statement or invoice submitted by the DIP

Agent to any Debtor, the Committee (if appointed), counsel to the Crossover Group, counsel to the Secured Lender Group or the U.S. Trustee with respect to the fees or expenses incurred by DIP Counsel may be redacted or summarized to preserve any applicable attorney/client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law.  The Debtors shall pay the fees, expenses and disbursements set forth in this Paragraph 25 and those of (a) one counsel (Cravath, Swaine & Moore LLP) for the Prepetition Agent; (b) one counsel (Akin Gump) and the financial advisors (PJT Partners LP and DH Capital, LLC) for the Crossover Group; (c) one counsel (Jones Day) and one financial advisor (Houlihan Lokey) for the Secured Lender Group as set forth in Paragraph 16(c); and (d) the Prepetition Trustee in accordance with the Prepetition Indenture as set forth in the RSA no later than five (5) days (the "Review Period") after the receipt by counsel for the Debtors, counsel for the Committee, if appointed, counsel for the Crossover Group, counsel for the Secured Lender Group and the U.S. Trustee of each of the invoices therefor (the "Invoiced Fees") (which invoices may be redacted or summarized to preserve any applicable attorney-client or work product privilege or protection) and without the necessity of filing formal fee applications, including such amounts arising before the Petition Date; provided, that the foregoing parties may dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, (i) the Debtors pay in full all Invoiced Fees other than the Disputed Invoiced Fees and (ii) a Debtor, the Committee, the Crossover Group, the Secured Lender Group or the U.S. Trustee notifies the submitting party in writing setting forth the specific objections to the Disputed Invoiced

Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least ten (10) days prior written notice to the submitting party of any hearing on such motion or other pleading). The Debtors shall pay any Disputed Invoiced Fees promptly after approval (and to the extent approved) by the Court. Notwithstanding anything to the contrary in this paragraph, for the avoidance of doubt, the Debtors shall pay the reasonable and documented fees and expenses of (a) Jones Day (as counsel) and Houlihan Lokey Capital, Inc. (as financial advisor) to certain of the DIP Lenders and the Secured Lender Group (as defined in the RSA) and (b) Akin Gump (as counsel) and PJT Partners LP and DH Capital, LLC (as financial advisors) to certain of the DIP Lenders and the Crossover Group (as defined in the RSA) no later than the Effective Date (as defined in the Plan).

(b)    In addition, the Debtors will indemnify the DIP Lenders, the DIP Agent and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each an "Indemnified Person") and hold them harmless from and against all costs, expenses (including but not limited to reasonable and documented legal fees and expenses) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility; provided, that, no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence, fraud, or willful misconduct of such person (or their related persons). No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the

40

Debtors or any shareholders or creditors of the Debtors for or in connection with the

transactions contemplated hereby, except to the extent such liability is found in an final

non-appealable judgment by a court of competent jurisdiction to have resulted solely

from such Indemnified Person's gross negligence, fraud, or willful misconduct, and in

no event shall any Indemnified Person be liable on any theory of liability for any special,

indirect, consequential or punitive damages.

26.     *Limitation on Use of DIP Facility Proceeds, DIP Collateral and Cash Collateral.*

Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facility,

the DIP Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve-Out or

proceeds thereof may be used: (a) to investigate (including by way of examinations or discovery

proceedings), initiate, assert, prosecute, join, commence support or finance the initiation or

prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion,

objection, defense, adversary proceeding or other litigation of any type (i) against any of the DIP

Agent, the DIP Lenders, the Prepetition Secured Parties, the Prepetition Trustee or the Prepetition

Noteholders (each in their capacities as such), and each of their respective officers, directors,

employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or

successors, with respect to any transaction, occurrence, omission, action or other matter (including

formal discovery proceedings in anticipation thereof), including, without limitation, any so-called

"lender liability" claims and causes of action, or seeking relief that would impair the rights and

remedies of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Prepetition

Trustee or the Prepetition Noteholders (each in their capacities as such) under the DIP Loan

Documents, the Prepetition Credit Documents, the Prepetition Indenture or this Interim Order,

including, without limitation, for the payment of any services rendered by the professionals

retained by the Debtors or any Creditors' Committee (if any) in connection with the assertion of

or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion,

objection, defense, adversary proceeding or other contested matter, the purpose of which is to seek,

or the result of which would be to obtain, any order, judgment, determination, declaration, or

similar relief that would impair the ability of any of the DIP Agent, the DIP Lenders, or the

Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral or seeking

affirmative relief against any of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties,

the Prepetition Trustee or the Prepetition Noteholders related to the DIP Obligations, the

Prepetition Loan Obligations, or the Prepetition Notes Obligations; (ii) invalidating, setting aside,

avoiding, or subordinating, in whole or in part, the DIP Obligations or the DIP Agent's and the

DIP Lenders' liens or security interests in the DIP Collateral, the Prepetition Loan Obligations or

the Prepetition Liens or the Prepetition Notes Obligations, as applicable; or (iii) for monetary,

injunctive, or other affirmative relief against the DIP Agent, the DIP Lenders, the Prepetition

Secured Parties, the Prepetition Trustee or Prepetition Noteholders, or the DIP Agent's, the DIP

Lenders', the Prepetition Secured Parties' respective liens on or security interests in the DIP

Collateral or the Prepetition Collateral that would impair the ability of any of the DIP Agent, the

DIP Lenders, the Prepetition Secured Parties, Prepetition Trustee or Prepetition Noteholders, as

applicable, to assert or enforce any lien, claim, right, or security interest or to realize or recover on

the DIP Obligations or the Prepetition Loan Obligations, to the extent applicable; (b) for objecting

to or challenging in any way the legality, validity, priority, perfection, or enforceability of the

claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the

Prepetition Secured Parties related to the Prepetition Loan Obligations, by or on behalf of the

Prepetition Trustee and the Prepetition Noteholders related to the Prepetition Notes Obligations,

or by or on behalf of the DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions (as defined herein) related to the DIP Obligations, the DIP Liens, the Prepetition Loan Obligations, the Prepetition Liens, or the Prepetition Notes Obligations; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens or any other rights or interests of the DIP Agent or the DIP Lenders related to the DIP Obligations or the DIP Liens, (y) any of the Prepetition Liens or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Loan Obligations or the Prepetition Liens, or (z) any rights or interests of the Prepetition Trustee or Prepetition Noteholders related to the Prepetition Notes Obligations; provided, that, no more than $50,000 of the proceeds of the DIP Facility, the DIP Collateral or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by the Creditors' Committee, if appointed, solely to investigate, within the Challenge Period (as defined below), the claims, causes of action, adversary proceedings or other litigation against (i) the Prepetition Agent or the other Prepetition Secured Parties solely concerning the legality, validity, priority, perfection, enforceability or extent of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Loan Obligations, or (ii) the Prepetition Trustee or Prepetition Noteholders.

27.    *Effect of Stipulations on Third Parties*.

(a)    The Debtors' acknowledgments, stipulations, admissions, waivers and releases set forth in this Interim Order shall be binding on the Debtors, their estates and their respective representatives, successors, and assigns, and all parties in interest in these Cases, including the

Creditors' Committee (if any), or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), unless (a) such party, in each case, obtains requisite standing, and has duly filed an adversary proceeding or contested matter, as applicable (each, a "Challenge"), challenging the validity, perfection, priority, extent or enforceability of the Prepetition Liens, the Prepetition Loan Obligations, the Prepetition Notes Obligations or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Prepetition Agent or the other Prepetition Secured Parties in connection with any matter related to the Prepetition Collateral, the Prepetition Liens, or the Prepetition Loan Obligations, or the Prepetition Trustee or the Prepetition Noteholders in connection with any matter related to the Prepetition Notes Obligations by no later than the earlier of (i) the effective date of a chapter 11 plan for the Debtors or (ii) (x) with respect to any Creditors' Committee, the date that is sixty (60) days after entry of the Final Order or (y) with respect to other parties in interest, no later than the date that is seventy-five (75) days after the entry of the Final Order (the time period established by the later of the foregoing clauses (i) and (ii), the "Challenge Period"); provided, that, in the event that, prior to the expiration of the Challenge Period, (x) these Cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these Cases, then, in each such case, the Challenge Period shall be extended for a period of 60 days solely with respect to any Trustee, commencing on the occurrence of either of the events described in the foregoing clauses (x) and (y); and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any Challenge.  If no such Challenge is timely filed prior to the expiration of the Challenge Period, without further order of this Court (x) the Prepetition Loan Obligations and Prepetition Notes Obligations shall constitute allowed claims, not subject to any Claims and

Defenses (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in these Cases and any subsequent chapter 7 cases, if any; (y) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and of the priority specified in Paragraph 5(b), not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery; and (z) the Prepetition Loan Obligations, the Prepetition Liens on the Prepetition Collateral, the Prepetition Secured Parties, the Prepetition Notes Obligations, the Prepetition Trustee and the Prepetition Noteholders shall not be subject to any other or further challenge and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period).  If any such Challenge is timely filed prior to the expiration of the Challenge Period, (a) the stipulations and admissions contained in this Interim Order shall nonetheless remain binding and preclusive on the Creditors' Committee (if any) and any other party in these cases, including any Trustee, except as to any stipulations or admissions that are (1) specifically and expressly challenged in such Challenge and (2) invalidated or modified as set forth in a final,
non-appealable order of a court of competent jurisdiction and (b) any Claims and Defenses not brought in such Challenge shall be forever barred; provided, that, if and to the extent any Challenges to a particular stipulation or admission are withdrawn, denied or overruled by a final

non-appealable order, such stipulation also shall be binding on the Debtors' estates and all parties in interest.

(b)     Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any Creditors' Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge (including a Challenge) with respect to the Prepetition Credit Documents, the Prepetition Loan Obligations, the Prepetition Indenture or the Prepetition Notes Obligations.

28.     *Release*.  Subject to the rights and limitations set forth in Paragraphs 26 and 27 of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Lenders, the DIP Agent, the Prepetition Agent, the Prepetition Secured Parties, the Prepetition Trustee, the Prepetition Noteholders and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof with respect

46

to or relating to the DIP Obligations, the DIP Liens, the Prepetition Loan Obligations, the Prepetition Liens, or the Prepetition Notes Obligations as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Secured Parties, the Prepetition Trustee and the Prepetition Noteholders.

29.    *Surety.*  Nothing in this Interim Order shall in any way prime or affect the rights of Westchester Fire Insurance Company or its past, present or future parents, subsidiaries or affiliates (the "Surety") as to: (a) any funds it is holding and/or being held for it presently or in the future, whether in trust, as security, or otherwise, including any proceeds due or to become due any of the Debtors or their non-debtor affiliates in relation to contracts bonded by the Surety; (b) any substitutions or replacements of said funds including accretions to and interest earned on said funds; or (c) any letter of credit related to any indemnity, collateral trust, bond or agreements between or involving the Surety and any of the Debtors or any of the Debtors' non-debtor affiliates (collectively (a) to (c), the "Surety Assets").  Nothing in this Interim Order shall affect the rights of the Surety under any current or future indemnity, collateral trust, or related agreements between or involving the Surety and any of the Debtors or any of the Debtors' non-debtor affiliates as to the Surety Assets or otherwise, including, but not limited to, the Agreement of Indemnity executed by Sungard AS on or about March 28, 2014, and the Rider to Agreement of Indemnity executed by Sungard AS on or about April 23, 2014.  In addition, nothing in this Interim Order shall prime or otherwise impact: (x) current or future setoff and/or recoupment rights and/or the lien rights of the Surety or of any party to whose rights the Surety has or may become subrogated;  and/or (y)

any existing or future subrogation or other common law rights of the Surety.  To the extent that any Surety Assets are being held by the Debtors and are used by the Debtors as part of cash collateral, a concomitant replacement trust claim or replacement lien shall be granted to the Surety equal to the amount of the use of those funds with any replacement trust fund claim to be equal to the amount of trust funds used, and any replacement lien to have the same priority, amount, extent and validity as existed as of the Petition Date.  In addition, notwithstanding anything in this Interim Order to the contrary, the rights, claims and defenses of the Debtors and of the Surety, including, but not limited to, the Surety's rights under any properly perfected liens and claims and/or claim for equitable rights of subrogation, and rights of the Debtors and of any successors in interest to any of the Debtors, and any creditors, to object to any such liens, claims and/or equitable subrogation and other rights, are fully preserved.  Nothing herein is an admission by the Surety or the Debtors, or a determination by the Bankruptcy Court, regarding any claims under any bonds, and the Surety and the Debtors reserve any and all rights, remedies and defenses in connection therewith. Notwithstanding anything herein to the contrary, and subject to the terms herein, the Debtors hereby agree that, during the pendency of these proceedings, the Debtors shall, in accordance with and subject to applicable law, reimburse the Surety for attorneys' fees incurred and to be incurred by the Surety.

29.30.  *Credit Bidding*.  The DIP Agent (at the direction of the Requisite Lenders), and the Prepetition Agent (at the direction of the requisite amount of Prepetition Lenders), shall have the right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of their respective claims, including, for the avoidance of doubt, Adequate Protection Superpriority Claims, if any, in any sale of all or any portion of the Prepetition Collateral or the DIP Collateral, including, without limitation, sales occurring pursuant to Bankruptcy Code section

363 or included as part of any restructuring plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii)-(iii); provided, that prior to the expiration of the Challenge Period, the right to object to any credit bid put forth by the Prepetition Lenders is hereby preserved.

30.31.  *Conditions Precedent*.  No DIP Lender shall have any obligation to make any DIP Loan under the respective DIP Loan Documents unless the conditions precedent to making such extensions of credit under the applicable DIP Loan Documents have been satisfied in full or waived in accordance with such DIP Loan Documents.

31.32.  *Binding Effect; Successors and Assigns*.  The DIP Loan Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, any Creditors' Committee appointed in these Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, provided, that, except to the extent expressly set forth in this Interim Order, the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan (whether under the DIP Loan Agreement, a promissory note or otherwise) to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not (i) be deemed to be in

control of the operations of the Debtors, or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates.

32.33.  *Limitation of Liability*.   In determining to make any loan under the DIP Loan Documents, permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not solely by reason thereof be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Interim Order or in the DIP Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders or any Prepetition Secured Party of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

33.34.  *No Third Party Rights*.   Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party or incidental beneficiary.

34.35.  *Retention of Jurisdiction*.   This Bankruptcy Court shall have and retain exclusive jurisdiction to enforce the terms of this Interim Order and to adjudicate any and all matters arising from or related to the interpretation or implementation of this Interim Order, including with respect to any and all disputes or matters under, arising out of or in connection with either the DIP Loans or the DIP Loan Documents.

35.36.  *No Requirement to File Claim for DIP Obligations*.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the DIP Agent nor any DIP Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Loan Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses; and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority or enforceability of any of the DIP Loan Documents or of any indebtedness, liabilities or obligations arising at any time thereunder or prejudice or otherwise adversely affect the DIP Agent's or any DIP Lender's rights, remedies, powers or privileges under any of the DIP Loan Documents, this Interim Order or applicable law.

36.37.  *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

37.38.  *Final Hearing*.  The Final Hearing is scheduled for [DATE] at [TIME], prevailing Eastern time, before this Court.  The Debtors shall promptly transmit copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to any

Creditors' Committee after the same has been appointed, or Creditors' Committee counsel, if the same shall have been appointed.  Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file a written objection; which shall be served upon (a) counsel to the Debtors, (b) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York, 10036, Attn: Philip C. Dublin, Esq. and Naomi Moss, Esq., counsel to certain of the DIP Lenders and the Crossover Group; (c) Jones Day, 250 Vesey Street, New York, New York 10281, Attn: Scott J. Greenberg, Esq., Michael J. Cohen, Esq., and Steven Domanowski, Esq., counsel to certain of the DIP Lenders and the Secured Lender Group; (d) Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, New York 10019, Attn: Stephen Castro, Esq. and Christy Rivera, Esq., counsel to the DIP Agent and certain of the DIP Lenders; (e) Cravath, Swaine & Moore LLP, counsel to the Prepetition Agent; (f) Carter Ledyard & Millburn LLP, 2 Wall Street, New York, New York 10005, Attn: James Gadsden, Esq., counsel to the Prepetition Trustee; and (g) the U.S. Trustee, and shall be filed with the Clerk of the United States Bankruptcy Court, District of New York, in each case to allow actual receipt by the foregoing no later than [DATE] at [TIME], prevailing Eastern time.  The Final Hearing shall be cancelled, and the relief set forth in this Interim Order shall not be granted on a final basis, if the Effective Date has occurred prior to the occurrence of the Final Hearing.

Dated: _____, 2019
        White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE